```
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3    UNITED STATES OF AMERICA,        )
                          Plaintiff    )
 4                                     )
      vs.                              )  No. 1:16-cv-12182-FDS
 5                                     )
      JANSSEN BIOTECH, INC.,           )
 6                        Defendant.   )
                                       )
 7                                     )
                                       )
 8                                     )

 9


10

               BEFORE THE HONORABLE M. PAGE KELLEY
11                 UNITED STATES MAGISTRATE JUDGE
                         MOTION HEARING
12

13

14

15          John Joseph Moakley United States Courthouse
                         One Courthouse Way
16                   Boston, Massachusetts 02210

17
                            May 6, 2021
18                           2:03 p.m.

19

20
                    Kristin M. Kelley, RPR, CRR
21                     Official Court Reporter
            John Joseph Moakley United States Courthouse
22                  One Courthouse Way, Room 3209
                    Boston, Massachusetts 02210
23                   E-mail: kmob929@gmail.com

24          Mechanical Steno - Computer-Aided Transcript

25
```

```
 1    APPEARANCES:

 2

 3            Theodore Jon Leopold

 4            Cohen Milstein Sellers & Toll, PLLC

 5            11780 US Highway One

 6            Suite 200

 7            Palm Beach Gardens, FL 33408

 8            561-515-1400

 9            Tleopold@cohenmilstein.com

10            for relators.

11

12            Casey M. Preston

13            Cohen Milstein Sellers & Toll PLLC

14            1717 Arch Street

15            Suite 3610

16            Philadelphia, PA 19103

17            267-479-5704

18            Cpreston@cohenmilstein.com

19            for relators.

20

21

22

23

24

25
```

1    APPEARANCES CONT'D:

2

3

4            Ethan M. Posner

5            Sarah Tremont

6            Shanya Dingle

7            Nick Baer

8            Covington & Burling, LLP

9            One CityCenter

10           850 Tenth Street, N.W.

11           Washington, DC 20001

12           202-662-6000

13           Eposner@cov.com

14           for the defendant.

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE CLERK:  Today is Thursday, May 6, 2021, and we are on the record in Civil Case No. 1612182, the United States of America verse Janssen Biotech Tech, Inc., the Honorable M. Page Kelley presiding.

Could we have counsel for the plaintiff please identify themselves and then counsel for the defendant.  Thank you.

MR. LEOPOLD:  Good afternoon, your Honor.  Ted Leopold and Casey Preston on behalf of the relator.

THE COURT:  All right.  Good afternoon.

MR. POSNER:  Ethan Posner, Sarah Tremont, Shanya Dingle and Nick Baer from Covington & Burling for the defendant.  Good afternoon, your Honor

THE COURT:  Good afternoon to everyone there too.

So we're here for a continuation on the relators' Motion to Compel.  Just to let the parties know, I think I've received everyone's letter.  The last thing I got was a May 6th letter, a three page letter from you, Mr. Posner, and then yesterday a letter from relator.  I think I'm all set.  I have the status report.  I have reviewed those things.  I'll hear you, Mr. Leopold.

MR. LEOPOLD:  Thank you, your Honor.  I'm not sure if your Honor had any particular order on how you would like to address the issues.  I'm happy to proceed in any fashion your

1    Honor would like.

2         THE COURT:  Well, I do want to make sure that we

3    understand -- I don't want to get too far afield from the

4    phased discovery.  As far as nationwide discovery, I'm trying

5    my best to limit it to things that are sort of trickling down

6    from above and not spreading out through the United States.  So

7    maybe just with that in mind.

8         MR. LEOPOLD:  Sure.  I think we can start a little bit

9    on the broader side and narrow the issues down a little bit.

02:06  10        First, let me start with the issue of rolling

11   production.  I think that goes into the issue of ESI as well.

12   We're dealing with two primary issues.  I'll handle the rolling

13   production issue and the net effect of that.  Mr. Preston will

14   also deal with the issue of the ESI, if that's okay with your

15   Honor.

16        First, as it relates to the rolling production, as

17   many times as we have inquired from the Court and the Court has

18   inquired of defense counsel, we still do not have any date yet

19   where they have affirmatively stated when their production will

02:06  20   be complete.  Since we are on a tight time frame, this makes it

21   very concerning to us.

22        In light of that issue, I think another factor also

23   needs to be expressed to the Court that gives us great pause.

24   There seems to be a little bit of a bottleneck, although the

25   parties appear to be generally close, which Mr. Preston will

1    address, on the ESI issues.  It seems most things are focused

2    on the ESI issue when we have a significant request for

3    production to them, which is distinct and different from ESI,

4    as I know your Honor is aware.  So we are dealing with a

5    request for production of actual documents, hard documents, if

6    you will, physical documents that are in the control of someone

7    or somewhere at the defendants, and we can't seem to really

8    even get those documents.

9            As many times as we read in their papers of the

02:07 10    millions and millions of documents they've produced to date,

11    despite all of the hearings we've had and the conversations and

12    meet and confers we've had, we don't -- we have the Department

13    of Justice documents, although that's not complete yet in terms

14    of production.  They're still looking at those.  We have the

15    relators' digital file.  That's really about it so far.  We

16    don't have responses to the various requests for production.

17            What is the status of that?  When will that be

18    provided to us?  When will the rolling production on those

19    items be to us?  That has nothing to do with ESI related

02:08 20    issues.

21            So we are asking the Court, and I appreciate all -- I

22    do think it's helpful to have meet and confers but we don't

23    seem, with all due respect, I say this not in any way

24    reflecting on defense counsel, I think it's just the nature of

25    the issues, we have spent a lot of time meeting and conferring

1    but we never seem to get very far.  We seem to come back to

2    your Honor.  This is now, I think, the third time generally

3    with the same issues.  We can't get a confirmation of an end

4    date for rolling production.  We don't know the status of the

5    request for productions that we've had.  We still don't have

6    complete production of the DOJ documents.  We don't have the

7    relators' digital file.

8         I'll let Mr. Preston talk about that goes in tandem

9    with this ESI production issue.

02:09  10         MR. PRESTON:  Good afternoon, your Honor.

11         THE COURT:  Good afternoon.

12         MR. PRESTON:  Before I get into the ESI, to add one

13    additional point to Mr. Leopold's comments there, the core

14    documents in this case, as we've talked about in both of the

15    prior hearings, are the management level documents that relate

16    to the oversight, the monitoring, the review of the legality of

17    these services, the value of these services.  Those are the

18    core issues in dispute here.  That is what we haven't yet

19    received.

02:10  20         Frankly, it seems once we receive those documents,

21    that will make the ESI process much easier because right now

22    the plaintiff is going based on her memory.  We don't have the

23    documents, the core documents, to reference the key terms.  So

24    the terms now have to be broader and the terms also seek

25    documents that really should be produced without having to do

1    ESI searches.  So once those core documents, which your Honor

2    and Chief Judge Saylor have instructed the defendants to

3    provide to this point, that will also make the ESI process more

4    efficient.

5         Directly more towards the ESI, the search queries that

6    we have been discussing with defense counsel, and we have

7    reached an agreement on a master list of search queries, but as

8    soon as we reach an agreement, Janssen basically immediately

9    upended it by saying that they want to impose substantial

02:11 10    limitations on these searches using geographic limiters.

11         Your Honor, the plaintiff's blowing the whistle on

12    conduct that's been occurring systematically over a long period

13    of time.  There are going to be a substantial volume of

14    documents and data that need to be produced, even in this first

15    phase.  It's unavoidable.  Simply because there's a large

16    volume of relevant documents, the defendant can't just impose

17    broad restrictions that will cause highly relevant documents to

18    not be turned over.  Use of the geographic limiting factors are

19    going to filter out what are an extremely large number of

02:12 20    highly relevant documents, which is exactly why Janssen is

21    proposing.  The geographic references don't normally appear in

22    e-mails and policy documents and training materials or other

23    discussions between managers and different levels of managers.

24         Those are important documents that go to the core

25    issues in this case.  To limit Janssen's production, even if

1    it's only for certain custodians to those documents that

2    contain those specific geographic terms, is really going to

3    filter out a significant number of highly relevant documents.

4        THE COURT:  Can I just ask you to get a little more

5    particular on this argument?  So you're asking for documents

6    concerning these areas that everyone agrees, well, maybe not

7    everyone, but Chief Judge Saylor and I think should be

8    provided:  Oversight monitoring, the valuing and the review of

9    illegality.  Are you now talking about training documents when

02:13 10    you're talking about they're filtering the ESI?

11        MR. PRESTON:  No, your Honor.  What their proposal is

12    is to apply these geographic limiters to every search query.

13    So we had finally agreed upon a list of search queries that

14    cover the main issues in dispute, covers several of the key

15    reports that the plaintiff is aware of.  The geographic

16    limiters would apply to everything, not just some training

17    materials.  It would apply to all documents that are being

18    sought after through these searches.

19        Your Honor, we're aware of numerous documents at this

02:14 20    early stage of discovery that we consider to be strong evidence

21    that supports the plaintiff's allegations that don't contain

22    these geographic terms.  If the geographic limiters are

23    imposed, then Janssen's going to be relieved from having to

24    produce these in large quantities of other highly relevant

25    documents.

1          THE COURT:  I don't think this is the end of discovery

2     in this phase.  I think, assuming you get beyond this phase,

3     you will get more discovery.  Janssen says they will not seek

4     to apply the geographic term limitations for the relators'

5     documents or for the additional four custodians who are senior

6     management level employees.  You think even if you get

7     unfettered access in the searches to senior management level

8     employees, you still need nationwide discovery on the terms

9     that you've agreed to?  I'm trying to wrap my mind around this.

02:15  10          MR. PRESTON:  Your Honor, these searches are within

11     the parameters of the phased discovery.  The particular

12     custodians that Janssen is proposing to apply these limiters to

13     are three individuals who formerly served as the plaintiff's

14     direct manager, call them the regional managers.  A woman,

15     Karen Trahan, who was a level above them, and she was really a

16     key person in all of this and a more senior manager than these

17     direct managers, these managers all take directives from the

18     national managers and executives at Janssen.  And there's going

19     to be discussions that go up the chain of command concerning

02:16  20     the services at issue that are within this phase of discovery,

21     as they are services that the plaintiff provided for 13 years

22     at the directive of these managers.  These managers, when they

23     correspond with each other, they're not sticking in geographic

24     terms in their correspondence.  It's really inefficient.

25          At Janssen's request, the Court has phased discovery

1    here.  So plaintiff has been limited, and we've been working

2    within those limitations, but this is just going to take things

3    to a whole other level and make discovery really inefficient

4    because then, in phase two, are we going to go back and have to

5    rerun more searches for these same witnesses?

6              THE COURT:  I see what you're saying.  Okay.

7              MR. PRESTON:  Your Honor, the ESI protocol that

8    Janssen agreed to, it called upon the parties to coordinate on

9    the ESI search query, and that's what we've done.  We've a

02:17  10   final agreement as to a list of search terms.  These were

11   requests by Janssen to strike and revise several search

12   queries.  We did that.  We went further and we found additional

13   search queries that we voluntarily removed or have revised.  In

14   all, there's 31 queries that have been removed over the last

15   week as part of this process.  We've revised a hundred others.

16             We told Janssen, if there's a particular problem with

17   the search query, let us know and we'll work with you.  If

18   you're receiving false positives because of the search query,

19   let us know and we'll work with you.  We're not -- we don't

02:18  20   have any interest in getting a bunch of irrelevant documents,

21   but what we do want are the relevant documents.

22             In our view, what Janssen is proposing with the

23   geographic limiters is contrary to the ESI protocol.  It's

24   drastic.  And it would be highly prejudicial.

25             THE COURT:  Let me just ask you.  You're satisfied

```
 1   with the list of queries that you agreed on except for the
 2   geographic limitations?
 3            MR. PRESTON:  Yes, your Honor.
 4            THE COURT:  I'm happy to hear you further.  I think I
 5   understand why you're saying that.
 6            MR. PRESTON:  One final point, your Honor.  The
 7   plaintiff here, she filed this case in October of 2016.  She's
 8   been patiently waiting to finally have an opportunity to obtain
 9   the evidence that she believes is going to prove her
10   allegations.  If it takes a few more weeks to review these
11   additional documents or a month, we've been patiently waiting
12   for this opportunity for years.  We just want the relevant
13   documents that we've requested.
14            THE COURT:  Okay.  Mr. Posner, do you want to address
15   the ESI dispute and the dates, setting dates for the rolling
16   production?  Do you want just to let plaintiff make their whole
17   argument?  It's up to you.
18            MR. POSNER:  Whatever is best for you.  It probably
19   makes sense, your Honor, for me to focus on the issue just
20   described.  Does that make sense?
21            THE COURT:  Yes.  Go right ahead.
22            MR. POSNER:  So we've produced certainly well over two
23   million pages, most of the DOJ production.  The rest of it, I
24   think, will be in about a week.  When the relator says we've
25   produced relators' digital file, that's tens of thousands of
```

1    pages.  Obviously, within that are a lot of management level

2    documents.  As you know -- and I appreciate the Court's

3    interest in keeping this to the phase as set forth by Chief

4    Judge Saylor.  As you know, the vast majority of documents in

5    the DOJ production don't relate to this district at all.

6    They're not management.  They just go -- it's nationwide

7    discovery.  We produced it, obviously.  We're also searching

8    hard copy sources as well.

9         As is set forth in our letter -- and I know this

02:21 10    letter was filed just before the argument.  We're moving very

11    quickly here.  We're bringing a lot of issues to you.  I

12    appreciate you reading these letters quickly.  I know I just

13    filed ours today.  I appreciate you looking at that.

14         What the relator wants, the master list, that the two

15    parties have agreed to, is about 190,000 documents, so maybe as

16    many as a million of pages for just the first four custodians.

17    So what we're trying to do is to see if we can limit that.  The

18    way we came up with is to limit it to the territory.

19         As your Honor rightly points out, for the senior

02:22 20    people or more senior people that they added, we're not

21    imposing that limit.  I'd like to, but we're not.  That's going

22    to be, as we note in our letter, a likely similar amount of

23    documents now without the geographic limiters.  Maybe that's

24    over a million pages on top of the couple of million pages they

25    already have, plus the hard copy and other sources we're

1    searching.

2         So what we were trying to do was see if we could limit

3    the first wave of custodians in a way that was focused on the

4    district that the Court said we need to focus.  That cuts it by

5    a little bit more than half.  So under a hundred thousand.

6    Still massive, but that was our intent, to try to focus this

7    case, as your Honor said, on this particular district.  They're

8    still going to get, as I said, a ton of information.  They

9    already have a ton of information, including management level

02:23 10   documents.  They're going to get the senior documents.  We've

11   already agreed to provide when your Honor said, give them the

12   stuff from the creation and the legal review, I don't care if

13   that goes back 22 years.  We're looking for that.  So they're

14   still going to get that.  We were just trying to impose a

15   reasonable limitation on the initial wave of production.

16        This is not that complicated a case.  They ought to be

17   able to prove their case with sort of millions of pages of

18   documents.  They keep saying, when are you going to be done,

19   but I want you to use really broad search terms.  I want you to

02:23 20   search millions of documents.  When are you going to be done?

21   To which we say, if we can limit this more, the answer is we'll

22   be done sooner, obviously.  The math is going to work that way.

23   We have given you the search terms we want to use, and when you

24   take that together with the other information that we have

25   already produced or will produce, you're going to have more

1   than everything they need, and they're still going to get

2   possibly as many as a million pages, even using our own search

3   terms with the limiters from all the custodians.  We're not

4   limiting the second tranche of custodians.

5       THE COURT:  So what do you say to Mr. Preston's

6   assertion that if you take these first four custodians, their

7   communications with the higher-ups are not necessarily going to

8   be captured by repeated references to their own district?  I

9   believe that's what he's saying.

02:24 10      MR. POSNER:  But they included the higher-ups in the

11  number of custodians without those limiters.  The DOJ

12  production has a ton of management level documents.  We're just

13  speculating on what it's going to exclude.  What I can tell you

14  is it's going to cut the 190,000 by a little over half.

15      THE COURT:  I'm delighted to cut it in half, but the

16  question is what are you cutting out.

17      MR. POSNER:  The answer is, look, ultimately I don't

18  know for certain because we haven't run all this.  What I can

19  tell you is it's still going to be hundreds of thousands of

02:25 20  pages and it's still going to include communications about her

21  region.  It's still going to include, even by our own estimate,

22  it's going to include the Pennsylvania region, central -- the

23  answer is it may exclude some things that went to other areas,

24  but that's the point.

25      If we have to go to phase two in this case, you just

1    remove those limiters, they're going to get other custodians.

2    It's easy enough to produce more from these existing

3    custodians.

4          As your Honor said, we're trying to phase this for a

5    reason.  We're trying to take the relators' allegations and

6    what happened in the relators' district and see if it violates

7    that statute.  If it doesn't, the case is over.  If it does,

8    you look at other regions in other districts.  This is more

9    than enough to get a snapshot as to the legality of these

02:26 10   programs because they're already getting a ton of senior level

11   information.

12         So I can't -- I don't know what it excludes. I know

13   what it includes.  It certainly includes anything that -- it

14   certainly includes the things that went down the chain into

15   her -- to her and into her district.  It includes that.  That's

16   going to be a fair amount of management level stuff.  That's

17   all I can tell you.  It's not going to include every page they

18   want.

19         THE COURT:  Let me ask Mr. Preston, if you don't mind,

02:27 20   to respond to that.  Go ahead, Mr. Preston.

21         MR. PRESTON:  I want to clarify one thing.  Mr. Posner

22   just made a significant mischaracterization of phase one

23   discovery.  Chief Judge Saylor did not say at the end of phase

24   one discovery there is a summary judgment process.  Phase one

25   discovery is to get more information about the services at

1    issue, the policies from management that directed those

2    services, the key issues in the case before opening it up to

3    broad discovery.  And this has been discussed at other hearings

4    and is laid out in our papers.

5          What Chief Judge Saylor was concerned about, and

6    wisely so, is to open up discovery to ABS activity, specific

7    activity with physicians in other regions.  That is a whole

8    area of other discovery that he wanted to avoid until we had a

9    good understanding of the services that are at issue and

02:28 10  limiting the activity between the relator and physicians, the

11   discovery toward those activities to this region.

12         At the management level, which is the key area where

13   the information at issue rests, is not limited to just

14   Pennsylvania.  Your Honor has guided us on that.  So it's just

15   inaccurate to say that this whole phase one is just going to

16   lead to a summary judgment process.  That is not what Chief

17   Judge Saylor said.

18         With regard to the geographic limiters, your Honor,

19   Mr. Posner acknowledged that approximately a hundred thousand

02:29 20  documents that he has no idea what the contents are other than

21   they were responsive to the search terms that Janssen has

22   agreed to and, in fact, most of those search terms Janssen

23   created.  At the very start of the search term process, Janssen

24   put together the list of search terms.  So now they're saying

25   these are way overbroad and we need these geographic limiters.

1    They want the geographic limiters because they don't want to

2    produce relevant evidence.

3         Your Honor, managers have conversations via e-mail,

4    important conversations.  Managers aren't going to just put in

5    there this conversation relates to central Pennsylvania, this

6    conversation relates to the town of Bethlehem.

7         THE COURT:  Okay.  I think I'm following you.

8         MR. POSNER:  Your Honor, one thing.

9         THE COURT:  Go ahead.  We interrupted you.  Go ahead.

02:30 10         MR. POSNER:  Sorry.  I know you know this.  They're

11   getting the senior level people they pick.  We haven't tried to

12   impose those limiters.  They are.  They're already getting all

13   those senior level documents.

14         I'm sorry.  Your Honor had a question?

15         THE COURT:  No.  So here's the thing.  I'm going to

16   order Janssen to go ahead and give up the geographic limiter

17   terms and just do what you agreed to before the imposition of

18   those terms.  I know that we're piling more and more on here.

19   So if you need more time in order to sort through these things,

02:31 20   I invite you to file something with Judge Saylor once you

21   figure it out, setting out the additional time you would need.

22   Try to be very conservative about that because I do think he

23   will give you some more time, but I don't think he will give

24   you much more time.

25         Let's just do the ESI in that way.  And I think I may

1  hold you to your statement, Mr. Posner, that you think you can

2  complete the DOJ production within one week. I'm not going to

3  order that you finish it in one week to the hour, but let's get

4  that done within a week or so. If it turns out it's eight days

5  or nine days, that's fine. Let's aim for seven days to

6  complete that.

7          MR. LEOPOLD: On that issue, we appreciate the time

8  frame and, of course, all Ethan has to do is call if he needs

9  an extra day. Whatever it is, it's not a problem. On the

02:32 10  request for production, I realize there is going to be a search

11  for ESI, but we do have the request for production of documents

12  that has been outstanding for months.

13          MR. POSNER: We've responded to that repeatedly.

14  We've given you our responses. We've told you what you're

15  searching. I don't like to interrupt, but this is really going

16  beyond the path.

17          THE COURT: We'll hammer out some additional dates in

18  a minute. Let's talk about, if you don't mind, Interrogatory

19  No. 18 that asked Janssen when did it begin and stop providing

02:33 20  the services at issue. I'd just ask you, Mr. Posner, to

21  respond to that, if you don't mind.

22          MR. POSNER: As I said, I don't think the company has

23  discontinued the provision of these services. That's because

24  they're lawful. DOJ investigated. They made this big point

25  about how the justice has been delayed here. Actually, the

1    United States Department of Justice, the U.S. Attorney's Office

2    in your district is known for many things.  Being soft on the

3    pharmaceutical industry is not one of those things.

4            THE COURT:  I know that.  I'm well aware of that.  Let

5    me just ask you.  With regard to stopping then, it is not

6    stopped?

7            MR. POSNER:  Not as far as I know.  These services are

8    publicly available.  They're normal.  They're all over the

9    industry.  That's why they've kept going, because they're

02:34 10    lawful.  All right?  In terms of when they started, do you want

11    me -- we could look through a ton of documents to figure out it

12    started at 8:00 a.m. on September 23, 1999.  A, they don't have

13    to have the hour and second when that occurred at the beginning

14    of the case.

15            Like we've gone -- there's no case that supports their

16    point on the interrogatories.  The reason we identified a bunch

17    of cases here, there's points on the interrogatories, in

18    fairness, your Honor, and respectfully, board on the frivolous.

19    They're not allowed to tell, to have all of these requests

02:34 20    about identify every instance of X, identify every instance of

21    Y.  We can tell generally, we think the services started in

22    this general period, which we think we've done already.  What

23    do you want, the date?  You want Monday, October 4, 1998?  It's

24    all within the scope of the time period anyway.

25            THE COURT:  Mr. Leopold.

1          MR. LEOPOLD:  Your Honor, I'm trying to focus on the

2     discovery issues and disputes.  With all due respect, besides

3     interruptions, if we were to play back all the things that

4     Janssen has stated in this hearing thus far, it's how much of a

5     burden we are on Janssen, how many millions of documents

6     they're producing, what they have to do and things of that

7     sort.  We're entitled.  This is what discovery is for.  This is

8     what the rules of federal procedure has allowed.

9          THE COURT:  I only have about 25 more minutes.  Just

02:35 10    go through Interrogatory No. 18 with me.  Can you tell me if

11    they give you a general date when something started?

12         MR. LEOPOLD:  Of course we would like due diligence of

13    counsel talking to their client and getting the most specific

14    date possible.  Nobody is asking for the hour, the seconds, et

15    cetera.  That's not the way discovery runs.  I assume Covington

16    knows that.

17         What we do want is a verified jurat page to the best

18    of their ability what the answer to an interrogatory is, and

19    that is required under the rules.  That's all we're seeking.

02:36 20    If that date, whatever it is, is a good faith effort of counsel

21    to do their due diligence by asking their client, that's what

22    is called for and that is what we're requesting.  So whatever

23    date that they can do with a verified verification page, we

24    will take that.  That is what we're asking for.

25         And if discovery points something out and we find out

1    that due diligence wasn't done, we will be coming back to your

2    Honor for appropriate relief, but just give us the best they

3    can by doing good due diligence lawyering work that I'm

4    assuming Covington is aware of and can do.  That is what we

5    want.

6         MR. POSNER:  Interrogatory 18 doesn't ask for that.

7    I'm quoting.  "Identify each month in the years 1998 to

8    present", so 23 years times 12, "that you provided IOI support,

9    including identifying each topic or type of IOI support that

02:37 10   was provided during each such month".  That's what the

11   interrogatory says.  That interrogatory is plainly improper.

12        MR. LEOPOLD:  That's something completely different.

13   Give us the best date you can.  You said you were going to be

14   able to do the most --

15        THE COURT:  I'm going to ask you not to address one

16   another.  If you don't mind, I'm going to ask you, maybe not

17   specifically the two of you, but some two other lawyers to see

18   if they can negotiate this and confer on this and come up with

19   a less picayune request and a more specific answer.  Honestly,

02:38 20   the request does seem very, very broad.  I understand why it's

21   drafted that way.  Let's confer on that and give whatever best

22   dates you can, Mr. Posner, as far as when certain services were

23   provided.

24        I know there's a dispute about when the information

25   ends and that Janssen says they don't have to produce

1    information beyond 2016 because that's when the relator left.

2    I just wonder why it doesn't make sense at this phase of

3    discovery to end things in 2016 for the time being.

4            I'll hear you on that, Mr. Leopold.

5            MR. LEOPOLD:  Your Honor, we will do that.  That's

6    fine.  That's fair.

7            THE COURT:  All right.  With regard to Interrogatory

8    No. 17, Mr. Posner, the identifying presentations, documents,

9    et cetera, that be made available to the public via the

02:39 10   internet, I think they're just trying to value the services,

11   right?

12           MR. LEOPOLD:  That's correct, your Honor.

13           MR. POSNER:  So they want to know -- I'm quoting

14   again.  "Identify any and all presentations, documents and

15   programming that you provided to IOI accounts", assuming the

16   time period for this is what, 1998 through 2016, "be made

17   available to the public via the internet, including the date

18   when the presentation document or program first became".  We'll

19   have to review all this.

02:40 20           THE COURT:  Can I ask you?  Were these presentations

21   made available to the public?

22           MR. POSNER:  Some were, not every presentation and

23   document that you provided to IOI account.  Was every

24   presentation and document over an 18-year period publicly put

25   on the internet?  No.  I have to -- don't I have to do two

1    things?  I have to look at, I don't know, hundreds of different

2    presentations over 18 years, and then I have to compare.

3    I'd -- the internet, are they in cache pages?  I'd have to go

4    back and compare each year.  Was it made available on the

5    internet in 2007, 2008?  I've never heard of an interrogatory

6    like that.

7            MR. LEOPOLD:  Your Honor, maybe the better --

8            THE COURT:  Go ahead, Mr. Leopold.

9            MR. LEOPOLD:  Maybe one of the things that counsel

02:41 10   could do is, instead of looking through thousands of pages of

11   documents, I'm not sure a document is going to say if it's on

12   the internet, but maybe ask the most appropriate people who

13   would have knowledge about the issue and ask.  That's all that

14   he can generally do.

15           MR. POSNER:  I'd have to -- you're not allowed to

16   require me to do an investigation and go to -- J&J doesn't have

17   a file on things put on the internet that -- we don't have a

18   file on that.  I'd have to go to a lot of different people.  We

19   can do that as discovery emerges, but there's no requirement to

02:41 20   do that now.

21           THE COURT:  Hang on a second, everyone.  I think I'm

22   going to deny this without prejudice at this time.  It seems to

23   me this might be for a 30(b)(6) witness or somebody who has

24   some institutional knowledge.  I don't think it's so critical

25   that we're going to deal with it now.  I want to focus on the

1  ESI and the other outstanding discovery right now.

2         What else, Mr. Leopold?

3         MR. LEOPOLD:  Your Honor, we have 5, 7, 8, 9, and 15,

4  which I think can be summed up pretty similarly.  In the letter

5  that you received and based on my review of the letter, it does

6  not reference the way it is couched in the letter.  We don't

7  ask about all people.  We ask specifically who were the people

8  that decided the particular issue.

9         I think if we just look at No. 5, for example, it's

02:42 10  not overbroad.  Respectfully, I think it's quite specific:

11  "Identify each employee who decided that you would contract or

12  who was involved in the decision for the two different outside

13  companies".  We don't ask -- in their letter in their first

14  line, "all people", that's not what it says.

15        All counsel for a client can do is use their best

16  efforts.  I think it is incumbent on counsel to do some

17  investigation with their client to get answers to discovery.

18  That's all that we're asking here.  We do that for five.  We do

19  that for seven.  It's not all people.  It's just give us the

02:43 20  name of the employee that made the decision, that decided.  We

21  do that for number eight.  We do that for nine.

22        In regards to 15, we just asked them to give us the

23  facts that support their affirmative defense.  We had this

24  conversation, I believe, at the last hearing.  I think we're

25  entitled to know what the facts are that support their

 1  affirmative defense.

 2          THE COURT:  Let me go back to your interrogatories 5,

 3  7, 8 and 9.  I agree these are employees with significant

 4  knowledge about the claims in the case.

 5          What can you do, Mr. Posner?

 6          MR. POSNER:  We can do what we did, which is we

 7  identified specific employees.  Ken Gilmer and Mike Wolf have

 8  knowledge about this.  I'm not aware of any case -- I'm trying,

 9  your Honor.  I'm really trying.

02:45 10          THE COURT:  I can see that, Mr. Posner.

11          MR. POSNER:  Look, I've been doing this a long time.

12  You've been doing this a long time.  We've all been doing this

13  a long time.  This is -- giving you the contracts, people that

14  executed it and specific names.  The interrogatory says

15  "identify each employee who decided that you would contract or

16  was involved" --

17          THE COURT:  What you've given is the contracts over

18  what period of time?

19          MR. POSNER:  Sarah, do you know the answer to that?

02:46 20          MS. TREMONT:  We'd have to get back to you.

21          MR. POSNER:  The more important point is we gave two

22  people who have knowledge about the contracts with Xcenda.  So

23  that's -- to give them all the people, "identify each employee

24  who decided that you would contract or was involved in your

25  decision to contract" --

1          THE COURT:  That's overbroad.  I grant you that's

2    overbroad.  What they are saying in their letter is that you

3    provided a vice president of sales and marketing from 2002, two

4    marketing employees from an undisclosed period, and a

5    compliance officer from 2013 to '16, and you don't specify what

6    decisions they performed, if any.

7          MR. POSNER:  Think of how many documents I'm going to

8    have to look through to find out all of that at this stage in

9    litigation.  That's not what interrogatories require.  You can

02:47 10   get that through other discovery potentially, but that's not

11   what the -- they don't require us to review 50,000 pages and do

12   a mini investigation for them.  That's our point on Rule 26,

13   your Honor.

14         MR. PRESTON:  Your Honor, if I may.  This is Casey

15   Preston.  It's troubling that at this point we're nearly

16   6 months into searching for documents.  They're not aware of

17   who the key people are.  How are we supposed to have any

18   confidence that they're appropriately gathering documents in

19   response to our requests if they don't know who the key people

02:47 20   are?  We're just asking who are the decision-makers, who are

21   the people with the most involvement in these services, not

22   just from 2002.

23         Mr. Posner says he has acknowledged these services are

24   ongoing.  We're not asking for every single person but we're

25   asking for people that we can go out and, one, make sure we're

1    getting the appropriate documents that we've asked for and,

2    two, we know who to go out and depose.  Right now we're

3    completely in the blind.  In their initial disclosures, they

4    identified three people.  In their interrogatories, they've

5    identified four people.

6           They're so quick to talk about how this is a practice

7    that's been occurring for 20 years and that they've got to

8    produce millions of pages of documents.  Where are they getting

9    these documents from?  Have they not reviewed the allegations

02:48 10  with their client?

11          MR. LEOPOLD:  Your Honor, if I could just say this.

12   Like some on this, I've been doing this a long time, well over

13   30 years now.  If we were to take the actions that Janssen

14   wants us to take and said all these people for depositions and

15   try to figure out who are the right people, they would be

16   coming to you with a protective order, saying it's a fishing

17   expedition and we're taking all these people for no reason at

18   all.  Instead of using a number of depositions, we're trying to

19   get the answer to who is the right person to depose.

02:49 20          THE COURT:  Okay.  I get what you're saying, but I

21   really think you're talking past each other.  Mr. Preston is

22   saying we want to know who the key people are.  Your

23   interrogatories are asking for every single person.  I'm sorry

24   again, but let's confer on this and figure out what are you

25   going to be satisfied with and what do they have.

1          Mr. Posner, you're going to have to do better than
2     what you've done so far.  They need to know who are they going
3     to depose to talk about the contract with Xcenda and The Lash
4     Group, and it may be over time, and the same with these other
5     issues, the infusion services review, and that type of thing.
6          MR. POSNER:  Didn't we give two specific names?
7     Xcenda is this unbelievably tangental issue.  The Lash Group
8     provided benefits review.  It's not even relevant for this
9     case.  Even a little issue like Xcenda, we gave them two names.
02:50 10     Isn't that the people to depose?
11          THE COURT:  Who are the two names?
12          MR. POSNER:  The two names were Janssen's Ken Gilmer
13     and Mike Wolf have knowledge about Janssen's contracts with
14     Xcenda.
15          THE COURT:  Are they the people?  If you depose them,
16     are they going to be like, this is in 2002?
17          MR. POSNER:  I haven't done, like, an 18-year
18     exhaustive review, but I certainly told them -- I told them
19     that they'd have knowledge about these contracts.  That's all
02:50 20     I'm required to do at this stage.
21          MR. LEOPOLD:  Your Honor, if I can say this, I
22     appreciate what counsel is saying.  Maybe at the end of the day
23     we might be left with these two people.  I don't know.  We
24     should know who at the time -- we're not at the point where
25     we're going to take a deposition yet.  We just want to know,

1    and it's clear in the interrogatory, who made the decision.

2    Who was the person at the time making the decision?  If that

3    person's not there anymore, doesn't mean we can't go and take

4    his deposition.  The person now may not even have been there

5    who they've cited as the person with, quote unquote, knowledge.

6    That's not the issue that we're trying to get to.  We want to

7    get to the person who made the decision of why this company was

8    initially retained.  That's the core issue, not just somebody

9    has knowledge about a contract.  I could get a tenth grader to

02:51 10    read the contract.

11            THE COURT:  I want you to redo your interrogatories to

12    ask for what you just asked for, not this every single person

13    and that type of thing.

14            MR. LEOPOLD:  We say the employer who decided.

15            MR. POSNER:  Your Honor, I would have them redo these

16    interrogatories and ask really specific questions.  We feel

17    like we've more than answered each and every one of these

18    interrogatories.  I'd ask they redo them with a very specific

19    list of questions, and obviously we'll engage with them.

02:52 20            MR. LEOPOLD:  I don't know how I could -- I could

21    break my back and yell with every single question, which seems

22    to be happening here.  I'm not sure how else we can ask a

23    question when we say, who decided to get into this.  That's

24    what the interrogatory says.  I'm not sure how more clear and

25    concise we can ask that question.  I'm just not sure.

1        THE COURT:  Here's what I'm going to do.  I'm not

2   going to have them rephrase the interrogatories.  I'm going to

3   have you confer on the existing interrogatories and see if you

4   can reach some agreement on what should be provided.  It may

5   be, Mr. Posner, you've provided the names and that's that and

6   it may be that you can come up with some better information for

7   them.

8        MR. POSNER:  Your Honor, I don't understand why -- we

9   supplemented our interrogatories.  He keeps saying what I

02:53 10   really want to know is X and the interrogatory, as you've

11   observed, doesn't say X.  It says something quite different.

12   Why is it so difficult to ask them to just specify what you

13   want?  Put it in writing so we know what the question is.  Why

14   is that so hard to do?

15        THE COURT:  Either way, I want the parties to confer

16   on 5, 7, 8, 9, and 15 further and figure out how you can reach

17   agreement on what the question is and what the answer is.

18   We're not going to go right back to the drawing board.  Scratch

19   that that I suggested that.  We're going to just move forward

02:54 20   as expeditiously as we can on that.

21        What's interrogatory 15?  That's the one about

22   employees who assert in their affirmative defense reasonably

23   interpreted statutes and regulations.  Mr. Posner, what's the

24   problem with identifying those employees?

25        MR. POSNER:  Interrogatory 15, I hate to keep quoting,

1   "state all the facts that you believe support your contention

2   in affirmative defense No. 13 that Janssen reasonably

3   interpreted the statute and regulations, including identifying

4   all persons involved in interpreting the statute and

5   regulations".

6           That's what it says.  It calls for a legal conclusion.

7   It's a contention interrogatory.  That's why we cited the

8   cases.  What we said -- we also cited specific statutory

9   programs.  They want to know all the reasons -- state -- what

02:55 10   does 15 say?  15 says "state all the facts that you believe

11   support your contention that this was a reasonable

12   interpretation of the statutes and regulations".

13          I mean, A, they want us to identify lawyers involved?

14   We're still investigating what happened 22 years ago.  What do

15   you actually want?

16          THE COURT:  Mr. Leopold?

17          MR. LEOPOLD:  Your Honor, you ordered this to be

18   answered last time.  That's why they had a supplemental

19   response.  Then this is what we have.

02:56 20          I think when we asked for state all the bases and

21   facts that support your affirmative defense, we're entitled to

22   know the facts or else we're not going to be able to counter

23   the affirmative defense by way of moving to strike it, summary

24   judgment, whatever it may be.  I think we're entitled to

25   recited regulations.  And case law is not the facts that they

1    are relying upon to support their own affirmative defense.

2           We had this same argument last time.  This is what

3    they gave it.  I don't think it's appropriate.  And if it is

4    lawyers, that doesn't mean we get to take their deposition, but

5    we're entitled to.  That's not privileged.  We're entitled to

6    know in an answer to an interrogatory the names of the people

7    involved.

8           That's where we're at at this point.  We're not at the

9    point where we're setting a deposition.  If we were to do that,

02:57 10    for whatever reason, I'm not saying we would, you could raise

11    that issue.  You could file a protective order or whatever.

12    We're not there yet.  We're at an answer to an interrogatory

13    with, which all due respect, Mr. Posner, every time we come

14    back, you've already been ordered to answer it.

15           THE COURT:  Okay.  So Mr. Posner, do you not have any

16    employees you would proffer in support of that defense?

17           MR. POSNER:  In support of our defense -- we lay out

18    our defense of the case in Interrogatory No. 1, which we cite

19    back to.  You want to know the employees that will support our

02:57 20    defense?  It's a lot of people and it's a lot of documents.

21    It's lawful.  I'm struggling.  They said "state all the facts

22    that support your affirmative defense".  Our affirmative

23    defense is it's lawful, and a lot of people were involved in

24    that in the execution of this.

25           THE COURT:  For an affirmative defense, that seems

1    pretty vague.  I'm sure you have more specific information to

2    kind of beef up just that it's lawful.

3         MR. POSNER:  We do in Interrogatory No. 1, which we

4    cite back to.  We go on for several pages about why we think

5    this -- if you want us to supplement why we think this was

6    lawful, I don't know what else -- that's why these things of

7    kind of contention interrogatories are not permitted and are

8    certainly premature at this stage.

9         THE COURT:  Okay.  So I'm going to just reserve on

02:58 10   Interrogatory No. 15 at this time.  Okay?  I really want the

11   parties to focus on actually producing some discovery,

12   Mr. Posner, getting it done, and getting it done quickly.  I

13   think Judge Saylor, I know we don't have a transcript of that

14   hearing yet, but I know Judge Saylor understands it's a lot of

15   discovery to produce in a short period of time.  Let's get busy

16   and just do the ESI production, finish up the DOJ production,

17   and then the so-called rolling production that is comprised of

18   other information, right?  Mr. Leopold, it's not complete?

19        MR. LEOPOLD:  That's correct, your Honor.  We'll have

02:59 20   to go through the numerous objections they have to our requests

21   for production.  We'll do a meet and confer and come back to

22   your Honor as soon as we can to tee those issues up.  Whatever

23   documents have not been produced yet related to the requests

24   for production that has been outstanding for months, I would

25   just like to have something from your Honor, respectfully, so

1    they can go to their client and say, the Court has ruled those

2    documents be produced.  If they need to come back for an

3    extension for a week or whatever, that's no problem.  Without a

4    due date, it makes it difficult for all parties, especially

5    with respect to defense counsel.

6              THE COURT:  Mr. Posner, how much time do you need?

7              MR. POSNER:  Your Honor, I was reacting to something

8    he said.

9              You sort of said it.  Obviously, we've been busy for a

03:00 10    while.  I don't mean to suggest we were doing something

11    different.  The Court ordered phase discovery.  We're not going

12    to worry about San Diego or Cleveland.  We're not going to

13    worry about that stuff.  The Court set a series of deadlines.

14              Since then, I think it's fair to say, the discovery

15    has been expanded, and we are obviously confronting the review

16    and production.  We've already produced a few million pages,

17    but we're now confronting the review and production of more

18    than a million pages based on your Honor's ruling for today,

19    which obviously increases the scope.

03:01 20              It's hard for me to give you a date on that large

21    discovery.  As I mentioned to Chief Judge Saylor, there's a

22    well worn process for your review.  You have to look at each

23    document for privilege and responsiveness and get stamped, and

24    then it's got to be reviewed by some lawyers.  We have our

25    normal process that your Honor is familiar.

1    I appreciate that you want us to go quickly.  And

2    there's obviously a lot of people on this case.  We are

3    confronting a completely asymmetric, right?  They're not doing

4    anything.  They've just completely ignored our discovery

5    requests.  So this is totally asymmetric.

6    We're obviously going to need more time than

7    July 16th.  I just don't have a date for you at this point.

8    Your Honor just upped our review of the documents by a factor

9    of two.  I understand your ruling.  I'm just saying that's the

03:02 10    impact.  The more documents we have to produce, the more time

11    it's going to take.

12    THE COURT:  Why don't you finish the DOJ production.

13    And what other than the ESI is still outstanding, Mr. Leopold?

14    MR. LEOPOLD:  Yes, your Honor.  One of the things that

15    has not been mentioned that Judge Saylor actually did say at

16    the end of the hearing was that this is very good for

17    Mr. Posner coming to him because they can stay busy with their

18    firm to get the documents reviewed.  He ended the hearing that

19    way.  So I think we should all keep that respectfully in mind.

03:03 20    The last thing that's on our agenda to talk about,

21    which we have met and conferred several times regarding the

22    issue, the defense of it makes no sense to me, and I've asked

23    several times, it's about whether or not the documents, all of

24    which are stamped attorneys' eyes only and, as your Honor

25    recalls, we addressed this at the last hearing.  We agreed the

1    relator could look at the DOJ documents.  I agreed at that time

2    they could have a month or whatever they wanted within reason

3    to look at the documents and take off what's -- because they've

4    marked everything that way.

5           Now they have come back and said the relator can look

6    at her own documents from her file, the DOJ documents, but she

7    can't look at any of the other documents Janssen is producing

8    in the case.  It doesn't make sense to me.

9           THE COURT:  Okay.  Mr. Posner.

03:04 10           MR. POSNER:  The reason it doesn't make sense is

11   because that's not what we said.  What we said was -- for

12   attorneys' eyes only right now there's a reason why you have an

13   attorneys' eyes only limitation, right?  It's so others have

14   limited access.  So we said, look, it's fine for the DOJ

15   production.  It's fine for her own documents.  We're not going

16   to extend that out.  We're saying the same thing in this narrow

17   way.  We're saying we're not going to blanket extend that out

18   to every document we produce.  We're willing to talk to them

19   about other attorneys' eyes documents that the relator can see.

03:04 20   The relator works for, Ted, Novartis, is that right?

21           MR. LEOPOLD:  She works for another company.  The core

22   issue is she's already seen documents that are being produced.

23   She's under a protective order.  We are keeping all eyes only

24   for attorneys until you can --

25           MR. POSNER:  This --

1         MR. LEOPOLD:  Let me just finish.  You've interrupted

2    me several times today.  You've circled the wagon on attorneys'

3    eyes only for everyone.  We just want her to be able to review

4    the documents that are being produced in this litigation by

5    your client.  She's -- she's under a protective order so

6    there's no harm.  So I don't understand why she cannot see the

7    rest of the documents that might be relevant that you're

8    producing.

9         MR. POSNER:  She might be.  All we're saying is we're

03:05 10   not going to apply -- you never apply an attorneys' eyes only

11   designation to the plaintiff for every document.  In every case

12   there's a protective order that doesn't provide.  That's why we

13   have this elevated level of protection.  What we're saying is,

14   fine, for the DOJ production -- and there may be other

15   attorneys' eyes only designations where we're going to have an

16   issue with the relator.  We're just not willing to extend it

17   out for everything we're going to produce for the rest of the

18   case, particularly given she works for a competitor.

19        THE COURT:  Mr. Posner, how do you propose that if

03:06 20   they want to show her something they're allowed to do it?

21        MR. POSNER:  They come to us and they ask.  If they're

22   being unreasonable about it, we'll come to you.

23        THE COURT:  Can we say that you'll confer on groups of

24   documents that are not allowed to be shown to her?

25        MR. POSNER:  Sure.

1          THE COURT:  If there's millions of documents, I don't

2    think they have to come to you for every specific page of every

3    specific document, right?

4          MR. POSNER:  Sure.  Your Honor, every case has this

5    prohibition.  Every complex civil case has the following

6    prohibition:  For attorneys' eyes only that means attorneys'

7    eyes only.  That means the plaintiff can't see it.  They're

8    saying she needs to see everything you produced in this case.

9    We're saying, yes, there's things we've designated as

03:07 10   attorneys' eyes only.  There's a bunch of stuff we can see that

11   she can see.  What we're saying is we're not willing to extend

12   that out for the rest of case for documents that we haven't

13   even produced or reviewed yet.

14         THE COURT:  I'm going to ask -- so the parties need to

15   work out some workable arrangement for designating documents

16   that are attorneys' eyes only that plaintiff can still see or

17   perhaps plaintiff cannot see, but that's something you're going

18   to have to work out between yourself.  It shouldn't be too

19   cumbersome.

03:07 20        I have to go now.  We're going to have another status

21   conference on June 3rd at 2 o'clock.  I want a status -- that's

22   a Thursday.  I want a status report to be filed on that

23   Tuesday, which would be June 1st, by close of business, on

24   where you are.  If you want to do letters as you've been doing,

25   that's fine.

1          Anything else that we just have to cover?  I have

2    another group waiting?

3          MR. LEOPOLD:  Appreciate your time, your Honor.

4          THE COURT:  Okay.  I'll try and put what we've done

5    here on the docket.  Thank you very much.

6          (Whereupon, the proceedings adjourned at 3:10 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   DISTRICT OF MASSACHUSETTS    )

 6

 7

 8          I, Kristin M. Kelley, certify that the foregoing is a

 9   correct transcript from the record of proceedings taken May 6,

10   2021 in the above-entitled matter to the best of my skill and

11   ability.

12

13

14       /s/ Kristin M. Kelley               May 11, 2021

15       Kristin M. Kelley, RPR, CRR              Date
         Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```