```
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF MASSACHUSETTS

 3    _____

 4    THE UNITED STATES OF AMERICA,
      ex rel,
 5
                            Plaintiffs,        Civil Action
 6                                             No. 16-cv-12182-FDS
      v.
 7                                             December 20, 2021
      JANSSEN BIOTECH, INC.,
 8
                            Defendant.         Pages 1 to 55
 9    _____

10

11

12          TRANSCRIPT OF HEARING VIA ZOOM VIDEOCONFERENCE
             BEFORE THE HONORABLE M. PAGE KELLEY
13              UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21                    JOAN M. DALY, RMR, CRR
                       Official Court Reporter
22                  John J. Moakley U.S. Courthouse
                   One Courthouse Way, Room 5507
23                      Boston, MA  02210
                       joanmdaly62@gmail.com
24

25
```

1      APPEARANCES:

2

3      FOR THE PLAINTIFF:

       Theodore Jon Leopold
4      Leslie Kroeger
       Casey M Preston
5      Diana Martin
       Cohen Milstein Sellers & Toll, PLLC
6      11780 US Highway One
       Suite 200
7      Palm Beach Gardens, FL 33408
       561-515-1400
8      Email: Tleopold@cohenmilstein.com
       Lkroeger@cohenmilstein.com
9      Cpreston@cohenmilstein.com
       Dmartin@cohenmilstein.com
10

11     FOR THE DEFENDANT:

12     Ethan M. Posner
       Kristen M. Cobb
13     Sarah Tremont
       Stacey K. Grigsby
14     Covington & Burling LLP
       850 Tenth Street, N.W.
15     Washington, DC 20001
       Email: Eposner@cov.com
16     stremont@cov.com
       kcobb@cov.com
17     Sgrigsby@cov.com

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          (The following proceedings were held via Zoom

3    videoconference before the Honorable M. Page Kelley, United

4    States Magistrate Judge, United States District Court,

5    District of Massachusetts, December 20, 2021.)

6          THE CLERK:  Today is Monday, December 20, 2021, and

7    we are on the record in civil case number 16-cv-12182, The

8    United States of America, ex rel, versus Janssen Biotech,

9    Inc.  The Honorable M. Page Kelley presiding.

10          Would counsel please identify themselves for the

11    record.

12          MR. LEOPOLD:  Good morning again, Your Honor.  Ted

13    Leopold on behalf of the relator along with Casey Preston,

14    Leslie Kroeger and Diana Martin.

15          THE COURT:  Good morning to all of you.

16          MR. POSNER:  Good morning, Your Honor.  Ethan

17    Posner, Covington & Burling, along with Kristen Cobb, Sarah

18    Tremont and Stacey Grigsby.  Good morning.

19          THE COURT:  Good morning.  All right.  So I'm

20    appearing remotely from outside the courthouse because they

21    were having fire drills in the courthouse today, and I didn't

22    want to get interrupted.  My connection has not been the

23    greatest, but hopefully we'll make it through this hearing.

24    We're here on two motions, number 218, which is the relator's

25    motion to reconsider discovery rulings.  And then number 223,

1    which has to do with additional discovery in the privilege

2    log.  I'll hear you first on number 218, Mr. Leopold or

3    whoever is prepared to argue that.

4            MR. LEOPOLD:  Yes, Your Honor.  Again good morning.

5    There is a lot of issues sort of on the table.  So I want to

6    try and do this in the most economic way.  Is there a

7    particular way you want us to handle these various issues or

8    just take one at a time?

9            THE COURT:  I agree with you there's a lot of

10   ground to cover today.  If we can't cover it all, I'm happy

11   to regroup another day.  I know you have your hearing before

12   Judge Saylor on the 22nd, and he wants to go forward with

13   that.  I just actually spoke to him this morning about these

14   pending motions, and he knows what's happening.  He still

15   wants to have that status with you, but I think he'll just

16   continue having periodic statuses.

17           I don't want to do this in a rushed way.  I know

18   that there's quite a lot you're asking for.  Why don't we

19   work our way through the first motion, number 218.  I'll try

20   to put on the docket what we can resolve today.  And

21   hopefully we'll get through both motions.  I am going to ask,

22   because I think it may have some relevance to what we're

23   talking about today, has any progress been made on the advice

24   of counsel defense?  Maybe I'll ask Mr. Posner that.

25           MR. POSNER:  Well, I think we are prepared to

1    advise the relator's counsel on December 21 of our

2    intentions.  So yes.

3            THE COURT:  So by tomorrow.  And is that going to

4    impact the issue about the privilege log, etc.?

5            MR. POSNER:  I don't think so.  I'm not 100 percent

6    sure, but I don't think so.

7            THE COURT:  So I'll just hear you, Mr. Leopold.

8    Let's start with 218.  I know you want more custodians.  I'm

9    not really inclined to give you 28 more, but I will give you

10   several more.  I wonder if you can just give me a brief

11   overview of that.

12           MR. LEOPOLD:  Yes, Your Honor, I can.  I think a

13   lot of these issues sort of dovetail with one another.

14   Starting with the custodian-related issues, it's a little bit

15   of a Catch-22, candidly, from our position and I think from

16   Janssen's position.  So just historically from a background,

17   as I think Your Honor can appreciate, I must say, in my

18   experience at least, this is the first time in my experience

19   the defense concept as they set forth in this particular

20   case, which is arguing that we're limited on the number of

21   custodians.

22           We have been limited in terms of getting those

23   particular relevant people.  We were out of the box not given

24   relevant names.  We did not get sort of the main players

25   until much later down the road.  And at that time that is

1    when we came back, Your Honor, and Your Honor gave us a few
2    more custodians.  But unlike what normally happens in a Rule
3    26 disclosure, the defendant usually has the duty and
4    obligations to give those relevant individuals names up front
5    so we know who from a material and relevancy standpoint would
6    be those custodians.  We didn't have that.  Number one.

7            Number two, this is also the first experience that
8    I have had where the defendants have admitted there are
9    relevant, numerous relevant individuals who were involved
10   going back to 1998, 1999, when these programs started, a
11   number of individuals would be relevant and material to
12   obtain and at least get documents from.

13           Number two, under the rules we all know that a
14   defendant or any party has a duty, an obligation in good
15   faith, to put a hold and search for documents where they
16   would reasonably be located.  The defendants have stated that
17   they did not do that here.  What the defendants stated is
18   under ESI go to these few handful of custodians.  And we
19   think that those were for the most part where the most
20   material documents would lie.  But they didn't search all the
21   other places where reasonable documents would be located.

22           Even though we are first in phase one, now we're in
23   phase two.  It's a national program in scope.  So there are
24   relevant material substantive witnesses that they have never
25   searched for, documents that would be relevant.  They have

1    limited their search to documents to those custodians which

2    we have been limited to ascertain materials from.

3           Number one, they say although there are, quote

4    unquote, corporate documents that they have searched for, but

5    we know from their own materials and documents and statements

6    that the attorneys on behalf of Janssen stated, there are

7    numerous numerous other people who have relevant material

8    documents.  We just didn't have the obligation to search for

9    them.  There are probably over 100 people that would have

10   relevant material.  We are not seeking that.  We think the 28

11   or so record custodians, if you will, are substantive people

12   that would be able to have relevant documents.  The

13   defendant's past arguments have been it's too burdensome, we

14   don't have enough time, we shouldn't have to do that.  But we

15   don't have that issue now.

16          We think that those record custodians should be

17   searched for because the defendants, as I said themselves,

18   have indicated they have relevant and material documents.

19   And I would just like to add that what is so odd to me,

20   candidly, is when a case gets filed, a defendant, any party

21   sends out a litigation hold on all of their documents

22   wherever there may be throughout the company.

23          Here there was a litigation hold.  They know who

24   has relevant documents, but again they put us in a Catch-22

25   as ha-ha, we gotcha, you're only limited to the custodians

1    that we have given you early on, which weren't even all of

2    the relevant main players in the litigation.  So I think

3    we're entitled, candidly, to relevant material documents from

4    those relevant material individuals.

5            THE COURT:  Okay.  Just so we don't get bogged

6    down, I'll ask Mr. Posner, do you want to just talk about

7    this?  First of all, I have read your briefing, but can you

8    just address the issue that you've only looked for documents

9    from the custodians and not otherwise.

10           MS. GRIGSBY:  This is Stacey Grigsby.  I'm actually

11   going to be addressing these arguments.  That is incorrect,

12   that assertion that we've only looked for documents from the

13   custodians.  And this is also covered with respect to the

14   motion to compel.  So there is the two issues.  There are the

15   central repositories which relator has brought up or

16   centralized sources.  And then in addition, there is just the

17   linear custodial searches.

18           As we have told relator and has been written in our

19   prior briefing, we have, in fact, looked for information from

20   centralized sources such as relevant databases, so that is

21   OEEOS, our review, our connect, viewpoint, and Janssen share

22   drive.  It is simply incorrect for the relator to allege that

23   we have not looked at other types of documents.

24           What we have said is that we believe that most of

25   the relevant documents would be generated by the custodians

and would be in custodial files.  So I just want to kind of
get into the substance of the argument.  I think we need to
take these things in turn.  So the first thing that -- and
the first premise that relator has in this entire motion is
that now we are no longer in phase one.  We're in phase two,
which is this nationwide, broad reaching discovery.  And
they've even said that.  They've said that we're in a
different phase.

However, the Court as recently as October 1, 2021,
made clear that it makes sense to be in phase discovery.  And
for the initial phase, which is the phase we're in about what
Julie Long knew, to test the varsity of her allegations,
should be finished and test that with summary judgment, which
we are all looking towards.

So relator now has had document search for 23
different custodians, and now they are saying that they need
additional custodians.  And we have added custodians as late
as July 2021 in response to their prior argument that they
did not have sufficient custodians, and that after reviewing
our interrogatory responses they needed additional
custodians.

The touchstone here is not whether there is
possibly a document with another person that may potentially
be relevant to the case, but we're guided by proportionality
here.  And I think it's important to look at the custodians

1    that the relator actually has.  Some of these custodians were

2    handpicked by the relator.  The relator has Julie Long, other

3    regional business managers, the regional business director,

4    but not just that.  Two regional business directors, and it

5    actually goes up in the chain to custodians who have national

6    roles.  So they have the VP of immunology.  They have the

7    national director of gastroenterology.  They have the HCC

8    compliance director.  They have a VP of sales and marketing.

9    They also have the VP sales immunology, VP strategic customer

10   group, the product director from side of care.  Again these

11   are national in scope.  These are not just limited.

12           So here relator's allegation that there are all

13   these people and they kind of are very very limited is just

14   simply untrue.  To the extent that now relator is looking for

15   28 additional custodians, we would say that's wholly

16   disproportionate in the light of the claims at issue and the

17   defenses here.

18           It seems to be more of a fishing expedition.  51

19   custodians total which is what relator is asking for isn't on

20   par with the number of custodians in other types of massive

21   multidistrict litigation.  And we do not think it's

22   warranted, especially in light of the fact that we are still

23   in phase one, not phase two.  We're still in what Judge

24   Saylor has called the relator phase of the case.

25           THE COURT:  Okay.  Let me just say with regard to

1      the phase one and phase two, my understanding is that at the

2      end of this, which I think Chief Judge Saylor would like to

3      see sooner rather than later, that there will be a summary

4      judgment motion.  And what he does not want to see is that we

5      have a lot of arguments over whether relator actually has the

6      discovery she needs to do that motion.  And then we're back

7      to square one and back to more discovery.

8            So my goal here really is to just make sure that

9      relator does have fulsome discovery on what she needs for

10     this part of the case, whether you call it phase one or phase

11     two, I do think you are headed to summary judgment.  We don't

12     want to see a bunch of claims at that stage that we can't

13     litigate it because there's not enough discovery.

14           That's why I'm trying to strike some balance here

15     so that relator has what she needs, and we're not going to

16     end up just getting stuck there.  But I do understand Janssen

17     feels that it's given plenty of discovery.

18           So, Mr. Leopold --

19           MR. LEOPOLD:  Your Honor, I don't want to go back

20     and forth and back and forth, but since it's our motion, they

21     responded, if I could have this brief rebuttal with whatever

22     the Court would like to do.  Just going to your last point, I

23     do think it's very important because it seems like after

24     every status conference or every hearing there is a complete

25     disconnect between what the relator believes the discovery is

1    versus what Janssen believes the discovery is.

2           I think at the last status conference hearing with

3    Judge Saylor was at least I believe was crystal clear both on

4    the record that everybody came away with it, (A), Judge

5    Saylor said everything is on the table for summary judgment,

6    even everything, scienter, everything it may be.  Number two,

7    came away with everything is on the table, but it's limited

8    to a geographical location of Pennsylvania, if you will,

9    where the relator basically worked.

10          So essentially what we have is since there is a

11   national program involved here, we essentially have, if I

12   could use this analogy, we have a national case here.  The

13   country has happens to be the State of Pennsylvania is what

14   we're looking at.  So all discovery is on the table.  They

15   are going, and Mr. Posner stated it at the last hearing that

16   we anticipate all issues, scienter, and whatever else is

17   going to be on the table, and we're entitled to try and get

18   the reasonable relevant discovery that would be all of those

19   issues so that it is not delayed at the end of the day when

20   we come back with an appropriate, I think it's Rule 56 to

21   come back and open up discovery after they file their papers.

22          Judge Saylor did not want that to take place.  He

23   was pretty clear on that issue.  So the bottom line is

24   discovery is supposed to be a search for the truth, not a

25   game of hide and seek.  I understand that 23 or so custodians

 1    may be a lot, but we didn't have all of these names.  We

 2    didn't have all of these documents to be able to filter

 3    through and ascertain the high, relevant individuals such as

 4    Mr. Jimenez and other people who were the corporate leaders

 5    that started the program.

 6              They have purposely, and I don't begrudge them for

 7    it, they're doing their job, but Janssen has purposely kept

 8    us and isolated us and put us in silos to try and keep us

 9    from getting those relevant pieces of documentation.  They

10    didn't even search two-thirds of the relevant people's

11    documents in their files, whether you want to call it ESI or

12    whatever we want to call it.  They searched for, as I stated

13    in my opening presentation, quote unquote, corporate

14    documents and only a handful of ESI documents.

15              There are 20 or so, 15 or so additional individuals

16    that all they have to do is go to their computers and run ESI

17    searches.  It may take some time, but that's what litigation

18    is.  And we shouldn't be prejudiced because they have refused

19    or say it's too burdensome to do that.

20              THE COURT:  Mr. Leopold, one of the things I have

21    read and when I'm speaking with him heard Chief Judge Saylor

22    really emphasize repeatedly is he wants to know about the

23    program as it was rolled out in Pennsylvania and sort of

24    pertaining to Ms. Long.  I think the idea was for you to sort

25    of test the waters, sure, in a thorough way, and for summary

1    judgment purposes with regards to those programs and that

2    geographic territory.  And I allowed the -- I ruled, I

3    ordered that information going, as I called it, up the chain

4    of command having to do with the formulation of these

5    programs that were being rolled out in Pennsylvania and

6    discussions about their legality, if they're not privileged

7    and have to be turned over, and that sort of thing.

8            So I just want to make sure that you are limiting

9    yourself in that way and that you're not -- A lot of the

10   requests I'm seeing look like you want nationwide information

11   about a program, like how much did you spend on this

12   particular program nationwide.  Go ahead.

13           MR. LEOPOLD:  I appreciate your questions.  I think

14   it's very important for purposes of moving forward.  I think

15   we cannot lose sight of the fact that these are, quote

16   unquote, and undisputed now when they filed their motion to

17   dismiss, now it's undisputed these are national programs.

18   These are also the 20 some odd programs, I think it was

19   approximately 24 or 25 programs that, we have identified as

20   core, main programs that we are focusing on are all programs

21   that were in, and I want to emphasize, that were in the

22   relator's territory.

23           So we are now going back and searching or hopefully

24   getting, have gotten some, there are still some issues that

25   we haven't gotten, about the beginning of these programs that

1    are isolated and focused just on the relator's area of

2    Pennsylvania, how they started, when they started, the

3    reasons behind they started, the focus of the programs, etc.

4    Just in our focused bellwether region, if you will.

5            I understand that the original request talked about

6    financial remuneration of these programs all around the

7    country, but that was early on when we did the request.  I

8    agree that that request should be focused myopically on the

9    financial remuneration just in the relator's territory.  But

10   how, when, why, who, what, etc., of the beginning of the

11   program, how the program got started, the main people that

12   got involved in the program, that, although it may be

13   nationally, is the same issues for myopically in the

14   relator's geographic location.  There's no difference.

15           THE COURT:  Okay.  So I agree with you that very

16   generalized information about how the program got started,

17   etc., what you just said, that doesn't necessarily pertain to

18   Pennsylvania is discoverable.  And then how those programs as

19   they work their way down the chain into Pennsylvania, how

20   they operated and how much the company spent on them and that

21   type of thing with regard to Pennsylvania is discoverable.

22   So I want you to get that information before you hit the

23   summary judgment phase.

24           MR. LEOPOLD:  Your Honor, if I could just reference

25   on that particular issue.  It may be difficult.  I don't know

```
1    if Janssen could do this, but if, for example, the way the
2    programs worked is either they built the programs in-house or
3    they had a company outside, Xcenda, do the PowerPoint
4    presentations, the research, etc.  They paid Xcenda millions
5    of dollars for all of the work that they did.  Xcenda did the
6    work not knowing -- they did it for them nationally.
7              I'm not sure they can break the number up and parse
8    out what the value of that was just for Pennsylvania.  It
9    might just be a global number.  I think where the issue of
10   the financial aspects comes in is just the physicians they
11   gave the programs to in the Pennsylvania region and the
12   values that those issues would be relator geographic
13   specific.
14             MS. GRIGSBY:  Your Honor, if I could just
15   interject.  I think there is a disconnect in what counsel is
16   saying today and what the actual request is in the substance
17   of the motion for reconsideration.  And it seems like this
18   might be the cause of some of this disconnect with the
19   parties coming out of each of these hearings and having
20   vastly different understandings.
21             So I heard relator say, relator's counsel say,
22   that, you know, they want to be focused myopically on, you
23   know, phase one and understanding how the program started,
24   how the program came down, what happened in central
25   Pennsylvania, which is relator's geographic territory, and an
```

1    acknowledgment that these would include some geographic
2    limits.  But if we're trying to match that in what they're
3    asking for in reconsideration, so let's just take the
4    custodians.
5         They're asking for several national custodians who
6    did not start at the inception of the program.  They would
7    not necessarily have information how these different programs
8    started.  They would not necessarily be geographically
9    limited.  And our view is that other custodians could provide
10   the information in terms of how the program operated in
11   relator's geographic region.
12        So just to say that they're being myopically
13   focused isn't the same as what is mapping onto the request
14   that they're actually making here.  So I think that obviously
15   if relator had pointed out, okay, there is some person that
16   are relevant to phase one, understanding the geographic
17   limits, is nonduplicative who we have a good reason to
18   believe was involved in the inception of the program, that's
19   something we would consider.  But that's not at all what
20   they're asking for here.
21        THE COURT:  I hear you, Ms. Grigsby, and I
22   appreciate this.  It seems to me one of the things, one of
23   the kind of themes of relator's request is that they have
24   felt for a while like they're kind of operating in the dark
25   about who these people are, which ones are important, etc.

1    And I think this also dovetails with their complaint that

2    they're getting some information from the custodians, but

3    they're not getting information that seems to be from a sort

4    of companywide document search, which I know you addressed

5    very well a few minutes ago.

6          But I wonder if rather than having 28 more

7    custodians, the parties ought to sit down together and

8    Mr. Leopold ask precisely what he wants, and you point out

9    the custodians instead of just having them kind of operating

10   in the dark about this and doing this kind of scattershot

11   approach.  And maybe it won't be necessary to do all of the

12   information from each of these custodians, but just to do

13   more targeted searches.  But I don't know, Mr. Leopold, what

14   about that?

15         MR. LEOPOLD:  Your Honor, I would like

16   Mr. Preston, if he could, on the financial and that

17   particular issue because he's been dealing with for a long

18   time the ESI and custodian issue.  Casey, do you want to

19   chime in?

20         MR. PRESTON:  Your Honor, I think we have a

21   bellwether summary judgment process.  At the local level in

22   central Pennsylvania, the focus is on the delivery of the

23   alleged kickbacks and the false claims that they were caused

24   to be submitted.  So the discovery related to what programs

25   were provided and when they were provided, that's all

1    information that we're seeking, and we're trying to get all

2    of that information.  But what seemed to be sort of lost in

3    the shuffle is these programs were designed, monitored, and

4    implemented by management.  And so what we're seeking is the

5    managers who oversaw this program.  People in marketing who

6    developed these programs.  People in sales who oversaw this

7    program.

8            One of the elements of an anti-kickback claim, as

9    you know, is we're going to have to show that Janssen knew

10   that providing these free IOI support services was unlawful.

11   So you're not going to get that by just focusing on Julie

12   Long's documents.  You've got to go to the documents such as

13   the compliance personnel, the attorneys who performed these

14   legal reviews, the senior managers who were responsible for

15   making these decisions.

16           So, yes, we need to focus on the ABSes who provided

17   these services in central Pennsylvania and the regional

18   business managers that supervise them, but what's more

19   important in the documents that are really central to this

20   case are the documents held by managers, attorneys,

21   compliance personnel.  And that's what we really have only

22   received a very small sample of those documents.

23           And Ms. Grigsby spent a lot of time about the

24   efforts that Janssen has undertaken to collect documents from

25   corporate repositories, but, Your Honor, in their briefing

1   they acknowledge there's hundreds of people that were

2   involved in this scheme.  It took place over approximately 20

3   years, and there's been a lot of turnover with the company in

4   some of these positions.

5           For them to just say, Sally Jones, we know she

6   possesses a lot of documents, but we're not going to produce

7   them because she's not one of the agreed upon custodians.

8   That just completely turns discovery on its head.  If they

9   know that there's individuals that possess discoverable

10  information and had significant involvement in this case,

11  they've got to go and produce those documents.  They can't

12  just let them sit there.

13          So we're stuck in this position where we haven't

14  received any of those materials.  They have not collected

15  documents from a single employee other than the custodians.

16  And they talk about the ten custodians from the government's

17  document request.  Well, those were selected by the

18  government.  And, Your Honor, they are all field level

19  witnesses from other territories.  So they're documents,

20  yeah, in some cases they're communicating with senior

21  managers and those documents are helpful, but for the most

22  part their documents relate to their interactions with

23  physicians in other territories and are outside the scope of

24  the bellwether summary judgment process.

25          So it's really the focus is on the 12 custodians in

1    this case and the relator, and that's all we have.  So all
2    the other marketing people and compliance people and
3    attorneys such as Mr. Jimenez, who they've acknowledged
4    provided legal advice regarding these services, they haven't
5    produced any of their documents.  And they haven't logged any
6    documents that they're withholding on a privilege log.  They
7    just completely said they don't have to do that.

8              So when we are seeking 28 additional custodians,
9    Your Honor, we need a lot of those custodians because we need
10   to perform ESI searches of their electronic files.  But
11   Janssen also has to go to those individuals who it knows had
12   significant involvement and produce the documents that they
13   possess.  They can't just sweep them under the rug and turn a
14   blind eye to them.  They exist, and they're important
15   evidence that the relator is entitled to receive.

16             I want to address the financial reports.  Yeah, we
17   can focus on central Pennsylvania, but that's not -- Janssen
18   when they create these financial reports, they're looking at
19   this program nationally.  So when their internal documents
20   don't just say, okay, this is what we're going to do in
21   central Pennsylvania, this is how much money we're going to
22   spend in central Pennsylvania, they look at this program as a
23   whole.  So the reports, they look at how much they're
24   spending on ABS salaries, how much they're paying outside
25   consultants to develop and provide these programs to

1     physician practices.

2              So when we're limited to just say, oh, you can only

3     receive those programs to the extent that they relate to

4     central Pennsylvania, well, then that just basically says,

5     okay, you don't get that relevant evidence because it's

6     reported at a national level.  That's prejudicial to the

7     plaintiff.  That's evidence that goes to directly the value

8     of these programs and Janssen's intent in providing the

9     programs.

10             THE COURT:  Okay.  Yes, Ms. Grigsby.

11             MS. GRIGSBY:  Yes.  I wanted to respond to a few

12    things because there are a lot of categorical statements with

13    which we would take issue.  Again to the extent that relator

14    now is claiming that we were aware of other relevant

15    individuals who were involved in the program and we've had

16    information on its inception, creation, and have just refused

17    to search for it, that is not true.

18             What we have said is that we along with relator

19    have agreed upon custodians.  We believe that those

20    custodians go all the way up the chain.  And they are the

21    most relevant custodians.  It's difficult just to understand

22    how relators can say, for example, Robert Gossmore, who is

23    the vice president in immunology, the vice president of

24    marketing, and the president of immunology is not in

25    marketing, is not involved in sales, and is not involved at

the highest level.  The same thing with Edmund Brenich, who

was an associate director of marketing and then compliance,

and he was the healthcare compliance director.  These are not

low level individuals who would not have either sales or

marketing or compliance within their purview.

The same is true for Scott Habig who is the vice

president of sales and marketing.

THE COURT:  Do some of the custodians that have

been chosen, were they only there for certain periods of time

so that there's gaps in this information.

MS. GRIGSBY:  Well, the custodian, for example,

Scott Habig was there from 2000 to 2010.  And for example,

Greg Fenner who was the national sales director,

gastroenterology was there from 1989 to 2008.  So they

actually do cover quite a large period of time.  Certainly

not all custodians cover all time, but it's just not the case

that there are significant gaps.

And it's not clear that relator's list that their

proposing of the 28 custodians is meant to either fill some

kind of temporal gap.  It seems to me like it is consistent

with their view that this is now some nationwide phase of

discovery, and they basically want to disrupt and blow open

the current phase, which is focused on how these programs got

started and then what happened in the central Pennsylvania

region.

1              THE COURT:  I don't really think they're doing

2      that.  I think they are correct that we are headed toward

3      summary judgment concerning the programs that have been

4      rolled out in Pennsylvania.  And to that end, I think a lot

5      of the things they're asking for such as how much were the

6      programs worth, how much did they cost, how much did Janssen

7      spend on them are really critical.

8              For example, if there's national reports that

9      aren't broken down by region how much a program cost Janssen,

10     then I think those national reports need to be provided.  A

11     lot of the information they're asking for I think they should

12     actually get.  And if they haven't gotten it yet, we'll just

13     have to take some more time here.  I hear you, but I don't

14     think it's just the beginning of the program and exactly what

15     was happening in Pennsylvania.  I think there's more to it

16     than that.

17             MS. GRIGSBY:  And I did not mean to oversimplify

18     their argument, but I think it's important to note really

19     they are making a lot of these allegations in terms of what

20     was provided in discovery and Janssen's refusal to provide

21     them adequate information.  I guess, the takeaway here is

22     that we agreed upon custodians with the relator.  We have not

23     been hiding the ball.  We've been conducting custodial

24     searches and reviewing them not because we think that there

25     are other custodians that were relevant and we are merely

1    withholding them, but because generally that is how now ESI

2    discovery works.

3         The parties agree upon the important custodians.

4    You do the searches, and those are the ones where you do the

5    linear searches and look for search terms.  We've also in

6    addition to that looked at shared drives, which I noted in my

7    initial statement and which relators completely ignored.

8         So I guess the problem here is that relators are

9    really making a lot of these allegations, but that is their

10   intuition.  It is not -- They do not have a factual basis.

11   In fact, they haven't pointed to documents or other types of

12   information that would actually show that there is something

13   that we are withholding from them.  I can tell you today that

14   we are not.  We are not withholding it.

15        What we are trying to do is to define a reasonable

16   scope of discovery such that we can reach an end, and that

17   Janssen will not be searching millions and millions of

18   documents just so that relator can find one additional piece

19   of information.  We provided them with 3 million pages from

20   the 21 custodians in addition to these other corporate

21   documents.

22        In terms of a resolution here, I think something

23   that we would suggest is that relators perhaps get a discrete

24   number of additional custodians, so like three or five.  And

25   we can discuss then what they need.  And they are articulate

1    a specific reason why they need these custodians as opposed

2    to this large net of saying they need 28 custodians from

3    different time periods.  And it's not clear to us at all why

4    they believe that there's even a gap in the documents they

5    have.  It's not even clear to us that they've reviewed all

6    the documents they have that we've produced to them.

7          THE COURT:  Okay.

8          MR. LEOPOLD:  Just to bring it to a closure and sum

9    up and say we're not saying they've kept documents from us.

10    They've limited the scope of the custodians that they have

11    produced.  Throughout their papers, and I've searched high

12    and low for, and in their oral arguments that I've listened

13    to on a number of occasions, I have not heard the reason why

14    they don't want to do the rest of the custodians that we are

15    requesting other than the fact is it's going to take some

16    time to review the documents.

17          We don't have an affidavit saying it's burdensome.

18    We don't have any evidence that it's going to be hard.  They

19    just don't want to the do it.  We keep hearing about 3

20    million pieces of paper.  And I've gone through this before.

21    At the core we're only talking about maybe 100,000 pieces of

22    paper and less documents than that that are relevant because

23    they haven't gone to the main people.  That's all we're

24    seeking.  Let's just get to the main corporate people that

25    were involved.  Those people's documents have not been

1    searched.  There's no prejudice to them other than the fact
2    that they may have to do some extra work to review the
3    documents.
4              THE COURT:  Okay.  So let's -- I'm going to take
5    that under advisement.  And let's move on to Janssen must be
6    required to produce all requested discovery that post dates
7    February 2016.  And I know Mr. Preston had argued this
8    before.  I don't know if he's going to argue it again.
9              I am aware of Judge Saylor's order, Mr. Preston, on
10   the Rule 30(b)(6) witness.  If I were to revisit this, would
11   you have to redo that deposition?
12             MR. PRESTON:  No, Your Honor.  That deposition has
13   not yet taken place.  Obviously I don't want to speak for the
14   Court, but we obviously have this issue pending before the
15   Court.  And it appears from Judge Saylor's order concerning
16   the 30(b)(6) that he was making a decision based on the
17   rulings that were in place at that time.  So I guess it's our
18   position that this is an issue we still believe should be
19   reconsidered.
20             THE COURT:  Okay.  So can you just succinctly
21   revisit that argument.  I don't have your prior motion in
22   front of me, but you had very limited number of the programs
23   that you were asking for post dating 2016, as I recall.
24             MR. PRESTON:  Yeah, Your Honor, just to summarize,
25   this is an ongoing fraud.  The relator left Janssen's

employment in February 2016, and that was the artificial cut
off to save some burden that was imposed.  But discovery has
shown and Janssen's counsel has acknowledged that many of the
programs continued after the relator left Janssen.  In fact,
some of the programs continued long after the plaintiff left
Janssen.

So these are alleged kickbacks that are causing the
false claims at issue.  So to just take a block of time where
the alleged misconduct is still occurring and say the
plaintiff doesn't get to take any discovery of that, that's
completely prejudicial.  And those are claims that are part
of our case.

In addition, sometime in around 2017 is when
Janssen learned about the plaintiff's allegation that these
services constitute kickbacks and are causing false claims to
be submitted.  The relator is entitled to know what Janssen
did in response to these allegations.  Did it change its
conduct?  Did it not do anything at all?  And that goes
strongly to the scienter obligation that we have in this
case, what happened during that time period.

And, in addition, the government conducted an
investigation of Ms. Long's allegations, and we don't know
the full extent of that investigation.  But Judge Saylor in
his order on December 1 said that's information that we're
entitled to learn about.  And he denied Janssen's request for

1    a protective order over all of the interactions that took

2    place during that time.  So it's just completely prejudicial

3    to cut off the plaintiff from receiving any documents that

4    are responsive to her document request just because these

5    documents originated after February 2016.

6              It's not a bald allegation anymore.  These are

7    confirmed, verified facts that they're continuing to provide

8    some of the programs that are alleged to be kickbacks in this

9    case.

10             THE COURT:  And do you have cut-off date?  If it's

11   after February 16, it's until what date?

12             MR. PRESTON:  Your Honor, I'll go back to that

13   letter that was filed with the Court and is ECF 189-3.  It's

14   a letter from Janssen's counsel that was essentially a

15   supplemental interrogatory response.  And it's from

16   August 11, and it lists several of the programs that are at

17   issue in this case.  There's a few of them that as of August

18   2011 they acknowledged are continuing to be provided.

19             So I think the volume of documents probably narrows

20   as you go.  Some of these has Janssen stopped providing some

21   of these services?  For example, according to their letter

22   the program considerations for proactive practice management,

23   it stopped providing that program in August 2017.  So I would

24   assume that the documents related to that program, probably

25   there's not much after that.  But with regard to the infusion

services review or also known as the IBIZ, that program, in their letter they state that's still being provided.  So we should continue to receive relevant documents that are responsive to our requests related to that program.

THE COURT:  Just as long as the litigation continues?

MR. PRESTON:  Yes, Your Honor.  Essentially it's an ongoing fraud.

THE COURT:  Okay.  Ms. Grigsby.

MS. GRIGSBY:  Your Honor, if I may respond.  I think we've said it a few times.  But this is completely contrary, one, to phase one; and two, it's not even clear how this relates to liability determination in phase one.  On the first point, we know that Ms. Long left in 2016.  And if the whole point of phase one is to determine what she knew, to test her allegations themselves, then 2016 onward is irrelevant.

In addition to that, I know that Mr. Preston noted that there might be something that is probative about, you know, what Janssen continues to do if it's a kickback.  I guess the question to ask is what additional information can be learned.  If the allegation is and we're looking at the programs that happened during Ms. Long's time at Janssen, then whether it's a kickback or not would depend on whether they were a kickback during that time.  It's really

1    irrelevant whether in 2016 that Janssen is continuing to

2    provide it or not.  It's completely continuous.  So it's not

3    clear what further information will be learned.

4          And then Mr. Preston also noted that the

5    government's investigation occurred in 2017, and that that is

6    also relevant.  I mean, I think we all know this, but the

7    government ultimately declined to intervene in this case.  So

8    the marginal probative value of anything related to even the

9    time after the government investigation is low because

10   Janssen again had no reason to believe that these programs

11   themselves were, in fact, kickbacks.

12         What it appears to be is relator is trying to

13   figure out with respect to damages and issues that are not

14   necessarily unique to this phase one.  It's just any

15   particular use that they would have for the materials from

16   2016 onward they could also find in that earlier period of

17   time that goes from 2006 to 2016 and then some time earlier.

18         And then the last point that I would like to make

19   is, you know, relator's argument that this is really just

20   kind of minimal and it's just adding on.  That that's six

21   additional years of discovery that relator now is requesting.

22   And that six additional years would obviously take a number

23   of documents which have marginal documents to phase one.  And

24   the effect would be postponing the end of discovery for

25   months.  This is not an inconsequential period of time.  And

1    really anything that relator is looking for has minimal to no

2    probative value with respect to the phase one liability

3    phase.

4          MR. POSNER:  Your Honor, one other point.  It's

5    difficult to envision that after the United States Justice

6    Department and HHS investigated these issues, they didn't

7    just decline to intervene.  They obviously didn't make any

8    statements about stopping payment.  There's no way there's

9    going to be liability.  We have a lot of materiality defenses

10   that predate 2017, which we'll raise, and a lot of government

11   discovery we are seeking prior to '17.

12         But if Your Honor is going to open up the time

13   period, then we're going to seek very very significant

14   discovery from the United States through that time period.

15   There is just no way that there can be liability after the

16   government's investigation commenced.  So we would just ask

17   you to keep that in mind when you're thinking about extending

18   the time period.

19         THE COURT:  I'm sorry.  You said if the time period

20   is extended, you would seek additional discovery from the

21   United States?

22         MR. POSNER:  We're already seeking discovery from

23   the government.  We were prepared to predate October of 2016.

24   And we will likely have a number of issues to bring to the

25   Court about government discovery.  But certainly I don't

1    understand how there's going to be liability after the

2    government declined and knew about the programs and took no

3    action.

4            Under the case law, it's not that the document has

5    probative value, there's going to be enormous liabilities

6    hurdles.  We'd ask you to keep that in mind.  But if you're

7    going to open up the time period post 2016, well then

8    obviously the government discovery becomes even more relevant

9    post that period.

10           We were prepared to limit it to October 2016 and

11   back of where there's a lot of government knowledge and a lot

12   of materiality issues.  But if you're going to extend

13   forward, then the government's stuff is going to extend

14   forward.

15           THE COURT:  Just a minute, Mr. Leopold.  When you

16   say the government discovery, you're talking about

17   discovering from the government the reasons why they decided

18   not to prosecute?

19           MR. POSNER:  No.  I want to know what the

20   government knew and when they knew it about all of these

21   programs over the years.  That's what I want to know.

22   Whether we get a declination memo, I want to know what did

23   HHS and DOJ know about these programs over the years.

24   Clearly under the Supreme Court's decision in *Escobar* and

25   related cases, that is a very material issue.  So if you're

1    going to open up discovery post 2016, I want to know what the
2    government knew and when it knew it.  When I say the
3    government, I just don't mean the Justice Department.
4              MR. LEOPOLD:  If I can respond --
5              THE COURT:  No, no.  Just a minute, please.  So
6    what about the fact that if the allegation is this is an
7    ongoing fraud, then just because Ms. Long left doesn't mean
8    that there isn't discoverable information about the program
9    that happened after she left.
10             First of all, I guess you should just seek all the
11   information from the government you can about why they
12   declined.  I think the government declines these kinds of
13   cases for a lot of reasons.  You should.
14             With regard to the ongoing nature of the fraud,
15   this bothered me after the first hearing just thinking, well,
16   the fact that she's claiming, okay, even if we want to call
17   it phase one here, these programs were violating the statute,
18   and then I happen to leave in 2016, and then they continued
19   to violate the statute.  Why isn't the information after she
20   leaves also -- why isn't it discoverable?
21             MR. POSNER:  As Ms. Grigsby said, it's an issue
22   about proportionality.  It's going to fail because of the
23   materiality defenses.  But, Your Honor, it's a
24   proportionality issue.  The District Court, as we all
25   acknowledge, what happens in Long's district, what did Long

1   know, so why not stop it when she left.

2          THE COURT:  That's why I limited it.  I just

3   thought let's just take this slice of time and see.  But on

4   reflection, it does seem to me if something important

5   happened the month after she left and it has to do with the

6   very same program that she's complaining about -- well, I

7   don't know.  But I hear you.  I know what you're saying.  I

8   do think proportionality is the strongest argument.  Just

9   we've got to terminate this at some point.

10          MR. POSNER:  But, Your --

11          THE COURT:  Let me just hear from Mr. Preston.

12          [Cross-talk.]

13          THE COURT REPORTER:  Counsel, please.  One person

14   at a time.  And do not interrupt the Judge.

15          THE COURT:  Thank you.  Thank you very much, and I

16   appreciate your support.  Let me hear from Mr. Preston.

17          MR. PRESTON:  Your Honor, I apologize if I

18   interrupted you.  First of all, I think Mr. Posner's

19   statements concerning the law and materiality and the context

20   of an anti-kickback statute violation is way off base.  He

21   has been free to pursue whatever discovery he wants from the

22   government.  But to make a threat that if we're giving the

23   discovery we're entitled to that somehow they're going to

24   unleash more burdensome discovery on the government is just

25   completely inappropriate.

1              Setting that aside, as Your Honor recognizes,

2     there's a lot of reasons why the government doesn't intervene

3     in a case.  The government also, as Your Honor knows, if it

4     believes that the case doesn't have merit, then the

5     government can seek to dismiss it.  The government did not do

6     that here.  This is a case that has substantial merit, and

7     the evidence is supporting that.

8              When we're looking at the evidence that post dates

9     February 2016, this is some of the most probably telling

10    evidence that we're going to take a look at.  And what was

11    the reaction when Janssen learned that they basically had

12    been caught, that somebody blew the whistle on them that they

13    were providing these services?  And this is an issue that

14    goes far beyond central Pennsylvania.  This is what was

15    happening at the management level.

16             Again with regard to the scienter element, that is

17    largely discovery that is all going to come from management,

18    compliance, and Janssen's counsel.  It's just completely

19    prejudicial if that is taken out of the case and we're not

20    allowed to use that to defend against summary judgment.

21             I'd like to ask the Court, once there is a summary

22    judgment process, then do we go back and take more discovery

23    in order to prepare for trial?  Really we should be in a

24    position where discovery is complete at the management level

25    and with whatever level advice and legal evaluations we are

1    going to see or learn about, that should all be complete by

2    the time of the summary judgment process.  It shouldn't be we

3    just get some of that and then after summary judgment we get

4    more, or as part of the summary judgment process we get more.

5            Really, the case should be ready for trial at that

6    point.  Otherwise this is completely inefficient to just do

7    sampling of evidence.  What Judge Saylor has explained is all

8    the issues -- discovery should be complete except at the

9    field level.  We don't need to know the specific interactions

10   between ABSes and physicians in California with regard to the

11   field level, discovery should be complete in central

12   Pennsylvania.  But at the management level, headquarters

13   discovery, that discovery should be complete.

14           THE COURT:  I think I've heard enough on this.  I'm

15   going to take it under advisement.  I think you've already

16   settled the promotional review committee records that predate

17   October 2009.  I don't think there's anything left there.

18           MR. LEOPOLD:  Just one issue.  We've been advised

19   that they are gathering the information and the materials.

20   We would just like instead of having an open date, some time

21   in January they claimed they were going to get it to us, we

22   would like a date certain.  But to have it a little bit

23   open-ended I think is not the right way.  If we can get a

24   specific day, whether it's January 10 --

25           THE COURT:  Ms. Grigsby?

1              MS. GRIGSBY:  So, Your Honor, I think as you

2       mentioned before, these are paper files in boxes.  And really

3       over the holiday and just looking at the team, we do not have

4       a date certain to review the hundreds of boxes.  Certainly

5       we're expediting it, and this is our first priority in terms

6       of things to wrap up in discovery.

7              THE COURT:  How about January 15?

8              MS. GRIGSBY:  I think January 15 may be difficult.

9       I guess if we could ask for the Court's indulgence to file a

10      further status next week, which I realize is the week between

11      Christmas and New Year's, such that we can really provide

12      some more detail in terms of how far our ability is because

13      first we have to retrieve the document boxes --

14             THE COURT:  Since the time we've already spent is

15      about a fraction of what we never to recover.  So with regard

16      to that, why don't you just figure out how much time you want

17      and confer with the relator.  And if you can't agree on a

18      date, I guess Judge Saylor doesn't like letters on the

19      docket.  I learned that.  So just file a status report

20      setting out the issue, and I'll pick a date for you if you

21      can't agree on one.

22             MS. GRIGSBY:  Yes, Your Honor.

23             THE COURT:  All right.  So how about the discovery

24      concerning scienter?

25             MR. LEOPOLD:  Yes, Your Honor.  Again as noted by

1    Judge Saylor, everything is on the table.  Mr. Posner is

2    dogmatic that that is going to be an issue in summary

3    judgment.  And up until now they have fought against us

4    getting any discovery along those lines.

5              THE COURT:  So what you're actually talking about

6    is discovery of legal advice and any legal reviews or

7    analyses?

8              MR. LEOPOLD:  That's right.  And they have refused

9    to even identify any documents on those issues, particularly

10   Mr. Jimenez who was intimately involved.  They haven't even

11   listed his documents on a privilege log which is respectfully

12   inappropriate.  They haven't gone to other locations to

13   identify any documents.  If they're privileged they need to

14   state it with specificity.

15             Now, I don't know what's going to happen tomorrow.

16   It sounded like Janssen is going to be of a view that they

17   are not relying on advice of counsel.  That opens up a whole

18   can of worms on other issues.  And I think the case law is

19   pretty clear that they can't have their cake and eat it too,

20   and that still opens the door to a lot of issues.  We'll

21   address that if that's their ultimate decision.  But I think

22   certainly scienter is a core issue.  It's one that they have

23   raised and said that they are going to be arguing on summary

24   judgment.  We're entitled to get full and complete discovery.

25             THE COURT:  I'll hear from defense.  I don't know

1     who is arguing that.

2            MS. GRIGSBY:  Yes, Your Honor.  So Janssen has

3     never refused to provide documents related to scienter.  And,

4     in particular, we've talked about the materials for

5     promotional review committee, which we have provided and are

6     continuing to provide to relator.  One thing, I think that

7     relator has previously said that the focus of their

8     discovery will mainly be on management's intent in providing

9     these business services to the account as well as a knowledge

10    of that service violating the anti-kickback statute.  They

11    should be specifying that information in response to our

12    custodial documents.

13           They've brought up a number of times and this kind

14    of melds with the argument about the privilege log that

15    Janssen is refusing to log documents or even search

16    documents.  To the extent we are performing custodial

17    searches and have searched other repositories, we are indeed

18    logging all of these documents.  They've brought up Freddie

19    Jimenez in particular.  The reason why Freddie Jimenez's

20    documents are not being specifically searched and logged,

21    rather to the extent we find them in other custodial

22    documents is because Your Honor has specifically ruled that

23    Freddie Jimenez would not be added as a custodian.  Freddie

24    Jimenez is an inhouse lawyer for Janssen.  He is not the

25    person returning the program.  He was not involved in the

1    inception of the program.  So Your Honor specifically denied

2    adding Freddie Jimenez.

3              And the reason is because you noted that the

4    purpose of adding him would be to generate a rather lengthy

5    privilege log.  So I see relator disagrees here, but it's

6    just not the case that we are again running into privileged

7    documents and not marking them and not putting them in our

8    privilege log.  That's a separate argument.  And we are not

9    withholding evidence of intent.

10             I guess the question is what specific discovery do

11   relators think that they do not have based on their very

12   broad discovery requests that we have not responded to.

13   Because, you know, in principle and in theory, they can say

14   they've been denied this discovery, but it's not clear how we

15   failed to respond to any one of their requests beyond the

16   limits that we've already been arguing about at some length

17   this morning.

18             THE COURT:  I guess regarding the scienter -- First

19   of all, I think scienter is in play at the motion for summary

20   judgment that's upcoming.  And I think what you need to do is

21   produce nonprivileged information about any legal advice you

22   got or any legal reviews or analyses you performed or

23   received.  Now, whether that means you produce, I don't know,

24   Mr. Leopold, whether they produce thousands of pages of

25   privilege logs or they just search themselves for

nonprivileged documents, I don't know how you're going to
claim a privilege if you don't have a log.  But it does seem
to me it could be really overwhelming.  I'll hear from you.

MR. LEOPOLD:  I think, first of all, we have to
take a step back.  I think what Ms. Grigsby has argued just
now is the perfect example of putting us in a Catch-22 which
is, well, Mr. Jimenez has documents that are relevant
material.  They may go in a privilege log, they may be
produced, but he's not one of the custodians.  So therefore
we didn't search him.  We're not going to tell you what they
are, and we're not going to put them on a privilege log,
number one.

Number two, Janssen has lost sight of the fact that
on April 23 Your Honor specifically ruled that all legal
analyses are both highly relevant, material, and should be
produced.  Yet to date Janssen has ignored that order, has
not produced any of these pieces of information, has not
logged any of these pieces of information or documents.  And
I think we're clearly entitled to it.

Litigation is burdensome, Your Honor.  We're not
dealing with a company that's not used to being involved in
litigation.  They've hired one of the largest --

THE COURT:  Okay.  We have to kind of get to the
point here.  I think what I said about not searching and
producing a privilege log for Mr. Jimenez earlier had to do

1    with an argument where we were talking about limiting a

2    number of custodians, getting through that discovery.  It

3    wasn't clear at that time that we were headed for summary

4    judgment.  And I just didn't think it was useful to have one

5    of the custodians be someone the vast majority of whose

6    communications were going to be deemed to be privileged.

7            However, at this stage I do think Janssen needs to

8    hand over relevant legal advice and legal reviews and

9    analyses that Janssen performed or received that are not

10   subject to a claim of privilege.  And I don't know if it

11   makes sense even here to make Janssen produce what's going to

12   be an incredibly voluminous privilege log.  So that's what I

13   asked you to address, Mr. Leopold.

14           MR. LEOPOLD:  Your Honor, all I can say is I think

15   a party has a duty and responsibility when they are searching

16   through documents to produce documents that are not

17   privileged.  And if they believe there is privilege under the

18   rules to provide a full and complete privilege log.  I am not

19   aware of any exception that says they're not to do that,

20   burdensome or otherwise.

21           THE COURT:  I just think for them to conduct for a

22   period of 20 years, or however long we're talking about, a

23   nationwide search for legal analyses, etc., of these 37

24   programs and also produce a privilege log is going to take a

25   long, long time.

1          MR. LEOPOLD:  But Your Honor, if they're going

2    through the documents to make that determination, they have

3    to review the documents.  They're going to be doing that and

4    producing nonprivileged documents.  I don't understand what

5    the added burden is on also setting forth in an appropriate

6    privileged log what the documents is, to who and from, and a

7    brief sort of note about what the document is.  They have to

8    do that anyway because they have to go through the documents

9    to determine what's to be produced.

10          So I don't see what the extra burden is.  That's

11    generally the way it works with a privilege log.

12          MS. GRIGSBY:  Your Honor, can I just interject?

13    Mr. Leopold has represented the process that we are

14    undertaking.  We are producing a privilege log to the extent

15    that we review privileged material, deem it's responsive, and

16    see that it's covered by privilege.  What we're seeing right

17    now is that we are not conducting independent custodial

18    searches of the company's attorneys in order to generate a

19    privilege log.

20          For example, let's use the PRC materials.  To the

21    extent we review the PRC materials, there were attorneys

22    involved in the PRC process.  To the extent the attorneys are

23    making themselves making comments as part of the promotional

24    review committee, that is reflected on our privilege logs.

25    So just for him to make the allegation that we somehow have

1    been collecting privileged materials and then have not been
2    putting them in a log, that is not accurate.  We've been
3    logging the materials as part of the searches as we've
4    described just during this conference and then all the
5    correspondence and motions that you've read.

6              THE COURT:  So can I just ask you -- Thank you,
7    Ms. Grigsby.  Can I just ask you, Mr. Leopold, what kind of
8    legal advice and legal reviews or analyses do you think would
9    not be privileged?

10             MR. LEOPOLD:  Well, I think that there might be
11   documents that are related to knowing, for example, that
12   these are potential problems in terms of programs, we
13   recommend that you not do certain things.  That in a Qui
14   Tam-type of case, kickback case like this, I don't believe
15   that that is privileged.  If they know that they're doing
16   something illegally, that is not appropriate to prevent the
17   documents from being produced.  It's the core issue in the
18   litigation.

19             So those are the types of documents, for example,
20   as one example that would not be privileged.

21             MR. PRESTON:  Let me provide a little bit more
22   information.  Your Honor, I think first of all, you're
23   hearing about sort of selective disclosure of legal advice.
24   They're talking about the promotional review committee.
25   There were some lawyers on that committee.  This is exactly

1    where it's inappropriate to say, oh, these lawyers approved

2    it, but we're going to withhold all the other legal advice

3    and you can't see that.  That's contrary to the law.  The

4    documents show their own internal policy documents talk about

5    how their legal department had to do separate reviews of

6    these programs before they could be provided.

7            There's this assumption that there was all kinds of

8    legal advice.  Your Honor, we don't even know that.  For all

9    we know Janssen just turned a blind eye to all of these

10   programs, reviewed it early on, and then never came back and

11   revisited.  We're entitled to know, and this is why it's

12   important to have a privilege log, we're entitled to know

13   what legal reviews they did.  Even if we can't see the

14   substance of the reviews, we're entitled to know, in fact,

15   they actually undertook a legal review or whether they just

16   completely acted recklessly.

17           We're entitled to know approximately when they

18   undertook these reviews.  So just to assume that it would

19   result in a thousand-page privilege log, we don't know that,

20   just because they can't withhold documents on a claim of

21   privilege and also not give us any type of privilege log to

22   allow us to assess what type of reviews and analyses took

23   place.  Otherwise, we are going to come back to the Court at

24   summary judgment and say, Your Honor, when they're claiming

25   that they acted in good faith, you know, we need to know who

1      they got advice from, when they got advice, what type of

2      reviews took place.  That's just in a case where one of the

3      elements of the claim as it is in a kickback case, did they

4      know they were acting unlawfully.  That is an element of the

5      claim.

6              So by the nature of this type of claim, their legal

7      reviews are at issue in this case.

8              THE COURT:  Okay.

9              MR. PRESTON:  We really need a privilege log, Your

10     Honor.

11             THE COURT:  Okay.  I hear you.  Let's finish up.  I

12     think that's all we're going to do this morning on the

13     documents responsive to requests for production number 20.

14     So I'll hear relator.

15             MR. PRESTON:  Your Honor, I think we covered that

16     one earlier.  This is a request for production that the Court

17     recognized was relevant during an earlier motion to compel,

18     but Your Honor thought that this was the type of information

19     that could be postponed until a later date not knowing that

20     the scienter issue and all of these issues were going to be

21     teed up for a summary judgment motion.  And this is the type

22     of information where again it's at the national level.

23             If Janssen has these reports and it can tell us

24     what it spent on ABSes and what it spent on outside

25     consultants, providing the support and the amount it paid for

dinners and lunches furnished in connection with providing
that support, if they can report it in a report for central
Pennsylvania, then we take that.  But they don't normally
break down their monitoring these expenses and investments in
a major marketing program.  I'm on just one territory.  The
information is kept at the national level.

THE COURT:  Okay.  Let me hear Janssen on that.

MS. TREMONT:  Good morning, Your Honor.  This is
Sarah Tremont.  I'll address that issue.  I think that the
nature of the request is quite clearly encompassing national
level information that has little relevance to the services
being provided in central Pennsylvania.  If you look at the
actual texts, RFP 30020, which I think is a little different
than what relator's counsel is saying now.  They're asking
for amounts spent on dinners and lunches furnished to
accounts all over the country.

They're asking for business manager and ABS
compensation.  A very very very large majority of is all
spent outside of the region.  And they haven't articulated
why this is relevant.  They're speaking about value.  But I
don't see how that is relevant to relator fees of the
discovery.  If anything, it's going to speak to damages.  And
we're just not at that point in the case.  And this
information is not important to address the issues that are
before the Court in the current phase of discovery.

1          THE COURT:  First of all, what about their getting

2     information that's national unless you have it broken down

3     for central Pennsylvania?  And then secondly, on whether it's

4     relevant.  Isn't it relevant as to the value of the services

5     as to whether it constitutes a kickback or it's just de

6     minimis?  It sound like dinners and luncheons might be such a

7     thing.  But maybe if you add it all up, it's very valuable.

8          MS. TREMONT:  Sure, Your Honor.  To take the second

9     point first, the, quote unquote, value of the services have a

10    specific meaning under the anti-kickback statute.  The amount

11    that Janssen internally is spending in relation to employees

12    that it is hiring and maybe other things that it's spending

13    for is not the same as saying that these services have that,

14    in fact, all the value under the anti-kickback statute.  That

15    depends on other factors and really is focused on the value,

16    if any, that physicians receive from these services separate

17    and apart from the value in relation to the drugs at issue.

18          That is not what is going to be shown by this

19    national level information.  So that's point one.  And then

20    on the point to whether this is kept by the company at the

21    national level, whether it can be broken down into central

22    Pennsylvania, we'd have to take that under advisement, Your

23    Honor.  I'm not prepared to addressed today specifically the

24    performance information event.  The request itself is for

25    national level information.

1          THE COURT:  Good.

2          MS. TREMONT:  If it's narrowed to records about

3   money that's being expended in central Pennsylvania, I

4   suppose we could look for that.  But I also think that would

5   be reflected in the custodial documents that they've received

6   from relator herself and everyone in her immediate

7   supervisory chain throughout the entire relevant period of

8   October 2006 to February 2016.  So they have information

9   about expenditures in the region.

10         THE COURT:  Let me hear from relator.

11         MR. PRESTON:  Your Honor, again, what we're looking

12  for is roll-up financial information.  These are

13  sophisticated companies.  They monitor their expenses.  The

14  expenses, the amount they invested in this major marketing

15  program is certainly relevant to the value of the program.

16  And we shouldn't be put in the position where we've got to go

17  and take a thousand different pieces of paper and try to come

18  up with some analysis as to what they spent in central

19  Pennsylvania when Janssen has roll-up information in their

20  financial department.

21         And if they can provide the roll-up for what they

22  spent on paying outside consultants to provide these services

23  in Pennsylvania, that's relevant.  In fact, Your Honor, I

24  believe back in the initial motion to compel, you instructed

25  them to do that.  They haven't done it.

1          THE COURT:  Can you just outline for me why is it

2     relevant to the value of the program given what was just

3     said?

4          MR. PRESTON:  Your Honor, this is a major marketing

5     strategy that was taking place over 20 years.  And they're

6     arguing that these services had no value.  Yet they invested

7     a lot of money in providing these services.  Not only paying

8     the salaries of ABSes who focuses on providing these services

9     but on paying the fees of outside consultants to provide

10    these services.

11         So it is relevant.  It's not the sole piece of

12    evidence related to the value, but it's certainly a relevant

13    factor in our argument as to the value of these services.

14         THE COURT:  Okay.

15         MR. POSNER:  Your Honor, can I just real quickly

16    raise two housekeeping matters?  One is in reading their

17    opposition papers to the motion to compel production of

18    documents and a privilege log, there are a few requests for

19    productions, for example, 4 and 34, where they say they are

20    still searching for documents and will produce them.

21         If we can just tack on to what Your Honor said

22    earlier about the PRC hard documents.  If they can advise us

23    on a date certain when those searches will be complete and

24    give us a timeframe, we can talk about that.  But I'd like

25    that included in that if we could instead of keeping it

```
 1    open-ended.
 2               And then the other issue is it's taken quite some
 3    time to get some job descriptions.  We have Ms. Trahan and
 4    Ms. Heckman who are two major players set for deposition I
 5    believe on the 14th of January and then a week later.  And in
 6    addition, so we don't have to come back again, we've been
 7    requesting not only the job descriptions, which I believe we
 8    got on Friday night, if I'm not mistaken, but also each of
 9    their job performance materials because that's relevant
10    material also for their depositions.  And we haven't gotten
11    those.
12               We would just ask for those two individuals right
13    now to get their job performance reviews so that we can go
14    over them with them during the course and scope of their
15    sworn testimony.
16               THE COURT:  So you got the job descriptions?
17               MR. LEOPOLD:  Yes.
18               THE COURT:  You're saying you want the job
19    performance materials.  What about that?  Ms. Grigsby or
20    whoever is --
21               MS. TREMONT:  I can respond on that, Your Honor.
22    With respect this is not something that's covered by their
23    first or second set of RFP's.  Their request for job
24    performance valuations that are covered by the RFP's were
25    Ms. Long only within the scope of phase discovery.  If
```

1   they're now asking for these materials, that's an entirely

2   new request.  And it's not anything that's teed up or ripe

3   for decision by the Court today.

4            THE COURT:  I think I'm just going to order you to

5   give them their job performance materials.  Let's just get

6   that done.  Why don't we do this:  Let's say by January 10

7   I'll ask the parties to file a joint status report on the

8   status concerning the paper documents that Ms. Grigsby was

9   saying everyone will have to go through.  I hope to learn

10  from the status report how long it will take.  And if there

11  is a dispute about how long it will take, what each party

12  would like for regarding a date.

13           And if you just can't get the job performance

14  materials to relator before the deposition, then you can talk

15  to them about that.  But if you can, I would like you to get

16  it to them let's try to do that by January 10 as well.

17           And then with regard to the request 4 and 34, that

18  you're still looking for other documents in the second

19  motion, let's have a little report on -- a brief report on

20  that on the January 10 status report as well.  I know we're

21  missing another whole motion here, and I'm going to schedule

22  something after the January 1 for that.  Hopefully the first

23  week of January.  And we'll go through that.  I didn't

24  realize it would take so long to get through this today.  But

25  we'll take that motion up.  And in the meantime if after

1    Janssen notifies relator concerning the advice of counsel

2    defense tomorrow that changes anything with regard to the

3    outstanding motion, or you for whatever reason are able to

4    narrow the issues in the motion, please file something prior

5    to whatever date we have a hearing.

6            And I'm assuming Chief Judge Saylor will refer the

7    two new motions to me as well, but we'll see.  I think

8    there's two more on the docket that the time for reply has

9    not come up yet.  So okay.  And I think we'll try to just get

10   through all of this in January.  And then Chief Judge Saylor

11   will see where you are with regard to how much time you need

12   for more discovery, if you're appealing any of this.

13           I think you could probably safely wait and we'll do

14   it all at once.  So I hope you'll all just stop working on

15   this case for a couple of days now and take a break.  And

16   we'll all get back to work in January on it.

17           MR. LEOPOLD:  Thank you for your time, Your Honor.

18           THE COURT:  I'm going to put this on the docket

19   today, and then we'll take up the rest of it after the

20   holidays.

21               (Court recessed at 12:29 p.m.)

22

23

24

25

```
 1                  - - - - - - - - - - -

 2                      CERTIFICATION

 3

 4          I certify that the foregoing is a correct

 5   transcript of the record of proceedings in the above-entitled

 6   matter to the best of my skill and ability.

 7

 8

 9

10   /s/ Joan M. Daly                    January 14, 2022

11

12   _____               _____

13   Joan M. Daly, RMR, CRR              Date
     Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```