UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE UNTED STATES OF AMERICA et al.
*ex rel*. JULIE LONG,
    Plaintiffs,

v.                                                     Civil Action No. 16-12182-FDS

JANSSEN BIOTECH, INC.,
    Defendant.

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION TO RECONSIDER COURT'S ORDER OF DECEMBER 20, 2021 (#251)

KELLEY, U.S.M.J.

    I.      Introduction.

This is a *qui tam* action alleging that a pharmaceutical company unlawfully provided free business advisory services to physicians who prescribed its medications, in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and caused physicians to submit false claims for reimbursement to Medicare in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a). Relator Julie Long alleges that Janssen Biotech, a company that manufactures and sells two infusible drugs, Remicade and Simponi ARIA, improperly employed teams of practice advisors, including relator, and hired outside consultants to provide services such as presentations, advice, and customized analyses to doctors to assist them in running profitable infusion businesses ("in-office infusion suites," or "IOIs").

1

The facts of the case and a detailed analysis of the claims in the Second Amended Complaint ("SAC," #55) are set out in Chief Judge Saylor's Order and Memorandum on Defendant's Motion to Dismiss (#75) and will only be repeated here as necessary to put the discovery motions at issue in context.

II.     Background Concerning the Scope of Discovery.

At the Rule 16 scheduling conference, Chief Judge Saylor explained that before "plunging into" nationwide discovery, the parties would engage in discovery relating to the specific allegations of relator, who worked as an "Area Business Specialist" ("ABS") for Janssen in Pennsylvania from 2003 to February 2016, and whose job involved "advising and assisting physician practices with, among other things, establishing and operating in-office infusion suites where Remicade and Simponi ARIA infusions were administered."[1] (#75 at 2; #90 at 4.) The parties were to take discovery on "her claims, what she did, what her managers . . . told her to do, information she got from people at a national level, if she got any, what happened with these . . .

---

[1] Chief Judge Saylor had mentioned this path of limited discovery in his Order and Memorandum on Defendant's Motion to Dismiss. The SAC contains details concerning only nine "top accounts" located in the territory in which relator worked for Janssen in Pennsylvania, and defendant argued that the court should limit the scope of discovery to those nine practices. (#69 at 11-12; #75 at 32.) The court noted:

> In cases where relators have alleged the submission of particular false claims only in some parts of the country, courts in this district have indeed limited discovery to those regions in order "to probe the validity of the kickback allegations before considering whether to authorize nationwide discovery." *See, e.g.*, *United States ex rel. Carpenter v. Abbott Lab'ys, Inc.*, 723 F. Supp. 2d 395, 409-10 (D. Mass. 2010); *U.S. ex rel. Rost v. Pfizer, Inc.*, 253 F.R.D. 11, 17 (D. Mass. 2008). The First Circuit has upheld such limits after reviewing them for an abuse of discretion. *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 719 F.3d 31, 39-40 (1st Cir. 2013). The Court will address that issue, as appropriate, in the Rule 16 scheduling conference.

(#75 at 33 n.12.)

2

nine accounts and see where we are at that point." (#90 at 10.) The court opined that this early discovery would concern "how the company organizes its business, how it trained people, how it supervised people, what writings there were and so on and so forth, and my hope is that once that information is out there, we'll have a better sense of . . . what the next phase of discovery ought to look like, assuming there is a phase." *Id*. at 10.

Soon after the scheduling conference, the parties began having discovery disputes, which were referred to this court. *See, e.g*., #100, Relator's Motion to Compel. Over the next several months, this court had frequent hearings concerning discovery, *see, e.g*., #116 (April 6, 2021 hearing); #126 (April 23, 2021 hearing); #131 (May 6, 2021 hearing); #157 (July 26, 2021 hearing). At the outset, this court made clear that discovery would not be limited to what relator knew, but would extend "up the chain of command" from relator to national policy-makers, and would include discovery concerning national strategies and policies concerning the programs in relator's territory. (#116 at 8.) This included information from those who "devised these policies and vetted them and assessed their legality." *Id*. Janssen agreed that this information was relevant. *Id.* at 10. The court also found that relator was entitled to discover "internal documents discussing [the] legality [of any program] that aren't privileged." *Id.* at 16.

The court will not go point by point through its rulings across the multiple hearings; suffice it to say that the court's aim was to cabin the discovery, so that the parties could meet the fairly short deadlines set by Chief Judge Saylor and, in this initial stage of discovery, to give relator just enough information to test her claims. This court repeatedly assured relator that however limited discovery was during what the parties came to refer to as "phase one," relator would, in the future, get more discovery. *See, e.g*., #131 at 10; #157 at 8-11. Janssen, which persistently argued that discovery should be as narrow as possible, conceded that phase one discovery was "not the end of

3

discovery. We're trying to look at the claims through a lens, and then you see where you are after [p]hase [one]." (#116 at 15.) In some instances, the court persuaded relator to back down from requests by assuring her counsel that she would be able to take certain discovery later in the case, even when the requested discovery concerned key elements which relator was obligated to prove, such as Janssen's scienter. *See, e.g.*, #157 at 9-10. In short, this court agrees with relator that this court, in an effort to provide her with "samples of the evidence," limited the number of custodians, limited discovery temporally, and postponed discovery on important issues such as scienter. (#266 at 7.)

While it was understood that the goal of phase one discovery was "to probe the validity of the kickback allegations before considering whether to authorize nationwide discovery," (#75 at 33 n.12 (quoting *United States ex rel. Carpenter v. Abbott Lab'ys, Inc.*, 723 F. Supp. 2d 395, 409-10 (D. Mass. 2010))), it was not clear what would happen at the end of it. In May 2021, for instance, Janssen intimated that it would file a motion for summary judgment after phase one. (#131 at 16 ("We're trying to take the relator's allegations and what happened in the relator's district and see if it violates that statute. If it doesn't, the case is over.")) Relator's counsel disagreed and responded that their understanding was that phase one discovery was to "get more information about the services" and other "key issues in the case," after which the parties would engage in broader discovery. *Id*. at 16-17; #157 at 6-7.

At a hearing on October 1, 2021, Chief Judge Saylor, after hearing argument from the parties concerning the progress of discovery and what should happen after phase one discovery, ordered that the parties should complete phase one discovery and litigate a bellwether motion for summary judgment. (#186 at 25-27.) The court cautioned that before the parties proposed a schedule for summary judgment, Janssen was to provide "complete fact discovery on the specific

4

relator's claims, however we define that, however far up the chain it goes, whatever documents or depositions are required." *Id*. at 27. At a second hearing on October 22, 2021, the court reiterated this plan and emphasized that the summary judgment motion would test all elements of relator's claims. (#203 at 11-12.)

Since Chief Judge Saylor's decision that the parties are headed to summary judgment, they have constantly disagreed over whether, as relator insists, the case has entered a new phase of discovery, or whether, as Janssen insists, discovery is substantially complete and the case is nearly ready to proceed to summary judgment. *See, e.g.*, #224 at 6 (recent memorandum from relator stating that "the case is in the second stage of discovery where plaintiff can obtain full discovery concerning all issues with the exception of field-level activities in other regions"); #248 at 4 (recent memorandum from Janssen stating that relator is attempting to "commence a brand new discovery phase, which the Court has neither ordered nor allowed"). The truth is somewhere in the middle. This court now seeks to ensure that, as Chief Judge Saylor ordered, relator receives "complete discovery" on her claims, so that that the summary judgment process is meaningful. This means, for example, that with regard to the programs at issue in relator's territory, she is entitled to receive robust discovery concerning Janssen's knowledge of the lawfulness of the programs, including at the highest levels of the company. At the same time, the court is mindful of its obligation to narrowly tailor discovery to the needs of the case.

      III.    <u>This Court's Ruling on Relator's Motion for Reconsideration (#218) and Janssen's Appeal</u>.

Soon after the October 22 hearing, relator filed an Omnibus Motion for Reconsideration of Discovery Rulings (#218), asking this court to reconsider previous rulings where the court had declined: to add more custodians; to allow discovery concerning specific programs that post-dated 2016, the date when relator left Janssen's employment; to allow discovery concerning Janssen's

5

scienter and intent; and to allow discovery concerning certain issues such as the compensation that Janssen paid certain employees and outside consultants. *Id*. at 1. The court held argument on the motion on December 20, 2021, and issued a brief order on the docket the same day, allowing many of relator's requests. (#237 ("December 20 Order" or "Order").)

Janssen appealed, objecting to the Order (#251) and Chief Judge Saylor referred the matter back to this court "for reconsideration and clarification in light of the issues raised in the notice of appeal." (#256.) On January 13, 2022, at oral argument on other motions, this court informed the parties that it would consider Janssen's brief objecting to the December 20 Order as a motion for reconsideration (#257) and ordered relator to file an opposition by January 28, 2022, which it did. (#266.) On February 11, 2020, Janssen filed a response, completing the briefing on the motion. (#271.)

    IV.    <u>The Legal Standard for a Motion to Reconsider</u>.

"A federal district court has the discretion to reconsider interlocutory orders and revise or amend them at any time prior to final judgment." *Boniface v. Viliena*, 417 F. Supp. 3d 113, 117-118 (D. Mass. 2019) (quoting *Davis v. Lehane*, 89 F. Supp. 2d 142, 147 (D. Mass. 2000)); *see Fernandez-Vargas v. Pfizer*, 522 F.3d 55, 61 n.2 (1st Cir 2008) (stating that "a district court has the inherent power to reconsider its interlocutory orders" and "encourag[ing] it to do so where error is apparent"). "[A] court should grant a motion for reconsideration of an interlocutory order only when the movant demonstrates (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law in the first order." *Davis*, 89 F. Supp. 2d at 147. "Reconsideration is also appropriate 'if the court has patently misunderstood a party or has made an error not of reasoning but apprehension.'" *State St. Corp. v. Stati*, No. 20-cv-12101-

LTS, 2021 WL 2117187, at *9 (D. Mass. Feb. 9, 2021) (quoting *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 82 (1st Cir. 2008)).

V.  The Law Pertaining to Discovery and the Proof Required in this Case.

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ." Fed. R. Civ. P. 26(b)(1). The party seeking information in discovery has the burden of showing its relevance. *Johansen v. Liberty Mut. Grp., Inc.*, No. 15-cv-12920-ADB, 2017 WL 6045419, at *1 (D. Mass. Dec. 6, 2017) (citing *TG Plastics Trading, Co. v. Toray Plastics*, No. 09-cv-336S, 2010 WL 936221, at *2 (D.R.I. Mar. 12, 2010)). Once the moving party makes a showing of relevance, the opposing party bears the burden of showing that the requested discovery is improper. *See Aronstein v. Mass. Mut. Life Ins. Co.*, No. 15-cv-12864-MGM, 2017 WL 2818993, at *2 (D. Mass. June 29, 2017).

"District courts exercise broad discretion to manage discovery matters" and "to tailor discovery narrowly." *Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41 (1st Cir. 2003); *Primarque Prod. Co. v. Williams W. & Witt's Prod. Co.*, No. 15-cv-30067-TSH, 2016 WL 6090715, at *2 (D. Mass. Oct. 18, 2016). Proportionality is determined "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

The court's decisions concerning discovery here are informed by the burden that relators face in litigating summary judgment. The AKS prohibits "knowingly and willfully" soliciting, receiving, offering, or paying "any remuneration . . . to induce" a person to refer a patient for goods or services that are reimbursed by a federal health care program. 42 U.S.C. § 1320a-7b(b). Relator

alleges that by providing illegal remuneration that resulted in the submission of false claims to Medicare, Janssen violated the FCA, 31 U.S.C. § 3729. Relator will have to show that the support Janssen provided to the physician practices constituted "remuneration"; that in providing the support, Janssen intended to induce use of Remicade and Simponi ARIA for Medicare beneficiaries; that Janssen acted knowingly and willfully in violating the AKS; that physicians submitted claims to Medicare after receiving the remuneration; and that Janssen acting knowingly in causing the physicians to submit the false claims. *See* 42 U.S.C. § 1320a-7b(b)(2)(B).

The "knowingly" and "willfully" requirements of the AKS merit particular attention as they are demanding and it can be difficult to muster evidence supporting them. The AKS sets a higher bar for scienter than the FCA, which requires that "a person has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information,'" *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016) (quoting 31 U.S.C. § 3729(b)(1)(A)), but "require[s] no proof of specific intent to defraud," *id.* at 187 n.2; *see United States ex rel. Gohil v. Sanofi U.S. Servs.*, 500 F. Supp. 3d 345, 368-69 (E.D. Pa. 2020) ("The FCA's scienter element is easier to meet than the AKS's scienter element: the FCA only requires recklessness or deliberate ignorance of illegality, while the AKS requires knowledge of illegality." (citations omitted)). A plaintiff may falter at summary judgment on this element:

> Although it is unusual to grant summary judgment on scienter, summary judgment on this issue is sometimes appropriate. "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."

*SEC v. Ficken*, 546 F.3d 45, 51 (1st Cir. 2008) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

The type of discovery a plaintiff might use to support the scienter element at the summary judgment stage may come from internal documents concerning compliance or non-privileged legal advice, among other things. For example, in *United States ex rel. Banigan v. Organon USA Inc.*, sufficient evidence to go to trial on an FCA claim premised on AKS violations "include[d] a[n] [internal] report flagging the pharmacy's relationship with [defendant]—characterized as 'quid pro quo'—as a potential problem and a[] . . . compliance policy that evinces ample familiarity with the AKS and related guidance." No. 07-cv-12153-RWZ, 2016 WL 10704126, at *3 (D. Mass. Aug. 23, 2016); *see id.* (finding that another defendant's 10-K "demonstrated a substantial awareness" of an OIG Fraud Alert discussing a similar relationship to the one that defendant was engaged in). It may be necessary for a plaintiff to discover detailed information about specific programs and individual employees' actions in order to litigate a motion for summary judgment. Insufficient evidence at the summary judgment phase has been found to include evidence of participation in compliance programs without evidence of specific content taught during those programs, so that a jury would have to make a "speculative leap" to interpret a defendant to have learned through those programs that his actions were unlawful. *United States v. Nora*, 988 F.3d 823, 831 (5th Cir. 2021). Evidence that only a single employee violated the AKS has been found to be insufficient. *See United States v. Pfizer, Inc.*, 188 F. Supp. 3d 122, 135 (D. Mass. 2016) (finding evidence that sales representatives were trained in the AKS and testimony that one sales representative sought to provide kickbacks to physicians insufficient where there was no evidence that others in the company had the same goal).

VI.     Discussion.

A.  Relator's Request for Additional Custodians.

In the December 20 Order, the court granted in part relator's request that Janssen be required to conduct ESI searches of additional employees' files. (#237.) Prior to the motion, relator had received documents from 23 custodians: thirteen, including relator, in phase one discovery, and ten custodians whose documents had been produced to the Department of Justice ("DOJ") and reproduced to relator. (#252 at 7 n.1.) Relator requested 28 additional custodians; the court allowed twelve. (#237.)

Relator submitted a list of the 28 additional employees whom it was seeking to add as custodians, together with their roles and the time periods during which they worked. (#219 at 13-14.) As many of the employees held their positions for relatively short periods, relator argued it was necessary to include more employees to obtain evidence for the full period at issue. *Id*. at 13. Some of the employees worked in the Central Pennsylvania territory, while others are described as "Senior-Level" managers. *Id*. at 13-14.

At oral argument on the motion, counsel for relator correctly argued that earlier in discovery, relator had been hindered in gathering names of possible custodians. (#259 at 5.) Out of the existing 23 custodians, relator had selected only seven. (#271 at 8.) The court notes that a chart setting out the number of documents from existing custodians shows that relatively few documents were produced for several of them. (#219 at 13, showing one custodian's files yielded 15 documents; another, 94, another, 123.) In addition, relator argues that the ten custodians from the DOJ production were chosen by the government, not relator, and "they are all field level witnesses from other territories" whose documents in many instances "relate to their interactions

with physicians in other territories and are outside the scope of the bellwether summary judgment process." (#259 at 20.)

Janssen argues that adding twelve custodians is not proportional to the needs of the case. (#252 at 10.) Taking into consideration the factors set out in Fed. R. Civ. P. 26(b)(1), the court disagrees. Relator alleges that Janssen provided illegal kickbacks to physicians over a period of more than twenty years in a nationwide Medicare fraud scheme and that the amount in controversy "far exceed[s] one hundred million dollars." (#219 at 14-15.) She estimates that during a five-year period, Medicare Part B paid approximately $6.8 billion for Remicade and Simponi ARIA, and alleges that a significant portion of these payments were the result of AKS and FCA violations. (#266 at 15.) Janssen alone has access to relevant information. Prior to the court's allowing the motion, relator herself had chosen only seven custodians, while the rest were selected by the DOJ or by Janssen. The discovery is important to the case, as it supplements existing discovery by adding mid-level and senior-level managers who developed, approved, reviewed, and oversaw the IOI services at issue. (#219 at 13.) As noted above, on summary judgment, it will be necessary for relator to show that more than one employee was violating the law. *See Pfizer, Inc.*, 188 F. Supp. 3d at 135.

Janssen attached to its objection to the December 20 Order a declaration from an attorney estimating the time and expense involved in producing documents from the additional custodians: perhaps as little as six months and perhaps a million dollars. (#252-1 at 3-4.) Given all the circumstances here, the court finds that the estimated increase in cost and delay in providing more discovery in this matter is proportional to the needs of the case, especially considering the alternative, which is a motion for summary judgment that gets the parties nowhere if relator is not permitted to take discovery sufficient to litigate it.

The court finds that this case, even at this stage of phased discovery, is comparable to cases in which courts have found that in complex litigation, similar numbers of custodians are warranted. *See United States v. Allergan, Inc.*, No. 8:18-CV-00203, 2021 WL 969215, at *1-2 (C.D. Cal. Mar. 1, 2021) (defendant ordered to search the electronic files of 52 custodians); *Cary v. Ne. Illinois Reg'l Commuter R.R. Corp.,* No. 19-cv-3014, 2021 WL 678872, at *2 (N.D. Ill. Feb. 22, 2021) (stating that "the Court is of the view that the 27 people identified by Plaintiff in her Reply Brief constitute a logical and reasonable list of custodians" and giving relator leave to request more); *United States ex rel. Poehling v. United Health Grp.*, No. 16-cv-8697, 2020 WL 10731245, at *2 (C.D. Cal. May 5, 2020) (referencing documents collected from 300 custodians in a complex, government-intervened case); *In re Abilify (Aripiprazole) Products Liab. Litig.*, No. 16-md-2734, 2017 WL 4399198, at *7 (N.D. Fla. Sept. 29, 2017) (defendant ordered to produce discovery from 58 custodians including sales representatives, executives, and mid-level employees); *United States ex rel. Oughatiyan v. IPC The Hospitalist Co.*, No. 09-cv5418, 2015 WL 4249195, at *2 (N.D. Ill. July 14, 2015) (allowing 80 custodians for first phase of discovery involving 7 states and, pre-2015 amendments to Rule 26, noting need for proportionality).

In sum, the court declines to change its Order that relator may choose twelve additional custodians.

### B.  Relator's Request to Expand Discovery to February 2020.

Relator left Janssen's employ in February 2016 and this case was filed in October 2016. Relator has correctly and persistently argued that documents and information that originated after 2016 are relevant to the claims and defenses in this case. *See, e.g.*, #219 at 16-18; *United States ex rel. Fiederer v. Healing Hearts Home Care, Inc.*, No. 2:13-cv-1848, 2014 WL 4666531, at *5 (D. Nev. Sep. 18, 2014) ("Limiting a relator's discovery rights to the duration of her employment

would weaken the [FCA] by placing limits on *qui tam* actions that do not exist for government-initiated actions. Additionally, it would dissuade whistleblowing by limiting a relator's claim, not to the plausible allegations regarding the submission of false claims—which is the Act's focus—but to the duration of the relator's employment, on which the Act is silent.")); *see also Longacre v. AB Home Health Care, LLC*, No. 2:16-cv-00279, 2018 WL 6037517, at *4 (D. Me. Nov. 15, 2018) (collecting cases in support of the proposition that courts often decline requests to limit discovery to the period of a relator's employment). In a previous effort to limit the discovery in phase one, however, this court found that notwithstanding the relevance and importance of such information, Janssen did not have to produce information that post-dates 2016. (#131 at 22-23; #201 at 34.)

 Relator brought up the issue again in its motion to reconsider. (#219 at 16.) Relator stated that information concerning Janssen's provision of IOI services after 2016 will be more readily available than older discovery and employees' memories will be clearer. *Id*. at 17. Janssen, seeking to cut discovery off starting the moment relator left her job, says that the fact that more recent evidence will be qualitatively better than discovery going back many years is "entirely beside the point," (#271 at 10), but the court disagrees. Given the information relevant to the claims here, including what employees were told, what precise actions they took in their day-to-day work, and what their state of mind was while doing so, and given the nature of the claims, where one cannot expect that evidence of wrongdoing will be documented, information post-dating 2016 is likely to be much more useful to relator than older information.

 In addition, after this case was filed in 2016, the DOJ investigated relator's claims. (#201 at 23.) According to relator, Janssen discontinued certain programs after that time. *Id*. Janssen argues that "evidence that post-dates the inception of the relevant programs is unlikely to be

relevant to assessing Janssen's state of mind at the time they were created," (#271 at 9), which of course is true, but what relator seeks is evidence concerning Janssen's state of mind at the time the relevant programs were terminated. Janssen further argues that "[t]he procedural history of this case weighs *against* the possibility that [r]elator would find evidence akin to what she posits: After investigating [r]elator's claims, the Department of Justice declined to intervene in her suit." *Id*. at 10 (emphasis in original). The DOJ may have declined to intervene for many reasons; the fact that it declined does not mean that relator does not get to take discovery from the period after it declined; and whatever discovery relator is seeking has to do with Janssen's response to the investigation, not the DOJ's decision. Finally, the fact that some of the information may be privileged, as Janssen argues, *id*., does not relieve Janssen from the obligation of searching for it at all.

Janssen argues that expanding discovery in this way is overly burdensome. (#252 at 14-15.) The court notes, however, that according to a letter from Janssen to relator concerning the time period of nineteen of the programs at issue in Pennsylvania, only six of the nineteen continued beyond 2016, and some of them for only a year or two. *See* #189-3. Janssen estimates that this additional production might take from three to five months and does not estimate the cost of it. (#252-1.) Balancing the burden of this production against the factors set out in Rule 26(b)(1), the court affirms its Order that Janssen update its prior productions and interrogatory responses up to February 2020.

        C.    <u>Relator's Request for Janssen to Produce Responsive Documents from the Files of Current and Former Employees Who Had Significant Involvement in Janssen's Provision of the Alleged Kickbacks</u>.

While Janssen states that it has produced documents from "corporate repositories,"[2] it has not searched for or produced responsive documents from any employees' files other than the present custodians'. (#252 at 15-17.) In its December 20 Order this court ordered Janssen to produce "documents responsive to relator's requests from all sources and not confine itself to the custodians' documents." (#237.) This was in response to a complaint by relator that Janssen was not complying with basic discovery obligations to search for and produce relevant documents from employees who had significant involvement in the alleged kickback scheme, other than the named custodians. (#224 at 14-16.) Janssen complains that the Order requires it to troll for documents across its entire corporate enterprise for a period of twenty years. (#252 at 16.) This is hyperbole. The Order means that as in every case governed by the Federal Rules, Janssen must make a reasonable inquiry and undertake a reasonable effort to produce requested documents possessed by current and former employees who had significant involvement in the development, review, approval, monitoring, and/or delivery of the support services at issue in this case, whether or not relator happened to name such employees as ESI custodians. The court orders the parties to confer regarding this Order, and to devise a strategy for sampling or conducting reasonable searches for relevant documents that, after a good-faith effort, Janssen knows exist in certain employees' files.

---

[2] At oral argument Janssen stated that it has "looked for information from centralized sources such as "relevant databases, so that is OEEOS, our review, our connect, viewpoint, and Janssen share drive." (#259 at 8.) The court assumes these are the "corporate repositories" to which Janssen refers in its briefing. Janssen has never supplied any further description of these databases and what types of information they contain.

15

>   D. Relator's Request that Janssen Provide Discovery Concerning the Scienter Elements and a Privilege Log.

In the December 20 Order, the court ordered Janssen to provide discovery concerning its knowledge of the legality of providing the IOI support, including all relevant non-privileged legal advice it received, and ordered it to produce a privilege log concerning this information. (#237.) As set out above, proving Janssen's knowledge is critical to relator's claims and in addition, Janssen has asserted an affirmative defense that any false claims were not submitted knowingly. (#83, Aff. Defense 8.)

Janssen objected on the grounds that it has already provided documents relevant to the scienter elements and that it is unclear to which discovery requests the Order is compelling Janssen to provide additional responses or productions. (#252 at 17-19.) Further, Janssen states that it provided a 13-page privilege log after reviewing the custodians' materials and materials from centralized databases, and that is enough; creating a privilege log for Janssen's in-house counsel and all other relevant legal advice "for the *sole* purpose of creating a privilege log" would be too burdensome. *Id*. at 19 (emphasis in original).

The court heard further argument on this issue on January 13, 2022. (#257.) Having reconsidered the Order, the court will limit Janssen's obligation by requiring it to review documents and materials for only three custodians (in addition to the additional custodians already allowed above in part A) who provided legal advice, reviews, or analyses for its programs. Relator will select the three custodians and, to the extent any relevant materials are found, Janssen shall produce them or log them on a privilege log, as appropriate.

VII.     Conclusion.

For the above reasons, Janssen's motion to reconsider is allowed in part and denied in part.

February 17, 2022                                                                /s/ M. Page Kelley
                                                                                         M. Page Kelley
                                                                                         United States Magistrate Judge