1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3    THE UNITED STATES OF AMERICA,    )
     ex rel.                          )
4    JULIE LONG,                      )  Civil Action
                                      )
5                   Plaintiffs        )  No. 16-12182-FDS
                                      )
6                                     )
     vs.                              )
7                                     )
     JANSSEN BIOTECH, INC.,
8                   Defendant

9

10   BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV

11

12             MOTION HEARING CONDUCTED BY ZOOM

13

14

15        John Joseph Moakley United States Courthouse
                    1 Courthouse Way
16                  Boston, MA 02210

17

18                  April 4, 2022
                     3:00 p.m.

19

20

21

22

23            Valerie A. O'Hara, FCRR, RPR
                 Official Court Reporter
24   John Joseph Moakley United States Courthouse
                    1 Courthouse Way
25                  Boston, MA 02210
              E-mail: vaohara@gmail.com

1    APPEARANCES VIA ZOOM:

2    <u>For The Relators:</u>

3        Cohen Milstein Sellers & Toll PLLC, by CASEY M. PRESTON,
     ESQ., 1717 Arch Street, Suite 3610, Philadelphia, Pennsylvania
4    19103;

5        Cohen Milstein Sellers & Toll, PLLC,
     THEODORE JON LEOPOLD, ESQ., LESLIE KROEGER, ATTORNEY,
6    POORAD RAZAVI, ATTORNEY, and DIANA L. MARTIN, ATTORNEY,
     11780 US Highway One, Suite 200,
7    Palm Beach Gardens, Florida 33408;

8    <u>For the Defendant:</u>

9        Covington & Burling LLP, by ETHAN M. POSNER, ESQ.,
     SARAH TREMONT, ATTORNEY, STACEY K. GRIGSBY, ATTORNEY,
10   BRADLEY MARKANO, ESQ. and KRISTIN COBB, ATTORNEY,
     850 Tenth Street, NW, Washington, D.C. 20001-4956.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

THE CLERK:  Court is now in session in the matter of United States vs. Janssen Biotech, Inc., Civil Action Number 16-12182.

Participants are reminded that photographing, recording and rebroadcasting of this hearing is prohibited and may result in sanction.

Would counsel please identify themselves for the record, starting with the plaintiff.

MR. LEOPOLD:  Good morning, your Honor, Ted Leopold, Casey Preston, Diana Martin, Leslie Kroeger and Poorad Razavi on behalf of the relator.

THE COURT:  Good morning.

MR. POSNER:  Good morning, your Honor, for the defendant, we have Ethan Posner, Stacey Grisby, Sarah Tremont, Kristen Cobb and Bradley Markano for the defendant.

Good morning.  We are in the office, and Ms. Grigsby and I are going to be standing up and sitting down at various places, so hopefully the Court will indulge us as we make the transition to in office arguing.

THE COURT:  All right.  Good morning.

MR. POSNER:  Good morning.

THE COURT:  This is a motion hearing on cross appeals from the magistrate judge's discovery decision as

1    well as I think I also have pending the plaintiff's motion

2    to compel legal opinions.

3         I think what makes sense from my standpoint is to

4    start with the larger motion, the largest motion, which is

5    Janssen's appeal of the decisions.

6         Mr. Posner, why don't I give you the floor and you

7    can see proceed as you see fit.

8         MR. POSNER:  Sure.  Thank you, your Honor,

9    Ms. Grigsby is going to handle many of those issues.  I

09:32AM 10    will handle certain of them.  We're happy to proceed issue

11    by issue.  If there are issues you would like us to start

12    with, obviously, we can do that.

13         THE COURT:  I'll say don't be afraid to make it

14    simple, or let me rephrase it, to make it clear.

15         MR. POSNER:  Very well, your Honor.

16         THE COURT:  Other than that, I'll let you proceed.

17         MR. POSNER:  Thank you, your Honor.

18         MS. GRISBY:  Your Honor, I'm going to start this

19    schematically.  This Court has said that discovery in this

09:32AM 20    case should proceed in phases, and Magistrate Judge

21    Kelley's discovery ruling basically upends your Honor's

22    carefully crafted process.

23         As this Court described on December 14th, 2020,

24    Phase I discovery was intended to encompass Julie Long's

25    experience, what Julie Long was told, what she read, how

1    she was trained, how she was supervised, and what happened

2    with the accounts she worked with.

3         The process was designed to test the accuracy and

4    the viability of Julie Long's claim, and it was focused on

5    Central Pennsylvania, accounts with which Julie Long was

6    involved.

7         Following this Court's order in phased discovery,

8    both of the parties engaged in negotiations.  We negotiated

9    on custodian.  Janssen began an extensive review of

09:33AM 10    documents, reviewing over 500,000 documents and ended up

11    producing over 2.8 million pages at a cost of over

12    $1.8 million.

13         As your Honor is aware, this is in our declaration

14    for Mosquera on ECF Number 252, but starting in August,

15    2020, relator has moved to expand scope of discovery in

16    Phase I.  You'll hear relator repeatedly say that we are no

17    longer in Phase I, that now the focus is in scienter and

18    has pushed this Court to read discovery basically every

19    prior ruling.

09:34AM 20         In response to relator's latest attempt to restart

21    discovery, the magistrate judge did reconsider rulings and

22    has issued rulings that go far beyond the parameters of

23    Phase I, which has proceeded over the last 16 months at a

24    significant cost and burden.

25         The orders effectively open a new phase of

1    discovery and require Janssen to search and review from

2    double of the amount of materials in Phase I, it adds 15

3    new custodians, and it really contravenes this Court's

4    order that this Phase I should proceed and then culminate

5    in summary judgment.

6         So, specifically, just to lay things out, we are

7    challenging the addition of the 15 custodians, 12 picked by

8    relators, three of them are legal, the additional searches

9    of the yet unidentified employees, who may have had

09:35AM 10  significant involvement in the program, the extension of

11   the discovery cutoff, the response to the relator's

12   untimely RFPs, which were served almost a year after the

13   first two sets of RFPs, the extension of discovery for the

14   relator, and for Karen Trahan, information from accounts

15   from other sources, the government communications, and

16   copies of Janssen's document retention policies that

17   predate when Janssen learned of this litigation, and

18   information about Janssen's privilege log.

19        These rulings as they are written are sure to

09:35AM 20  spark extensive discovery, in fact, they are sure to spark

21   discovery on discovery, which is what you're seeing, and

22   they're not warranted in this phase of this case, so I'm

23   going to start with the issue about the 12 new custodians.

24        So, Magistrate Judge Kelley has ordered Janssen to

25   review and produce documents from 12 new custodians, which

1  would nearly double the volume which Janssen needs to

2  review within this phase of discovery.

3       Janssen has already provided relator with

4  discovery from 23 highly relevant custodians, so there are

5  six custodians that are most relevant to this phase, and

6  these custodians go up the chain for relator.

7       There's the relator, there's the regional business

8  managers, who served as relators' direct supervisors during

9  the discovery period, there's the regional business

09:36AM 10  director, which is above that who had national level

11  supervisory authority over the area of business

12  specialists, like Julie Long in the field organization.

13       Now, seven of these custodians were, in fact,

14  selected by relator, so these were not custodians that

15  Janssen hoisted upon relator, but, in fact, relator, after

16  these negotiations, decided on the seven custodians, many

17  of whom worked at the national level in various functions,

18  including compliance, sales and marketing.

19       These are all of the vice presidents or above, so

09:37AM 20  these high level positions include vice-presidents and

21  national sales directors.  And relator has all the

22  information she needed to select these well custodians at

23  the time.  She had access to thousands of pages of

24  discovery.  She had access to the discovery produced in the

25  underlying government CID investigation.  She is a former

1    Janssen employee, so certainly to the extent that she is

2    making allegations in this case, she also would have been

3    aware of the people who were in her direct chain of

4    command, so independent of even the prior discovery she

5    received, she herself should have had knowledge of who the

6    custodians would be, and in addition to the seven that the

7    relator had selected, there are also 10 nonoverlapping

8    custodians, whose documents are provided to the Department

9    of Justice.

09:38AM 10    So then, in addition to that, Janssen not only has

11    provided these documents from the custodial searches, but

12    Janssen has also provided documents related to the search

13    of central repositories, as relator would refer to, or

14    noncustodial sources, so those sources include the

15    promotional review committee databases, the ones that are

16    the subject of also another one of relator's motion to

17    compel, and so it is just not the case that relator did not

18    have what she needed when she propounded discovery in the

19    beginning of 2021 in selecting these custodians.

09:39AM 20    So, adding these custodians will not only take a

21    significant amount of time, we said in our declaration, it

22    would take 6 to 9 months, so basically we are starting

23    again.  It would add over $1 million or more to this phase

24    of discovery, just this particular order alone, and it's

25    unlikely to add anything meaningful concerning the practice

1    of support services provided in the account in Central

2    Pennsylvania or concerning relator's specific allegations.

3        In fact, it's almost unbelievable or not credible

4    that it could add significantly to what relator's specific

5    allegations are given the fact that relator could not

6    identify some of these custodians at the very outset of

7    discovery.

8        And many of the relator's 28 with the exception of

9    one person, in fact, had no connection to Central

09:40AM 10   Pennsylvania, and that one single custodian was a person

11   who was an area business specialist who began at Janssen in

12   the Central Pennsylvania area after relator left the

13   company in 2016.

14       So, in terms of the cases that the magistrate

15   judge cited in support of her decision to grant these

16   additional custodians, many of them are in opposite.  I

17   think, as we pointed out in our briefing, only one dealt

18   with phase discovery such that it was not, you know, it was

19   not proceeding as this one was, and the other circumstances

09:40AM 20   are different.

21       Those cases were more complex and involved

22   multiple defendants, so one case involved dozens of

23   defendants, another was multi-district litigation, and the

24   remaining cases where the Court ordered three additional

25   custodians, the Court -- and there's one where the Court

1    basically skipped a number of custodians.

2         Again, three additional custodians is far in

3    excess of the 12 custodians that were ordered in this

4    particular matter.

5         So the next issue we were going to address

6    specifically was the three additional legal custodians.

7    Mr. Posner was going to address that, unless your Honor has

8    questions.

9         THE COURT:  No, go ahead, Mr. Posner.

09:41AM 10         MR. POSNER:  So, your Honor, the magistrate

11    ordered us to -- originally the magistrate said you don't

12    have to review the documents from one of the in-house

13    lawyer's files because you're just going to end up creating

14    a massive privilege log, motions for reconsideration.

15    She's now ordered us to review documents from three

16    additional legal custodians.

17         She didn't identify the legal custodians, so the

18    problem, of course, we're confronted with in this case is

19    that the relator is seeking certainly the longest time

09:42AM 20    period I've ever heard of, which is a 20-year plus time

21    period.  They want to now go to 2020, and they've asked for

22    documents from the late '90s and the early 2000's, so now

23    the order appears to require us to go back two decades,

24    figure out all of the in-house lawyers who may have worked

25    on the patient support services, I guess, offer up the

1    three of them, although it's unclear how that's supposed to

2    work, and then, of course, virtually all those documents

3    are going to be put on a log.

4         It just seems like an extremely burdensome, you

5    know, waste of time for us to have to research all the

6    lawyers at a large company over two decades, I guess offer

7    up the three legal custodians and then log, I don't know,

8    thousands of additional entries, hundreds, you know,

9    obviously, I don't know what the volume is because I don't

09:43AM 10   know what the custodians are because we haven't looked for

11   it yet, so it just seems really excessive.

12        We, obviously, have based on the documents we have

13   reviewed created an existing privilege log, we have

14   precisely and carefully logged the privileged material.

15        Now, that privilege log is going to be exploded

16   and we're going to have to dig around for 20 years to

17   figure out which lawyers worked on this and then log

18   virtually all of their stuff.  I don't know what we find.

19        So, you know, obviously it just seems excessive to

09:43AM 20   us.  I think Magistrate Judge Kelley's instinct, initial

21   instinct, on this was the correct one.  You know, we had

22   this dispute about whether we had to search the laptop for

23   one of the in-house lawyers whose name is Fred Jimenez.

24        You know, we know he looked at -- we're not

25   relying on this, I'll get to it this in a minute -- but,

1    you know, he was a lawyer who served in a capacity where he

2    would review materials, and she originally said you don't

3    have to review his entire laptop because you're going to

4    have to log virtually everything, and after various

5    motions, she's ordered us not to apparently do that but to

6    do additional legal custodians, so we just think it's not,

7    you know, it's too much effort.

8         Obviously, we all want to focus on getting this

9    case to summary judgment, certainly we want to do that, and

09:44AM 10    that just seems disproportionate to the phasing of this

11    case, so that's our view on the three custodians.  I'm

12    happy to take questions, I'm happy to move to the next

13    issue, your Honor.

14         I guess one of the things I did want to address

15    was expanding discovery to February, 2020.  So the

16    magistrate I think initially limited discovery to put the

17    end date at least for Phase I at February of 2016.  The

18    relator left in February of 2016.

19         The case was filed several months later, so,

09:45AM 20    obviously, she has no personal knowledge what occurred

21    after she left.  So previously we had a time period of,

22    according to the relator, the late '90s to 2016.  Now they

23    want the late '90s through 2020, maybe even through the

24    present.  It might be 2023 for a time period if they want

25    something to the present.

1          Obviously, the materials that post date her

2      departure cannot by definition relate to the claims in the

3      relator's district journal or tenure, which was the point

4      of phased discovery, and the practical, the real world

5      problem, your Honor, in this is we have to redo all the

6      searches, right, we have to go back, to figure out, redo

7      all your searches, put in the last four years of the time

8      period, and now they want us to add a bunch of custodians

9      to that.

09:46AM 10          That alone, according to our estimates, is going

11      to delay things by three to five months, just that alone,

12      so, again, obviously, we're all searching for the right

13      balance for what's proportional.

14          We contend that it makes sense in Phase I to limit

15      this case at the end of the time period to when she left.

16      Several other courts have done that, have cut off

17      discovery, sometimes liability, but certainly discovery for

18      when the relator leaves the company, so, you know, we just

19      think, I mean, right now we have a 16-career plus time

09:46AM 20      period.  We think a 20-year time period is grossly

21      excessive, but, obviously, that's your Honor's

22      determination.

23          I guess while I'm up here, one other issue, your

24      Honor, was, unless your Honor has questions on the time

25      period issue, they want the communications with DOJ and

1    OIG HHS since 2016.  They want disclosure of information

2    disclosed to DOJ concerning what I will call Investigation

3    Number 2, the investigation from 2016 that resulted in the

4    deprivation by the United States in this case, then they

5    want whether Janssen ever sought an OIG opinion on the

6    programs in question.  We told them we did not, and then

7    they want any communications with Medicare that may relate

8    to the claims in this case, although the company doesn't

9    have claims data, the company doesn't submit the claims,

09:47AM 10   the doctors submit the claims.  SMS has possession of the

11   claims data.

12         We've already produced -- let me focus on DOJ for

13   a minute.  We've already produced the documents that were

14   produced to DOJ during this investigation.  Of course, they

15   span a long time period, although not as nearly as long as

16   the one in this claimed qui-tam, and they cover lots of

17   different custodians.  We've produced the cover letters.

18         We certainly agree to the extent that is in

19   question that what the government knew and when the

09:48AM 20   government knew it is quite relevant to scienter.  We will

21   be heard at length on that question shortly.

22         You know, look, we'd be willing to provide some

23   additional materials provided to DOJ, assuming we get, you

24   know, a contemporaneous production from DOJ and OIG about

25   their investigation.

1            In any event, on OIG, we told them, we didn't make

2    any OIG advisory opinion requests for the programs in

3    question, we've answered that.  On the Medicare, they want

4    communications, I think, between company and Medicare I

5    think relating to the programs in question, which, again,

6    are now spanning 20 years.  We told them, well, the

7    government has the claims data.  We'd have to search a

8    completely different part of the company to determine

9    whether there were any communications, I guess, with SMS

09:49AM 10    about these programs.

11            We told them that we don't have anything relating

12    to an OIG advisory opinion request for these programs, and,

13    again, it's about proportionality, right?

14            The claims data are very important.  It's a false

15    claims act case.  The government has the claims data.

16    They're supposed to produce that to the parties.  They have

17    not, but so we don't think we have to go search some

18    different area of the company to see whether potentially

19    there was some communication with Medicare about the

09:49AM 20    programs in question.

21            That's where we are on sort of the proportionality

22    as to that issue as well, your Honor.  Ms. Grigsby will

23    address the other areas in our appeal.  Thank you.

24            THE COURT:  Okay, Ms. Grigsby.

25            MS. GRISBY:  Yes, your Honor.  So now I want to

1    address the addition of further employees, the searches of

2    unidentified employees, and so this is part of the

3    magistrate judge's order on page 15 where there's an order

4    to search and produce documents from current and former

5    employees who had significant involvement in the

6    development, review, approval, monitoring and/or delivery

7    of the support services at issue in this case, whether or

8    not relator happened to name such employees as ESI

9    custodians.

09:50AM 10            Fundamentally, the issue here is that this is not

11    tied at all to proportionality.  The parties cooperated and

12    went through an ESI procedure in order to identify the most

13    relevant custodians to relator's allegations and claims,

14    and based on that, Janssen has searched and reviewed those

15    custodians.

16            What this piece of the discovery order does is

17    basically take -- make unfettered access or an unfettered

18    search for any potential employee who might have had, you

19    know, some kind of involvement in these particular

09:51AM 20    presentations and programs.

21            So I'll just give you an example just to make this

22    very concrete because there may be further disputes about

23    what is actually significant involvement.  It could be that

24    there is a person from accounting who every single time a

25    presentation or a program occurred actually signed the

1    receipt for payment.  That person arguably could have

2    significant involvement in the approval of the support

3    services at issue in this case, but going out and looking

4    for every single individual like that would take hundreds

5    of hours, if not, you know, thousands to review, produce,

6    and make sure that we have gotten every single person who

7    may have touched this program in somewhat of a repetitive

8    way.

9           Relator's accusation that Janssen somehow is

09:52AM 10   trying to hide the ball or disrupt the process is just

11   false.  We have worked with relator throughout a

12   multiple-month negotiation period to review some

13   custodians, including custodians that relator handpicked in

14   order to produce these purpose of documents.

15          We, according to the ESI protocol, cooperated in

16   identifying the appropriate limits of discovery, and we

17   further agreed that one of the appropriate limits was to

18   limit the number of custodians.  This is all contemplated

19   by the ESI protocol itself.

09:52AM 20          The position that Janssen now needs to just

21   conduct further searches for all employees, for current or

22   former, who had significant involvement, which is

23   incredibly vague, is basically, again, trying to remove any

24   limit that might have previously existed for this discovery

25   process.

1    And just to bring it back, this is in

2 contravention of the Rule 26 standard, which the touchstone

3 is proportionality.  It is not that relator is entitled to

4 every single document that could potentially be, you know,

5 relevant to her claim, including that accountant's, you

6 know, signature on a particular form, it is that, you know,

7 you would look at proportionality to determine whether

8 those documents will be searched.

9    In our briefing, we talk about the *Sedona*

09:53AM 10 principles, which lay out electronic discovery and ESI

11 protocols, which, again, go to the fact, and they

12 understand that it is neither reasonable, nor feasible for

13 a party to search and produce information from every

14 electronic source that might contain information relevant

15 to every issue in the litigation, nor is a party required

16 to do so.

17    That is in the *Sedona* principles itself.  And the

18 reason is because as we all know with this electronic age,

19 electronic documents proliferate.  There could be like we

09:54AM 20 were saying, hundreds of potential people who could have

21 these repetitive documents, but these documents aren't

22 necessarily significant, nor are they necessary to test

23 Ms. Long's claims, and they are not necessarily necessary

24 to say what she knew and to test at summary judgment

25 whether she would have a solid claim.

1            So we think that the ESI review to date, the

2       review of the dozens of custodians is the appropriate

3       limitation here.  We used a well-established manner to

4       review these documents, which is using the ESI protocol in

5       order to respond to the discovery requests, and relator has

6       somehow mentioned that there is some kind of separate

7       process by which we should have been looking for, you know,

8       dozens, hundreds of employee's documents in addition to the

9       ESI protocol.  That is inconsistent with ESI discovery

09:55AM 10       itself.

11            Generally we looked at centralized sources, as I

12       said, but when you decide on the custodians, the reason why

13       is so that the parties do not need to go to every

14       electronic scrap in order to fulfill document requests

15       because, as we all recognize, that comes at substantial

16       burden and substantial expense.

17            So the order itself just erases that.  It really

18       erases any limitations that were in the ESI protocol and

19       basically makes Janssen start over, conduct some kind of

09:56AM 20       broad scour of all of our potential employees during this

21       multi, this over a dozen years in order to find someone who

22       may have had significant involvement and search their

23       documents in addition to, you know, all of the custodians

24       that the magistrate judge previously ordered, so this is

25       really kind of a fishing expedition.

1          So just kind of on that, I think I've made the

2     point, so I'm going to move onto the third set of our RFPs,

3     and just to make this clear, so relator served 23 requests

4     for production of documents at the very end of Phase I

5     discovery.

6          That is in addition to two sets of requests for

7     production of documents that the relator had already

8     served.  These requests were served nearly 11 months after

9     the Court's deadline for the service of the RFPs, so as our

09:57AM 10  briefing said, our first argument is -- and really these

11    requests themselves are untimely.

12         This Court on December 18th, 2020 had set a

13    deadline of January 21st, 2021.  That's at ECF 89, and this

14    Court set this deadline after the Court made the order that

15    this case would proceed in phases, so it is not the case

16    that the Court was unaware of what the existing structure

17    of this discovery would be in setting the deadline.

18         Relator has argued that she hasn't had the

19    opportunity to serve these types of discovery requests,

09:58AM 20  and, in particular, she notes that many of her requests go

21    to scienter.

22         As we've mentioned in our brief, that is just

23    not -- that's incorrect.  In fact, the vast majority of

24    issues raised in her prior request for production are ones

25    that she has already accepted the prior requests, and, in

1    addition, her request, in fact, do touch upon the issue of

2    scienter.  That is the existing request that Janssen has

3    already responded to, so, in particular, relator's request

4    for production, which was served on December 30th, 2020

5    include a request for all management level documents

6    concerning the purpose, reason or objective of providing

7    IOI support, that's RFP 24, and for all management level

8    documents concerning the lawfulness of providing IOI

9    support or any other management advisory services

09:59AM 10    depositions.  This is RFP 33.

11         So it is just not correct to say that relator

12    somehow missed the boat or wasn't provided the opportunity

13    to discover and delve into the issue of what Janssen

14    thought of the lawfulness, nor is it fair to say that

15    relator didn't have the opportunity and didn't, in fact,

16    serve requests related to what Janssen knew.

17         Relator really can only point to one prior

18    discovery order, and that's the one related to

19    Freddy Jimenez that Mr. Posner just mentioned where she was

09:59AM 20    denied the opportunity to look, to get documents from this

21    particular custodian, and part of the reason was because

22    Magistrate Judge Kelley said that it would just create a

23    very large privilege log.

24         But other than that, relator has had free reign to

25    look into scienter, and, in fact, has served discovery

1    addressing that issue.  And so we have in our briefing a

2    chart showing just how some of these RFPs match up to some

3    of her prior RFPs.  Certainly the wording is different on

4    some of them, but they are the same general, the same

5    general request in many cases.

6         The magistrate judge reconciled all this by saying

7    if Janssen has already responded to the prior art piece,

8    Janssen can just tell relator that Janssen has already

9    responded, but I guess the question here is if Janssen has

10:00AM 10   already responded, if relator already had opportunity to

11   take discovery on subjects that she wanted, then Janssen

12   should not have to undergo any burden to respond to these

13   untimely requests, requests that were served almost a year

14   after the cutoff established by this Court, and certainly

15   Janssen should not be required to engage in new searches in

16   order to respond to these new RFPs, the dozens of new RFPs

17   that were served.

18        So if there are no questions on this particular

19   area, then we can move onto the extension of discovery

10:01AM 20   where relator has asked the discovery go back prior to 2006

21   for relator and for Ms. Trahan, Attorney Trahan, and

22   basically the magistrate before discovery with a couple of

23   exceptions or with a few exceptions, we were looking at

24   2006 to 2016, when Ms. Long left the employ of Janssen.

25        Now, the magistrate judge's order basically says

1    that documents during the development of the program,

2    including defendant's evaluation of the legality of the

3    program, should go back for at least one custodian,

4    Karen Trahan to the start of the program.

5         So the first point is that these documents or

6    these are not likely to include nonduplicative, relevant

7    materials because we've already produced the information on

8    the programs for over a 10-year period, for a 10-year

9    period, including from the files of the relevant

10   custodians, which include, as I said, the vice-presidents,

11   the national sales directors, people who are quite high up

12   in Janssen.

13        Relator had no involvement in the origination of

14   the program or any other topic prior to 2006.  I mean, that

15   is just undisputed, so it's not clear why we would be going

16   back further than what relator knew or, you know, the

17   origination of the program for which relator was not

18   involved.

19        But with respect to Ms. Trahan, there just appears

20   to be a misunderstanding about what Ms. Trahan did.  Her

21   role as regional business director, it supervises the area

22   of business specialists such activities, and we've produced

23   documents from the time period from October, 2006 through

24   Ms. Long's separation, but basically Ms. Long has said that

25   this means that we should, you know, tie everything to

1    Ms. Trahan and continue to go back and to look back at

2    anything Ms. Trahan knew.

3         Relator has already said that it wants to notice

4    Ms. Trahan's deposition, and relator can certainly explore

5    some of these topics at Ms. Trahan's deposition when it

6    takes place and after the parties have some understanding

7    of any further document discovery that is necessary, but at

8    this time to ask Janssen to reach back into Ms. Trahan's

9    documents that now are over 16 years old from now and to

10:04AM 10   basically try to do new searches is overly burdensome.

11        Basically using the parties' search terms from

12   prior to October, 2006, that would lead to perhaps tens of

13   thousands of documents to review, which at this stage could

14   take one or two months, so this is just not something where

15   we can press a button and do it quickly, and, again, this

16   is kind of outside the phase of the current discovery,

17   which really does relate to Ms. Long and what she knew and

18   what was going on in Central Pennsylvania during the time

19   that Ms. Long was employed at Janssen.

10:04AM 20        If your Honor doesn't have further questions about

21   this particular area, then I'm going to move onto the

22   information about these when it comes from other sources,

23   so this is the particular part of Magistrate Judge Kelley's

24   order, which is ECF 284 on pages 5 and 6, and the order

25   requires Janssen to produce documents that show or track

1    certain information from Phase I accounts, but it orders

2    Janssen to search other sources for this information going

3    back to the date when Janssen started to provide IOI to

4    physician practices in Central Pennsylvania.

5         So we generally don't have reasonably more

6    valuable information to provide on this.  We've provided

7    information that is available in what we call the CRM, the

8    customer client relationship management database for the

9    relevant discovery period, so that would cover the Central

10:06AM 10   Pennsylvania accounts as well as the ESI from relator and

11   from her direct chain of command.

12        In a nutshell, we're just not aware at this point

13   without launching some kind of further investigation that

14   there is any other information, and, again, this part of

15   the order should be overturned in its entirety because the

16   discovery period is really from October, 2006 onward.

17        Information concerning the specific practices,

18   support services provided by Janssen to physicians'

19   practices outside the statute of limitations period is not

10:06AM 20   at issue in Phase I now, and the burden of identifying what

21   could have been provided going back more than 16 years is

22   incredibly burdensome and certainly disproportionate, the

23   burden is disproportionate in this case.

24        If your Honor doesn't have any more questions on

25   that, I just want to move to the document retention

1    policies.  So basically there has been an argument by

2    relator that Janssen must produce additional document

3    retention policies, and the magistrate judge's order agreed

4    that document retention policies in place at the time

5    Janssen learned of the litigation are more relevant but

6    required Janssen to produce prior versions of its document

7    retention policies.

8          So, just to be clear, Janssen has produced its

9    current document retention and preservation policies.

10:07AM 10    That's not disputed.  Relator has the particular document

11    retention policies, but what this order does is it not only

12    says that perhaps Janssen should produce the document

13    retention policies from 2017, which is when Janssen learned

14    of this particular investigation and its litigation but

15    instead that Janssen should produce document retention

16    policies perhaps at any point, which would be maybe from

17    2010 and from 2006, and, again, it's not clear how this is

18    really relevant to Phase I discovery and certainly it's

19    unduly burdensome.

10:08AM 20          There is no question, Janssen, when it learned of

21    this litigation or this investigation, in fact, was

22    following document retention policies.  It's not at all

23    clear what relevance the document retention policy in 2010

24    would have to any issues this case except to be a fishing

25    expedition.

1          Relator has not alleged that Janssen failed to

2     properly preserve its documents, and certainly relator has

3     provided no evidence that Janssen has somehow, you know,

4     not followed its standard document retention policies, so,

5     at a minimum, if this Court were inclined to uphold part of

6     the order, Janssen asks that it be limited to the policies

7     that were in effect in 2017, when Janssen learned of the

8     government's civil investigative demand as opposed to some

9     kind of open-ended requirement to produce every single

10:09AM 10   version of Janssen's document retention policies.

11          So the next issue really is the information about

12    the privilege log.  You know, Magistrate Judge Kelley found

13    that Janssen's privilege log met the standards of Federal

14    Law 26, it identifies names of the individuals, whether

15    they were known to the attorneys, information that's

16    required to later evaluate the particular privilege claim.

17          So, Magistrate Judge Kelley, however, ordered

18    Janssen to provide additional information not required by

19    the protective order, in particular, who the parties are in

10:10AM 20   each communication and what their roles were in the

21    company.

22          So, again, this is in excess generally of what is

23    required under Rule 26 for a privilege log.  Normally you

24    write the -- you indicate who is the attorney and the

25    parties to the communication.

1          This would be burdensome because we, as attorneys

2    for Janssen, would have to go back and find every single

3    person's name, the nonattorneys, and try to match it with

4    their particular titles and roles during the relevant

5    period for the hundreds of log entries, so that in and of

6    itself would be a bit of a research and a fishing

7    expedition.

8          It's also, I think we noted in our appeal and the

9    reason below, it's at odds with the particular log format

10:11AM 10    that the relator herself has used.  Her privilege log does

11    not contain the names of every single person's title, and

12    it certainly isn't what we agreed to in the protective

13    order and what the parties have agreed to.

14          So, relator argues that she needs this information

15    to evaluate the privilege claim, but really the only thing

16    that relator needs in order to evaluate a privilege claim

17    is information on whether an attorney was involved.

18          So, relator has access to millions of

19    nondisclosure documents that relator has access to the

10:11AM 20    organizational charts, to employee rosters, and if relator

21    is interested, to figure out what particular role that

22    person provides, then she is free do so.

23          I mean, generally this Court recognizes that

24    privilege can extend up and down this organization and that

25    we no longer have use of what they call the control test,

1    so really in terms of evaluating whether something is

2    privileged, relator does not need Janssen to go through the

3    exercise of writing down titles for hundreds of log

4    entries.

5         So the next issue really is related to relators'

6    appeal, so I guess does this Court have any further

7    questions on the issues brought up by Janssen's appeal?

8         THE COURT:  No.  I'll let Mr. Leopold or the

9    plaintiff suggest their cross-appeal and then let you

10:13AM 10   respond to that.

11        MS. GRISBY:  Yes, your Honor.

12        THE COURT:  Okay.  All right.  Mr. Leopold.

13        MR. LEOPOLD:  Thank you, your Honor.  Mr. Preston

14   is going to respond to the appeal of Magistrate Judge

15   Kelley's order.

16        THE COURT:  Okay.  Mr. Preston.

17        MR. PRESTON:  Good morning, your Honor.  We just

18   heard pretty much a complete rehash of Janssen's arguments

19   and several briefs that Judge Kelley has closely considered

10:13AM 20   multiple times, and she has rejected these arguments, and

21   the reasons why she's rejected these arguments are set

22   forth in detail in our briefing and in Judge Kelley's

23   orders, but just to summarize your Honor, in December of

24   2020, your Honor devised a discovery plan in which

25   discovery would evolve.

1          If your Honor would like, I can go back and I can

2     read the transcript from the December, 2020 scheduling

3     hearing.

4          THE COURT:  Let me get one thing on the table

5     here, okay, we're still in Phase I.  I know you keep saying

6     that we're not in Phase I anymore, we're in Phase I, we're

7     still on Central Pennsylvania and policies affecting

8     Central Pennsylvania, okay.  We have not evolved, devolved,

9     revolved, we are in Phase I.  I have never issued a

10:14AM 10  contrary order.

11          MR. PRESTON:  Your Honor, we don't necessarily

12     disagree with that.

13          THE COURT:  It's my order.  Whether you agree or

14     disagree doesn't really matter, the point is that Phase I

15     discovery is the relator's case.  We are on the relator's

16     case.

17          Now, you can define that broadly, narrowly, you

18     know, whatever, whether that means you get names and

19     privilege logs or whatever, fine, but it's the relator's

10:15AM 20  case, not the entire universe, not what was happening in

21     Seattle or Spokane.

22          MR. PRESTON:  Your Honor, none of the discovery

23     disputes before your Honor or before Judge Kelley related

24     to discovery about what was happening in Spokane, this all

25     relates to the services that were provided in Central

1   Pennsylvania, but, your Honor, when you look at the

2   instructions provided in December of 2020, your Honor did

3   not say that based on the three months of limited discovery

4   that you were providing at that time and based on

5   instructions, it did not say that summary judgment was

6   going to be based on that limited discovery, and your Honor

7   in December or, excuse me, October of 2021, your Honor

8   provided updated instructions in which you clearly said you

9   wanted the relator to provide complete discovery on all

10  elements of her claims except with regard to the field

11  level discovery as to what was happening in other

12  territories such as Spokane, and Chief Magistrate Judge

13  Kelley agrees with our interpretation that the instructions

14  changed in October of 2022.

15         Her rulings were based on her interpretations of

16  the Court's instructions, and in her orders, she explains

17  how she proceeded and she limited the discovery that we

18  were able to receive particularly on the issues related to

19  scienter, and she didn't provide us full discovery because

20  she was trying to meet the short deadlines that were

21  imposed as part of the earlier instructions.

22         So, your Honor, the initial instructions, it was

23  supposed to be a very limited period of initial discovery

24  where discovery would help guide what future discovery

25  would take place in the case.  This was not to end in a

1    dispositive motion.

2          Your Honor, Janssen stretched out that three-month

3    period by objecting to all our discovery requests, refusing

4    to identify key witnesses, and then slowly reviewing and

5    producing documents.  So that initial three-month period

6    got stretched out all the way out to November.

7          Your Honor, in accordance with the Court's

8    instructions during that stretched-out initial period, we

9    focused on the discovery that confirmed that Janssen

10:17AM 10   provided the illegal remuneration at issue in plaintiff's

11   former territory, and that that illegal remuneration was

12   provided under a national directive.

13         We complied with the Court's instructions to

14   obtain additional foundational information that would

15   enable future discovery in the case to be conducted more

16   efficiently.

17         Again, in October, your Honor provided updated

18   instructions, again, directing the parties to provide

19   relator complete discovery on all elements of her

10:18AM 20   anti-kickback statute and False Claims Act claims.

21         Your Honor imposed one restriction, and that's

22   because Janssen provided the same practice management

23   infusion operation support services in all territories.

24   Your Honor wanted discovery of documents and information

25   regarding the delivery of those services and related

1    interactions with physician practices.  This is what we've

2    been calling field level discovery.  Your Honor wanted that

3    to be focused on Central Pennsylvania.

4         Your Honor at that time advised, made it clear

5    that once discovery is completed, it was going to conduct a

6    summary judgment process concerning all elements using the

7    free services provided in Central Pennsylvania as a

8    Bellwether.

9         After your Honor updated the instructions in

10:19AM 10    October, plaintiff immediately began seeking the remaining

11    discovery she needed to prepare for depositions and to be

12    ready for the Bellwether summary judgment process and

13    trial.

14         Clear, plaintiff is not seeking --

15         THE COURT:  I never talked about a Bellwether

16    process or trial, and we specifically talked about that

17    Phase I would result in a summary judgment motion.  That

18    was entirely -- there's no point in having a Phase I if

19    Phase I is just a label that immediately segues into

10:19AM 20    Phase II, we may as well just call it discovery.

21         The plan from the beginning was to do discovery on

22    the claims in Central Pennsylvania, again, however defined,

23    and we would talk about that, that would lead to a summary

24    judgment motion, and, of course, you can say, for example,

25    Rule 56(d), you don't have sufficient information to oppose

1    it, and, you know, that might be fair or not, but that was

2    always the plan.

3         I'm pretty sure if I go back and look at the

4    record, we can talk about that.  This is not an MDL.

5    There's nothing about Bellwether, initial trial, there was

6    nothing about any of that, but continue.

7         MR. PRESTON:  Your Honor, I'm going to read from

8    Judge Kelley's Order 282:

9         "The Court will not go point by point through its

10:20AM 10   rulings across the multiple hearings.  Suffice to say, the

11   Court's aim was to cabin the discovery so the parties could

12   meet the fairly short deadlines set by Chief Judge Saylor,

13   and in this initial stage of discovery, to give relator

14   just enough information to test her claims."

15        "This Court repeatedly assured relator that

16   however limited discovery was during what the parties came

17   to refer to as Phase I, relator would in the future get

18   more discovery."

19        "Janssen, which persistently argued that discovery

10:21AM 20   should be as narrow as possible, conceded that Phase I

21   discovery was not the end of discovery.  We're trying to

22   look at the claims through a lens, and then you see where

23   you are after Phase I."

24        "In some instances, the Court persuaded relator to

25   back down from requests by assuring her counsel that she

1    would be able to take certain discovery later in the case,

2    even when the requested discovery concerned key elements

3    which relator was obligated to prove, such as Janssen's

4    scienter."

5        "In short, this Court agrees with relator that

6    this Court in an effort to provide her with samples of the

7    evidence limited the number of custodians, limited

8    discovery temporarily and postponed discovery on important

9    issues, such as scienter."

10   "It was understood that the goal of Phase I

11   discovery was to probe the validity of the kickback

12   allegations before considering whether to authorize

13   nationwide discovery.  It was not clear what would happen

14   at the end of it."

15       And that is the guidance that the magistrate judge

16   operated under.  Your Honor, so it's not just the plaintiff

17   that was not -- didn't believe that there was a summary

18   judgment at the end of the three-month period of discovery

19   that was initially set, Chief Magistrate Judge Kelley

20   wasn't aware of that either.

21       Your Honor, after October and we got, received the

22   clarified instructions, we immediately began seeking the

23   remaining discovery needed, mostly focused on scienter but

24   also to expand the number of custodians and other witnesses

25   who possessed relevant documents.

1          Janssen is asserting that depositions, expert

2     reports, and the Bellwether summary judgment or summary

3     judgment based on Central Pennsylvania, whatever you want

4     to refer to it as, should be based strictly on the small

5     samples of documents that plaintiff received at the initial

6     stage of the discovery period.

7          Under Janssen's unreasonable interpretation,

8     during the summary judgment process, it's going to require

9     substantial additional discovery.  Janssen is free to raise

10:23AM 10     any issue that it chooses during this summary judgment

11     process, so by virtue of the fact that we have only

12     received a sample, any response to the summary judgment is

13     going to require additional discovery.

14          And then after the summary judgment is complete,

15     discovery would have to reopen again and be completed in

16     order for plaintiff to prepare for the summary judgment she

17     intends to file.  This shouldn't be a one-sided process

18     where only Janssen gets to file for summary judgment.

19          Your Honor, as a result, depositions would need to

10:24AM 20     be opened multiple times, expert reports would need to be

21     supplemented.  This approach would significantly delay the

22     resolution of these issues.

23          Judge Kelley rejected Janssen's version of the

24     plan and determined in light of the updated instructions

25     provided in October, additional requested discovery is

1    necessary and appropriate under Rule 26's proportionality

2    factors.

3           This is all basic discovery that's indisputably

4    relevant, such as producing documents from the files of

5    employees who had significant involvement.  Nevertheless,

6    Janssen has asserted meritless objections for a second

7    time, some to Judge Kelley's orders requiring it to comply

8    with its basic discovery obligations.

9           Judge Kelley, who has handled the myriad discovery

10:25AM 10   disputes since the commencement of discovery found that the

11   discovery at issue is relevant and proportional to the

12   needs of the summary judgment process and the case as a

13   whole.

14          Judge Kelley understands the plan, Judge Kelley

15   understands the case can't move towards resolution while so

16   much relevant information and evidence is being withheld.

17          Judge Kelley recognizes that it would be a waste

18   of resources and counterproductive to take depositions,

19   have experts prepare reports and conduct a summary judgment

10:25AM 20   review before the completion of document discovery on the

21   central issues in dispute in the case.

22          Because these are discovery rulings involving

23   issues of mixed law and fact, Judge Kelley's rulings must

24   be afforded significant deference.  Judge Kelley did not

25   ignore and misapply Rule 26, nor did Judge Kelley abuse her

1   discretion or make clear error in assessing the

2   proportionality of the discovery of the needs to the case.

3          She considered all of the proportionality factors

4   extremely closely, relevant extremely closely, which is

5   evident from her orders.  She did not grant plaintiff

6   everything she was requesting.  In fact, you denied a

7   significant amount of additional significance discovery

8   plaintiff was requesting.

9          Janssen can't legitimately complain about any

10:26AM 10  delay associated with completing this discovery, as these

11  delays could have been avoided if Janssen had complied with

12  its obligations concerning this fundamental discovery.

13         And further delaying the discovery, Janssen is

14  merely rehashing arguments it made earlier to Judge Kelley

15  while improperly trying to assert several new arguments

16  because all of Janssen arguments asserting that

17  Judge Kelley's rulings were clearly erroneous, contrary to

18  law, or meritless, all of its appeals should be denied.

19         We believe our briefing explains why all the

10:27AM 20  appeals should be denied.  I can take the approach of

21  Janssen's counsel and go through each particular appeal and

22  address them individually, your Honor, or if your Honor has

23  specific questions concerning particular appeals, I'm happy

24  to address those.

25         THE COURT:  Why don't you address your cross

    1    motion.

    2           MR. PRESTON:  Yes, your Honor.  I think

    3    Diana Martin is going to address our cross motion.

    4           THE COURT:  All right, Ms. Martin.

    5           MS. MARTIN:  We filed a limited appeal of a single

    6    issue on plaintiff's -- our motion to compel in response to

    7    Requests Number 51.  In that request, we asked for all

    8    documents concerning the review or approval of a contract

    9    with a vendor or outside consultant who developed and

10:28AM 10    provided any of the various types of audit support

    11    services, including --

    12           COURT REPORTER:  Excuse me, you are breaking up.

    13           THE COURT:  Same here.

    14           MS. MARTIN:  I'm sorry.  Is this better?  I'm

    15    getting some background, too.

    16           THE COURT:  Why doesn't everyone but you moot.

    17    Let's see if that helps.

    18           MS. MARTIN:  Thank you.  So this is our limited

    19    appeal of compelling a response to request to produce

10:29AM 20    Number 51.  That's where we were seeking all documents

    21    concerning the review or approval of a contract with a

    22    vendor or outside consultant to develop or provide any of

    23    the various types of IOI support services provided,

    24    including immunology, marketing, commercial agreement

    25    routing slips, and we specifically mentioned those routing

1    slips because we were provided with one single routing slip

2    in the responses to our earlier request for production, and

3    so we included that routing slip as an exhibit to our

4    motion.  It's Exhibit A, and we believe that that routing

5    slip shows why these types of documents are relevant here

6    and relevant to proving the key issues of our case.

7         In this routing slip, it shows that it's -- as

8    Janssen itself says, it's a summary of its agreement with

9    Xcenda regarding the project title is 2013 SOC Site of Care

10:30AM 10    Programs at a projected cost of $600,000, and so this

11    demonstrates that Janssen directed Xcenda to develop and

12    deliver site of care support services to select physician

13    practice groups.

14         These are services that the plaintiff has claimed

15    in their complaint constitute a legal remuneration and

16    violation of the anti-kickback statute, and this routing

17    slip, so it states that Janssen's, what their objective is

18    in having these services provided, that they're paying

19    these outside consultants a significant amount of money to

10:30AM 20    provide consulting services that value these physician --

21    that benefit these physician practice groups.

22         We believe this goes to Janssen acting knowingly

23    or voluntarily in providing these free services.  It shows

24    their strategic imperative written right on the document,

25    it's to sustain and grow the infusion model, it shows the

1    estimated cost of 600,000, which we believe shows this has

2    significant value, it constitutes remuneration.

3         They deployed the program's according to business

4    need, and they were not offered to all physician practice

5    groups, and this document shows that Janssen's -- it shows

6    who signed off on the project, Janssen's legal department,

7    senior managers, including its vice-president and its

8    president, approved Xcenda in developing and delivering

9    these programs, which we believe all goes to showing that

10   Janssen acted knowingly, voluntarily and willingly in

11   providing these services.

12        And so the magistrate determined that these

13   documents were not relevant at this stage of discovery, and

14   we believe that decision was an error, that by looking at

15   this single document that we provided, and we believe there

16   must be others out there that also summarize these

17   agreements that Janssen had with these outside consultants

18   that they're relevant and should be produced at this stage

19   before we come to this close of this phase of discovery and

20   enter the summary judgment process.

21        THE COURT:  All right.  Ms. Grigsby, are you going

22   to respond to that?

23        MS. GRISBY:  Your Honor, yes, I am responding to

24   that, and also I did want to address a few factual issues

25   that were raised in Mr. Preston's arguments in response to

1    our appeal, but on these particular routing slips, just to

2    keep it clear and simple, the reason why relator is able to

3    bring this up is because of all the immunology marketing

4    routing slips that are related to the contracts themselves

5    were produced that we found, so relator has the contracts

6    with the service providers, so they already knew the amount

7    because we've already searched for and produced the

8    contracts themselves for the support services.

9         What relator is pointing to is not just the

10:33AM 10   entirety of its attachments, it's pointing to a single

11   sheet of paper that accompanied the contract and then

12   arguing that Janssen should do some full scale search for

13   these routing slips.

14        It is duplicative of what relator already has

15   because relator has the routing slips that go with the

16   contracts.  Again, it's untimely for the reasons we

17   discussed.  This was served in November, 2021, well after

18   the discovery cutoff, and it's cumulative.

19        Relator has all these pieces of information about

10:34AM 20   the consulting -- about these slips, and they said they

21   believed that there are routing slips out there, but they

22   have no basis to actually claim that.

23        So, big picture is that this is going to going on

24   these wild goose chases for documents that we have no

25   reason to believe exist could delay this case for a

1    significant amount of time, and that is in addition to the

2    other things that relator wants.

3          We are not slow walking it, we are working with

4    all deliberate speed, and our estimate is that this could

5    take up to a year because relator now unsatisfied with what

6    they have want to go and have Janssen look at every single

7    piece of paper or every single electronic file for

8    thousands and thousands of employees over a decade period.

9          But just to kind of go back and just larger state

10   setting on our appeal, I did hear relator say that we were

11   refusing to identify key witnesses.  Again, in the record,

12   there is no basis for that statement.  Janssen responded to

13   interrogatories, relator herself has independent knowledge

14   of the people who are in her command chain.

15          The idea that somehow Janssen waited to provide

16   relator with identification of witnesses such that they

17   could only do it in November, 2021 just is not in the

18   record, and I would actually say that relator should cite

19   to some precise -- a documentation before levying these

20   types of allegations.

21          The other thing that relator said is that Janssen

22   is slow walking discovery.  Your Honor has been closely

23   managing this case along with Magistrate Judge Kelley.

24   Again, there's no indication that Janssen somehow was

25   waiting to provide documents.

1           As Janssen said, in collecting documents, it

2     performed a review based on these custodial searches and

3     reviewed over half a million documents in order to make

4     production burden relator.  In fact, Janssen early on made

5     a production of the government discovery, so that's the

6     discovery related to the government investigation.

7           And on March 23rd, 2021 before you, your Honor,

8     relator's counsel represented that the documents produced

9     to DOJ would 99 percent provide us the discovery that we

10    generally need.  That's in the transcript, page 9, lines 11

11    through 12, so it is not the case that Janssen has just

12    been sitting and waiting.

13          We have been responding to relator's requests,

14    we've been adding custodians, we've been reviewing

15    documents in reliance of the fact that relators would

16    comply with what the process was that this Court set out in

17    December of 2020 and not attempt to restart discovery in

18    November, 2021.

19          And with that and for the reasons we've walked

20    through, these magistrate judge discovery orders would add

21    a significant cost, it would be a significant burden, it

22    would cost, you know, millions of dollars, and it would

23    basically blow up discovery in this case.

24          We've noted that we believe that they are clearly

25    erroneous and contrary to law, in particular, this Court's

1    order, Rule 26, as well as the local rules and for all

2    those reasons, we ask that you grant our appeal.

3        THE COURT:  All right.  Let's take up the motion

4    to compel legal opinions.  Who is going to handle that?

5        MR. LEOPOLD:  I am, your Honor.

6        THE COURT:  Mr. Leopold.

7        MR. LEOPOLD:  Thank you, your Honor.  Your Honor,

8    with the understanding and knowledge of where we have come

9    from, the central issue, as your Honor is aware, relators

10:38AM 10  have alleged Janssen knew that the IOI infusion services

11   were unlawful in a way as it relates to the drugs of the

12   Simponi ARIA and the other drug.

13       Janssen knew that providing the IOI services

14   support would result in false claims to Medicare.  Janssen

15   not only in defending against these claims but also

16   asserting affirmative defenses that it cannot be held

17   liable because it believed it was acting lawfully.

18       Janssen states that the following facts supports

19   their position that it's PRC review and approval of these

10:39AM 20  materials that they undisclose employees, including

21   attorneys reviewed and approved the materials, that

22   undisclosed employees and attorneys reviewed the probable

23   available guidance that these materials would provide, the

24   inaction by the DOJ, and the review of various court

25   rulings.

1        That being said, Janssen has now asserted into the

2   litigation, it has asserted from day one, not only their

3   affirmative defenses but statements on the record to this

4   Court at a variety of hearings that it has injected as a

5   critical issue that it has acted lawfully.

6        Janssen, we believe, must produce all of the

7   analysis and reviews that are set forth for not only the

8   PRC but the other various legal counsel inside and outside

9   of Janssen who were involved in these particular reviews of

10:40AM 10   the materials, the IOIs, et cetera.

11        Your Honor is certainly well versed in these

12   particular issues and understands that these are not only

13   important issues but legally can be very important as it

14   relates to the litigation of these types of claims.

15        THE COURT:  To my understanding, this is a light

16   switch that is either on or it's off, either they are

17   relying on counsel or they're not, there's no middle

18   ground.

19        MR. LEOPOLD:  That's correct, your Honor.

10:40AM 20        THE COURT:  And, you know, if they've made the

21   choice, they're not going to rely on the advice of counsel,

22   they can't hint at it, they've made that decision, and

23   that's that.  That's my understanding.

24        MR. LEOPOLD:  That's correct, your Honor.  And

25   your Honor raised that issue when your Honor ordered, I

1    believe it was back in October, if I'm not mistaken,

2    somewhere in October, November to provide the Court with

3    their position.  They sort of walked the line at both ends,

4    and they are in lighter form on the record saying that they

5    at this time, I believe it's the words that they used,

6    they're not relying on the advice of counsel.

7         Your Honor at that hearing then stated, well,

8    don't expect to come back six, eight months from now and

9    change your view, we'll need to address that if and when

10:41AM 10   that occurs.  That being said, your Honor, they are

11   talking, respectfully, out of both sides of their mouths.

12        On the one hand, they're saying they're not

13   relying on advice of counsel, but, on the other hand, they

14   are saying we are relying upon the advice of counsel who

15   reviewed the PRC materials and the lawyers signed off

16   saying that it was lawful, so they are having it, you know,

17   having their cake and eating it, too.

18        They're saying officially we're not relying upon

19   the advice of counsel, but yet here are the PRC documents,

10:42AM 20   here are the lawyers, here are all the reviews of what we

21   did, and we're relying upon the advice of counsel, so they

22   have thrown in both expressed and implied type of waiver as

23   it relates to these particular issues, and as your Honor

24   has both addressed in court opinions that when you have

25   either the expressed or implied waiver, there are certain

1    criteria that are necessary to review.

2         And as your Honor has set forth in both the

3    *United States vs. Gorski* matter as well as the *Diamond*

4    *Staffing vs. Diamond Staffing*, you applied those particular

5    criteria, and at least the *Diamond Staffing* litigation, you

6    found that there was a waiver.

7         Again, your Honor, the Catch-22 that we are in is

8    I agree with your Honor, if they are of the position that

9    they are not relying upon the advice of counsel, then they

10   cannot say we are relying upon the PRC and the lawyers

11   involved or any other lawyers within Janssen or outside of

12   Janssen to say what we did or didn't do was lawful.

13        So perhaps Janssen should state now that they are

14   withdrawing any reliance upon any of the PRC materials, any

15   of the lawyers, and we are standing on our letter that we

16   are not relying upon the advice of counsel, and that will

17   be done with the issue.

18        But, again, your Honor, I don't want to beat a

19   dead horse, but that is not what they're saying behind the

20   scenes.  They are saying to you, your Honor, we are not

21   relying upon the advice of counsel, but in all of the

22   discovery responses and all of their affirmative defenses

23   and all the statements to the magistrate and all of the

24   statements to your Honor in the past hearings, they are

25   saying that we are relying upon the advice of counsel as it

1   relates to all of the approvals that were done related to

2   the PRC and in other aspects of in-house counsel and

3   outside counsel.

4        So really the burden is on I would say Janssen at

5   this point in time to say with specificity that they are

6   withdrawing any reliance upon the PRC, any reliance upon

7   the lawyers, and we are not relying upon the advice of

8   counsel.

9        If they are not able to say that, then they have

10  waived that issue, and we should be entitled to receive all

11  of the materials that address that issue.

12       THE COURT:  All right.  Mr. Posner.

13       MR. POSNER:  Your Honor, let me begin what is

14  undisputed in this case, all right.  1, we have carefully

15  withheld the documents that were privileged, logged them on

16  the privilege log.

17       We have not revealed any substantive legal advice

18  at any time at all.  Mr. Leopold is simply wrong.  The

19  reason he didn't cite or quote from any document in that

20  recitation is because if you look at the facts, if you look

21  at the documents, we have not in any way placed legal

22  advice at issue in any materials at all.  We have carefully

23  logged the privileged documents, we have declined to invoke

24  the advice of counsel defense which, by the way, is very

25  narrow.  Your Honor set out a very demanding five-part test

1    in the *Gorski* case about what that is, and we have been

2    very careful, there has been no waiver of privilege in this

3    case at all.

4           The First Circuit has made it very clear in *Keeper*

5    *of Records* case that an implied waiver is very rare.  The

6    client has to explicitly reveal an attorney communication

7    and rely on that communication or assert reliance on

8    attorney advice as a defense.  None of that has happened

9    here.  You will not find any example of that in any exhibit

10:45AM 10   attached to the relator's motion at all.

11          Now, we haven't placed any -- we haven't revealed

12   any attorney advice, we haven't cited to any legal advice,

13   the substance of any advice, much less that we're going to

14   rely upon.

15          We disclaim that we are going to rely on the

16   advice of counsel defense.  Our interrogatory responses,

17   all it says is that one lawyer reviewed, you know, had the

18   job title of reviewing programs like this.

19          The law is completely settled, including your

10:46AM 20   Honor's decision in *Gorski* that nearly revealing the fact

21   that a lawyer reviewed something without revealing the

22   substance of that communication is not a waiver.  If the

23   contrary were true, that would be a dramatic change in the

24   law.

25          Now, all we have said, look, the cases here, your

1    Honor, overwhelmingly support it.  Let's look at your

2    Honor's decision in the *Diamond Staffing* case.  It's a long

3    time ago, it's 2005.  The party there offered an affidavit

4    of the lawyer and the lawyer's advice to be rebut an

5    allegation of bad faith.  We have done none of that.  The

6    party disclosed the lawyer's work, it was a trademark case,

7    and the defendant said, well, we have a lawyer check the

8    trademark and take all these steps, and so the lawyer is

9    really relevant.

10:47AM 10        The way I read the Diamond Staffing, your Honor

11   still didn't find a waiver and allowed the party to decide

12   about the advice of counsel.

13        The touchstone of all of these cases, of Gorski,

14   of Diamond Staffing, of the *In Re:  Keeper of the Records*

15   in the First Circuit, you have to exquisitely place the

16   lawyer's advice, and you have to say what the advice is and

17   that you're relying on it.  You have to meet all these

18   factors that your Honor set out in the *Gorski* case.

19        And in the *Gorski* case, you know, your Honor read

10:47AM 20   a lot of opinions, that was a motion to disqualify the

21   Mintz firm, really focused on that, and there the defendant

22   was going to argue that Mintz was involved in the events in

23   question and the conduct was lawful because they hired

24   Mintz, and the Court still said, well, as long as you're

25   declining to invoke the advice of counsel defense, you

1    know, that's sufficient for now.  We've been very clear, we

2    are not waiving, we are not invoking the advice of counsel

3    defense.

4         Now, let me get to the promotional review

5    committee materials.  That is a very -- all major

6    pharmaceutical companies have this process.  Sometimes they

7    call it, you know, the review committee or promotional

8    review committee.  It's a multi-disciplinary committee that

9    produced thousands of pages of documents relating to the

10:48AM 10   PRC with one very significant exception, we have not

11   produced any criminal shot use (ph) from the PRC process,

12   but, you know, it involves medical, legal, you know, sales,

13   marketing, you know, advertising, and they review materials

14   before first use, including the materials that are now

15   alleged to be kickbacks.  Obviously, the idea that Janssen

16   knew these were unlawful is ridiculous, not before your

17   Honor.  Obviously, we deny that.

18         It's very common.  We have never argued that the

19   PRC is tantamount to a legal review, we're not arguing that

10:49AM 20   the PRC process, you know, per se makes it lawful.  We

21   withheld any privileged material from the PRC process

22   itself.  Your Honor, the PRC is one of the ways in which

23   Janssen and more candidly many other pharmaceutical

24   companies comply with the law.  It's part of their

25   compliance process.

1          The idea that the PRC or some other aspect of the

2     company's compliance program waives the clerical issue

3     would be a dramatic escalation and a dramatic departure

4     from settled law in this district and in this circuit.

5          There are plenty of cases that allow a defendant

6     to say we operated in good faith for many reasons.  One of

7     the ways is, well, we have compliance policies.  Guess

8     what, we've produced these detailed compliance policies to

9     the relator.  They have hundreds of pages of our compliance

10:50AM 10    policies, which actually go to some of the very practices

11    in this case.  None of that waives the privilege, none of

12    that.

13         The PRC process is another way in which companies

14    comply, and there are many cases that allow a company to

15    rebut an allegation of bad faith or to disprove science by

16    allowing reliance on a compliance policy, and the idea that

17    that would constitute a privilege waiver would be a massive

18    development for corporate clients in this district.

19         We all know how active the U.S. Attorney's Office

10:50AM 20    has been in this district in healthcare cases.  And, in

21    fact, the justice department, I think the Associate

22    Attorney General just gave a speech.  You know, the

23    Department of Justice often gives speeches that say, you

24    know, we encourage companies to have compliance programs,

25    and we'll factor that into our analysis, but the

1    United States went further.

2         The United States said that a compliance policy

3    can actually rebut scienter.  It would come as quite a

4    surprise to the United States, certainly corporate

5    defendants in this district if that came with some sort of

6    implied privilege waiver because the implication of barring

7    the reliance on the PRC process as, one, we're not talking

8    about the legal advice.

9         We've redacted that, we've excluded that, we're

10:51AM 10   not relying on explicit legal advice that came out of that

11   PRC process, but the fact that they have a

12   multi-disciplinary process that imputes a lawyer that we

13   can rely on without waiving.  The law is clear.  Your Honor

14   cited to it in *Gorski*.

15        The mere fact that a lawyer reviewed something is

16   not privileged.  And, in fact, if you look at Exhibit, I

17   think it's Exhibit F and G, the copy review approval form,

18   all that it was disclosed is, well, the lawyer looked at it

19   on this day, and that's the lawyer's signature, but there's

10:51AM 20   no responsive, it doesn't say approved or lawful or, you

21   know, if there were any substantive communications, that's

22   exactly the kind of thing that we withheld.

23        And the mere fact that a lawyer reviews or signs

24   something like this -- I mean, if this had otherwise been

25   privileged, the relator would certainly say we would have

1    to log the fact that the lawyer reviewed it, and the law is

2    clear, you said it in *Gorski*, you know, you cited a

3    D.C. Circuit case in *White*, the mere fact that a lawyer

4    reviewed something doesn't constitute any kind of waiver,

5    you know, companies can rely on that.  That's been clear

6    for years.  We're not relying on the legal advice, we're

7    not saying that the lawyer reviewed it and it's lawful.

8    That's the kind of affirmative invocation, you know, that

9    sometimes can get at the advice of counsel.  We've been

10:52AM 10    very clear to stay far away from that.

11            This is a very important issue to us, your Honor,

12    and, obviously, if your Honor, you know, has concerns about

13    what are one of our positions might be, it would be better

14    to know that now, you know, I hope summary judgment is in a

15    few months and not in 18 months, but, you know, if your

16    Honor has concerns or questions about the idea that I'm

17    saying here and the conduct is lawful, and that's some sort

18    of waiver, what am I supposed to say?  Of course, I think

19    the conduct is lawful.  That's not an implied waiver.

10:53AM 20    Obviously, there are no cases that support that

21    proposition.

22            All we said in our letter, we were required to

23    state in December of 2021 whether we were going to vote.

24    We were clear that we were not going to, and all we said

25    was, and, we, of course, we didn't have any motion on this,

1    Mr. Leopold is making points about a motion based on

2    discovery that hasn't happened in a motion we haven't filed

3    yet.  That may be not yet filed depending on how your Honor

4    rules on the reconsideration issues, that may not get filed

5    for awhile, but all we've said is, you know, we've reserved

6    our rights, and on all other available arguments and

7    defenses, including the Janssen, followed a business

8    practice of having a multi-disciplinary committee that

9    included a lawyer review and approve the challenged

10:54AM 10   presentations and resources.

11          We're going to reveal the lawyer's advice, we're

12   not going to say the lawyer said it was Weikel, and, of

13   course, we cite a case in the letter which says exactly

14   that.  We cited a case in the Northern District of Georgia

15   that you don't waive the attorney-client by presenting

16   evidence regarding how they manage and structure their

17   business, and that includes that you consult with counsel.

18          And, you know, we cited the *White*, the D.C. case

19   that your Honor cited in *Gorski* about a general assertion

10:54AM 20   lacking substantive content.  That's what it lacks.  We're

21   not providing any substantive content, all we're saying is

22   we have a PRC process composed of 7 or 8 groups, including

23   a lawyer, that's all we're saying, not revealing any of

24   that advice.

25          MR. LEOPOLD:  Your Honor, may I briefly respond?

1          THE COURT:  Briefly.

2          MR. POSNER:  Does your Honor have questions or

3     concerns about anything?

4          THE COURT:  Let me hear from Mr. Leopold.

5          MR. POSNER:  Sure.

6          MR. LEOPOLD:  Just briefly, your Honor.  Thank

7     you.  Janssen has been on the record at almost every

8     hearing with the magistrate and several hearings with your

9     Honor that they are relying on the PRC and the lawyer on

10    the PRC.

11          One of the things that Janssen did not respond to

12    is if we look, for example, not at Exhibit G but if we look

13    at Exhibit D that sets out the review and approval process

14    for the PRC for the legal attorney on that committee, the

15    responsibilities are as follows and I am quoting:

16          It assures that the PRC review materials comply

17    with applicable state and federal laws and corporate

18    policy, including but not limited to those relating to FDA

19    advertising or promotion, Medicare and Medicaid

20    requirements, healthcare compliance, False Claims Act,

21    Layman Act, fraud and liability abuse laws, and product

22    liability, then if you go to Exhibit G, it specifically has

23    the lawyer's name on there who did that review of that

24    particular review.

25          Now, Janssen is of the view that, oh, no, we're

1    not relying, we have expressly stated to the Court that we

2    are not relying on advice of counsel, but, by inference,

3    the fact that a lawyer sat on a PRC committee to review

4    this is sufficient.

5         Now, how we would be able to rebut the inference

6    to a jury or to the Court that everything is kosher because

7    the lawyer sat on that committee if we're not having the

8    ability to depose either the lawyer, look at the documents,

9    the supporting documentation, the opinions of the lawyer?

10:57AM 10  I mean, it's a double-edge sword, again, it's a shield and

11   a sword.

12        And I would address the issue of the *Gorski* case

13   because I do think that it's insightful for us on the

14   implied waiver because your Honor has written, there's

15   three criterias.  One is the party takes some affirmative

16   steps, such as filing a pleading here, several affirmative

17   defenses stating that they did not do anything wrong, they

18   didn't knowingly falsify or violate any laws, then the

19   second criteria is whether the affirmative act put the

10:57AM 20  privileged information at issue.

21        Clearly, the PRC and other documentations along

22   these lines put it at issue and whether upholding the

23   privileges would deny opposing party access to the

24   information vital to the case.

25        Clearly, again, when you have a PRC and

1    specifically the legal counsel in there is reviewing as his

2    or her responsibilities all of the issues that are set

3    forth that makes the quantifying decision as to whether or

4    not this is legal or not puts that at issue, and we have

5    the -- I believe we have the right to rebut those issues by

6    taking discovery and looking at the documents that the

7    lawyers themselves used to say and check off that it is all

8    legal.

9         So, your Honor, again, they can't have it both

10:58AM 10    ways.  It's either all off the table or it's all on the

11    table, but by merely writing a letter we're not relying

12    upon the advice of counsel but we are relying upon lawyers

13    sitting on the PRC as that being sufficient without us

14    being able to appropriately investigate, cross-examine and

15    do due diligence, I think is extremely prejudicial to the

16    plaintiff.

17         THE COURT:  All right.  Just one question,

18    Mr. Posner.  How -- what's your response to that?  I mean,

19    I'll paraphrase the argument, if you say we ran this by a

10:59AM 20    PRC and the PRC had a lawyer on it, isn't that implicitly

21    arguing that the lawyer approved it?

22         MR. POSNER:  Well, no, because, I mean, you can't

23    reconcile that with the cases that allow -- I mean, the

24    *Bacchi* case, you know, there's a line of cases that

25    obviously says the mere -- you can cite that a lawyer

1    reviewed something, but what you can't do is provide the

2    substantive legal advice behind that, so all we

3    have -- look, we haven't made any argument, but all we said

4    in our letter of December of 2021 was that we reserved the

5    right to argue that Janssen followed a business practice of

6    having a multi-disciplinary committee that included a

7    lawyer review and approve the challenged presentations.

8              I don't exactly know how we are going to argue

9    this.  I don't even know when summary judgment is going to

11:00AM 10    be.  We're look at a lot more discovery.

11             What we were following was the line of cases that

12    said that you can cite to the fact that a lawyer reviewed

13    it, what you can't do is provide the substantive legal

14    advice, which we're not going to do and we haven't done,

15    and, you know, it's an argument that hasn't been made yet,

16    but I don't think we have a plan to say, well, it's lawful

17    because a lawyer reviewed it.  We've never said that,

18    never, not once, in any of these papers have we said that.

19             The PRC is part of the way that the company has,

11:00AM 20    you know, complies with the law, and they have compliance

21    policies, we're going to rely on those.

22             Now, we may not rely on them to say, well, it's

23    per se lawful because we have these compliance policies.

24    No, it's a factor in the scienter analysis.  You know, if

25    you look at the -- I mean, if you look at the, you know,

1     one of Magistrate Cabell's case, the *Bacchi* case, the

2     *Bacchi* case rejects specifically the idea that invocation

3     of defenses, like "reasonable interpretation" or "in a

4     court with industry practice" specifically rejects the idea

5     that that's an implicit waiver.

6          The party, Magistrate Cabell said in the *Bacchi*

7     case, the ACCA Tribe, has to explicitly the legal advice at

8     issue and claim reliance on specific legal advice that the

9     conduct was lawful, we have not done that, and we don't

11:01AM 10   have plans to do that, but, you know, there's a line of

11    these cases that say as long as you're not revealing the

12    substance of the communication, you can cite that a lawyer

13    reviewed something.

14         It's certainly our plan to rely on a

15    multi-disciplinary review process in the PRC.  You know,

16    what exactly -- you know, look, by the way, Mr. Leopold

17    cited the policies.  The policies talk about the lawyer's

18    role, but we have no plans to argue that that makes it

19    per se lawful.  All we've done is produced a policy.  We

11:02AM 20   haven't made any argument about the policy.

21         I mean, if I withheld the policy because it was

22    privileged, we'd have a motion to compel on our hands.

23    This is a broadly-issued policy, so we produced it.  It

24    describes the roles of the members, but we're not going to

25    be -- we don't have to plans to argue, well, see the lawyer

1    had a rollover during the legality and therefore the lawyer

2    reviewed it, so, therefore, it's per se legal.

3         There are many ways that you can make arguments

4    that are short of that.  We haven't made any of these

5    arguments, and, obviously, our view is it's completely

6    premature and won't opine on a motion we haven't filed

7    based on facts that haven't even been developed yet in

8    discovery.

9         But the answer to your question, your Honor, to be

11:03AM 10  simple and clear about it is that the law is clear that a

11   company can cite a lawyer's review as long as they don't

12   provide the underlying substance of the advice.  That's

13   what the cases seem to say, your Honor.

14        THE COURT:  Okay.  I'm going to -- we've been at

15   this for an hour and a half, I'm going to shut this down,

16   and I'm going to take the three motions under advisement.

17        MR. POSNER:  Thank you for your time, your Honor.

18        THE COURT:  Thank you.

19        (Whereupon, the hearing was adjourned at

20   11:03 p.m.)

21

22

23

24

25

1              C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6              I do hereby certify that the foregoing transcript,

7    Pages 1 through 63 inclusive, was recorded by me

8    stenographically at the time and place aforesaid in Civil

9    Action No. 16-12182-FDS, THE UNITED STATES OF AMERICA ex rel.

10   JULIE LONG vs. JANSSEN BIOTECH, INC., and thereafter by me

11   reduced to typewriting and is a true and accurate record of the

12   proceedings.

13              Dated April 7, 2022.

14                        s/s Valerie A. O'Hara

15                        _____
                          VALERIE A. O'HARA
16                        OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25