1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3    THE UNITED STATES OF AMERICA,      )
     ex rel.                            )
4    JULIE LONG,                        )  Civil Action
                                        )
5                      Plaintiffs       )  No. 16-12182-FDS
                                        )
6                                       )
     vs.                                )
7                                       )
     JANSSEN BIOTECH, INC.,
8                      Defendant

9

10   BEFORE:  MAGISTRATE JUDGE PAGE M. KELLEY

11

12                 MOTION HEARING CONDUCTED BY ZOOM

13

14

15        John Joseph Moakley United States Courthouse
                       1 Courthouse Way
16                     Boston, MA 02210

17

18                     January 23, 2022
                       11:00 a.m.
19

20

21

22

23        Transcribed by Valerie A. O'Hara, FCRR, RPR
                    Official Court Reporter
24   John Joseph Moakley United States Courthouse
                      1 Courthouse Way
25                   Boston, MA 02210
                 E-mail: vaohara@gmail.com

1   APPEARANCES VIA ZOOM:

2   For The Relators:

3       Cohen Milstein Sellers & Toll PLLC, by CASEY M. PRESTON,
    ESQ., 1717 Arch Street, Suite 3610, Philadelphia, Pennsylvania
4   19103;

5       Cohen Milstein Sellers & Toll, PLLC,
    THEODORE JON LEOPOLD, ESQ., GARY L. AZORSKY, ESQ.,
6   and POORAD RAZAVI, ESQ., 11780 US Highway One, Suite 200,
    Palm Beach Gardens, Florida 33408;

7
    For the Defendant:
8
        Covington & Burling LLP, by ETHAN M. POSNER, ESQ.,
9   JASON C. RAOFIELD, ESQ., SARAH TREMONT, ATTORNEY, and
    KRISTIN COBB, ATTORNEY, 850 Tenth Street, NW,
10  Washington, D.C. 20001-4956.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2          THE COURT:  Okay, good morning, everyone.

3          MR. LEOPOLD:  Good morning, Judge, nice to see you.

4   Happy New Year.

5          MR. PRESTON:  Good morning, your Honor.

6          THE COURT:  Same to you.  We'll let Mr. Lovett call

7   the case.

8          THE CLERK:  The court is on record in the matter of

9   United States of America ex rel. vs. Janssen Biotech. Inc.

10  Would counsel identify themselves for the record.

11         MR. LEOPOLD:  Good morning, your Honor, again,

12  Ted Leopold, along with my partners, Casey Preston and

13  Poorad Razavi and Gary Azorsky.

14         THE COURT:  Good morning.

15         MR. POSNER:  Good morning, your Honor, this is

16  Ethan Posner, good to see you again.  I'm joined by

17  Kristen Cobb who will be arguing our motions today,

18  Jason Raofield has joined our team, I think some of our

19  other colleagues are on as well.  Good morning.

20         THE COURT:  Great.  Good morning.  Good morning,

21  Ms. Cobb and everyone else.

22         MS. COBB:  Good morning, your Honor.

23         MR. RAOFIELD:  Good morning, your Honor.

24         THE COURT:  All right.  So we have quite a lot of

25  ground to cover here.  There's three motions that have been

1   referred by Chief Judge Saylor, Number 328, Number 333,

2   Number 345, and I guess I'm just going to start off with a

3   question to you, Ms. Cobb.  I'm here to hear your argument

4   however you want to make it, but I'm just baffled that you

5   can't get better information and more definite information

6   about these personnel, who supposedly you ought to know

7   about, I think, so that the names that you've given are so

8   tentative, and, you know, I don't think the language that

9   you've chosen may have information about the relevant

10  information and it's unsworn to and that type of thing.

11          To me, it does look like you're hiding the ball, so

12  I'm wondering what you did precisely to come up with these

13  names and why doesn't the company have better records?

14          MS. COBB:  So, your Honor, we are not hiding the

15  ball in any way.  I think, you know, we did an extensive

16  investigation, we reviewed thousands of documents, we looked

17  at organizational charts, and we provided relator with the

18  names of about 50 people that to the best of our knowledge

19  had significant involvement in these programs, and I was

20  personally involved in this investigation, and it took

21  probably hundreds of hours, but until we actually review

22  their documents, you know, it's not like we can say this

23  person definitively had significant involvement, but of the

24  people we provided to relator, those are the people that had

25  involvement in these programs that we think would have the

1    most significant information related to these programs, and

2    so we were in no way trying to hide the ball, we were in no

3    way concealing information, we really did take this

4    seriously, and we did a reasonable investigation, and these

5    are the individuals that we've come up with.

6         It is 40 programs over 25 years, so to say that

7    maybe Janssen hasn't kept the best records while we're going

8    back to, you know, 1998, 1999, it's over a significant

9    period of time, so we don't know what else we could do to

10   provide any more or better information.  These are the

11   people.

12        This is the information that we have, and we may

13   have couched language as in these people may have

14   significant involvement because until we've collected their

15   documents and reviewed their documents, you know, we can't

16   say with 100 percent certainty.

17        THE COURT:  So what's wrong with having you do

18   that, collect their documents, review them and then certify

19   that these are the people with the heaviest responsibility

20   and the most responsibility that you've been able to find?

21        MS. COBB:  I think we would be willing to do that,

22   but your order didn't require that, your order required that

23   we come up with a process for sampling the documents in the

24   first instance to see, so we were proceeding under the

25   instructions in your order which were that we would do a

1    reasonable investigation, we would come up with these

2    individuals and then the parties would confer on a way to

3    sample those documents and then produce, you know,

4    responsive documents from those people, and so we haven't

5    gotten to that second part yet of conferring on a process

6    for sampling the documents.

7         THE COURT:  Okay.  Let me just ask you,

8    Mr. Leopold, giving the benefit of the doubt to defendant

9    here, what would be your view of actually, my order may not

10   have been the greatest, but actually looking at the

11   documents that turn up with these various I think it's

12   actually 29 people that they've newly identified and then

13   seeing if you're satisfied that they are the ones with

14   enough responsibility that they're of use to you?

15        MR. LEOPOLD:  So, your Honor, first of all, I would

16   say that your order was very good and quite clear on what

17   the duties and obligations of the parties were, and, as your

18   Honor knows by I'm sure at this point in time after the

19   hearings have been canceled I think once and has read the

20   papers, this is not the only issue where we are alleging the

21   failure of Janssen to comply with many issues of the Court's

22   order.

23          The thing that I have quite a lot of concern about

24   here is this is one of the core issues in the case.  They

25   have given 29 various names.  Of course, if we were to go

1    out and say we want to depose all 29 of these individuals,

2    you could imagine the, you know, multiple protective orders

3    that the defendant would say were fishing expedition and

4    everything else.  The obligation at this point is for the

5    defendant to identify the substantial individuals that were

6    involved.

7              Now, I have a hard time understanding how they have

8    not yet looked at the documents to formulate that conclusion

9    as to key people that were approving these programs, which

10   is the core issue of this litigation.  We are now multiple

11   years into this litigation.  Every time an issue like this

12   comes up, the Court enters an order, we have to go back

13   because they don't comply with it, it's months and months of

14   more delay and delay and delay, and we're not further along

15   because they obviate the Court's order, and it's enough.

16             I respectfully say it's enough.  We need the core

17   individuals that are responsible, whether they look through

18   the documents or maybe they ask some people who were there,

19   who were formerly there, maybe they go to the general

20   counsel's office and ask who was involved, but to say with

21   all due respect, we're this far down the road, they haven't

22   looked at the documents yet who exactly is the core

23   individuals to respond to the Court's order.

24             I find it hard to understand, respectfully, and I

25   would ask the Court that within two weeks they provide those

1    names, look through the documents, get as many people as

2    they need to look through the documents and talk to people

3    and give us the core people so that we can take the

4    deposition.

5          And as Mr. Preston can talk, they've moved for a

6    protective order on the 30(b)(6), where, okay, you don't

7    want to go look at the documents, you don't want to give us

8    names, we're going to take a 30(b)(6)deposition and we're

9    trying to get it from you, no, no, no, you can't do that, a

10   protective order.  Another six months delay by the time the

11   briefing is done, we get a hearing, that's what's going on.

12         We're entitled to get the information of the core

13   people who were involved and the Court respectfully should

14   again order it within two weeks and no more nonsense of all

15   this.  It's getting old.

16         THE COURT:  So I hear you, and I understand your

17   frustration and I'm happy to hear from Mr. Preston, too, but

18   I'm just wondering rather than asking them again to do the

19   same thing, which they say, well, we did it, it makes sense

20   in spite of the trouble it might even be faster, which I

21   agree with you, I would like to really get things moving

22   here, maybe for you to sample these people to look at their

23   documents and maybe depose a certain number of them with the

24   idea that if you uncover more information, then you can act

25   on that because I just don't know the value of repeatedly

1    asking them to do something, when as Ms. Cobb said, they did

2    it and this is what they came up with.

3         MR. LEOPOLD:  Well, they didn't fully respectfully,

4    in my view, comply fully with the Court's order.  It was not

5    only just to provide the name but provide the names in good

6    faith which, means doing due diligence and looking at

7    documents and things of that sort, which they clearly

8    haven't done.

9         It doesn't take a rocket scientist to say, okay,

10   give us all the names of the people involved, we're not

11   going to look at the documents, we're just going to give

12   them the names, so that's what happened here.  If they want

13   to say within one week give us all the documents that go to

14   these individuals, whatever these documents are, whether

15   employment files, reviews, whatever it is about them, give

16   it to us within a week and we'll plow through it and then

17   we'll be able to identify the core individuals.

18        What I don't want to happen, which is the game that

19   is going on here, with all due respect, we've all been doing

20   this a long time, is we're going to get to trial, and

21   there's going to be like 25 people.  We're still not going

22   to know who the core people are, we're not going to be able

23   to call anybody, and all of a sudden, in their case they're

24   going to call the core person or people in their defense,

25   and that's the game of gotcha that is not fair, and that's

1    why we have discovery.

2          So give us all the documents, don't hold any

3    document back, privilege or anything else, by Friday of this

4    week and we'll get through the documents and then we'll take

5    the depositions, and then when we take the depositions and

6    we find out that they were either not truthful or the

7    documents are relevant or whatever, we're going to come back

8    to the Court respectfully and move for appropriate sanctions

9    if that's the game they want to play, but if they don't want

10   to go through the documents on their own, give us the

11   documents, we'll get through them and we'll start taking the

12   depositions.  We can't even get to the point of taking

13   depositions yet.

14         MS. COBB:  Your Honor, can I respond?

15         THE COURT:  Yes, go right ahead, Ms. Cobb.

16         MS. COBB:  So, first of all, I don't think we're

17   playing any games.  We've produced well over 3 million pages

18   of documents.  To say that they don't know who the people

19   are, that we're going to show up at trial with some witness

20   they've never heard of is just kind of impossible at this

21   point given the amount of information that we've given them.

22         Second of all, we're not going to produce privilege

23   information, and we're not just going to hand over documents

24   without reviewing them.  That's not how discovery works, but

25   I also think there's like a little bit disconnect of how

1    documents work.

2        To review documents from 50 individuals who haven't

3    been named as custodians prior to them being named as

4    custodian is simply not how discovery works.  Discovery

5    works, you name custodians, you review the custodial files,

6    you review company files, but to tell you Janssen needs to

7    take on the burden of just reviewing 50 individual documents

8    before they'll pick custodians doesn't necessarily comport

9    with how discovery is contemplated under the Federal Rules.

10        Now, if the court would like us to sample these

11    documents and give them information about, you know, these

12    individuals or if we sample them and review them and come up

13    with a different list of people or identify another

14    individual, maybe that happens, but at the end of the day,

15    to say we just have to produce all this information without

16    reviewing it and give them privileged information, that's

17    just not how discovery works.

18        MR. LEOPOLD:  Your Honor, if I could say one thing

19    because I think -- just to be crystal clear, they've given

20    us approximately 25 to 29 names, so our options are to take

21    every one of those individual depositions who are the

22    relevant and substantial individuals.

23        If we did that, we would need a Court Order because

24    we're only limited to I think 10, 12 depositions, so we're a

25    little bit on a catch 22, right, because if we noticed them

1    all, they would object saying it's too many, you're outside

2    the Court's order, okay, fine.  We're going to do a 30(b)(6)

3    and ask the person with knowledge based on their

4    investigation, whatever they do before the deposition, no,

5    we can't do that, there's a protective order that's been

6    filed.  So, you know what is -- what are our alternatives,

7    what is the game going on?

8            THE COURT:  So I don't know that the 30(b)(6)

9    deposition is really your best option here because of the

10   things that the defendant has said in its briefing about how

11   they would just have them read these names into the record.

12           I guess you would be able to ask them what did they

13   do to come up with the names, and I guess it would be

14   certified, it would be under oath, which you don't have this

15   information under oath.

16           I mean, it just looks like there's so much distrust

17   and suspicion, and I don't know that defendant has really

18   been as transparent as you should have been to quell these

19   suspicions, like why isn't this certified, why don't you --

20   why are you couching it in such tentative terms?  What did

21   you do, like if you didn't look at any of their documents

22   and you don't know really who they are, how can you put

23   their names forward?

24           MS. COBB:  So --

25           THE COURT:  Those are the kind of questions that

1    come to mind.

2          MS. COBB:  So we reviewed thousands of documents

3    when we did this, and the people that show up, we didn't

4    pull the custodial file let's say of Joe Smith and looked at

5    his individual custodial file, but he is on documents that

6    have already been produced in this case, so we have reviewed

7    tons of documents.

8          We have not pulled his individual e-mail and gone

9    through it, but we've reviewed, you know, all of the PRC

10   records, and what I can say is they want to know the people

11   that were involved in developing the programs, right.  Well,

12   every single one of these programs went through PRC.  The

13   person who submitted it to the PRC, the marketing person is

14   named own that PRC form, and that's the person that was

15   responsible for the program in the marketing division for

16   developing the content, for working whatever third parties.

17         Information has been produced, and that's the type

18   of information we're talking about when we say we didn't

19   look at their individual e-mails but we looked at other

20   e-mails, we looked at other company documents, we looked at

21   PRC forms.  We did a very extensive investigation.

22         And, you know, Mr. Leopold keeps saying they're

23   going to have to take 29 depositions.  Well, this is what

24   happens in every litigation.  You have to pick custodians.

25   You don't get to get every single custodian that may have

1    information.  You have to make strategic decisions and pick

2    the people you think that you would like their documents

3    from.

4        And over a year ago, they filed a brief that

5    included dozens of potential custodians that they wanted

6    documents from, and so now to say they don't have any

7    information about who had significant involvement, well,

8    they should know, too.  We've produced documents.  The

9    relator in this case worked at Janssen for 16 years.  They

10   themselves have reviewed all of the information that we've

11   produced.

12       We've given them letters.  Like if they want a

13   sworn statement, if that's what is really tying this up, I

14   think we would be amenable to, you know, putting these names

15   and supplemental interrogatory responses, like I don't think

16   there's an issue about the veracity or the truthfulness of

17   these individuals names.

18       And we're, you know, if that's really the issue is

19   that it's just not a sworn statement, we're happy to do

20   something to cure that issue.

21       THE COURT:  So I guess I would also like to see you

22   say that these are the only names you know of and that

23   you're not holding anyone back.

24       MS. COBB:  Absolutely.  These are the only people

25   we know of.  We are not holding any names back, and we've

1   been transparent that we may discover in some document that,

2   oh, maybe this person did rise to the level of significance

3   involvement, you know, there is sort of this isn't a black

4   and white situation where it's like, yes, this person had

5   significant involvement and this person didn't.

6           Right now based on information we've reviewed,

7   we've made some judgment calls as to who was significantly

8   involved and who was just tangentially involved, but there

9   comes a time, you know, once we start reviewing these

10  documents and producing documents that we discover an

11  additional person rises to the level of being significantly

12  involved, and at that time we'd be happy to, you know,

13  inform relator and produce those people's documents as well.

14          We are really, really not trying to make this

15  difficult, and we are really trying to do the best we can.

16          MR. PRESTON:  Your Honor, I think there is

17  something being overlooked here.  Janssen has never made its

18  initial disclosures.  It's asserted 38 affirmative offenses.

19          THE COURT:  Okay.  I would like to get -- but I

20  first want to get you, I would like -- I would really want

21  to get to that subject, Mr. Preston, because I know you've

22  really emphasized that in your briefs, but I'm interested in

23  figuring out how can we get you reliable, thorough

24  information about these 29 people and whether you would like

25  to select them as your custodians, and I understand this is

1    a related issue.

2         They need to make initial disclosures fully before

3    you can do that, too, but I'm just wondering if they do a

4    supplemental interrogatory answer that is certified and that

5    gives you detailed information about, as you have been

6    asking about how the person's documents are stored and what,

7    why does Janssen think that person is significant, you know,

8    what, as Ms. Cobb, just so nicely explained, is it that they

9    were the one who presented the program to the committee or

10   what and give you some assurance that if new people do come

11   up in the course of discovery that I would entertain you

12   allowing to -- I would entertain allowing you to add those

13   people.

14        I'm trying to work out some compromise to get you

15   moving on that.  So I don't know if those kind of things

16   would satisfy you.

17        MR. PRESTON:  We appreciate that, your Honor, and

18   that is definitely a first step, but I, again, the main

19   issue in this case, your Honor, is Janssen's knowledge of

20   the unlawfulness of these services.  That is a core element

21   of the anti-kickback claim, and Janssen is asserting as an

22   affirmative defense that it reviewed the law and that it

23   believed it was acting lawfully, and those are the key

24   witnesses.

25        There is nowhere, Ms. Cobb can't point to a single

1    document where Janssen has actually said these are the

2    witnesses and these are the documents that we are relying

3    upon in asserting this defense and these are the key

4    witnesses of the case, and they asserted this defense two

5    years ago, your Honor, so for them to act like, oh, we need

6    to review more documents, these are the key witnesses, and

7    some of them may very well be attorneys, but they need to be

8    identified.

9          And this isn't something where there should be

10   further investigation.  If they asserted these defenses,

11   they were required to assert them in good faith.  They

12   certified that they believed these defenses were accurate,

13   so what's the basis for them?  Those are the key witnesses.

14         MR. LEOPOLD:  And that's why we have drilled down

15   on the three primary affirmative defenses at this point in

16   time because it's based upon what they have written as there

17   are core people that supported this defense.

18         Is it 29 people that were involved?  I highly doubt

19   it.  Are we going to have to take 29 depositions to prove

20   that or they should know their affirmative defense that has

21   been on the record for years now, when they made it, as

22   Casey said, somebody in good faith wrote it down and said,

23   here, guys, outside lawyers, this is our affirmative

24   defense, these people were involved.

25         Who are those people?  I've never been involved in

1    a case three years down the road where they can't identify

2    those core individuals that support their affirmative

3    defense.

4            MS. COBB:  Your Honor --

5            MR. LEOPOLD:  Withdraw it if it's not a defense.

6            MS. COBB:  Your Honor --

7            THE COURT:  Ms. Cobb, you can respond.

8            MS. COBB:  We have provided them with the

9    identities of the individuals involved in the review of the

10   programs at issue, including the legal and healthcare

11   compliance personnel.  This demand stems from relator's

12   improper assertion that they're entitled to examine the

13   advice Janssen received from its attorneys concerning the

14   legality or illegality of the programs.  They're not

15   entitled to that.  Judge Saylor has already decided this

16   issue when he reviewed the on the advice of counsel motion.

17           THE COURT:  Sure.  Can I just ask you, are those

18   the people who are listed in your answers to Interrogatory

19   Number 20?

20           MS. COBB:  Yes.

21           THE COURT:  Okay.  So those are the people that

22   you're relying on?

23           MS. COBB:  Yes, those are the people.  It seems to

24   go far beyond just those people.  They want the information.

25   They think they're entitled to the legal, like to review the

1    legal advice and the documents.  We're not waiving

2    privilege, so they aren't entitled to that.  We will produce

3    nonprivileged responsive information about the illegality or

4    legality of the programs, but to the extent they're asking

5    for privileged information, we said we're not waiving

6    privilege, we're not asserting the advice of counsel

7    defense, and so they're not entitled to that information.

8              THE COURT:  I guess I can let them argue

9    themselves, but I guess their request at this stage is they

10   want your -- the names of people, not necessarily their

11   discovery.

12             MS. COBB:  And we gave them the names.  Those are

13   all the names we have, it's the legal individuals and the

14   healthcare compliance personnel.

15             MR. LEOPOLD:  So if I understand correctly, the 29

16   names are those people in some way, shape or form were

17   involved that goes to the affirmative defense, and if that's

18   the case, I agree with your Honor, we're not there

19   determining work product or attorney-client client

20   communications or whatever, those names, so I guess one

21   thing that we're going to need to ask the Court, perhaps do

22   it ore tenus now, we need leave of court to take all of

23   those individual's depositions to find out who knows what.

24             MS. COBB:  I think there might be a little bit of a

25   discrepancy here.  If they're only talking about they want

1    the individuals involved in the analysis of the legality or

2    the illegality, we provided them with those individuals'

3    names, but your order required us to provide information

4    about individuals with significant involvement in the

5    development, in the review, dissemination, all aspects of

6    the program, not just the legality or illegality of the

7    program, so I guess are we only focusing on that or we

8    focusing on the entire process of the program for

9    significant involvement?

10          THE COURT:  So here's my feeling at this stage.  I

11   understand that the relator thinks that the answer to

12   Interrogatory Number 20 is insufficient and that you don't

13   want to choose people off the list of 29 if they're not the

14   relevant people for the affirmative defenses; is that

15   correct, Mr. Preston?  Have I said that properly?

16          MR. PRESTON:  Yes, your Honor, I think when you

17   read their response to the interrogatory and the fact that

18   they haven't made any initial disclosures, it's unclear.

19   They do not explicitly state, there's not one person that

20   they explicitly state this is the person we're relying upon

21   who provided us the legal analysis, the legal advice that we

22   adopted in believing that we were acting lawfully.  They

23   haven't done that, so they need to explicitly identify those

24   individuals.  They need to explicitly identify the basis for

25   the defense, and, Ms. Cobb, she mischaracterizes

21

1    Judge Saylor's decision, which related to an entirely

2    separate issue.

3         It hasn't been decided whether Janssen can assert

4    this good faith belief that it acted lawfully and at the

5    same time withholding legal advice that it received that

6    would disprove that assertion.

7         Judge Saylor --

8         THE COURT:  I agree with you that he did not

9    squarely -- that was not squarely presented to him, and he

10   did not squarely rule on it either, however, you haven't

11   either.  It's not for me either at this stage, so, I mean,

12   if you want me to order Janssen to go ahead and formally set

13   out its initial disclosures on this, not just in an answer

14   to interrogatory, then I can do that.

15        MR. PRESTON:  Yes, your Honor, again, we are not

16   asking for a ruling by the Court as to a waiver, but we

17   can't even bring that issue before the Court until we know

18   what the actual basis for their defense is, and they're

19   engaging in gamesmanship and stonewalling on this.  They've

20   been doing it for years, so, yes, if we have the actual

21   basis for the defenses, who they're relying upon, if they're

22   asserting that the advice is privileged, then we need a

23   privilege log, and we need to know who the counsel was that

24   provided that advice, and then whether there's been a waiver

25   and we can address that issue with the Court.

1          THE COURT:  So I have a slightly different view

2     than you do.  I think, I think before ordering them to give

3     you discovery on who every counsel who gave them advice over

4     all these years, their names, and to come up with a

5     privilege log that I think it would be more efficient for

6     the Court to first decide if they'd waive the privilege, if,

7     in fact, because we do know from what Judge Saylor said,

8     just because they're raising a good faith defense does not

9     mean they've automatically waived the privilege, and I know

10    you have that nice *Honig* case, however you pronounce that,

11    but I don't really think that issue has been teed up at this

12    stage.  I mean, maybe it's time.

13          My understanding from reading the transcript of

14    what Mr. Posner said to Chief Judge Saylor, they're not

15    raising that defense.  They're not raising the advice of

16    counsel defense, so I think it's going to be, you know, a

17    pretty fine point whether they waive the attorney-client

18    privilege, Judge, by raising the good faith defense.

19          MR. PRESTON:  Your Honor, I don't know how they're

20    going to pull this off.  I mean, they're trying to juggle

21    this defense that they believe they were acting lawfully and

22    at the same time not relying upon advice of counsel, so I

23    guess they were relying upon nonlawyer's advice regarding

24    the anti-kickback statute and whether they were complying

25    with it, but until they're forced to actually specify the

1    basis for their defense, then how do we come to the Court

2    and argue that there's been a waiver?

3          THE COURT:  Okay.  So let me, Judge, ask you,

4    Ms. Cobb, how about doing that?  How about giving the

5    relator a little more detail as if it is, I mean, I don't

6    know that you did this in your initial disclosures but to go

7    ahead and provide the information as to an initial

8    disclosure as to how you're going to prove up your defenses?

9          MS. COBB:  Yes, we would be willing to do that.

10          THE COURT:  So just regarding what we've done so

11    far, I'm inclined to ask the parties to sit down again, I

12    know it may not prove to be very fruitful, about these 29

13    witnesses and to work out how the supplemental interrogatory

14    ought to be worded, and the type of evidence that the

15    discovery that's going to go with each witness I do think

16    needs to be sampled and vetted, and I do think that Janssen

17    needs to tell relator what kind of evidence, how the

18    discovery is stored, as they're asking, because otherwise

19    they're just selecting someone in the dark, and it could be

20    like in the original list of 29, someone has 10 documents,

21    which, of course, is not going to be very helpful.

22          MS. COBB:  Your Honor, that's fine.  I do have one

23    issue to raise.  In terms of an interrogatory, relator, you

24    know, I think you've reviewed their 30(b)(6) notice, and I

25    worry that they're going to, you know, propound an

1   interrogatory that requires that level of detail that they

2   were seeking in the 30(b)(6) notice.

3          It's virtually impossible to provide that kind of

4   detail for 40 programs going back over 25 years.  They want

5   to know every single person that was involved in the

6   program, what dates they were involved, what years they were

7   involved.

8          Like some of these programs lasted many, many

9   years, and many, many people were involved in it, and so I

10  feel we're like in a catch-22 situation where no matter

11  information we give them, they will be back in front of the

12  Court saying it's not sufficient, when we are really trying

13  our best here.

14         It's just a lot of information, a lot of people

15  over 25 years, and so I don't know if there's a way to, you

16  know, limit the type of information that they need to

17  receive in order to be able to pick their custodians but to

18  simply say you need to give us every single piece of

19  information about every program and every person that was

20  involved before we can pick our custodians, what's the point

21  of discovery then?  We're just basically doing the discovery

22  for them.

23         THE COURT:  Okay.  Let me ask Mr. Preston, let's

24  assume that there are some problems with their

25  recordkeeping, suspend disbelief for a minute and assume

1    that's true, how could you in conferring with them figure

2    out if their search for these people was adequate?

3            MR. PRESTON:  Your Honor, I think that --

4            THE COURT:  What reassurances would you need that

5    they had actually made a good faith effort?

6            MR. PRESTON:  Let's take a step back.  There was,

7    you know, Ms. Cobb, our requests asked for individuals with

8    significant involvement.  We're not asking for every single

9    person who was involved.  We made that clear, and your Honor

10   has helped us sort of craft this standard for what documents

11   need to be produced, and it's clear to us following your

12   Honor's order last February where it instructed Janssen that

13   it didn't do an adequate search, it didn't comply with the

14   Federal Rules, and it has an obligation to go out and

15   determine which employees had significant involvement, and

16   then a year later now, they still haven't done that.

17           Yeah, they added some names, but they're saying

18   they might have some involvement.  So I'm not sure Janssen

19   is -- I feel like we need to take a deposition because all

20   we're getting is information from counsel rather than

21   information from Janssen itself, and Janssen's counsel has

22   demonstrated that it really is not doing a thorough

23   investigation if we're still two years into the case and

24   they can't specifically provide individuals and identify

25   what their role was, including the individuals that support

1    their own defenses.

2         THE COURT:  So who would you propose deposing?

3         MR. PRESTON:  The individuals at Janssen that

4    Janssen's counsel has been working with to interview people

5    to determine who had significant involvement.  I'm not sure

6    how it's burdensome to take a 30(b)(6) deposition of the

7    individual who has been helping counsel put together their

8    witness list.

9         THE COURT:  Okay.  Ms. Cobb, in the interest of

10   assuaging the kind of very fundamental skepticism of relator

11   about your efforts, what about having a deposition, a

12   limited deposition, 30(b)(6) of whoever has been assisting

13   you in figuring out who had significant involvement in how

14   those names were derived, and whether there's any better way

15   to do it?

16        MS. COBB:  To be honest, I think we'll be back here

17   in two months and they'll be arguing that the witness wasn't

18   sufficiently prepared because we've given them the

19   information we had.  This is the information we've gathered

20   from the company.  This is the information we have.  So I

21   don't think they're going to get any different information

22   in a 30(b)(6).

23        I do think your suggestion that we look at the

24   documents and do some sort of sampling would be more

25   efficient than preparing a witness to answer questions

1    because it's not just going to be about -- if you look at

2    their notice, it's not just about the identification of the

3    witnesses involved, it goes way beyond that.

4         It goes into the years these people worked there,

5    what exactly they worked on, what programs they were

6    involved in, and I don't think a 30(b)(6) witness can retain

7    that much information.  You know, I just don't think that's

8    possible.

9         THE COURT:  So I hear your complaint that the

10   requested information, that is, who had significant

11   involvement in these programs over many years is a tough

12   question to answer, but I'm worried that, in fact, in order

13   to answer it accurately, you actually have to know these

14   very specific things, such as how long was the person there

15   and what exactly --

16        MS. COBB:  We gave them that information.  We gave

17   them all of that information for the people that we've

18   identified.  We gave them their role, we gave them how many

19   years -- I mean, many of these people still work at Janssen,

20   no longer in a relevant role, but we gave them the years

21   they were in the relevant role, we gave them their titles,

22   and we know from our investigation that those are the people

23   that were involved in developing the programs and on sitting

24   on the PRC, the people that reviewed it, the healthcare

25   compliance people that reviewed it.

1          We've given them all that information, and we

2     produced documents that support all of that information.

3     We've cited to documents that we ruled on in our various

4     correspondence, we've produced work charts going back to

5     2002 to substantiate why we chose people.

6          I really don't know that there's anything more we

7     can do.  It's literally these are the people, these are the

8     people who were involved in the programs.  We're not hiding

9     the ball, and we're willing to do whatever it takes, but I

10    don't think they're going to get any more information from a

11    30(b)(6).

12         I do think that would be a waste of time and

13    burdensome.  I think we would like to move forward, and

14    we're just not willing to, you know, I mean, we're willing

15    to do whatever the Court wants, but the amount of skepticism

16    they have without any real proof that we're lying about

17    anything or hiding things or concealing things is sometimes

18    frustrating.

19         MR. PRESTON:  I don't think, respectfully, nobody

20    is saying anybody is, quote, "lying," whatever.  The issue

21    is just getting the information that we need in order to not

22    be prejudiced in putting our case forward, and what I'm

23    hearing is there's 29 or so names that the defendant feels

24    are people that were involved, how many of them were

25    significantly involved, as your Honor has ordered them to

1    provide.  It sounds like their view is all these people were

2    involved, and, therefore, all had significant involvement,

3    and if that's the case, we need their documents.

4          I don't think -- respectfully, Judge, to go back

5    and for the parties to keep talking about these issues, it

6    always end up as a stalemate, and we're just back here, you

7    know, three months later or six months later with delays.

8          If that's the case, let us take --

9          THE COURT:  What's your proposal then?

10         MR. PRESTON:  As much as I don't want to do it, we

11   need the documents that go to these individuals, and we need

12   leave of court to take as many of these depositions as we

13   feel is necessary.  And we're going to have to take every

14   one of them.  Probably many will be very short, but at the

15   end of the day, we'll find out of these 29, so we're not

16   going to be prejudiced at trial, what they did, who they

17   are, who they spoke with, what did they say, and if somebody

18   says attorney-client privilege, we'll have to deal with that

19   at some point later.

20         It's not the most efficient way because I highly

21   doubt 29 people were involved that made, you know, the legal

22   decision, although now it's not lawyers evidently, somebody

23   made the decisions that these programs were appropriate.

24   It's one or more of these 29 people, probably a handful of

25   them, maybe less, maybe none of them, but that's what we

1    need, and we shouldn't.  I just know what's going to happen

2    without a Court Order, they're going to say no way you're

3    going to take all these depositions.

4         THE COURT:  I don't know it's necessary for you to

5    take 29 depositions especially if you can see the documents

6    and then choose which ones are going to be your --

7         MS. COBB:  Your Honor.

8         THE COURT:  Yes.

9         MS. COBB:  Your Honor, I think we are -- we want to

10   move discovery forward, we want to start reviewing

11   documents.  We have no more documents to review.  We're sort

12   of in a stalemate.

13        We, I think, would be willing, if they wanted to

14   pick 12 of the 29 people, you know, we can maybe discuss,

15   you know, providing them with information on search term

16   hits for these people so they can get a sense of how much

17   did these people have, but, you know, they can pick 12

18   people, and then we can deal with the rest as the

19   significant involvement people, but, you know, outside of

20   those people 12 people, if they really think another person

21   should be added as a custodian, I think we'd be willing to

22   add a few of these additional custodians, if some of these

23   remaining of the 29 people turn out to be more significant,

24   but I do think there's a way to move this forward without

25   them needing to take depositions, without them needing to

1    like, you know, I do think we just want to start getting

2    them information, and there should be at least some people

3    they know of the 29 that they want documents for so they

4    should start picking some custodians and we can start

5    reviewing those documents.

6           MR. PRESTON:  Your Honor, your orders last

7    February were that Janssen is obligated to produce documents

8    from individuals that had significant involvement in the key

9    facets of the kickback scheme, and then in addition to that,

10   relator was able to choose 12 additional ESI custodians.

11   Now Janssen is trying to go back and limit the witnesses

12   from whom it has to search and produce documents and limit

13   it to 12 custodians.

14          This is the problem, right, if Janssen is aware of

15   documents that are relevant that exist, they need to be

16   produced whether or not that person is identified as a

17   custodian.

18          And the fact that they're acting like, well, we

19   don't know who has relevant documents until we review the

20   documents themselves, that's not the way discovery is to

21   take place.  Janssen has an obligation to go and investigate

22   which employees had significant involvement and who holds

23   relevant documents that need to be produced.

24          THE COURT:  Okay.  So I think I've heard enough on

25   this.  I'll just take it under advisement and issue

1    something.  If I issue an order that the parties agree

2    should be tweaked in some way, I'm happy for you to agree on

3    that, but I'll do my best on this.

4          So let's move on.  I know there's a lot of other

5    issues in docket 328, protective orders that Janssen is

6    seeking.  Ms. Cobb.

7          MS. COBB:  Yes, so I think there's a few more

8    issues.  I think we've discussed the storage of employee's

9    documents.  I don't necessarily think that is required,

10   Janssen is required to do that under the Federal Rules

11   unless there's evidence we've engaged in bad faith or

12   unlawfully withheld documents.  Relator hasn't presented any

13   such evidence, so I think we've already sort of discussed

14   that issue though.

15         THE COURT:  Okay.  Can I just ask you, Ms. Cobb, my

16   sense of this is that part of the information they're

17   looking for is how much trouble will it be to retrieve

18   employee's documents and how many documents there would be

19   for an employee if someone's relatively not so important,

20   vis-à-vis enough person, they wouldn't choose that person,

21   so I think my take on this is that a yes for relator on this

22   issue would just help them to make a choice about who they

23   want to pick as a custodian.  Do you agree with that?

24         MS. COBB:  Yeah, I mean, if you're saying we should

25   provide them with information about how much data we have

1    for each employee, each of these 29 individuals, I think

2    that will, you know, it depends on also what search terms

3    we're running.  If we're -- you know, this goes back to the

4    original order, and, you know, they'll have 12 custodians

5    that seemingly get all of the search terms run but then

6    there was these significant involvement employees that we

7    were supposed to agree on, you know, some sort of limited

8    set of search terms, so if we're talking about running just

9    all of the search terms on all 29 people, then I think that

10   might provide some clarity about who was significantly

11   involved based on hits that are returned for those people,

12   but that could also be somewhat misleading because there

13   could be someone that was only in a relevant role for a year

14   but they were the most important person in that role and so

15   they don't have that many documents because it was for a

16   short period of time, so this is why we're having a hard

17   time saying definitively these are the people with

18   significant involvement because, you know, someone could

19   have been involved for only six months but they were the

20   main person on a program for six months but someone else was

21   involved for five years, you know, so it is not just a very

22   simple question that's answered.

23          THE COURT:  Okay.  Anything else you want to

24   highlight?  I have read this, and I will go through it when

25   I'm writing my order.

1      MS. COBB:  Yeah, I think the two other most

2   important issues that we raised were the identification of

3   the roles of the nonlegal personnel on the privilege log

4   and, you know, we acknowledge that the court ordered Janssen

5   to do this, however at the time that we briefed that issue,

6   which addressed many, many issues, we hadn't analyzed the

7   number of individuals on the log, and after doing so there

8   are well over 700 people.

9      To put that in context of the over 700 people, only

10   25 people appeared 10 or more times and 562 are only listed

11   one time, and this would be a pretty burdensome process to

12   go through and try and identify the roles and the years of

13   all of these people when that's not necessary for analyzing

14   privilege.

15      Privilege is based on substance of a communication,

16   not the role a person held who is cc'd on a communication,

17   so, you know, and also they get three legal custodians.  We

18   are in the process, we're almost done reviewing the

19   documents from the legal custodian, and we're about to

20   produce a new privilege log to them, and so the number of

21   people is only going to continue expanding.

22      THE COURT:  So I guess the problem is if a lawyer

23   is e-mailing, even if it seems like legal advice but they're

24   e-mailing with people who they don't have a privilege,

25   they're not in that privilege circle or whatever you call

1    it, then it's not privileged, so I guess what you're looking

2    for in a review is are these people within that circle of

3    need to know and seeking or getting legal advice even if the

4    communication itself from your vantage point of having

5    somebody review it for you, even if it looks like legal

6    individuals, if the person is not a client and you can

7    really break that circle if you include a few people that

8    shouldn't have gotten it, so I think that's the problem.

9         Let me ask you, Mr. Preston, I know you don't want

10   to have the responsibility foisted on you for figuring out

11   which e-mails you think are questionable, but anything you

12   can say about maybe picking out certain e-mails that seem

13   questionable to you?

14        MR. PRESTON:  Well, your Honor, I think that

15   they're trying to shift the burden to us and really the

16   Court because we're going to ask, we're going to have to ask

17   for an in-camera review of many of these documents and this

18   is a case --

19        THE COURT:  I don't mind doing an in-camera review,

20   but I hear you that you shouldn't have to figure out who

21   those 700 people are either.

22        I mean, I'm just curious why are there 500 plus

23   people listed once, is it like a secretary or a paralegal?

24        MS. COBB:  Yes, there's, I mean, Janssen has

25   hundreds of thousands of employees.  Like, you know, there

1    is privileged communications that go all the time to certain

2    departments which could be hundreds of people, and it's, you

3    know, this is legal advice like, you know, within the

4    company, and so there are certain communications that have a

5    lot of people in them because it's a large company.

6              MR. PRESTON:  Your Honor, I think you struck it,

7    the nail on the head earlier, just because it's an e-mail or

8    a correspondence from an attorney doesn't mean that it's

9    privileged if it's not being sent to individuals where it's

10   actually for purposes of providing legal advice and it's

11   intended to be confidential, and when you're copying

12   numerous people on an e-mail, then there's serious questions

13   as to whether that was intended to be confidential.

14             The other fact of this case is Janssen had

15   significant relationships with outside consultants that

16   provided these services that helped them develop these

17   services that are at issue, and so many of these

18   correspondence likely were shared with people outside the

19   company.

20             There would be no privilege there, but unless we

21   know who that individual is, what their role was, and

22   whether they even worked for Janssen, we have no way of

23   assessing whether they claimed privilege is accurate.

24             THE COURT:  So with the consultant issue, I don't

25   know if you're correct about that.  I mean, it seems to me

1    if you have a consultant providing these services, it could

2    very well be that you would want to pass onto them legal

3    restrictions and things.  As they're developing the program,

4    they need to keep in mind they can't violate certain tenets.

5           MR. PRESTON:  It's possible, you may be right, but

6    that's the whole reason why we need this information so we

7    can assess whether these communications are, in fact,

8    privileged legal advice.

9           THE COURT:  So how many e-mails have been up

10   designated as privileged?  How many entries do we have on

11   the privilege log?

12          MS. COBB:  I am not sure about that, but, like I

13   said, we've been in the process of preparing an updated

14   privilege log, a supplemental log, and so it's going to be

15   in a matter of weeks, it will be significantly more because

16   this will include all of the communications from one of the

17   legal custodians that they've chosen.

18          THE COURT:  And, Mr. Preston, is it your position

19   that this is already these issues or is it just you're

20   waiting on this privilege log and you anticipate this being

21   an issue?  Do you already have a privilege log?

22          MR. PRESTON:  I'm not sure I understand what issue

23   you're referencing, your Honor.

24          THE COURT:  Do you already have a privilege log

25   where you don't know who the participants in the

1    conversations are?

2            MR. PRESTON:  We have a privilege log that hasn't

3    been updated for a year, despite numerous productions, but

4    that earlier privilege log which your Honor made a ruling

5    last February that they should disclose the roles of the

6    individuals on the privilege log, yes, that contains

7    numerous communications where we question whether the

8    communication contained confidential legal advice based on

9    large number of people who were copied on those

10   communications.

11           THE COURT:  So that was like a nine-page document,

12   right, that privilege log, as I recall?

13           MR. PRESTON:  Approximately, Yes, your Honor.

14           THE COURT:  And I do admit it was little bitty

15   lines, so there were a lot of entries, but it's still only

16   nine pages.  If it were a small number -- I don't know what

17   I'm going to rule on this, but I just don't know what to

18   say.  I hear Janssen there's 700 people who they or may not

19   be able to identify.  I just don't know what to say.

20           MR. LEOPOLD:  Your Honor, as I'm hearing all this,

21   the bottom line is your Honor ordered this a year ago and

22   now we're still here arguing the same issue.

23           THE COURT:  I know I did, but I don't think Janssen

24   knew at the time, nor did I, that this would be this type of

25   issue.

1          MR. LEOPOLD:  No, I understand that, but the core

2     issue is why do we have to amongst ourselves outside the

3     Court keep addressing this issue, get nowhere, and now we're

4     here a year later?  Shouldn't Janssen have come back a long

5     time ago and said all of this instead of meandering the

6     issue around instead of following the Court's order?  I

7     mean, nothing we could do about it now, but the issue is

8     okay, we hear the issue, you know, within two weeks, not

9     weeks from when a privilege log will be up and ready to go.

10          Somebody has got to put the foot to the pedal and

11     get it to us.  It's been over a year since it's been

12     ordered.  When are we going to get it?  That's the first

13     issue.  Then we can all look at it and decide which of those

14     issues need to come before the Court or the parties could

15     talk further or whatever.

16          THE COURT:  I think you're getting the privilege

17     log shortly.  Ms. Cobb, do you know when that's going out?

18          MS. COBB:  It should be, I don't want to give a

19     certain date, but it should be either the last week of

20     January or the first week of February.

21          THE COURT:  Okay.

22          MS. COBB:  And we suggested to relator at the

23     beginning of this process if they had certain entries that

24     they were more concerned about, we would be willing to look

25     at those, but to just have to provide them with a list of

1    750, I think it's actually 845 people are on the list.  We

2    gave them all the legal personnel that are listed on the

3    log.  Like we have tried to work with them on this, and

4    they're just unwilling to compromise, and there's only going

5    to be more names.  The next log we serve them, it might have

6    1,000 names, it might have 1200 names.  I mean, it is a real

7    big undertaking.

8            THE COURT:  Well, I understand.  I mean, the

9    balancing consideration here really is, I think some of this

10   information, if it isn't privileged is really, really

11   important to relator, and, for example, if there are outside

12   consultants that are being given legal advice, then that's

13   something that they might want to litigate, and so just sort

14   of leaving them in the dark is problematic.

15           Have you only identified legal personnel and no one

16   else?

17           MS. COBB:  Yeah, that we provided to relator, yes.

18           THE COURT:  It does seem kind of crazy not to know

19   anyone.

20           MS. COBB:  We know people, but, you know, like of

21   the 25 people that appear 10 or more times, it's like

22   Karen Trahan, they're custodians in this case.  We, of

23   course, know who those people are, we know their roles.

24   Mr. Preston and Mr. Leopold also know those people and know

25   their roles.  When you get down to numbers 600, I'm sure,

1     you know, I'm not going to say I'm sure we could figure it

2     out because some of those people may have worked at Janssen

3     2003, 2004, you know, we may not have information for every

4     single person on the log, just because the log goes back so

5     long.  And, you know, we don't know if those people worked

6     at Janssen for a long time.  Janssen migrated HR systems a

7     number of times.

8            This isn't -- I think Mr. Preston and Mr. Leopold

9     think there's some Google type search we can do and it pops

10    up, information for every single one of these people.

11    That's not necessarily the case.

12           THE COURT:  I haven't looked at the privilege log

13    in a long time.  The privilege log, does it give the names

14    and e-mail addresses of all of the parents to a certain

15    e-mail?

16           MS. COBB:  It's the names, yes.

17           THE COURT:  But not their e-mail addresses?

18           MS. COBB:  I don't believe the e-mail addresses are

19    on them, no.

20           THE COURT:  Because that might go a long way toward

21    identifying if someone works for Janssen or if someone works

22    for some outside consultant rather than just the names, but

23    I don't want to mess up the delivery of the privilege log

24    either.  I don't want another big delay because I'm ordering

25    you to change the way you're doing your log.

1          Okay.  So I think the first I would say, as quickly

2     as you can get the privilege log to relators, the privilege

3     logs that you're preparing now, and I'm going to take this

4     under advisement right now.

5          I mean, there has to be some way, some work- around

6     this so we can know who these people are.  I don't know that

7     you making list 800 some odd people and their precise role

8     in the company especially, if they might have been there a

9     shorter time is really that critical, but I do think -- I

10    don't know, maybe the e-mail addresses Mr. Leopold or

11    Mr. Preston would help you sort through this.

12         MR. PRESTON:  Your Honor, I think that would be

13    helpful to have e-mail addresses, and, you know, that will

14    help us identify people at least that were outside the

15    company that were being provided this purported legal

16    advice.

17         MS. COBB:  We're amenable to doing that.  We can

18    pull that information.  I'm not in charge of preparing the

19    privilege log, so I cannot say whether or not it will delay

20    or significantly delay, but I don't think it would be so

21    significant.  It might push it back a week or so, but I

22    don't think it would cause, you know, a massive delay.

23         MR. PRESTON:  I think, your Honor, with that

24    information and with information of disclosing who in these

25    communications were lawyers and then with giving us the

1    ability to go back to Janssen for those entries in the log,

2    that either there's a large number of individuals who were

3    copied on that purported legal advice, I think those are the

4    ones where we're concerned is that really considered to be

5    confidential legal advice when it's disseminated to such a

6    large number of people?

7            THE COURT:  Sure.  And I do think there's a sort of

8    need to know rule if you're distributing something

9    company-wide, it can lose its privilege nature, so I hear

10   you on that.

11           MR. LEOPOLD:  Or outside the company.

12           THE COURT:  Outside the company, for sure, although

13   I'm thinking of a *Crane* decision, that is C-r-a-n-e, where

14   Crane had -- I think it was Crane -- had engaged some kind

15   of financial firm to give them financial advice, and I found

16   that that was privileged because you just need in a business

17   context, you just need to share privileged information with

18   them so you can consult with them, but, I mean, it's a

19   complicated issue, and I understand that you're waiting for

20   the privilege logs and you intend to comb through them and

21   make sure there's not some discoverable information in

22   there, and I do think we've got to help you do that, you're

23   entitled to do that, and so I don't want to hamper you in

24   doing that.

25           I do just also want to say while I'm thinking of

1    it, Ms. Cobb, that you know, Judge -- my memory of the

2    transcript where Judge Saylor was having the conversation

3    with Mr. Posner about your client raising an advice of

4    counsel defense, Mr. Posner was saying in kind of a

5    tentative way that you hadn't decided to yet, and if I

6    remember correctly, Judge Saylor basically said, well, you

7    better make up your mind, so you do want to be careful when

8    you're making this disclosure that I'm going you to order

9    that that is actually your defense and that is your complete

10   defense because you're in control of that information, and

11   you've had a long time now to figure that out, so and I

12   understand the relator is frustrated about that, but you'll

13   make your decision however best you think you should, but

14   you may not be able to revise it down the road.

15          Okay.  So I'm worried that we're not making that

16   much progress here.  Could we talk for a minute about the

17   time limitations on the communications with the government?

18          MS. COBB:  Yes.

19          THE COURT:  Because I thought the relator did a

20   pretty good job pointing out that that was -- I know

21   Judge Saylor's order, if you sort of read it literally, ends

22   everything at 2020, but I'm not sure he was thinking about

23   this particular category of discovery, and I just don't

24   know, I don't think it would be hard for you to come up with

25   it.  I don't think it's burdensome, I do think it's

1    relevant, and I just wonder what's your best argument on

2    that, Ms. Cobb?

3         MS. COBB:  Well, it's not only that Judge Saylor

4    cut off discovery at February 2020, but in his previous

5    ruling on this, he ordered us to produce communications with

6    DOJ, he did not order us to produce communications of HHS

7    OIG, and we don't have any communications with Medicare at

8    this point, so it's not only that we believe it should be

9    cut off at February 2020, given Judge Saylor's ruling on

10   this, but we also think we're not required to produce

11   communications with HSS OIG, and we've otherwise complied

12   with the order, and just on Friday, we produced all our

13   communications with DOJ through February 2020, so, you know,

14   I think that looking at Judge Saylor's orders on this issue

15   that it's our interpretation that it should be cut off at

16   February 2020.

17        MR. POSNER:  Your Honor, this is Ethan Posner.

18   Sorry, remind me again, I may have forgotten, I'm not sure

19   I've seen a Court Order discovery about communications with

20   the government years after the relator left and after the

21   complaint was filed, just remind me again, if you would, the

22   court's view as to why that's relevant.

23        THE COURT:  So I just think that as you're

24   communicating with the government, as the case goes on, as

25   this case goes on and you continue to communicate with the

1    government about this case, I don't know why there should be

2    a cutoff as to when you disclose that, like why would

3    something you communicated with the government in

4    February 2020 be so much less relevant than something you

5    communicated with them about in March 2020, I mean, so much

6    more relevant, excuse me, I said that incorrectly, and I

7    don't know that that discovery issue concerning your

8    communications with the government is the same as the

9    discovery issues about your generally providing discovery to

10   relator in the case.

11              MR. POSNER:  Okay, I guess I'd ask you need to rule

12   on this now, I guess I'd ask for some leeway if your Honor

13   thinks that's relevant.  Obviously we have discovery

14   requests to the government that are pending, and, of course,

15   we have discovery requests to the relator relating to its

16   communications with the government that are pending.  We'd

17   obviously ask when we bring these issues up that your Honor

18   give us some leeway on that, given your Honor's ruling here.

19              THE COURT:  So you mean if I order you to provide

20   that to relator that relator has to reciprocate?

21              MR. POSNER:  Well, I mean, you know if our

22   communications with the government are relevant in your

23   Honor's view, not, I mean, this is years after the conduct,

24   then, yeah, obviously the relator's communications with the

25   government not only after but during the relevant time

1    period and certainly other government communications are

2    going to be relevant, too.

3         MR. LEOPOLD:  That's fine, but we're not talking

4    years after the litigation, we're talking, you know, a year

5    and a half, two years since this litigation has been pending

6    and the defendant has continuously endeavored to extend

7    things, talk with, subpoena with the government, other

8    governmental entities regarding these issues, and they're

9    continuing to do it up until this day, so it's all relevant.

10   It doesn't matter that it's post February 20th, it's all

11   relevant your Honor has said, and if Mr. Posner wants to

12   serve us, or if he has, we'll respond accordingly and

13   appropriately to the discovery.  We're not saying we're not

14   going to respond or whatever, but, you know, there's

15   no -- there's no line in the sand that, you know, Janssen

16   says February 20th is the date.

17        This is all manufactured by them.  We want the

18   discovery as it should be, all the way through and

19   continuing, and they're continuing to go after the

20   government, subpoena the government.  That's great, they can

21   do whatever they want, but they shouldn't say, ah-huh, you

22   don't get to see it.  It's in the middle of litigation right

23   now.

24        THE COURT:  Okay.

25        MR. PRESTON:  Your Honor, if I just may, I think

1     Ms. Cobb tried to sort of draw a distinction communications

2     with OIG and SMS and DOJ.  Well, any communications with any

3     of the government agencies related to this action are

4     relevant, and they're relevant for the same reasons that the

5     communications with the DOJ are relevant, so it's, you know,

6     there's no reason to allow them to withhold their

7     communications with OIG and SMS to whom they have issued

8     subpoenas, to whom they have had communications concerning

9     what they consider to be the merit of the claims, and this

10    is all happening ex-parte.

11          We represent, you know, this case is being brought

12    on behalf of the United States, I shouldn't say we represent

13    the United States, this case is being brought on behalf of

14    the United States, who is the real party in interest, and

15    we're entitled to know what communications are going on, and

16    we shouldn't have to subpoena this information from the

17    United States, shouldn't have to be burdened with that, it

18    should come from Janssen, and we're entitled to that

19    information.

20          THE COURT:  Okay.  Okay.  So, what else?  Let me

21    ask you, Ms. Cobb.

22          MS. COBB:  I think there's one other issue, and

23    it's relator's request for documents located in the offices

24    or data systems of any outside counsel that Janssen has used

25    in the last 25 years.

1          THE COURT:  So, let me just ask you with regard to

2     Akin Gump, were they actually giving you legal advice, or

3     were they consulting?

4          MS. COBB:  No, Akin was restained by Janssen, you

5     know, as legal counsel, outside legal counsel.

6          THE COURT:  So what about their providing

7     nonprivileged seminars to doctors that Janssen paid them

8     for?  That's not privileged, right?

9          MS. COBB:  No, we produced the information that we

10    have about those seminars.

11         THE COURT:  So I think do they want the contracts,

12    is that the sticking point?

13         MS. COBB:  They want our engagement letters with

14    Akin Gump.  We didn't have a separate engagement letter to

15    do this presentation.  Janssen has an engagement letter with

16    its outside counsel, and this fell under that broad

17    engagement letter.  The engagement letter, you know, we

18    don't think is relevant at all, and I think courts, you

19    know, in the First Circuit don't think that engagement

20    letters are relevant, but it's beyond just Akin Gump,

21    they're requesting files from outside counsel stored in

22    outside counsel's offices, not stored at Janssen.

23         They're requesting that we go to any outside

24    counsel we used over the last 25 years and search their

25    files for responsive documents, which will all be

1    privileged, of course, but -- and then put them on the

2    privilege log, but your order only required to us do three

3    legal custodians, and so to have to go through this

4    burdensome process of going to any outside counsel we've

5    used, Janssen is a huge company, they've used many outside

6    counsel over the last 25 years with respect to this.

7            THE COURT:  Okay.  Let me hear relator's response.

8            MR. PRESTON:  Your Honor, again, they've never

9    disclosed who the outside counsel who provided relevant

10   legal advice concerning the lawfulness of these services.

11   If they've used 30 different law firms, which I find hard to

12   believe.  I think that's, you know, just a lot of bluster,

13   then they've got to identify who those law firms were, and

14   they have an obligation under the Federal Rules to produce

15   documents in the possession of its outside counsel.

16           They can't just store documents at their outside

17   counsel and then not have to produce them.  I think

18   there's --

19           THE COURT:  So you're asking for nonprivileged

20   documents in the possession of outside counsel, and you

21   think they haven't done a request or searched for those?

22           MR. PRESTON:  They haven't.  They acknowledged that

23   they haven't, and we're not asking for work product, we're

24   not asking for Covington & Burling work product in this

25   action, but if Covington & Burling possesses evidentiary

1    documents, they're obligated to produce those.

2         THE COURT:  Let me stop you right there.  What

3    about that, Ms. Cobb?

4         MS. COBB:  So we did go to an outside counsel's

5    office in New Jersey.  I think we've explained this a number

6    of times with respect to the government investigation that

7    took place in 2003, and we produced all of the documents

8    that were produced to the government.

9         Those were stored at an outside counsel's office,

10   and we did have to go collect those, but I don't understand

11   Mr. Preston and Mr. Leopold think we're just storing

12   documents at outside counsel's offices.  I don't know that

13   to be the case.  I don't know why we would do that.  I think

14   we have produced everything that Janssen has and we're not

15   hiding documents at outside counsel's offices.

16        I don't really understand the need to go and, you

17   know, if there's nonprivileged information stored at an

18   outside counsel's office, what's likely produced in this

19   matter, but I would probably think that most of anything

20   stored at outside counsel is going to be privileged

21   information, and it's going to be another burden on Janssen

22   to start logging privileged communications with outside

23   lawyers, and there could be tons of them.

24        MR. PRESTON:  Your Honor, to start with, they

25   should disclose which outside counsel they retained to

1   review the lawfulness of these services.  A minute ago we

2   were hearing that there could be numerous outside counsel,

3   and now we're hearing there was just two, but clearly

4   there's never been --

5        MS. COBB:  That's not what I said.

6        MR. PRESTON:  An investigation hasn't been

7   undertaken to actually determine how many outside counsel

8   provided legal advice concerning the lawfulness of these

9   services.

10       MS. COBB:  Again, we're not asserting an advice of

11  counsel defense, so I find this information to not be

12  relevant.  If we were asserting an advice of counsel

13  defense, perhaps we would have to go and gather up all of

14  the advice that might be stored at an outside counsel's

15  office, but we are not asserting an advice of counsel

16  defense, so the advice we got from outside counsel about the

17  legality or illegality or whatever documents are stored at

18  outside counsel's office is not relevant to this issue.

19       THE COURT:  So when you said earlier, Ms. Cobb,

20  that you did at the beginning of the government's

21  investigation go to a counsel's office in New Jersey and you

22  got a bunch of documents, what were those?

23       MS. COBB:  Those were the documents that were

24  produced to the government in the previous investigation, so

25  it wasn't privileged information, that was information that

1    was produced to the government in an investigation into

2    Remicade marketing practices between 2003 and 2011, we

3    produced the documents that were produced to the government

4    that were responsive to this action.

5         MR. POSNER:  Just so we're clear, your Honor,

6    United States obviously investigated the underlying conduct

7    in connection with this qui tam.  We are talking about

8    something very different here.  The evidence in this case

9    shows that the U.S. Attorney's Office in New Jersey together

10   with Main Justice and its investigative partners at HHS

11   reviewed the same conduct at issue, the same slide decks

12   starting in 2003 and ending in 2011.

13        I mean, obviously, that's going to be the subject

14   of, you know, any number of motions and defenses, but we

15   went back to New Jersey's counsel to find, okay, what was

16   produced, what did DOJ look at.  That's how we know they

17   looked at the very same conduct that the relator is now

18   challenging, so that's what we produced for New Jersey

19   counsel, but I want to be clear about what that evidence

20   shows.

21        MR. PRESTON:  Your Honor, I would just like to

22   address that because I think it's important that, first of

23   all, what Mr. Posner said is inaccurate.  Janssen did not

24   make full disclosure of the services that they provided and

25   the value of those services, and, in fact, the information

1    that was disclosed to the government very early on was at

2    the beginning stages of the kickback scheme that's alleged,

3    and the services that were provided later were much more

4    sophisticated, but I think what's important also is Janssen

5    did not produce all of the documents that it produced to the

6    government in connection with that earlier investigation.

7           It's selectively chosen some documents to provide

8    to us, so it's also false for Mr. Posner to say that they

9    have given us all the documents they provided to the

10   government back in 2003, but I think what we're more

11   concerned about with this issue is we don't know the other

12   law firms that Janssen retained to obtain legal advice

13   regarding these services.  Maybe there weren't any.

14          It sounds like there were several because they're

15   arguing that it would be burdensome for them to have to go

16   and see if they possess relevant documents, but at a

17   starting point, they have to disclose which law firms

18   Janssen retained to review the legality of these services

19   and the categories of documents that those law firms

20   possess.  We're entitled to that information.

21          MS. COBB:  So, your Honor --

22          THE COURT:  So, if you're raising an advice of

23   counsel defense, why do you need to know with whom they

24   consulted?

25          MR. PRESTON:  Your Honor, because they also at the

1    same time they're asserting an advice of counsel defense,

2    they're asserting that they had a good faith belief that

3    their conduct was lawful.

4         THE COURT:  So I think as we addressed earlier

5    here, I think it's premature for you now to be collecting

6    that information.  If you want to tee it up for Chief

7    Judge Saylor to decide whether you're going -- they've

8    waived their -- they waived their privilege by raising their

9    good faith defense, I think this is a little bit of the cart

10   before the horse to have them disclosing to you all the

11   lawyers they consulted with.

12        I am very interested in whether there are outside

13   counsel who are in possession of discoverable documents and

14   whether Janssen has reasonably tried to find those or made

15   any effort.  I mean, the fact that this one counsel in

16   New Jersey had a bunch of discoverable documents --

17        MS. COBB:  Your Honor, that was a very unique

18   situation, and the reason it was unique is because they had

19   to produce documents in paper back then in 2003, 2004, 2005,

20   and Janssen didn't get a copy of the production, like they

21   didn't get the boxes and boxes and boxes and boxes that were

22   sent to DOJ, so the only person that had the paper

23   production was -- it actually even it wasn't outside

24   counsel's office, it was their storage facility because they

25   no longer kept it in their office and they were moving and

1    said we are going to destroy all these documents if you

2    don't come get them, so to make sure that no documents were

3    destroyed, we went and got all of the documents, like 300

4    boxes of documents that were produced, so it was a very

5    unique situation.  That situation was very different than I

6    think what we're talking about here.

7            THE COURT:  Okay.

8            MR. LEOPOLD:  Your Honor, we do have a little bit

9    of a different issue with Akin because they potentially in

10   addition to providing legal advice to Janssen about the

11   appropriateness of the programs, specifically they did

12   training at doctor's offices, so a little bit different, and

13   I think --

14           THE COURT:  What are you missing about those

15   trainings?

16           MR. LEOPOLD:  I'm sorry.

17           MS. COBB:  Your Honor, they didn't provide any

18   trainings at doctor's offices, they gave a teleconference

19   about Medicare rules, it was open to anyone, and it was just

20   about legislative actions.

21           THE COURT:  Sure.  So I think, I read the brochure

22   about that, that was I think one of the exhibits, and what

23   else do you need to know about that, Mr. Leopold?

24           MR. LEOPOLD:  Well, we would like as part of the

25   scope and production, I think we're entitled to the

1    materials that were provided by Janssen, letters about the

2    program, whatever they may have provided that would not be

3    privileged, not legal issues, but if they hired a law firm

4    to do work within this program to outside doctors' offices,

5    technicians, whatever controllers of the offices for the

6    doctors, et cetera, all of that correspondence, e-mails,

7    letters, program materials, et cetera should be produced.

8    That's clearly not privileged.

9         THE COURT:  And you mean the e-mails, letters,

10   et cetera between Akin Gump and the nonprivileged people

11   they were communicating with?

12        MR. LEOPOLD:  At Janssen, yes, your Honor.

13        THE COURT:  So, Ms. Cobb, I know you've given them

14   the brochure that explains what Akin Gump was communicating

15   to the people in the doctors' offices.  Any other

16   information about that that hasn't been turned over?

17        MR. PRESTON: Your Honor, the key information --

18        THE COURT:  Just a minute.  I'm going to let

19   Ms. Cobb answer, then you can talk, Mr. Preston.  Go ahead.

20        MS. COBB:  Akin Gump didn't disseminate the

21   information, like the invitation to the doctors' offices.

22   That was done by the ABSs and the salespeople, so Akin Gump

23   was never communicating with any doctors' offices about the

24   presentation, like the invitation, none of that.  So

25   anything else that happened in, you know, within Janssen,

1    you know, that's arguably privileged.  I haven't reviewed

2    the communications myself, so I'm not sure if we made

3    privileged calls on those, but they were not communicating

4    outside Janssen, that was left to the salespeople and the

5    ABSs to disseminate the brochures and the program

6    information.

7              THE COURT:  Okay.  Yes, now go, Mr. Preston.

8              MR. PRESTON:  I'm sorry about that, your Honor.

9              THE COURT:  That's okay.

10             MR. PRESTON:  Your Honor, I think what is missing,

11   if they have an engagement agreement with Akin Gump that

12   apparently not only relates to legal advice provided to the

13   Court but also these consulting services they were paying

14   Akin Gump, then they can redact the portion that related to

15   any legal advice, but I think what's important with those

16   contracts and other documents is the fees that were paid to

17   Akin Gump because it shows the value of these services that

18   Akin Gump provided to doctors' offices free of charge.

19             And only select doctors offices were invited to

20   these conferences that provided some sophisticated

21   information, otherwise you wouldn't have Akin Gump being the

22   presenter, so I think it's not just the contracts that set

23   forth the purpose of providing these services but also any

24   documents that show the fees that Janssen paid Akin Gump to

25   provide these consulting services to their select customers.

1          THE COURT:  Okay.  Anything to say about that,

2     Ms. Cobb?

3          MS. COBB:  I don't know that a contract or an

4     engagement letter would show how much they're paying Akin to

5     do this.  You know, they're not asking for legal invoices I

6     would think like related to this, but an engagement letter

7     with Akin Gump wouldn't necessarily elucidate how much

8     Janssen paid for the services that were in connection with

9     this presentation.  There's, you know, an engagement letter

10    is not going to show that.

11         THE COURT:  Okay.  Perhaps I'll just order you to

12    provide whatever documentation you have about how much you

13    paid Akin Gump to educate the people on the ground.

14         MS. COBB:  Understood, and, you know, I'm imagining

15    a scenario where there's, you know, monthly invoices that we

16    sent to Akin Gump.  Pursuant to Mr. Preston's suggestion, I

17    think we would redact any legal services or any fees paid

18    for legal services, it would just be to the extent it's

19    separated that way.  We can redact anything that's not

20    specifically related to these programs.

21         THE COURT:  So I do think whatever time the law

22    firm spent just doing the teleconference is relevant but

23    also getting ready for it would also be included.

24         MS. COBB:  I understand.

25         THE COURT:  So let's try to, I'd like to wrap this

1    up.  Is there any other issues that we've missed?

2          MR. PRESTON:  Your Honor, I think there's a major

3    issue, there's the extended period that your Honor granted

4    back in February was the period of February 2016 to

5    February 2020, and Janssen is refusing to identify the

6    individuals who had significant involvement during that

7    period related to the specific relevant facets of the

8    alleged kickback scheme that Judge Saylor identified, which

9    is, you know, who were the individuals involved in deciding

10   to stop providing these services.

11         THE COURT:  So if I can just say, I understand this

12   issue and thanks for raising it.  I had forgotten about it,

13   but, sure, it just seems to me like the parties are talking

14   past themselves, so Judge Saylor says documents created

15   between February 2016 and February 2020 that concern the

16   termination or phase out of the specific practices or

17   programs.  So I don't understand what is it about that

18   that's a problem?

19         MS. COBB:  Your Honor.

20         THE COURT:  Yes, go ahead.

21         MS. COBB:  We've agreed to provide them with -- you

22   know, we don't think this relates to significant involvement

23   at all, we think this is a very discrete issue.  We need to

24   provide them documents related to the termination or

25   phase-out of the practices.  We think this is separate from

1    whatever significant involvement in the development, review

2    of the programs.  They're entitled to documents about the

3    termination or phase-out which necessarily might be PRC

4    documents, and we've already told relator what we're going

5    to do to search for those documents, and it seems like

6    they're trying to just conflate the two issues that they can

7    have discovery essentially through 2020 that Judge Saylor

8    said they were only entitled to 2016 generally, that by

9    saying we need to identify all these custodian, potential

10   custodians from 2016 to 2020 sort of eviscerate his order

11   that was very specifically limited to two category of

12   documents.

13          MR. PRESTON:  Your Honor, those are the types of

14   witnesses we want to speak to and depose, and if an

15   individual who may have had responsibility for these

16   programs in 2018, it was limited to that period, they've got

17   to disclose it, and that may be someone who we select as a

18   custodian and someone who we want to depose, and their

19   documents obviously would have to be produced.

20          They can't withhold the identities of witnesses

21   from this 2016 to 2020 period.

22          THE COURT:  So I do think Judge Saylor's order says

23   to the extent that my order generally expanded the range of

24   dates of documents, and then he goes on to talk about

25   documents, and I don't know that he was really thinking

1    about the fact that the documents may point to witnesses,

2    and I don't know why the documents would be relevant, but

3    the witness who could explain them or further talk about

4    what the documents mean is thereby excluded, so that's going

5    to be my view.

6            Obviously, you know very well how to appeal, so you

7    can appeal it, so it just doesn't make sense to me that

8    Judge Saylor would want relator to have documents pertaining

9    to the termination or phase-out of any of the programs and

10   he even more limited it, it's only programs that relator

11   participated in or personally observed or the potential

12   legality or illegality but he is somehow cutting them off

13   from witnesses on those subjects, so I just think -- I don't

14   know, I agree with you, it's open to interpretation, but I

15   don't -- I just think it doesn't make sense to limit the

16   witnesses.

17           MS. COBB:  Your Honor, that's fine, but I think it

18   needs to be clear that if we identify witnesses, it's about

19   the termination only, and then they're entitled to documents

20   about the termination only.  They're not entitled to get,

21   run all of the search terms on those custodial files to the

22   extent there's relevant, you know, it's only relevant for

23   the termination of those programs.

24           MR. PRESTON:  It's not just the termination though.

25           MR. LEOPOLD:  If it's relevant to the issues in the

1      case, it's relevant.

2              MR. PRESTON:  It's the lawfulness.  Judge Saylor

3      was broader just the decision to terminate or phases out a

4      program, it was also their assessment of the lawfulness of a

5      program, so it's broader than just that.

6              THE COURT:  Okay.  So I hear you and I'll consider

7      this and I just want to say it's very, very well briefed,

8      and I really appreciate that.  Okay.

9              MR. LEOPOLD:  One other just housekeeping, more of

10     a housekeeping issue, I'm sure I speak for everybody, I

11     greatly appreciate your time in all of this.  I think it

12     would be important, as you can see from the papers of

13     Janssen in this matter; many areas, they say quote, "We're

14     still looking for documents," et cetera.

15             I appreciate that, but these are orders that are

16     months and months and months, if not over a year long.  I

17     would ask the Court to please put specific time frames on

18     there, and if the defendant needs additional time, they can

19     contact us, but at least we have a court-ordered deadline

20     when they have to produce documents or else it just keeps,

21     they just say we're looking for documents.  Well, that's

22     great, but when?  We need a cutoff date.

23             THE COURT:  Okay.  All right.  I will consider that

24     in the context of the specific things they had that very

25     helpful chart showing what's still outstanding and what

1    they're working on.

2            MS. COBB:  Your Honor, just so you know, in our

3    filing on Friday, we produced everything that we said we

4    were ordered to produce.  There were two outstanding issues,

5    the Akin Gump engagement letter and the DOJ communications,

6    but other than that, everything has been produced, so we've

7    worked really hard since the order came down in September.

8            As I said, earlier we've made productions on the

9    average of every two weeks, so to say we're doing this as

10   quickly as possible.  I understand it will never be as

11   efficient as Mr. Leopold and Mr. Preston would like it, but

12   this is how it goes when you have this many documents over

13   this many years.

14           THE COURT:  Okay.  So I think that's all.  Anything

15   else anyone?

16           MR. PRESTON:  Thank you for your time, your Honor.

17           THE COURT:  Thank you all very much and great to

18   see you again.  Thanks a lot.

19           MR. LEOPOLD:  Thank you for your time.

20           MS. COBB:  Thank you very much, your Honor.

21           MR. PRESTON:  Thank you for your time, your Honor.

22           (Whereupon, the hearing was adjourned at

23   12:47 p.m.)

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6              I do hereby certify that the foregoing transcript,

7    Pages 1 through 65 inclusive, was transcribed by me

8    stenographically at the time and place aforesaid in Civil

9    Action No. 16-12182-FDS, THE UNITED STATES OF AMERICA ex rel.

10   JULIE LONG vs. JANSSEN BIOTECH, INC., and thereafter by me

11   reduced to typewriting and is a true and accurate record of the

12   proceedings.

13              Dated January 255, 2023.

14                        s/s Valerie A. O'Hara

15                        _____
                          VALERIE A. O'HARA
16                        OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25