```
 1                 UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2


 3


 4    THE UNITED STATES OF AMERICA,    )
      ex rel.                          )
 5    JULIE LONG,                      )  Civil Action
                                       )
 6                     Plaintiffs      )  No. 16-12182-FDS
                                       )
 7                                     )
                                       )
      vs.                              )
 8                                     )
      JANSSEN BIOTECH, INC.,
 9                     Defendant


10


11    BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV


12


13                    MOTION TO DISMISS


14


15


16        John Joseph Moakley United States Courthouse
                     1 Courthouse Way
17                   Boston, MA 02210


18


19                     May 29, 2020
                        10:00 a.m.
20


21


22


23            Valerie A. O'Hara, FCRR, RPR
                  Official Court Reporter
24     John Joseph Moakley United States Courthouse
                     1 Courthouse Way
25                   Boston, MA 02210
              E-mail: vaohara@gmail.com
```

1    APPEARANCES VIA TELEPHONE:

2    For The Relators:

3        Cohen Milstein Sellers & Toll PLLC, by CASEY M. PRESTON,
     ESQ., 1717 Arch Street, Suite 3610, Philadelphia, Pennsylvania
4    19103;

5        Shapiro & Teitelbaum LLP, by JONATHAN SHAPIRO, ESQ.,
     55 Union Street, Suite 500, Boston, MA 02108;

6
         United States Attorney's Office, by STEVEN T. SHAROBEM,
7    ASSISTANT UNITED STATES ATTORNEY, and DAVID J. DERUSHA, and
     GREGG D. SHAPIRO, ASSISTANT UNITED STATES ATTORNEY, ASSISTANT
8    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts 02210;

9
     For the Defendant:
10
         Covington & Burling LLP, by ETHAN M. POSNER, ESQ.,
11   SHANYA DINGLE, ATTORNEY, 850 Tenth Street, NW,
     Washington, D.C. 20001-4956.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2          THE CLERK:  Court is now in session in the matter

3   of United States of America vs. Janssen Biotech, Matter

4   Number 16-12182.

5          Parties are reminded that recording and

6   rebroadcasting of this hearing is prohibited and may result

7   in sanctions.

8          Would counsel please identify themselves for the

9   record beginning with plaintiff's counsel.

09:59AM 10          MR. PRESTON:  Good morning, your Honor, this is

11   Casey Preston from Cohen, Milstein representing the relator,

12   Julie Long.

13          THE COURT:  All right, good morning.

14          MR. SHAPIRO:  This is Jonathan Shapiro representing

15   the relator.

16          THE COURT:  Good morning.

17          MR. POSNER:  And for the defendant, this is

18   Ethan Posner from Covington & Burling for the defendant, and

19   I think there are a couple of my colleagues on as well.

10:00AM 20          THE COURT:  All right.  This is a hearing on the

21   motion to dismiss.  We're conducting this by telephone.  Let

22   me begin by confirming that we have our court reporter with

23   us and that she can hear us.

24          COURT REPORTER:  Yes, Judge.

25          THE COURT:  Okay.  So, Mr. Posner, are you taking

4

1      the lead?  It's your motion, I think?

2           MR. POSNER:  Yes, thank you, your Honor.  And

3      thank you to chambers for setting up this call.

4           So, your Honor, there's a lot of paper here, we

5      recognize that, but this question of product support service

6      is a familiar one for the OIG and the government.  A number

7      of relators have attempted to transform these services,

8      which I understand they sound valuable at first read into

9      kickbacks, but I think the IOG advisory opinions cite to

10:00AM 10   several.  I'll specify which ones I'm talking about.

11          On the two cases on which we rely, the *Forney* case

12     and the *Suarez* case, I think provide a framework to analyze

13     the question.  Under the OIG guidance, these kind of support

14     services do not constitute remuneration, or at least do not

15     implicate the anti-kickback statute.  They do not provide

16     substantial and independent value, so you see these OIG

17     opinions that state that extensive product services do not

18     implicate the anti-kickback statute.

19          There are a number of OIG opinions on insurance and

10:01AM 20   billing and coding and reimbursement assistance, calling

21     insurers, helping physician offices with the kinds of coding

22     and reimbursement and prior authorization paperwork, with

23     which we may all be personally familiar.

24          There are OIG opinions about, you know, kiosks in

25     pharmaceutical, in physician offices, or even providing

1    personnel in the office for training and education, so the

2    OIG has recognized as long as those products, which cost the

3    pharmaceutical companies a lot of money -- although the

4    inquiry isn't whether it costs them money, as long as it is

5    tied to the product.  I'll get into that in a minute --

6    don't provide the kind of substantial or value independent

7    from the product that would implicate the anti-kickback

8    statute.

9         Obviously, the courts, at least twice, have applied

10:02AM 10    the OIG guidance.  The *Forney* case involved, you know, free

11    staff and clinics and device checks with specific patients.

12    The relator said that was all free labor and helped the

13    physicians' bottom line.

14         In the *Suarez* case, the nurses actually came into

15    the physician office and worked with the patients and the

16    physician staff.  It's called the Ambassador Program.  It

17    helped with insurance program coverage.  They fielded all

18    sorts of administrative questions, and when you look at the

19    OIG opinions and you look at these two cases, they cover,

10:03AM 20    you know, all the kinds of coding and billing and

21    administrative support about which the relator has

22    complained here.

23         They all involved former company employees working

24    directly sometimes for years with physicians, physician

25    office staff to assist in the administration of the

1    medicines and getting them billed and coded.

2          Now, another aspect that we have here that we

3    didn't have in *Suarez* or *Forney* or even the OIG guidance is

4    that some of the core issues about which relator complains

5    are publicly available.

6          Now, I understand that we provided a lot of this to

7    the Court, too much, but let me cite some very specific

8    items that are in the public domain.

9          There is an article in the <u>International Journal of</u>

10:04AM 10  <u>MS Care</u>.  It's Exhibit F, page 27, and it talks about all of

11   these, it advises physicians about in-office infusion

12   suites, which is what this case is about, and it gives them

13   all sorts of advice about space and staffing and how to do

14   this and how do you buy and bill and how do you bill

15   Medicare and what codes should you use, and it's got that

16   kind of public advice, which you see in the J & J materials

17   that are cited in the complaint and that we think are

18   appropriate for this Court's consideration at this stage.

19         There's also a chart about an infusion suite in the

10:05AM 20  J & J materials, and if you look at Exhibit H, page 5, you

21   will see literally the same chart about an infusion suite,

22   you should put the nurses here, and you should put the lab

23   there, and here's how you arrange your billing and coding

24   personnel and your clinical area and here's how many chairs.

25   It's literally the same chart that you see in the J & J

1    materials.

2          So, you know, this question about infusible suites,

3    which, obviously, the rheumatologists and the

4    gastroenterologists needed because Remicade and then the

5    other medicines, Simponi ARIA, which are RA and Crohn's

6    disease and all sorts of colitis medicines were the first

7    kinds of infusible products, and the relator makes the same

8    allegations about value that the relators made in the *Forney*

9    and *Suarez* cases.

10:06AM 10          THE COURT:  Let me interject, if I can.  This

11    information you say is publicly available.  Can I consider

12    that on a Rule 12(b)(6) motion or is that more appropriately

13    addressed through summary judgment?

14          MR. POSNER:  Well, there's a few reasons that we

15    believe you can, your Honor.  Number 1, we're comparing it

16    to items in the complaint, which your Honor can consider the

17    items in the complaint under Rule 12, and what we're doing

18    is using them for an incredibly narrow purpose, just using

19    them to show, and I do think your Honor can take judicial

10:06AM 20    notice of a journal article or something that we've provided

21    a website cite for.

22          We do think your Honor in this narrow instance can

23    take notice of comparing something in the complaint, it's

24    cited in the complaint, it's certainly fair game under

25    Rule 12, and then comparing it to a publicly available item

1    like a journal article, that we do think, since we're not

2    using the journal article for a wider purpose, we're just

3    using it to show it was public, and here's what it says.

4         And I don't think there's any dispute that the

5    journal article is accurate or doesn't say what it says.  I

6    mean, it's a published journal article, so in that sense, we

7    do think your Honor can consider this under Rule 12.

8         I understand that we added a lot of paper of

9    publicly, you know, publicly-available material, and I'm

10:07AM 10   trying to distill all this to just a few items, but we do

11   think your Honor can for these narrow purposes under Rule 12

12   use that.

13        And, obviously, we're citing the OIG opinions as

14   well, and the courts have, you know, implemented and used

15   those under Rule 12 as well.

16        You know, the *Forney* and *Suarez* cases that use the

17   OIG opinions, we have more here with the publicly-available

18   stuff, but what those cases did was they dealt with the same

19   arguments that relator is making about the business is more

10:08AM 20  profitable, Janssen devoted people and resources to the

21   physicians, or, well, the physicians might pay consultants

22   for this, but the Court found that that was too conclusory,

23   and, obviously, that's what we think as well, and those

24   cases, I mean, those were nurses in the office fielding

25   administrative questions, in *Suarez*, billing and

1    reimbursement support, and, of course, the next step is

2    whether the services have any independent value, and the OIG

3    and its opinion in 2000, it's called 00-10 said that the

4    drug companies often offer free assistance to physicians,

5    insurance coverage, billing, reimbursement, and these

6    services, the OIG said, have no value apart from the

7    products, they're properly considered part of the products,

8    and they have no independent value.

9        The test is whether they're linked, and here these

10:09AM 10   services are obviously linked to Remicade and Simponi, they

11   were the only infusible medicines for a long time in these

12   therapeutic areas.  There was no other reasons to offer

13   these services but for these products, and there was no

14   value outside the product.

15       There is a conclusory allegation that, well, in

16   theory the physicians could use these infusion suites for

17   other infusible medications, but there's just that

18   conclusory allegation.

19       The relator says she worked at the company for many

10:10AM 20   years.  She said she had these unidentified patient counts,

21   and she worked closely with them, but she doesn't have any

22   example where these physician offices with whom she worked

23   closely for many years, according to the complaint, actually

24   used these infusion suites or any of the advice that sort of

25   standard reimbursement and infusion suite advice that was

1    provided for any other medicines.

2        And *Forney* rejected a conclusory allegation just

3    like this, where theoretically, you could use this kind of

4    advice or service for some other medicine, but there's no

5    evidence of that here, there's no specific allegation at

6    all.

7        Let me turn briefly, if I can, to 9(b).  I reread

8    your Honor's ruling in the *Hagerty* case a few years ago.

9    It's a qui tam like this one.

10:11AM 10        THE COURT:  I always tell lawyers I hope you have

11    better authority than me.

12        MR. PRESTON:  Yeah, well, this was pretty on point

13    in our view, your Honor.  We -- I mean, as your Honor will

14    recall, what, you know, there was a lot -- there were a lot

15    of allegations about the defendant's misconduct, as there is

16    in this case, and as your Honor noted, look, any

17    pharmaceutical case is going to have, you know, Medicare and

18    Medicaid claims arising from whatever the scheme that is

19    alleged, and your Honor found that the details on the scheme

10:11AM 20    were enough.

21        We're not contesting the very narrow way under

22    Rule 12 that the allegations about the advice at large are

23    not enough under 9(b).  The Court, of course, focused on

24    there was that there was nothing about the specific claims.

25        Now, in the *Forney* case, the complaint named the

1    specific physicians, which we don't have here but nothing

2    about specific patients or specific claims.  Of course, here

3    we have nine unidentified accounts, A through H in paragraph

4    176, and there's information about what J & J provided, what

5    kind of service, you know, they had a sales rep, the sales

6    rep was really helpful, this was the kind of business advice

7    that these accounts got, and paragraph 176C is the one where

8    the relator says, look, I worked with this account for 15

9    years.

10:12AM 10        There's no -- there's not a single claim.  All

11    paragraphs 191 to 193 say is that these unnamed physicians,

12    I have no idea who they are, submitted lots of claims to

13    Medicare, but I have no idea which ones were false.  There's

14    no specific claim, and so I think, like the relator in the

15    *Hagerty* case, what you have are allegations, you have

16    statistics about Medicare claims generally.

17        Your Honor concluded in the *Hagerty* case that the

18    statistics were not focused or precise, and I do think

19    that's what we have here, we obviously have no date, no

10:13AM 20    patients.

21        You know, we all understand that logically, yes,

22    Remicade was a revolutionary medicine, lots of patients used

23    it, Medicare and Medicaid logically must have reimbursed for

24    loss of those claims, but the Court said the logic isn't

25    enough, and this is already the second-amended complaint.

1          This is the third try here, and we still have no

2     claims data at all.  We have no -- there's nothing in here

3     about how the services linked to any claims, which specific

4     claims there were, we just have the general allegation that

5     these were rheumatologists, I worked with them for years,

6     they submitted thousands of claims in Remicade, and we don't

7     think that is enough under Rule 9(b).

8          So, your Honor, we think even though there's a lot

9     of paper here that if you take the five or six or seven OIG

10:14AM 10     opinions that we cite, and we think we cite the Westlaw

11     cites for those, and you look at just couple of

12     publicly-available items, look at the two cases that already

13     provides the framework to dismiss these under Rule 12, as

14     the courts did in *Forney* and *Suarez*.

15          THE COURT:  Okay.  All right.  Who's going

16     to -- I'm sorry, Mr. Posner, were you finished?

17          MR. POSNER:  I am, unless your Honor has any

18     questions for me.  I guess I would reserve.

19          THE COURT:  Yes, of course.

10:15AM 20          MR. POSNER:  Not that I have sort of the clock is

21     running, but I guess I would reserve if your Honor would

22     permit me to respond briefly to whatever the relator's

23     counsel says.

24          THE COURT:  Yes, of course.  Mr. Preston, are you

25     going to take the lead?

1          MR. PRESTON:  Yes, your Honor.

2          THE COURT:  Okay.

3          MR. PRESTON:  Good morning, your Honor, on behalf

4    of plaintiff relator Julie Long, may it please the Court,

5    your Honor, I'm going to first address Janssen's argument

6    that the relators' complaint does not allege illegal

7    remuneration.

8          In making this argument, Janssen is suggesting that

9    the Court should accept as true its version of the facts,

10:15AM 10   not the facts in the complaint.

11         As your Honor knows, Congress intended for the term

12   "remuneration" to have broad application such that it covers

13   the transfer of anything of value in any form or manner

14   whatsoever.

15         HHS OIG has issued guidance to healthcare industry

16   warning about arrangements that could involve the offer of

17   payment of remuneration that would violate the anti-kickback

18   statute under the OIG guidance that Janssen Biotech's

19   counsel has referenced, but they are focused on one

10:16AM 20   paragraph of one specific guidance related to product

21   support, but there's substantial other guidance that OIG has

22   issued concerning remuneration that Janssen Biotech

23   overlooks.

24         That guidance to the healthcare industry warned

25   about arrangements that are gifts or payments of kind, and

1   that is what we allege that the business services are here.

2   These are not product support.  Under the OIG guidance from

3   1994 cited in Ms. Long's briefing, the gifts or payments in

4   kind violate the anti-kickback statute when they are

5   provided to a person or physician that generates business

6   for the drug manufacturer.

7          Janssen services specifically targeted high

8   prescribers, not all physicians, just the top accounts or

9   accounts that have the potential to be the top account.

10:17AM 10   That's not product support.

11          The very nature of these services aren't related to

12   a specific product, they are related to increasing infusion

13   volume by helping accounts build infusion suites hoping

14   accounts grow infusion suites.

15          Under the OIG guidance, the services merely have to

16   be more than nominal in value.  As explained in Ms. Long's

17   briefing, the complaint alleges specific facts that

18   plausibly show that the primary purpose of the ABS program

19   is to induce growth and account infusion businesses and in

10:18AM 20   turn induce purchases and infusions of Remicade and Simponi

21   ARIA.

22          Those allegations include the frequency and level

23   of the infusion business support that Janssen Biotech

24   provided.  It's based upon sale volume.  Many of the

25   services that are specifically designed to help grow IO

1    accounts, the infusion office suites.

2         Janssen directs the area business specialists, this

3    team of special employees who only provide these services,

4    and they don't just provide them by the presentation that

5    Janssen has submitted to the Court, which is, you know, a

6    few of the many presentations they provide.

7         They provide -- these are in-person individualized

8    consultations regarding operation of infusion businesses

9    that add value to all infusion products and services and

10:19AM  10   general value to the entire medical practice in many cases.

11        And, in fact, if you do consider the presentations

12   that Janssen has submitted, you can see from those

13   presentations that they don't relate specifically to

14   Janssen's products, the information in those presentations

15   applies generally to practice management.

16        THE COURT:  I mean, isn't that sort of the critical

17   issue, like, in other words, whether it has independent

18   value?  I mean, sales reps, they used to call them detail

19   men.  I'm showing my age here, but, of course, they focus on

10:20AM  20   physicians who are going to prescribe more of the product,

21   and so, you know, a physician in Midtown Manhattan is going

22   to get more attention than somebody in rural Maine, there's

23   no surprise there, but that the issue, is it not the key

24   issue whether this was not simply product support but had

25   independent value?  Isn't that the critical inquiry?

1          MR. PRESTON:  Yes, your Honor, even if these

2     services were considered to be product support, which,

3     again, we don't believe they are, but if they were

4     considered to be product support, they do have substantial

5     independent value.

6          They confer significant benefit on the physicians

7     that receive them.  They have benefit far beyond just use of

8     a product.  In fact, they don't relate to the proper

9     administration of Remicade or Simponi ARIA, they relate to

10:21AM 10     operation of an infusion business, operation of a medical

11     practice.  The information has as much value to Orencia or

12     Rituxan or other infusible drugs that these physicians

13     utilize than it does to Remicade and Simponi ARIA.

14          Your Honor, returning to the OIG guidance, the OIG

15     guidance sets forth numerous hallmarks and red flags of

16     illegal arrangements that are identified by courts.  All

17     those, several of those red flags are present in this

18     arrangement that Janssen has with top in-office infusion

19     suites.

10:22AM 20          The services are provided to doctors who have

21     direct influence on generating business for Janssen.  The

22     services increase the use of overutilization and

23     inappropriate utilization.  The services take into account

24     sales volume in deciding who receives the services and how

25     much services they receive.  The services are far more than

1   trivial in value.

2        The 2003 OIG guidance warns that services, they are

3   only offered to select purchases based on volume of business

4   generated, as is alleged here, are more likely to violate

5   the anti-kickback statute.

6        The 1994 OIG guidance specifically warns that

7   providing free training in areas such as management

8   techniques to induce patient referrals would constitute a

9   suspect set of arrangement.

10:23AM 10        While it's clear from the statute and from the OIG

11   guidance that it constitutes illegal remuneration, the value

12   of services only need to be more than nominal or trivial.

13   The facts alleged by Ms. Long give rise to a strong

14   inference that the services have significant and substantial

15   value.

16        In fact, as the complaint explains, the services

17   have a discernible cash value, the significant amount that

18   Janssen Biotech and physicians pay consultants to provide

19   many of the same services that the area business specialists

10:23AM 20   provide for free.  In fact, Janssen Biotech pays outside

21   consultants over $1,000 per consultative session to provide

22   many of these services to top accounts.

23        Yet, Janssen disregards these allegations and

24   argues that the infusion business support doesn't have

25   independent value apart from Remicade and Simponi ARIA and

1    confers no benefits to physicians.  That's just not what the

2    complaint alleges, your Honor.

3        I'd like to address the *Suarez* and *Forney* cases as

4    well as the advisory opinions that Janssen is relying so

5    heavily upon.  Your Honor, any examination of those

6    authorities shows that the services at issue in those cases

7    and advisory opinions are just completely different than the

8    business support services that are at issue in this case.

9        In *Suarez*, Abbvie is providing nurses to help

10:25AM 10   patients, not physicians, to help patients properly

11   administer injections of its drug to make sure they are

12   properly trained and knowledgeable about the administration

13   of the drug.

14       Abbvie is not alleged or the relator in that case

15   does not allege that Abbvie is providing business advice,

16   practice management consulting services, anything that

17   remotely resembles what relator alleged Janssen is

18   providing.

19       Janssen's counsel I think misspoke because he

10:26AM 20   reported that the nurses are actually stationed in the

21   physicians' offices, and, therefore, taking the burden off

22   of the staff.  That's not accurate.  The nurse ambassadors

23   go out to the patients' homes and meet with the patients at

24   their homes and are available by telephone if the patients

25   have questions.

1          The interfacing that the nurse ambassadors are

2     alleged to have with physicians relates to reporting any

3     information about the clinical use of the specific product

4     that the patient may raise with the nurse ambassador, but

5     the nurse ambassadors are not stationed in the physicians'

6     offices, and the nurse ambassadors are not providing advice

7     and assistance on operating the practice or an infusion

8     suite.

9          Your Honor, Janssen's reliance on the *Forney* case

10    is interesting.  In that case, the assistance relates to

11    specific cardiac devices, such as pacemakers and

12    defibrillators, and the device manufacturer provides a

13    representative that assists the physician in implanting that

14    device.

15         In addition, the representative follows up with

16    patients to ensure that the device is working properly,

17    performing what are called interrogations, and, yes, in the

18    *Forney* case, it's alleged that the device manufacturer also

19    helped with reimbursement support for their devices.

20         Initially, in that case, the Court ruled that the

21    relator did not satisfy Rule 9(b), but after amendment, the

22    Court held that, in fact, the relator had alleged even those

23    services, which are far different than the services alleged

24    here and are more along the lines of product support.  The

25    Court determined and ruled that the relator there had

1    plausibly alleged that those services had independent value

2    and conferred a benefit to the physician.

3        Your Honor, with regard to the advisory opinions, a

4    review of these advisory opinions, the services have nothing

5    to do with business support, and, in fact, not only is

6    Janssen's reliance on them factually inaccurate, the

7    advisory relying on them, it's procedurally inappropriate.

8        These aren't Janssen's advisory opinions.

9    Janssen never sought an advisory opinion regarding this

10:29AM 10    business support.

11        Under HHS regulations, Janssen's barred from using

12    these advisory opinions to try to prove that they didn't

13    violate the anti-kickback statute, and, in fact, citing that

14    regulation, this Court in *U.S. ex rel. Banigan v. Organon*,

15    which is cited in Ms. Long's briefing, refused to consider

16    advisory opinions requested by other entities.

17        Your Honor, I'm now going to turn to this attempt

18    by Janssen to have your Honor assess the value of all the

19    services that Janssen is providing to its top accounts based

10:30AM 20    on a few examples of slide decks that they selected and

21    submitted to the Court.

22        Your Honor, that's just not a fair approach to a

23    factual assessment, and any factual assessment at this stage

24    would be premature.  You asked Janssen's counsel whether

25    it's appropriate for the Court to consider these

1   presentations.  It would be inappropriate to view these

2   presentations as central or integral to the relator's claims

3   because they represent a small portion of the presentations

4   that were used.  These services have been provided, as

5   Ms. Long details in her 120-plus page complaint.  These

6   services have been provided going back as far as 2003.  She

7   provided them for over 13 years.

8          There are numerous presentations and variations of

9   the presentations, but presentations are just one part of

10:31AM 10   the services they provided.  They are, actually, the area

11   business specialists are there hands-on, in-person helpings

12   diagnose practice management issues.  They spend more time

13   implementing changes and assistance than they do on a slide

14   deck, which Janssen knows potentially could get into the

15   wrong hands.  And the slide decks, again, your Honor, even

16   if they were to be considered, you will see that this is not

17   traditional product support, and the services that are

18   outlined in those particular samples that Janssen Biotech

19   has selected relate to the entire infusion business, entire

10:32AM 20   practice.

21          A factual assessment of the value of the infusion

22   business support requires consideration of other evidence

23   regarding these services value, such as what was

24   management's purpose in providing the service.

25          Ms. Long alleges that the purpose of providing

1    these services was to induce utilization by helping these

2    accounts grow their in-house infusion business, and,

3    therefore, they would in turn grow their use of Remicade and

4    Simponi ARIA.

5         To do a fair factual assessment of the value of the

6    infusion business support services at issue here, then

7    you've got to look at the market value and demand from these

8    services that are provided by other practice management

9    consultants.

10:33AM 10    Janssen wants to act like it is paying these area

11    business specialists, this large team of special employees

12    that this is a team in addition to your traditional sales

13    representatives in addition to your clinical science

14    liaison.

15         Relator isn't aware of any other drug manufacturer

16    employing a team like this that solely are dedicated to

17    helping offices operate their infusion business.

18         They want to act like they've been providing these

19    services for years, but they have no value to physicians,

10:33AM 20    and they've been paying outside consultants top dollar, but

21    those services have no value to physicians.

22         In order to do a fair factual assessment of the

23    value of the infusion business support, you've got to also

24    take a look at defenses and the value that the top IO

25    accounts derive from the services.

1          Janssen's counsel claims that the relators'

2    complaint doesn't set forth any particularity with regard to

3    the services that were provided to specific accounts.

4    That's just untrue.

5          In paragraph 176, the relator provides several

6    examples of accounts that she regularly provided the

7    services to and had those accounts valued the services, and

8    it also talks about how the services had value that went far

9    beyond Remicade and Simponi ARIA and were focused on

10:34AM 10   management of the accounts' infusion businesses.

11         Your Honor, I'm going to turn to Janssen's argument

12   concerning Rule 9(b), and, your Honor, this case in

13   relators' complaint, she alleges with substantial

14   particularity specific accounts, although identified by

15   letter, rather than name, Janssen knows who those accounts

16   are.

17         As is set forth in the complaint and explained in

18   detail, Janssen selects who receives the infusion business

19   support.  Janssen closely monitors every account that

10:35AM 20   receives the infusion business support, and, in fact,

21   Janssen follows the results of the infusion support by

22   following how much additional use of Remicade, Simponi ARIA,

23   and other competing infusibles and non-infusibles these

24   accounts use.

25         If Janssen was concerned about the identities of

1    these particular accounts, it could ask for the names of

2    these particular accounts.  It hasn't.  The relator has that

3    information and is willing to share it, and if your Honor

4    would like that information, I can provide those names to

5    you during this argument, but Janssen knows who those

6    physicians are.

7         Your Honor, in addition to specifying in the

8    complaint the regular services that the relator provided to

9    those accounts, the complaint also pleads CMS data that

10:37AM 10    shows that while those accounts were receiving the free

11    services regularly from the relator, they were also billing

12    Medicare for Remicade.

13         The data is over a long period of time.  Not all of

14    the data is available, but based on that data with

15    physicians that received these services, regularly billed

16    for a large volume of Remicade.

17         There's also an example of a physician that billed

18    for a large volume of Simponi ARIA while that physician was

19    regularly receiving the kickbacks from Janssen.  Those are

10:38AM 20    false claims.

21         The complaint specifies a patient who received

22    services for infusions of Remicade from a physician who was

23    regularly receiving the kickbacks from Janssen.

24         The complaint sets forth the who, what, when, where

25    of the false claims in great detail, and, in addition, and

1   when the Court applies the First Circuit's, they call it the

2   more flexible approach to 9(b), a 9(b) assessment that was

3   set forth in the *U.S. ex rel. Nargol vs. DePuy Orthopaedics*

4   case.  The statistical evidence that is set forth in the

5   complaint clearly shows that, you know, with certainty that

6   the top IOI accounts, who are the biggest market for

7   Remicade and Simponi ARIA, are billing Medicare and Medicaid

8   for infusion services as well as Janssen's drugs while they

9   are receiving the free business support.

10:39AM 10          In addition to that, the complaint alleges facts

11  that show that this is a nation-wide scheme.  Relator is one

12  of many ABSs.  The ABSs don't act on their own.  The ABSs

13  take direction from Janssen's management, and the complaint

14  sets forth in significant detail how Janssen's management

15  has created this ABS program, the alleged anti-kickback

16  scheme, and directs the ABSs to provide the specifics for --

17  it trains them how to provide the services, it closely

18  monitors the ABSs' activities as well as the resulting drug

19  utilization and growth at the recipient's infusion

10:40AM 20  businesses.

21          The complaint describes how the relators' regional

22  manager, who oversaw ABSs in each state, directly

23  participated in providing infusion business support to

24  accounts.  These and other alleged facts give rise to a

25  strong inference that Janssen is providing alleged kickbacks

1    and causing false claims to be filed cross country.

2          Janssen's attempt to limit the scope of relators'

3    case to cover all these false claims filed in our

4    territories got to be denied.

5          THE COURT:  Okay.

6          MR. PRESTON:  Finally --

7          THE COURT:  I'm sorry, go ahead.

8          MR. PRESTON:  Unlike in cases where discovery was

9    limited to a region, the allegations here are based on

10:41AM 10    Ms. Long's credible firsthand information that Janssen is

11    paying kickbacks to top prescribers of its drugs, not just

12    in her testimony and not just throughout the mid-Atlantic

13    region but nationwide.

14          Janssen's request to limit discovery for Ms. Long

15    has even been afforded an opportunity to present her

16    discovery plan is premature.

17          Your Honor, if you have any questions, I'd be happy

18    to answer them.

19          THE COURT:  No, let me hear Mr. Posner's quick

10:41AM 20    response.

21          MR. POSNER:  Yes, sure, a couple of things.  These

22    arguments are exactly the kind of arguments that were

23    considered in the *Suarez* and *Forney* case and that the OIG

24    grapples with, right?  Like the company spends a lot of

25    money on these kind of services.

1              In the *Suarez* case, and, by the way, there was a

2      specific allegation in paragraph 75 of the *Suarez* complaint

3      that the nurses are visiting the doctor's offices.  They

4      actually go into the doctor's office and they say, Doc, is

5      there an administration question that you got, so tell us

6      that and we'll go handle it.  That's exactly the allegation.

7              And in the *Suarez* case, the nurses were going out

8      to the patients in the doctor's offices and fielding and

9      handling all sorts of administrative questions and billing

10:42AM 10   and coding and reimbursement, and relators always say, well,

11     that costs a lot of money.

12             The question isn't whether it costs money for the

13     company, I'm sure it does, we're not disputing that, the

14     question is is there independent value apart from the

15     product to the doctor, and I think the OIG and the cases say

16     there is not.

17             You know, the other cases also dealt with an

18     allegation, well, you know you're focusing on more

19     significant physicians, and that's what detail men and women

10:43AM 20   have been doing for years, that yes, there's certainly a

21     hope or an expectation that this kind of assistance, you

22     know, may yield a favorable view of the medicine, but that's

23     been true in all of these product support opinion cases.

24             You know, the OIG has just not analyzed these as

25     gifts or payments in kind.  Gifts and payments in kind are,

1    you know, cash.  The general rule on this, you're not

2    supposed to replace the receptionist at the doctor's office,

3    you're not supposed to provide something that easily can be

4    used for other functions.

5          There's no OIG opinion that says, well, you can

6    provide a computer so long as the computer is linked to your

7    product, and, but, you know, you can't provide sort of a

8    general computer that you'll use 90 percent of the time for

9    other things as sort of a line that the OIG has drawn.

10:44AM 10          And so these kinds of arguments about the company

11   spent a lot of money, they focus on the bigger doctors, they

12   spend a lot of time with the physicians, that was true in

13   *Forney* and *Suarez* and these OIG opinions.

14          These product support services do, in fact, cost

15   these companies a lot of money, reimbursement support,

16   coding support, prior authorization.  We're all familiar

17   with the paperwork involved in some of these more high end

18   specialty medicines that are innovative.  There's a lot of

19   prior op. and other kinds of requirements, and companies do,

10:45AM 20   in fact, spend a lot of money on assisting patients and

21   doctors through these kind of administrative morass, and

22   they spend a lot of money to do that.

23          And the OIG I think has determined if they are

24   linked to the product, if they really aren't, you know, if

25   they are really just, yes, maybe, you know, in theory they

1    cost the companies a lot of money, as long they are linked

2    to the product, and billing and coding assistance for

3    Remicade doesn't have any particular applicability outside

4    of Remicade, that's -- it's targeted at the product.

5         Now, on paragraph 176 under the 9(b) issue,

6    relators' counsel is correct, 176 does, in fact, describe

7    the services provided to these particular accounts.  I mean,

8    I have no idea who these accounts are, but the accounts

9    aren't the -- the identity of the accounts aren't really the

10:45AM 10  problem or the fact that services were provided to them, I'm

11   sure they were.

12        The problem is that all that's in the complaint is,

13   well, they submitted thousands of Medicare and Medicaid

14   claims.  I'm not disputing that, I just have no idea how

15   they are linked to this case or what specific claims there

16   are.

17        THE COURT:  Okay.  Is that it?

18        MR. POSNER:  That's it.

19        THE COURT:  Last word, Mr. Preston.

10:46AM 20  MR. PRESTON:  Your Honor, I think that upon review

21   of the *Suarez* decision and the *Forney* case, including the

22   subsequent decision after the decision that Janssen cited

23   will show that those cases, the service in those cases bare

24   zero resemblance to the services Janssen is providing.

25        The reference to the computer that is at issue in

1    one of the advisory opinions that Janssen improperly relied

2    upon, the services at issue here are in-person,

3    individualized practice management consulting.

4         The fact that OIG would be concerned that a

5    computer, whether that computer allows access to support for

6    other products in addition to the manufacturer's product,

7    who supplied the computer to the physician shows that these

8    services are far more, raise similar, far more concerns

9    about inducing utilization of the product than a computer

10:47AM 10   would.

11        These are again, these are services that help these

12   physicians operate an entire infusion suite and their entire

13   practice.  They are not product support.  If they are

14   considered to be product support, under the OIG standard for

15   evaluating whether product support constitutes illegal

16   remuneration, the services alleged here easily satisfy that

17   standard.  They have independent value beyond

18   Janssen's products, and they confer substantial benefit to

19   the physicians that receive them.

10:48AM 20        MR. POSNER:  Your Honor, all I would say, just take

21   a look at page 27 of Exhibit F.  It's a public article.

22   It's a lot of consulting advice.  I agree it's a lot of

23   consulting advice.  It's just free.  Thank you, your Honor.

24        THE COURT:  All right.  Thank you, I will take it

25   under advisement.  Thank you.  It was well argued on both

1    sides, and, again, I'll take it under advisement, and we'll

2    stand in recess.  Thank you.

3                (Whereupon, the hearing was adjourned at

4    10:49 a.m.)

5                      C E R T I F I C A T E

6

7    UNITED STATES DISTRICT COURT )

8    DISTRICT OF MASSACHUSETTS ) ss.

9    CITY OF BOSTON )

10                I do hereby certify that the foregoing transcript,

11    Pages 1 through 31 inclusive, was recorded by me

12    stenographically at the time and place aforesaid in Civil

13    Action No. 16-12182-FDS, THE UNITED STATES OF AMERICA ex rel.

14    JULIE LONG vs. JANSSEN BIOTECH, INC., and thereafter by me

15    reduced to typewriting and is a true and accurate record of the

16    proceedings.

17                Dated May 11, 2023.

18                          s/s Valerie A. O'Hara

19                          _____
                             VALERIE A. O'HARA
                             OFFICIAL COURT REPORTER
20

21

22

23

24

25