1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3    THE UNITED STATES OF AMERICA,    )
     ex rel.                          )
4    JULIE LONG,                      )  Civil Action
                                      )
5                    Plaintiffs       )  No. 16-12182-FDS
                                      )
6                                     )
     vs.                              )
7                                     )
     JANSSEN BIOTECH, INC.,
8                    Defendant

9

10   BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV

11

12             MOTION HEARING CONDUCTED BY ZOOM

13

14

15        John Joseph Moakley United States Courthouse
                      1 Courthouse Way
16                    Boston, MA 02210

17

18                    May 18, 2023
                      11:00 a.m.

19

20

21

22

23            Valerie A. O'Hara, FCRR, RPR
                  Official Court Reporter
24    John Joseph Moakley United States Courthouse
                      1 Courthouse Way
25                    Boston, MA 02210
               E-mail: vaohara@gmail.com

1  APPEARANCES VIA ZOOM:

2  For The Relators:

3     Cohen Milstein Sellers & Toll PLLC, by CASEY M. PRESTON,
    ESQ., and GARY L. AZORSKY, ESQ., 1717 Arch Street, Suite 3610,
4  Philadelphia, Pennsylvania 19103;

5     Cohen Milstein Sellers & Toll, PLLC,
    THEODORE JON LEOPOLD, ESQ., and LESLIE KROEGER, ATTORNEY,
6  11780 US Highway One, Suite 200,
    Palm Beach Gardens, Florida 33408;

7
    For the Defendant:
8
      Covington & Burling LLP, by MATTHEW F. DUNN, ESQ.,
9  ETHAN M. POSNER, ESQ., JASON C. RAOFIELD, ESQ., and LAURA WILK,
    ATTORNEY, 850 Tenth Street, NW, Washington, D.C. 20001-4956.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2        THE CLERK:  Court is now in session in the matter

3    of United States vs. Janssen Biotech, Civil Action

4    Number 16-12182.

5        Participants are reminded that photographing,

6    recording or rebroadcasting of this hearing is prohibited and

7    may result in sanctions.

8        Would counsel please identify themselves for the

9    record, starting with the plaintiff.

11:01AM 10        MR. LEOPOLD:  Good morning, your Honor, Ted Leopold,

11    Leslie Kroeger and Casey Preston on behalf of the relator and

12    Gary Azorsky, I'm sorry.

13        THE COURT:  Good morning.

14        MR. LEOPOLD:  Good morning.

15        MR. DUNN:  Good morning, your Honor, Matthew Dunn from

16    Covington & Burling on behalf of defendant Janssen Biotech,

17    Inc.  I'm joined by my colleagues Jason Raofield and

18    Laura Wilk.

19        THE COURT:  Mr. Dunn, you're a little far away from

11:01AM 20    the camera, and the mic. seems to be a little weak, actually

21    the volume is, what I'm particularly concerned about, if you

22    could somehow pick it up or move the mic.

23        MR. DUNN:  Bear with me one second, your Honor, while

24    I get that sorted.  Is that better, your Honor?

25        THE COURT:  Yes, it is, thanks.

1      MR. DUNN:  Thank you, your Honor.

2      THE COURT:  This is a hearing on Janssen's motion for

3  a judgment on the pleadings.  Mr. Dunn, I think it's your

4  motion, I assume you're taking the lead?

5      MR. DUNN:  Yes, your Honor, thank you.

6      THE COURT:  All right, go ahead.

7      MR. DUNN:  So, as your Honor knows, this is Janssen's

8  motion for judgment on the pleadings, and we respectfully ask

9  the Court to dismiss relator's three remaining claims pursuant

11:02AM 10  to the public disclosure bar under the False Claims Act.  Under

11  the well-developed case law and the record here, dismissal

12  pursuant to the disclosure bar is clearly warranted.

13      The First Circuit has stated that the ultimate inquiry

14  of the public disclosure bar is whether the government has

15  received fair notice prior to the suit about the potential

16  existence of the fraud.  The answer here is clearly yes.

17      What is relator's case about?

18      THE COURT:  Doesn't it really turn on what the statute

19  says, right, and the statute says the government has to be a

11:03AM 20  party or an agent.  I mean, you could publish it on the front

21  page of the New York Times, and, you know, that wouldn't

22  satisfy the statute, at least the part about the government

23  being a party or an agent being a party, right?  Doesn't it

24  kind of turn on whether the statutory requirement has been

25  satisfied?

1          MR. DUNN:  Yes, your Honor, that is the second part of

2     the *Winkelman* test.  If it was on the front page of the

3     New York Times, it would be a separate type of disclosure, it

4     would be in the news media.

5          THE COURT:  Right.

6          MR. DUNN:  For our purposes, it is whether it is a

7     federal civil hearing in which the government or its agent was

8     a party, so, your Honor, I'll start with because we have

9     different disclosures here, I'll start with the two qui tams,

11:03AM 10     the *Heineman* and *Greer* cases that we referenced.

11          On those, the United States is in the caption.  The

12     best reading of the statute is that relator is at least the

13     agent of the government in such cases even if you don't

14     consider the government a party in a declined qui tam case.

15          The weight of the authority supports this reading.  We

16     cite the Sixth Circuit case, *Holloway vs. Heartland Hospice,*

17     and we cited other cases, which followed the *Holloway* lead.

18     *Holloway* states, quote, "Because the government is the real

19     party-in-interest, the relator is the assignee of the

11:04AM 20     government's damages claim, and the government exerts a fair

21     amount of control over qui tam litigation.  A qui tam relator

22     is in all cases the government's agent under this portion of

23     the public disclosure bar."

24          It also asks the very good question, "Who, if not the

25     private relator, is the government's agent?"  So even in a

1    qui tam case, the relator still pursues the action on the

2    government's behalf, and the government always remains the real

3    party-in-interest.  The government gets the filings, it

4    maintains a degree of control, it can dismiss, it can get

5    involved in settlement, et cetera.

6          So, you know, we cite other cases in our briefs that

7    land the same way as *Holloway*, including and one, you know,

8    that we didn't cite, but there's more, there's *U.S. ex rel.*

9    *Folliard v. Comstor Group*, 308 F. Supp. 3d 56.

11:05AM 10          Relator cites one outlier case, *Medtronic*, and we

11    respectfully, for the reasons stated in our papers, believe

12    that that case was incorrectly decided.  We do not believe

13    there's any reason to depart from the Sixth Circuit on this.

14          THE COURT:  One of the many odd ball things about this

15    is the statute could easily use the word "relator," but it

16    doesn't, it uses the word "agent," which normally, you know,

17    has a well-established meaning of, you know, an agent has

18    agency from the principal to do various things.

19          That's one of the things I'm struggling with here is

11:06AM 20    it's a fair point, who, if not the relator is the government

21    agent, but, of course, it doesn't use the word "relator," so

22    what am I supposed to do with that?

23          MR. DUNN:  Your Honor, I believe that the reading of

24    "agent," they didn't use the word, "relator," you're correct.

25    I believe that the reading of "relator" to include, "agent,"

1    I'm sorry, your Honor, to include "relator" is the best reading

2    of the statute, and the best way to effectuate the purpose of

3    the public disclosure bar, which is, again, to identify

4    instances in which -- I'm sorry, bear with me for a moment --

5    the ultimate inquiry, which is whether the government has

6    received fair notice prior to suit about the potential

7    existence of the fraud.

8            Qui tam cases are sent to the government by statute.

9    They are required to investigate those cases.  That's a

11:07AM 10    statutory requirement of the False Claims Act.  The government

11    has to make a decision whether or not to decline or intervene.

12    The government is certainly on fair notice of claims that are

13    brought by a qui tam relator.

14            THE COURT:  All right.  Continue.

15            MR. DUNN:  Your Honor, so now I will turn to what I'll

16    call the *AWP* case.  The only courts to have considered the

17    question that we are aware of in the post-amendment context, so

18    after the public disclosure bar was amended in 2010, have

19    correctly determined that *AWP* is a qualifying public

11:07AM 20    disclosure, that's the *CSL Behring* in the Eastern District of

21    Missouri and the Eight Circuit's affirmance in 2017 in which

22    the Court held that the *AWP* litigation constitutes a disclosure

23    made and a qualifying source.

24            Those, importantly, your Honor, those decisions

25    related to the exact same action within the MDL that's at issue

1    here.  CSL Behring was a co-defendant of Janssen in that

2    matter, and respectfully, your Honor, we believe those courts

3    got it right.

4         The government was listed on the docket as an

5    interested party.  The statute doesn't say what type of party,

6    and, moreover, in keeping with the purposes of the statute, the

7    government was a party in all the way that matters for purposes

8    of the public disclosure bar, which is that it received fair

9    notice.

11:08AM 10        The government received all the filings in the *AWP*

11    case.  That includes what I'll probably get to later, which is

12    the deposition testimony of Mr. Hoffman, a vice-president of

13    Centocor, which was listed on that docket.  The government

14    actually participated in the multi-district litigation,

15    including making filings that were applicable to all motions.

16        And, your Honor, I would just point out that the

17    government received far more notice through the *AWP* MDL in

18    which it was an interested party in what you would typically

19    receive from one of the statutory methods that you referred to

11:09AM 20   earlier, the news media.

21        Oftentimes, there's no reason to think at all that the

22    government might actually know or be on notice about, you know,

23    a random news article or publication, you know, that may be

24    obscure, but it counts for disclosure, nonetheless.

25        Here, there was actual disclosure to the government --

1    sorry, your Honor, the phone is ringing -- here, there was

2    actual disclosure to the government because the government

3    chose to join the MDL and be listed an an interested party.

4         Not treating *AWP* as a qualifying public disclosure

5    would be inconsistent with the statute and its purposes.  We

6    don't believe there's any reason to depart from the Eighth

7    Circuit on this.

8         THE COURT:  Again, "party," "party," like "agent," you

9    know, is a word that has a well-established meaning.  I mean,

11:10AM 10    you know, we have rules about this, you know, are you an

11    indispensable party?  Are you the real party-in-interest?  We

12    basically have two kinds of parties, plaintiffs and defendants,

13    putting aside cross-claim plaintiffs and counterclaim

14    plaintiffs and all of that.

15         And, you know, in other words, it's a term of art,

16    you're either a party or you're not, you're either in or you're

17    out, and there's no halfway in, at least in other contexts,

18    and, again, I agree that as a practical matter the government

19    is participating as an amicus or whatever is they were doing.

11:10AM 20    They may have actual notice, but that's not really what the

21    statute says, the statute says you have to be a party.

22         MR. DUNN:  Correct, your Honor, it doesn't say

23    interested party, it does say party.  I do believe that the

24    Eighth Circuit was correct though in finding that the

25    government was a party for purposes of this statute and how

1    parties should be interpreted within the public disclosure bar

2    statute, which, again, the purpose of it is about notice to the

3    government and where the government actually received notice in

4    a federal court litigation in which it has chosen to be on the

5    docket and be an interested party and receive the information.

6    You know, it's not something where the government

7    didn't receive the information, you know, it received the

8    filings on the docket that the best reading of the statute is

9    that you're a party under those circumstances.

11:11AM 10    THE COURT:  Okay, go on.

11    MR. DUNN:  So, your Honor, I'll kind of turn back to

12    the beginning here, and in a moment, I'll go through the

13    *Winkelman* test, the three-part test.  We just covered the

14    second part.  But, again, I'd like to step back.  Here's how

15    relator described the so-called scheme in paragraph 5 of the

16    second-amended complaint.

17    Relator alleged that the company provided the services

18    to help the practices establish infusion suites so the

19    practices would directly administer Remicade and SIMPONI Aria

11:12AM 20    infusions, and then once opened, to help practices operate the

21    infusion businesses more efficiently and profitably so the

22    practices would grow their infusion businesses by prescribing

23    and infusing more Remicade or SIMPONI Aria and the first part

24    of the *Winkelman* test, your Honor, is whether the essential

25    elements about the alleged scheme have been disclosed.

1        That Janssen was engaged in this type of conduct was

2    no secret.  It was openly disclosed, and I'll take you through

3    both *AWP* and the qui tams, your Honor.

4        So, in *AWP*, John Hoffman, he's not some low-level

5    employee, he's a vice president at Centocor, and he testified

6    as follows:  And you will hear it sounds remarkably similar to

7    the summary of relator's allegations that I described to you.

8    There were significant complexities associated with not only

9    setting up initially an IOI position office on an ongoing

11:13AM 10    basis, making sure that the billing, coding, reimbursement,

11    scheduling, handling of infusion redactions, all of the things

12    associated with it were addressed.

13        As a result, Centocor established a practiced

14    management program, which was designed, quote, "to provide

15    education and tools to physicians to help them not only get

16    over some of these disincentives and obstacles that they had

17    but also to be able to deliver those infusions in a more

18    effective and efficient manner on an ongoing basis, as well as

19    helping physicians analyze the financial implications and how

11:14AM 20    to do coding, et cetera.

21        These, in summary, they stated that Janssen was

22    providing information to assist with opening and optimizing IOI

23    infusion suites.  Relator attempted to diminish these

24    disclosures, such as on page 17 of its opposition brief in

25    which it said there was no disclosure that Janssen provided

1    practiced management programs that had independent value beyond

2    Remicade or that the doctors did not have to pay to attend the

3    valuable programs.

4         That's just not correct, as I just read Janssen's VP

5    testified about the practiced management program.  Judge Saris

6    used those very words in her opinion in the *AWP* bench trial.

7    She wrote, quote, "Centocor developed and implemented a

8    practiced management program to educate physicians on buying,

9    infusing, and billing for Remicade."  "Infusing."  Judge Saris

11:15AM 10   understood that that was -- part of the practice management

11   program was about based on the record in that case.

12         Your Honor, I won't belabor it.  You have Exhibit I to

13   our brief, but I know there's a lot of paper that you've been

14   provided with in connection with this motion, so I wanted to

15   point you to that because it shows that relator's other

16   arguments that the prior disclosures were just about *AWP* and

17   marketing spread, that's just incorrect.

18         We're going to try, and I hope we don't mess up the

19   tech, your Honor, to share one slide with you quickly.  And if

11:15AM 20   that's hard to see, your Honor, I'm going to summarize it.

21         THE COURT:  I can --

22         MR. DUNN:  I'm sorry, your Honor.

23         THE COURT:  I can see it.

24         MR. DUNN:  Okay, thank you.  This is the office-based

25   infusion guide that was disclosed in the *AWP* case.  It's not

1    just about marketing the spread or inflating prices.  As you

2    can see, just from the table of contents, and then the guide

3    goes through it, it has a ton of information about opening and

4    optimizing IOI.  It talks about resource evaluations, the space

5    requirements, essential and operational infusion suite

6    equipment, the necessary administration supplies, the staff,

7    training and certification that would be necessary if you were

8    to open an IOI suite, how to optimize your resources.  It goes

9    on to talk about the timing of infusions, maximizing

11:16AM 10   efficiency, and then patient comfort, the types of things

11   relator talks about here, eating, drinking, entertainment

12   options, the setup.

13        The guide goes through that.  It is not just about

14   *AWP*.  It clearly disclose that the company was involved in

15   providing information about opening and optimizing IOI suites.

16        THE COURT:  But somebody, you know, looking at this

17   information would need to draw, take the next step, in other

18   words, this is litigation about wholesale pricing, it's not a

19   litigation about kickbacks or false claims, so somebody would

11:17AM 20   have to look at this and not only understand the fact pattern

21   but also say, ugh, this may constitute a kickback or this may

22   result in a false claim, right?  In other words, the words

23   "kickback" and "false claims" are not present in *AWP*, right?

24        MR. DUNN:  No, it is a case about fraud against

25   Medicare, right, in general, it's that AWPs were inflated

1    fraudulently causing the government, and, in this case, the

2    private payors, to pay more than they otherwise would have.

3         But, you know, a few things, your Honor, in response

4    to that.  First, *Winkelman* forecloses the argument that you

5    have to use magic words like fraud.  It says, quote, "The

6    public disclosure bar contains no requirement that a public

7    disclosure use magic words or specifically label disclosed

8    conduct as fraudulent."

9         It also states that a relator's ability to recognize

11:18AM 10    the legal consequences of a publicly-disclosed fraudulent

11    transaction does not alter the fact that the material elements

12    of the violation already have been publicly disclosed, and what

13    I would argue, your Honor, is that relator states that

14    providing, broadly speaking, providing information about how to

15    open and optimize office infusion suites is unlawful

16    remuneration.  That's what the case is about.

17         So once you disclose, it wasn't an allegation, but it

18    was disclosed that they were providing that type of information

19    by the company.  That is more than enough to put the government

11:18AM 20    or anyone else on the trail of fraud if you believe relators'

21    theory that this is somehow fraudulent.

22         And, your Honor, bear with me for a moment.  I would

23    just add that even without *AWP*, the prior, previously filed

24    qui tams, *Heinemann* and *Greer* standing alone put forth the

25    essential elements.  They state, for instance, that Janssen

1    improperly marketed Remicade by hiring individuals with the

2    position entitled reimbursement specialists, who conducted

3    business reviews, and they provided independent consultants to

4    advise providers on how to run a profitable practice and

5    promote the business using Remicade.  That's not in a vacuum,

6    your Honor.

7         There's this additional allegation in the *Heineman*

8    complaint.  They state not only were they providing business

9    reviews and independent consultants, but, quote, "The

11:19AM 10   defendants also marketed the product Remicade by funneling

11   money into positions of offices through the use of

12   preceptorships to assist physicians in acquiring infusion

13   chairs and establishing infusion suites to allow for their

14   administration of the drug."

15        So, pulling that together, you have an allegation

16   they're providing reimbursement specialists, business reviews,

17   independent consultants about how to run their practices, and

18   in another allegation relating to what I'll broadly call IOI

19   support, it's far more serious than the allegations put forward

11:20AM 20   in this case, which is that they were actually purchasing the

21   equipment for the practice, providing them the money, providing

22   them the equipment so they could open it.

23        So it was out there that there were allegations that

24   Janssen was improperly involved in setting up and providing

25   information about IOI infusion suites, and that alone is enough

1    to put the government squarely on the trail of fraud.

2        Your Honor, relator makes several arguments that these

3    are not sufficient, that they're unavailing under the case law,

4    the well-established case law in this circuit.

5        First, relator argues that we've just pulled out

6    snippets from different matters.  *Winkelman* disposes of this,

7    quote, "The set of facts publicly disclosing an alleged fraud

8    may originate to different sources, as long as they lead to a

9    plausible inference of fraud when combined."

11:21AM 10        Second, relator alleges that, you know, that the words

11    "fraud" and other similar words involving a legal conclusion

12    were not used in the prior disclosures.  As I pointed out

13    earlier, your Honor, *Winkelman* forecloses this argument.  It

14    says that there's no requirement for magic words and there's no

15    requirement that just because a relator can recognize the legal

16    consequences of a disclosed scheme, that does not suffice to

17    say that they are not, that there has not been a public

18    disclosure.

19        Furthermore, on that point, your Honor, two of the

11:22AM 20    cases are qui tam complaints, which by their nature relate to

21    fraud.  Both of those claims allege that there's kickbacks that

22    led to violations of the False Claims Act, and *AWP* was a case

23    about Medicare fraud.

24        Third, and, finally, your Honor, relator argues that

25    Janssen somehow mischaracterized the record.  That's just not

1    so.  The things that we cite speak for themselves.  We

2    accurately quoted them.  They're quoted in the brief

3    side-by-side with relator's allegations.  We have a chart on

4    page 19 to 22 of our opening brief that I would defer your

5    Honor to, but they're accurate.

6            We're obviously accurately quoting the information.

7    Your Honor, I'll skip step 2 of *Winkelman* because we've already

8    discussed it, unless you have more questions on it, and that's

9    whether or not it was in a qualifying source.

11:23AM 10            I'll move onto step 3 of *Winkelman*, which is I'll call

11    it the substantial similarity test.  You compare the substance

12    of the prior disclosures with the substance of the relator's

13    complaint and see if they're substantially similar.  This does

14    overlap, I think as relator acknowledges well.  It overlaps

15    significantly with the inquiry under step 1, but it is a

16    different part of the test.

17            *Winkelman* focuses on the term "anatomy of the scheme."

18    If the anatomy of the scheme has already been revealed, a new

19    complaint that targets the same scheme is barred, even if it

11:23AM 20    offers more details.  That is on all fours with our situation.

21    The fact or the allegation, the information that Janssen was

22    providing information concerning opening and optimizing IOI

23    suites was in the public domain long before this complaint was

24    filed.

25            It's the exact same scheme, alleged scheme, I should

1    say, that has been in place continuously, according to the

2    relator's complaint, from 2003 to 2016.  Relator merely alleges

3    that that scheme has evolved, but a scheme just adding more

4    details or color under *Winkelman* is not enough.

5            Again, your Honor, disclosures only need give rise to

6    an inference of fraud and set the government on the trail of

7    fraud.  *U.S. ex rel. Poteet*.  That's a First Circuit case from

8    2010.  That's very instructive on the substantial similarity

9    inquiry.

11:24AM 10       There, the earlier filed case, which served as the

11   public disclosure, alleged that Medtronic had been providing

12   essentially bribes, you know, money to doctors in exchange for

13   use of the products.

14           The later filed case, *Poteet II*, we'll call it, that's

15   this *Poteet* case, the Court said it added, you know, one new

16   allegation, and that was that the defendant had engaged in

17   off-label marketing to encourage off-label use and also

18   encouraged that, you know, off-label uses were reimbursable by

19   Medicare under -- I know your Honor is quite familiar with

11:25AM 20   these types of cases, and, you know, normally one might think

21   of paying a bribe and providing off-label information,

22   off-label promotion are two different things, but, here, the

23   Court said it's part of the same overall scheme, which is that

24   it's substantially similar because it's the same scheme to

25   induce action by doctors for improper scripts.

1          And it held that, you know, although those off-label

2     allegations added some color, that was the word it used, they

3     ultimately targeted the same overall scheme.

4          *Banigan* is also quite instructive, your Honor.  That's

5     a First Circuit case from 2020.  There, the Court found

6     relator's allegations were substantially similar even though

7     they included a longer period of time, implicated a different

8     kind of remuneration, applied two additional drugs, and

9     utilized, quote, "different, more regressive tactics."

11:26AM 10          That's a lot of what relator argues here makes it not

11     substantially similar.  They point to the addition of SIMPONI,

12     but they point to -- but there's no reason to believe that's a

13     different scheme, it's the same, it's just a different drug

14     with the same alleged scheme applied to it as described by

15     relator.  And then they add more color and more information

16     about specific tactics.  They say the company got more

17     aggressive over time.

18          That's exactly what *Banigan* said is insufficient, so

19     unless you're -- you know, and relator didn't speak to even

11:27AM 20     distinguish these cases or grapple with them, and I believe

21     that's because relator is not.

22          Your Honor, unless you have questions on that piece,

23     I'll move onto the original source.

24          THE COURT:  All right.

25          MR. DUNN:  Thank you.  Very quickly, the key here, the

1    part of the statute we're dealing is whether or not it

2    materially adds to what was publicly disclosed, and it must be

3    before she filed this action.

4        *Winkelman* lays out the framework again, and it's very

5    clear.  It says the task is to ascertain whether the relator's

6    alleged new information falls into, quote, "The narrow category

7    of information materially asked," says that adding detail for

8    color to previously disclosed elements is not enough.  It says

9    that trumping one's personal knowledge or adding specific

11:27AM 10  examples of the conduct does not provide any significant new

11   information where the underlying conduct has already been

12   disclosed.

13       And, again, your Honor, it says that merely adding

14   detail about the precise manner in which a company operated the

15   program and a relator who merely adds detail or color, again,

16   that's not materially adding anything.

17       Finally, *Winkelman* says that adding information that

18   is easily inferable, okay, that's insufficient, easily

19   inferable from the prior public disclosures.

11:28AM 20       So, you know, I'm not going to go through each of

21   relator's alleged material additions, but I'll discuss a

22   couple.  You know, relator says she provided information based

23   on her knowledge from 13 years.  She says she provided specific

24   and detailed information concerning the IOI support.  She says

25   that she, you know, added the insight that these might have

1   substantial and independent value, but there is no new alleged

2   scheme.  She didn't allege a new scheme, she merely added

3   color.

4          With respect to substantial independent value, that's

5   not even a new fact, that's a new conclusion, and, if anything,

6   it's a consequence of the underlying scheme, it's not a new

7   scheme.

8          Two others, your Honor, relator argues that the, you

9   know, conduct continued for years.  That's foreclosed by

11:29AM 10  *Winkelman* where there's, quote, "Every reason to think that a

11  scheme would continue," given that the company had already

12  indicated that it was engaged in the conduct.

13         And, finally, she, I'll point out that the relator

14  states that she has made a material addition relating to

15  scienter.  Again, *Winkelman* dealt with that in this context

16  where a company has already stated what it is doing.  You're

17  not, you know, adding materially adding where, you know, you

18  argue that the company is kind of doing it intentionally when

19  the company has already indicated it's engaged in certain

11:29AM 20  conduct.

21         Your Honor, I know I've been going for a while now.

22  Unless you have questions, I can turn it over to relator's

23  counsel.  I would just -- go ahead, your Honor.

24         THE COURT:  I doubt this has any legal significance,

25  but I'm just curious to know the response.  The relator's lead

1    off with the proposition that, you know, this is a Hail Mary,

2    this is years into the litigation.  Again, I'm not sure that

3    makes a difference legally, but I'm curious to know your

4    response to that.

5         I mean, I would maybe frame it this way.  If a new qui

6    tam were filed in Ohio tomorrow on, you know, Remicade and

7    SIMPONI and IOIs, I'm sure you'd say, no, hold it, you know,

8    we've been down this path, this is barred by the prior

9    disclosure doctrine, and you say that this is round four,

11:30AM 10  you've got the two qui tams never went anywhere plus *AWP*, and,

11   you know, why wasn't this let's say a 12(b)(6) motion right off

12   the bat if this is so obvious?

13        MR. DUNN:  Understood, your Honor.  So, first, it has

14   no legal relevance.  Relator has some rhetoric in the opening

15   portions of her brief, but she doesn't argue that that's a

16   legally relevant question in terms of timing.  It is a timely

17   motion.  You can bring a 12(c) motion any time, yu know, after

18   you answer, it won't delay trial, and that's what we've done

19   here.

11:31AM 20       With respect to why it wasn't raised at the motion to

21   dismiss stage, your Honor, you know, all I can say is

22   defendants make strategic decisions all the time about what

23   arguments to include and not include, and that doesn't

24   necessarily reflect, as I'm sure your Honor appreciates, their

25   belief on the argument on the merits.  Companies frequently

1   wait until summary judgment to raise a public disclosure

2   argument.  What I can say here is, you know, I'm newer to the

3   case, but I do know that there was a thought that summary

4   judgment might be occurring earlier than it has, and at this

5   point, it's much more efficient to raise this argument now than

6   wait for summary judgment, and so that's what we've done.

7          THE COURT:  Okay.  All right.  Mr. Leopold, are you

8   taking the lead?

9          MR. LEOPOLD:  Your Honor, Mr. Preston is going to be

11:32AM 10   arguing for the relator in this particular matter.

11          THE COURT:  Okay, Mr. Preston.

12          MR. PRESTON:  Good morning, your Honor.  I obviously

13   want to go through all the points why Janssen's motion doesn't

14   satisfy the public disclosure requirements, and clearly the

15   original source exception applies here, but on that last point,

16   you know, Mr. Dunn talked about there was some strategy behind

17   waiting, which, frankly, really makes no sense given all the

18   discovery that's taken place, but I just want to bring to your

19   Honor's attention, and this is set forth in the declaration we

11:33AM 20   provided with our opposition, Exhibit 1, in discovery, right

21   off the bat, we issued an interrogatory asking Janssen to

22   identify all cases involving any kickback claims brought

23   against it, right?  It didn't identify *Heinemann or Greer* or

24   *AWP*, it identified two cases that Mr. Dunn hasn't referenced

25   today.  We sent out that interrogatory at the very beginning of

1    discovery.

2          Finally, in I believe it was March of 2022, well into

3    discovery, that Janssen, and, again, your Honor, this is over a

4    year ago that Janssen identified *Heineman* and Greer claiming

5    that it wasn't even aware, so I'm not sure how this could

6    possibly be a public disclosure here if Janssen wasn't even --

7    these cases really didn't even -- it didn't believe they were

8    significant enough to even put in their response to our

9    interrogatory.

11:34AM 10          THE COURT:  But isn't that just kind of rhetoric?  I

11    mean, like again what legal consequence flows from that?  It

12    would not surprise me given how far back these things are, you

13    know, that different law firms were involved, maybe in-house

14    counsel.

15          I'm constantly confused here by what's Janssen, what's

16    Centocor, what's Johnson & Johnson, but I imagine there's a lot

17    of turnover and different counsel involved, but the real point

18    being what legal consequence flows from that, if any?  The

19    motion is not untimely in the sense I'm going to dismiss it on

11:35AM 20    that basis.  I don't hear you saying that this needs to wait

21    for summary judgment because these are not matters at which,

22    you know, the filings in those cases are not things that I can

23    consider, so, you know, the bottom line is the statute says

24    what it says, and either this fits or it doesn't, right, isn't

25    that the framework I'm supposed to analyze this under?

1        MR. PRESTON:  That's correct, your Honor, I think the

2   point is that the whole analysis is whether these allegations

3   and information from these really old cases put the government

4   on notice of the fraud, and, right, and if Janssen isn't even

5   highlighting them in their original motion to dismiss or in the

6   discovery, clearly they weren't obvious public disclosures.

7   That's really the point, your Honor.

8        THE COURT:  All right.  But, and, again, one of the

9   many odd ball things about this, it's not subjective.  You

11:36AM 10   don't have to point to some person in the government or for

11   that matter Janssen who says, ugh, I knew about this, it's

12   objective, what was the information that was out there, right?

13        MR. PRESTON:  Yes, your Honor.

14        THE COURT:  That's the standard, for better, for

15   worse.

16        MR. PRESTON:  I'm sorry to get sidetracked, I just

17   wanted to address that point.

18        THE COURT:  Okay.

19        MR. PRESTON:  By the way, your Honor, Covington &

11:36AM 20   Burling has been representing Janssen from the very beginning.

21   This isn't a case where there's been turnover in law firms,

22   there's been turnover amongst Covington & Burling's team on

23   this case, but --

24        THE COURT:  I'm shocked to hear that.

25        MR. PRESTON:  But they have handled this case from the

1    beginning.

2           Your Honor, the public disclosure theory that Janssen

3    has gone to great lengths to construct streaming together a few

4    vague and innocuous assertions and allegations from these three

5    lawsuits that predate March of 2007 and are focused on

6    completely different conduct is meritless, and it meets none of

7    the False Claim Acts' prepublic disclosure requirements, and

8    even if the asserted disclosures did meet the statutory

9    requirements and they were found to be enough to put the

11:37AM 10   government on notice of the fraud alleges, we strongly assert

11   that it's not, but if that were the case, the motion still

12   fails.

13          The relator, who participated in the alleged kickback

14   scheme for 13 years, she provides numerous material additions

15   to any disclosure that ay have occurred.  Ms. Long clearly

16   meets the original source exception to the public disclosure

17   bar.

18          As your Honor observed in the *Hagerty* case, the

19   purpose of the public disclosure provision is to prevent

11:38AM 20   parasitic qui tam actions, and I'm quoting this, to prevent

21   parasitic qui tam actions in which relators rather than

22   bringing to light independently discovered information of fraud

23   simply feed off of previous disclosures of public fraud.  A

24   comparison of the relator's allegations and this collection of

25   information and allegations that Janssen 's pieced together

1    clearly demonstrates that the relator's allegations are not

2    parasitic.

3         If the fraud relator alleges had actually been

4    previously disclosed, Janssen's counsel could directly point to

5    it and would have raised this argument in its motion to dismiss

6    filed three years ago, not now, two years into discovery, and,

7    in fact, again, Janssen didn't even view most of the asserted

8    disclosures, most of which relate to marketing the spread, a

9    practice from the late '90s and early 2000's, which Judge Saris

11:39AM 10   concluded ended in December of 2003, when Congress changed the

11   payment system to stop the abuse that they're not -- Janssen

12   determined that they weren't of sufficient relevance to produce

13   and identify them in discovery before filing this motion.

14        Your Honor, I'm going to just briefly address why

15   Janssen's theory doesn't meet the public disclosure provisions

16   requirements.  To start, the asserted disclosures weren't made

17   in a federal proceeding in which the government or its agent

18   was a party, as the public disclosure provision requires.

19        Starting with the *AWP* class action, none of the

11:39AM 20   parties in that case were agents of the government, and the

21   United States clearly was not a plaintiff or a defendant to

22   that action.  And as your Honor pointed out, Janssen's argument

23   ignores the ordinary meaning of the term "party" and that

24   Congress amended the statute to narrow the judicial proceedings

25   that can be the source of a public disclosure.

1          Janssen argues that the government should be treated

2    as a party to the *AWP* class action because it was noted on the

3    docket as an interested party because it received copies of

4    filings and because it may have submitted some briefing.

5          Well, those limited connections don't make the

6    government a party to the action.  For example, in a

7    non-intervened qui tam, the government is the real

8    party-in-interest.  It receives copies of all the filings, it

9    submits filings and oftentimes some briefing, but the

11:40AM 10    Supreme Court held in the *Eisenstein* case that this is not

11    enough to make the government a party to a non-intervening

12    qui tam.

13          Because the government was not a party to the *AWP*

14    class action and the parties to that action were not agents of

15    the government, none of the information and allegations from

16    that lawsuit can constitute public disclosures.

17          Mr. Dunn talked about the *CSL* case from Missouri and

18    the Eighth Circuit's affirmance of that case.  Well, in that

19    case, the relator was making an argument very similar to

11:41AM 20    marketing the spread, and it was clear that that scheme had

21    been publicly disclosed, and the relator never objected that

22    the Court considered that information because it was

23    essentially a moot point.

24          So to the extent that those courts considered

25    information from the *AWP* class action, it was erroneous.

1    That's certainly not binding on this court, and it really

2    shouldn't even be persuasive to this court.

3           Likewise, your Honor, in the *Heineman* and *Greer* qui

4    tam actions, those aren't qualifying federal proceedings under

5    the public disclosure provision.

6           The government declined to intervene in both of those

7    qui tams, and, therefore, it wasn't a party to those cases.

8    The few courts that have considered whether a relator in a

9    non-intervening qui tam constitutes an agent of the government,

11:42AM 10    they've reached different conclusions, and we talked about

11    those earlier.

12           Again, we submit that the Eastern District of

13    Pennsylvania's decision in the *Forney* case is the appropriate

14    analysis.  The government is not paying the relator a fee to

15    act on its behalf.  The relator has a separate interest in the

16    case's outcome.  The government does not control the

17    litigation.  The typical agency relationship doesn't exist

18    here, and, again, Congress specifically selected the term

19    "agent."  It did not include relators.

11:42AM 20           The argument from Janssen ignores the ordinary meaning

21    of the term "agent."

22           THE COURT:  I certainly understand that argument, but

23    as I think it was the Sixth Circuit pointed out in *Holloway*, is

24    that the name of the case, that if the relator isn't the agent,

25    who is, who could that possibly apply to?  Can you name a

1    person or an entity that might be an agent under these

2    circumstances that, you know, to which the disclosure bar might

3    apply?  I'm kind of scratching my head here trying to think of

4    some category of agent.  It can't be a government employee.  I

5    mean, that's theoretically an agent of the government, but it

6    can't be that.

7         MR. PRESTON:  Your Honor, this is a practice area of

8    our law firm where we represent Attorney Generals in bringing

9    cases.  They sometimes hire outside counsel to represent them

11:44AM 10    or, you know, there could be cases where they allow a public

11    interest group to represent the government's interests in a

12    case.

13         The False Claims Act does not have that type of a

14    construct, and, in fact, the government tells the relator not

15    to act on its behalf, right?  This is a very different type of

16    relationship than your typical agency relationship, and

17    Congress chose the term "agent," and they did not take into

18    account, they could have, they could have specified that it

19    would apply in a qui tam action, they chose not to, and there's

11:44AM 20    no basis to expand the term "agent" to include nonagents, such

21    as relators.

22         THE COURT:  But basically you think I should follow

23    the *Forney* case as opposed to *Holloway* on this point, right, I

24    mean it kind of comes down to that, which court got it right?

25         MR. PRESTON:  Your Honor, we believe that the *Forney*

1   case is the more appropriate analysis, and we believe that the

2   *Forney* cases also consistent with the Supreme Court's analysis

3   in the Vermont case that's cited in the *Forney* action.

4   THE COURT:  Wasn't the Judge in *Forney* in the

5   Eastern District of Pennsylvania unduly suspicious of people

6   who may be Eagle's fans or people of that ilk?  Should I take

7   that into account, maybe drop a footnote?

8   MR. PRESTON:  That's a fair concern, your Honor, but I

9   think that Judge Smith is someone who you can rely on his

11:45AM 10   analysis, and he's certainly objective.

11   Kidding aside, your Honor, I think his decision in

12   *Forney* is well reasoned, very thoughtful, and appropriate here,

13   and we believe that it's the more appropriate analysis than the

14   Sixth Circuit's analysis in *Holloway*.

15   THE COURT:  Continue.

16   MR. PRESTON:  So, again, the government was not a

17   party to *Heineman* and Greer.  The relators were not agents of

18   the government, and so the asserted disclosures from those

19   actions cannot constitute public disclosures.

11:46AM 20   Even if the three earlier cases were qualifying

21   federal proceedings under the public disclosure provision, the

22   fraud, your Honor, that the relator alleges still wasn't

23   disclosed in those cases.

24   Janssen manufactured its public disclosure theory by

25   taking pieces of information and assertions that, frankly, had

1    unearthed from the *AWP* class action and has pasted them

2    together with a few vague allegations from the *Heineman* and

3    *Greer* complaints, two cases that really went nowhere, and under

4    the First Circuit law, this collection of outdated information

5    of allegations and assertions only constitutes a public

6    disclosure if it provides sufficient information concerning the

7    essential elements of the fraud that relator alleges, such that

8    the government should have already been on notice of that

9    fraud.

11:47AM 10       And, importantly, and as your Honor recognized in the

11   *Flanagan* case, in order to be a disclosure of fraud, the

12   disclosure must contain either a direct allegation of fraud or

13   both misrepresent a state of facts and a true state of facts

14   such that the fraud may be inferred, and that's not the case

15   here.  None of the three earlier cases allege the fraud relator

16   alleges.

17       When the asserted disclosures are read in their

18   original context, not quoted, and selectively quoted and

19   paraphrased and pieced together and then compared to the

11:48AM 20  relator's allegations, it's clear that they wouldn't have put

21   the government on notice of the fraud relator alleges.

22       Relator's allegations concern Janssen's strategy and

23   practice of having its special team of practice advisors called

24   area business specialists as well as outside consultants such

25   as Xcenda, advised physician practices on how to open an IOI

1    and assist them with getting it up and running.

2          And even more significantly in order to gain the

3    loyalty and grow and maintain sales of its products of that

4    IOI, Janssen had the area business specialists and the outside

5    consultants regularly provide the select IOI accounts, not all

6    accounts, but just select IOI accounts, practice management,

7    and infusion business advisory services and support on a wide

8    range of topics that had broad value, such as increasing IOI

9    infusion volume and capacity, enhancing the IOI, optimizing

11:49AM 10  infusion scheduling and staffing, negotiating higher

11   reimbursements from insurers, managing relationships with

12   insurers, tracking payments from insurers and patients,

13   developing standard operating procedures to optimize the IOI

14   work flow, managing drug inventories, qualifying for incentive

15   payments under the government's incentive programs.

16          In our briefing, we collectively refer to this package

17   of infusion business services and support, which are the

18   alleged kickbacks in this case that are at issue as the IOI

19   support.  And relator alleges that the IOI support had

11:49AM 20  substantial and broad value beyond Remicade and SIMPONI Aria.

21   Relator also reported that Janssen regularly provided these

22   services to select IOI accounts for free in order to induce the

23   doctors to prescribe and infuse Remicade and SIMPONI Aria to

24   Medicare patients.

25          On the other hand, the information, allegations and

1    assertions from the three earlier cases don't allege any of the

2    essential elements of the fraud relator alleges and much less

3    even suggests that Janssen provided the IOI support at issue.

4          The three earlier cases focused on fundamentally

5    different conduct, such as:  Marketing the spread, which is the

6    *AWP* class action and the *Heineman* case; underpayment of rebates

7    to the government, that's *Greer;* off-label marketing, that's

8    *Greer*; kickbacks from the scheme that were different from the

9    scheme alleged here, such as paying doctors cash bribes to help

11:50AM 10   them open the IOI and to utilize or prescribe Remicade.

11   There's no allegation in our case about paying bribes to

12   doctors or giving them financial support for the IOI.

13         In *Heineman*, it talks about paying doctors for

14   attending advisory board meetings at luxury resorts and sham

15   research and education grants.  That's outside the scope of

16   what we've alleged.

17         We've submitted as Exhibit 2 to our brief a table that

18   lists the information and allegations from the other cases that

19   Janssen contends constitute public disclosures.  And this

11:51AM 20   exhibit also provides additional context.  It's not all of the

21   context that can be read in those exhibits that Janssen

22   provided and relies on, but they show how Janssen

23   mischaracterized some of these asserted disclosures by

24   paraphrasing and quoting them out of context.

25         Under the framework that the Court applied in

1    assessing whether relator's complaint states a plausible

2    anti-kickback violation, in order for services to constitute

3    illegal remuneration, they must have substantial independent

4    value.  They must be provided for free or significant discount.

5         One of the purposes of providing the services must be

6    to induce prescriptions to Medicare beneficiaries, and the

7    services must have been provided knowingly and willfully.

8         In addition, it's critical that the recipients of the

9    services must have subsequently prescribed the drugs and sought

11:52AM 10  payment from Medicare.  The vague references to practice and

11   management program, business review and consultant in the three

12   earlier cases weren't accompanied by these essential

13   allegations for information that would have made the government

14   aware of the elements of the fraud relator alleges.

15        In addition to not even asserting a kickback claim

16   based on these activities, there's no allegation that Janssen's

17   predecessor, Centocor, had employees and consultants regularly

18   provide the referenced program and business review to select

19   IOI accounts.  There's no allegation that the reference program

11:53AM 20  and business review had substantial value beyond Remicade.

21   There's no discussion of the value of the reference program

22   from those cases.  There was no allegations that the doctors

23   didn't have to pay for that reference program.  There's no

24   allegation that the reference program and business review

25   weren't provided to all doctors but rather only to select high

1   volume and targeted accounts.  There was no allegation that the

2   factual support or providing factual support that Janssen's

3   predecessor Centocor knew that providing the reference program

4   and business review was illegal.  There's no allegation that

5   the physicians who received the reference program and business

6   review subsequently prescribed Remicade and submitted false

7   claims to Medicare where they falsely represented that they

8   weren't accepting illegal remuneration.

9           And now apparently conceding that these essential

11:54AM 10   elements of the fraud that relator alleges weren't alleged in

11   those earlier cases, Mr. Dunn and Janssen in its briefing,

12   they're now arguing, well, these essential elements could have

13   been inferred, but the vague and innocuous asserted

14   disclosures, they don't provide a basis for such inferences,

15   and in this motion, all reasonable inferences have to be drawn

16   in favor of the non-movant, which is the relator.

17           And Mr. Dunn spent some time and he put the

18   office-based infusion guide up on the screen, and I just want

19   to make a couple points about that.  That guide was available

11:55AM 20   on Janssen's website.  Relators' allegations are not based on

21   what pamphlets Janssen made available or information it made

22   available on its website to all doctors.

23           This is about consultative services that a team of

24   special employees provided to select accounts and that Janssen

25   paid outside consultants, like Xcenda, substantial fees to

1    provide to their best customers.  And when you look at that

2    office-based infusion guide, it specifically says that it's

3    geared for just Remicade.  It doesn't talk about all infusible

4    products, it's really geared towards Remicade.

5         And also, importantly, it specifically states that the

6    guide is for doctors who are considering opening an IOI or

7    start infusing Remicade in their practice.  What relators'

8    allegations focus on are the free services, the IOI support,

9    this collection of business services and support that was

11:56AM 10    provided to select accounts after they had opened the IOI.

11        These IOIs were already up and running, and Janssen

12    wanted to grow them, and, therefore, increase utilization of

13    Remicade.  So the mere references to practice management

14    programs, business reviews, and consultants that focused on the

15    profit opportunity from infusing Remicade, that wouldn't have

16    put the government on notice of the elements of the fraud that

17    the relator alleges.

18        Similarly, the relator's action doesn't allege the

19    same allegations and information that Janssen has pulled

11:56AM 20    together from these three earlier actions.  A comparison of the

21    asserted disclosures with the allegations in relator's

22    complaint makes clear that the fraud that relator alleges is

23    substantially different than the asserted disclosures, again,

24    nearly all of which focussed on promoting the profit that could

25    be made on Remicade, how to infuse Remicade, how to bill for

1    Remicade.  Because none of the three public disclosures

2    requirements are met, Janssen's public disclosure theory cannot

3    trigger the public disclosure bar.

4         Turning, your Honor, just quickly to the original

5    source exception, even if these information and assertions and

6    allegations from the earlier cases were enough to trigger the

7    public disclosure bar, Janssen's motion still fails.  The

8    relator unquestionably meets the three requirements of the

9    original exception.

11:57AM 10         Her knowledge is independent.  We didn't hear any

11   argument from Mr. Dunn, and you don't see it in their papers

12   that the relator somehow just obtained her knowledge from these

13   vague disclosures.  She obtained her knowledge by providing the

14   alleged kickbacks for 13 years.  She wasn't even aware of the

15   *Heineman* and *Greer* actions until about a year ago when Janssen

16   disclosed them.

17        Janssen also doesn't dispute that the relator complied

18   with the False Claims Act's presuit disclosure requirements.

19   The details of her compliance with these requirements are set

11:58AM 20   forth in the declarations submitted as Exhibit 1 to our brief.

21        What Janssen argues is that Ms. Long is an original

22   source because her knowledge and information don't materially

23   add to the asserted disclosures from the three earlier cases.

24   Frankly, this contention is meritless, your Honor.

25        Under the First Circuit law, a relator's knowledge and

1    information materially add to publicly-disclosed allegations if

2    it is significant or essential.  That's in the *Winkelman* case,

3    and as *Winkelman* pointed out, as the level of detail in the

4    public disclosure increases, the universe of potentially

5    material additions shrinks.

6        Here, because the asserted disclosures provide none of

7    the essential elements and essentially no information about the

8    fraud that relator alleges, the universe of potential material

9    additions is really large.

11:59AM  10        This is not a case where an opportunist relator merely

11    adds some detail or color to a previously disclosed fraud.

12    Here, the relator is supplying all of the essential elements,

13    all the details, all the allegations.

14        Relator provides the fundamental addition of alleging

15    that Janssen's provision of the IOI support violated the

16    anti-kickback statute and that those violations in turn caused

17    the recipients to cause false claims to Medicare in violation

18    of the False Claims Act.

19        Your Honor closely reviewed the relator's allegations

12:00PM  20    under the heightened standards for pleading fraud before

21    determining that they stated a plausible fraud claim.

22        Respectfully, your Honor, no court would find that

23    Janssen's hodgepodge of asserted disclosures from the earlier

24    actions state a plausible fraud claim.  As detailed in our

25    briefing, relator provided numerous other significant and

1    essential additions.  She adds the knowledge gained from

2    providing the IOI support for 13 years, which has enabled her

3    to plead the fraud with the level of particularity and support

4    needed to move past the pleading stage and obtain the discovery

5    needed to prove her claims.

6          Relator adds the specific and detailed information

7    concerning the IOI support that constitute the illegal

8    remuneration.  These are not mere details, they're the

9    essential allegations.  Relator adds the essential information

12:01PM 10   about how Janssen provided the IOI support for free.  Again,

11   this isn't a mere detail, this is an essential element of the

12   claim.

13         Relator adds the essential information regarding the

14   IOI support's value, including their substantial value beyond

15   Remicade and SIMPONI Aria.  These aren't mere details, this is

16   a required element, as the Court held in deciding Janssen's

17   original motion to dismiss.

18         Relator adds the essential information that one of

19   Janssen's main purposes in providing the IOI support was to

12:01PM 20   induce doctors to prescribe and infuse Remicade and SIMPONI

21   Aria to Medicare beneficiaries.  Again, this is an essential

22   element, not just color.

23         Relator adds the information and allegations that

24   created a plausible inference that Janssen knew that it was

25   unlawful to provide the services to select physician practices

1    to induce them to prescribe and infuse Remicade and SIMPONI

2    Aria, an essential element, not mere details.

3         Relator adds the essential information linking

4    Janssen's provision of the illegal remuneration to subsequent

5    false claims to Medicare submitted by the doctors who received

6    the kickbacks, an essential element of a False Claims Act

7    claim.

8         Those allegations don't appear in any of the earlier

9    cases.  Relator's allegations focus on the provision of the IOI

12:02PM 10    support from October 2010 to the present.  Like Mr. Dunn's

11    assertions, if you read the asserted disclosures, the conduct

12    reported in the three earlier cases all predated March 2007,

13    and none of the information or allegation from those cases

14    would have given any indication that Janssen's predecessor

15    planned to continue engaging in the conduct going forward.

16         This entirely separate time period is a significant

17    addition.  The government would have no reason to believe that

18    the conduct referenced in the earlier cases to the extent it

19    overlapped at all with the fraud that relator has alleged would

12:03PM 20    continue for another decade.

21         Relator adds the material information that is starting

22    in July 2013.  Janssen provided the IOI support to also induce

23    providers to prescribe Remicade's successor drug, SIMPONI Aria.

24    SIMPONI Aria had not even been approved at the time of *Heineman*

25    and *Greer* and the *AWP* class action.

1            Finally, your Honor, relator has obtained substantial

2    additional information about the alleged fraud since amending

3    their complaint more than three years ago, and this information

4    and evidence was only obtained because of the relator's

5    allegations and demonstrates the materiality.

6            Again, relator is supplying all the essential elements

7    that details the allegations.  None of the elements of this

8    fraud were revealed by the asserted disclosures.  Because the

9    relator's knowledge, information, allegations materially add to

12:04PM 10   any prior disclosures, even if the Court were to find that the

11   public disclosure bar was somehow triggered by the disclosure

12   theory Janssen's fabricated, Ms. Long clearly satisfies the

13   original source exception.  In fact, if Ms. Long does not

14   qualify as an original source, it's not clear who would meet

15   the original source standard.

16           Your Honor, we respectfully request that Janssen's

17   motion be denied.

18           THE COURT:  Thank you.  Mr. Dunn, a couple of minutes

19   of response.

12:04PM 20   MR. DUNN:  Your Honor, I know we've taken up a lot of

21   your time already.  I believe that in our papers, we've

22   responded, you know, with citations to the relevant cases to

23   every point Mr. Preston just made, so we will rest on our

24   papers on that, and we believe that the key is not rhetoric but

25   it's to look at what the cases actually say and is not

1    sufficient under the public disclosure bar of the original

2    source exception.

3         One thing I did want to do, your Honor, it's not

4    really a correction but it's a clarification.  It's not legally

5    relevant, but Covington has represented Janssen in this matter.

6    It didn't represent Janssen in the prior matters that are at

7    issue here, so I just wanted to clarify that for your Honor.

8         THE COURT:  All right.  On that point, it's clear, I

9    don't think that's legally relevant, so, in any event.  All

12:05PM 10    right, thank you, all, it was really argued on both sides, and

11    I'll take it under advisement.  Thank you.

12         MR. DUNN:  Thank you, your Honor.

13         (Whereupon, the hearing was adjourned at

14    12:05 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                 C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6              I do hereby certify that the foregoing transcript,

7    Pages 1 through 44 inclusive, was recorded by me

8    stenographically at the time and place aforesaid in Civil

9    Action No. 16-12182-FDS, THE UNITED STATES OF AMERICA ex rel.

10   JULIE LONG vs. JANSSEN BIOTECH, INC., and thereafter by me

11   reduced to typewriting and is a true and accurate record of the

12   proceedings.

13              Dated June 2, 2023.

14                        s/s Valerie A. O'Hara

15                        _____
                          VALERIE A. O'HARA
16                        OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25