# EXHIBIT 6

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------x

UNITED STATES OF AMERICA
ex rel. JULIE LONG,
      Plaintiffs,
  vs.
JANSSEN BIOTECH, INC.,
      Defendant.

Civil Action No.:  16-12182-FDS

-------------------------------x

VIDEOTAPED DEPOSITION OF JANICE BABIA-RAMOS
Tuesday, December 19, 2023
Conducted Remotely

REPORTED BY:
Christina Diaz, CRC, CRR, RMR, CSR-NY/NJ, CLR
HUDSON COURT REPORTING & VIDEO    (800) 310-1769

## Page 2

December 19, 2023
9:04 A.M. E.S.T.

    Videotaped deposition of JANICE BABIA-RAMOS, taken by plaintiffs, pursuant to notice dated December 11, 2023, conducted remotely, before Christina Diaz, a Certified Realtime Captioner, Certified Realtime and Registered Merit Reporter and Notary Public within and for the State of New York.

## Page 3

A P P E A R A N C E S

COHEN, MILSTEIN, SELLERS & TOLL, PLLC
Attorneys for Plaintiff Relator Julie Long:
   3 Logan Square
   1717 Arch Street, Suite 36
   Philadelphia, PA 19103
   267.479.5700
   cpreston@cohenmilstein.com
BY:  CASEY M. PRESTON, ESQUIRE
     - and -
   11780 U.S. Highway One, Suite N500
   Palm Beach Gardens, FL 33408
   561.515.1400
   prazavi@cohenmilstein.com
   tleopold@cohenmilstein.com
BY:  POORAD RAZAVI, ESQUIRE
   THEODORE J. LEOPOLD, ESQUIRE
     - and -
   Two Logan Square
   100-120N 18th Street, Suite 1820
   Philadelphia, PA 19102
   atoric@cohenmilstein.com
BY:  ADNAN TORIC, ESQUIRE

## Page 4

A P P E A R A N C E S (Cont'd.)

COVINGTON & BURLING, LLP
Attorneys for Defendants and
Witness Janice Babia-Ramos
   One City Center
   850 Tenth Street, N.W.
   Washington, D.C. 20001-4956
   202.662.6000
   jraofield@cov.com
   mdunn@cov.com
   adiciurcio@cov.com
   npastan@cov.com
   nbaer@cov.com
BY:  NICHOLAS PASTAN, ESQUIRE
   JASON C. RAOFIELD, ESQUIRE
   MATTHEW F. DUNN, ESQUIRE
   NICHOLAS BAER, ESQUIRE
   ALISON DiCIURCIO, ESQUIRE

ALSO PRESENT:
   EDWIN MENDEZ, Videographer

Page 185

J. Babia-Ramos

Q. Were your communications with the PRC done through telephone discussions, a live meeting or via e-mail, or a combination of those three?

A. So it would be a combination. But mostly in person, like physically in the meetings.

And what I mean by a combination is, sometimes one of the members on the team would have to call in to be part of the meeting.

Q. And where did the meetings take place?

A. Home office.

Q. In a conference room?

A. Yes. In a conference room.

Q. And then as the project initiator, you would present the strategy or program that you wanted the PRC to review?

A. As the project initiator, I was responsible for shepherding that item through PRC, going back and making any edits if they recommended any edits and

Page 186

J. Babia-Ramos

bringing it back through PRC until final approval.

Q. In the context of the site of care 360 support strategy, do you recall that the PRC asked you to make changes to your submission?

MR. PASTAN: Object to form.

A. Yes. As a process, I know I remember that happened but I cannot remember any specific instance and details around that because it was a long time ago.

BY MR. PRESTON:

Q. Do you recall the PRC raising concerns about the proposed strategy?

MR. PASTAN: Object to form.

A. I remember putting everything through PRC and if there were any edits or feedback we would make those changes until it was approved and everything that was approved was -- were the items that we used with customers and with our internal stakeholders.

BY MR. PRESTON:

Q. Again, give your counsel an

Page 187

J. Babia-Ramos

opportunity to voice an objection.

Do you recall Mr. Jimenez raising concerns about the SOC 360 support strategy?

MR. PASTAN: I am going to object, Casey, and instruct the witness not to answer that question, which necessarily depends on any communications that she received from counsel. And it's privileged.

MR. PRESTON: Ms. Ramos, before you answer or provide any information, Nick, I am again having a hard time hearing you.

THE WITNESS: Can you hear me now?

MR. PASTAN: Sorry. Is this any better?

MR. PRESTON: That's much better. Thanks.

MR. PASTAN: This microphone, you have to like eat it to get the sound out of it apparently. It's on the record.

Page 188

J. Babia-Ramos

MR. TORIC: Could I have the objection either read back or stated again. It didn't come through very well.

MR. PASTAN: Sure. I am happy to make it again.

Like I said, I am objecting and instructing the witness not to answer the question about whether Mr. Jimenez provided certain feedback.

It necessarily depends on communications that she received from counsel, and it's privileged.

MR. PRESTON: Even though that that happened within the context of a PRC review?

MR. PASTAN: Yes. Like we said, you guys are asking questions. We are not putting a legal PRC review at issue. We are not waiving privilege. We have made this very clear. And we have consistently objected to this through all the depositions.

Pages 185 to 188

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 189

1       J. Babia-Ramos
2   BY MR. PRESTON:
3       Q.   Ms. Ramos, did the promotional
4   review committee approve of the site 360
5   support strategy concept?
6       A.   The PRC committee approved
7   several assets, resources, tools, content
8   that supported the site of care strategy.
9       Q.   So it moved beyond the concept
10  stage?
11           Right now, we are focusing on the
12  concept review.
13      A.   Right.
14           What are you specifically asking
15  was approved through the concept review?
16      Q.   Correct.
17           Did the PRC approve of the SOC
18  360 support strategy after you submitted it
19  for a concept review?
20      A.   So, again, I did not submit a
21  strategy.  I submitted assets, programming,
22  content, that, within those assets and
23  content, supported the site of care
24  strategy.  So they would approve the
25  content ultimately.

Page 190

1       J. Babia-Ramos
2           So whatever we used in the site
3   of care program was approved by PRC and so
4   therefore, yes.  The site of care strategy
5   was approved.
6       Q.   As part of the presentation of
7   request for approval of programming related
8   to the site of care 360 support strategy,
9   did you present information to the PRC that
10  concerned the independent value of the
11  programs beyond Remicade?
12           MR. PASTAN:  Object to form, and
13      to extent it calls for a legal
14      conclusion.
15      A.   So I am not familiar with that
16  term.  So I can't answer that question.
17  BY MR. PRESTON:
18      Q.   As the employee who was -- sort
19  of spearheaded the development of the SOC
20  360 support strategy, you didn't take a
21  look at whether this -- the programs had
22  any independent value beyond Remicade?
23           MR. PASTAN:  Object to the form
24      of the question.
25      A.   The content was to provide

Page 191

1       J. Babia-Ramos
2   information that would help health care
3   providers understand what the key
4   considerations were to infuse Remicade.  So
5   what that meant to the practice -- you
6   would have to ask the practice what that
7   meant to them.  But that was the intent of
8   the program and everything that was
9   reviewed through PRC was what we used to
10  support the strategy and to support the
11  programming.
12  BY MR. PRESTON:
13      Q.   Did you provide the PRC with an
14  evaluation of the value of the SOC 360
15  programs or the benefits those programs
16  provided to physician practices?
17           MR. PASTAN:  Again, object to the
18      form of the question.
19      A.   Depending on what the asset was,
20  I mean, we would have to say what the
21  intent was, right.  So was it education?
22  Was it helping the practice identify
23  potential barriers?  So in that regard, we
24  provided helpful information to help
25  practices understand how to incorporate

Page 192

1       J. Babia-Ramos
2   Remicade in their daily operations.
3   BY MR. PRESTON:
4       Q.   And once you received a PRC
5   review approval, what did you do?  What was
6   your role, then, in implementing that
7   approved program or strategy?
8       A.   So if there were edits
9   recommended for approval, then I would make
10  those edits.  Once it was finally approved,
11  then -- again, it depends on what we are
12  talking about -- but the audience that it
13  was intended for and who was delivering the
14  message was also approved as part of the
15  PRC process, and so we would go ahead and
16  execute all that.  Deliver that tool or
17  resources or whatever we are talking about
18  to the intended audience through the
19  approved modality.
20      Q.   Was it reviewed with the PRC that
21  Janssen would have outside consultants
22  present the SOC 360 programs?
23      A.   That was also part of the
24  approval process.  So we would have to
25  indicate who was delivering the content and

Page 209

1  J. Babia-Ramos
2  would also be set forth in the submission
3  to the PRC?
4       A.   That was part of the information
5  submitted, yes.
6       Q.   Maybe you answered this question.
7  I'm sorry if I already asked it, but when
8  you were submitting the concept review
9  related to the SOC 360 programs, you
10 reviewed that with Mr. Jimenez as part of
11 the PRC review?
12      MR. PASTAN:  I'm just going to
13 caution the witness to not reveal any
14 communications with counsel.  She can
15 answer a question about whether
16 something was reviewed, but I would
17 limit it to that.
18      You can answer, if you know,
19 whether the concept review and
20 associated programs was with
21 Mr. Jimenez.
22      A.   So legal is part of several
23 reviews along with other members of the PRC
24 committee.
25      MR. PRESTON:  I'm going to mark

Page 210

1  J. Babia-Ramos
2  as Plaintiffs' Exhibit 140 --
3       MR. PASTAN:  Casey, it's been
4  about an hour.  I don't know how long
5  that next exhibit's going to take.
6  They have been taking a while.
7       MR. PRESTON:  Yes.  Let me finish
8  up this line of questioning, and then
9  we'll take a break.
10      I'm marking, as Plaintiffs'
11 Exhibit 140, an e-mail that is Bates
12 numbered JANSSENBIO 55-773 and the
13 attachment is to that was JANSSENBIO
14 55-774.
15      I don't have questions concerning
16 the attachment, Ms. Ramos.
17      (Exhibit 140, e-mail string
18 beginning with e-mail dated 1/10/06
19 with attachment bearing Production Nos.
20 JANSSENBIO 55-773 through 774, 13
21 pages, was marked for identification)
22 BY MR. PRESTON:
23      Q.   I have a question regarding the
24 e-mail at the top of the first page of the
25 exhibit, an e-mail from Mr. Firriolo that

Page 211

1  J. Babia-Ramos
2  you were copied on and it states, "Attached
3  are slides that Kara wants to present
4  tomorrow at the Train the Trainer in prep
5  for the NSM.  I believe this content
6  (Practice Support Programs, PSP), is what
7  was discussed (in concept) by Janice Babia
8  at PRC a couple of weeks ago.  Edmund, I
9  believe you participated in that discussion
10 along with Freddy."
11      And I guess I'm showing you that
12 in order to see whether this refreshes your
13 memory that you reviewed the practice
14 support programs concept with Mr. Jimenez
15 in late 2005 or early 2006 at a PRC concept
16 review?
17      MR. PASTAN:  Again, I just want
18 to caution the witness not to reveal
19 anything about what was communicated if
20 -- strike that.
21      Let me start over.
22      First, I just want to make it
23 clear.  We are not waiving privilege.
24 I can't control what questions you ask
25 about this, obviously, Casey, but we

Page 212

1  J. Babia-Ramos
2  have made it very, very clear
3  throughout the entire process we are
4  not waiving privilege.  If the witness
5  can answer that without revealing any
6  communications with counsel or any
7  advice of counsel, she can answer
8  whether a discussion was had, but I
9  would limit it to that if she recalls.
10      A.   Can you ask me the question
11 again?
12 BY MR. PRESTON:
13      Q.   Does the e-mail at the top of
14 Exhibit 140 refresh your memory that you
15 reviewed the practice support programs
16 concept with Mr. Jimenez in late 2005 or
17 early 2006 as part of a PRC concept review?
18      MR. PASTAN:  Again, I just want
19 to reiterate my objection.  Without
20 revealing any specific communications
21 or advice of counsel, you can answer
22 that question, if you recall.
23      A.   I don't remember this e-mail,
24 though, I see that I'm cc'd on it, but I
25 did not write it.  So I don't have any

Pages 209 to 212

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 213

1      J. Babia-Ramos
2  recollection of this e-mail and the details
3  around it.
4      BY MR. PRESTON:
5      Q.   I am not asking for your
6  recollection of the specific e-mail, but
7  does it refresh your memory as to a meeting
8  with Mr. Jimenez and Mr. Greenidge
9  concerning the PRC concept review related
10 to the practice support programs?
11     MR. PASTAN:  Again, I just want
12 to caution the witness not to reveal
13 any advice or communications with
14 counsel.  I think she can answer what
15 she recalls without doing so.
16     Again, I don't think that this
17 would be anything more than what would
18 be revealed on a privileged log.  But I
19 just caution her when answering the
20 question to keep that in mind.
21     A.   I don't recall.
22     MR. PRESTON:  Okay.  Go off the
23 record.
24     THE VIDEOGRAPHER:  The time is
25 2:49 p.m., and we are off the record.

Page 214

1      J. Babia-Ramos
2      (Recess)
3      THE VIDEOGRAPHER:  The time is
4  3:02 p.m., and we are back on the
5  record.
6      MR. PRESTON:  I am going to mark
7  as Plaintiffs' Exhibit 141 a PowerPoint
8  presentation that was provided in
9  native format.  The slip cover sheet is
10 JANSSENBIO 52-73.
11     (Exhibit 141, Native File bearing
12 Production Nos. JANSSENBIO 52-73, 25
13 pages, was marked for identification)
14 BY MR. PRESTON:
15     Q.   Ms. Ramos, you were identified as
16 the custodian of this document when it was
17 produced and that you were involved in
18 its -- you played a role in drafting it.
19     I will give you a moment to just
20 page through it again.  I have a question
21 on a couple of the slides.
22     I don't want to spend too much
23 time on the document, but I will give you a
24 moment to refamiliarize yourself with it
25 before I ask some questions.

Page 215

1      J. Babia-Ramos
2      A.   Okay.
3      (Witness reviewing document).
4      Q.   All right.  Ms. Ramos, do you
5  recall having a role in creating this
6  document?
7      A.   Yes.  I'm just nearly finished
8  going through.  I am on slide 18.
9      (Witness reviewing document).
10     Okay.
11     Q.   Again, according to the metadata
12 from this document, it's from January 2006.
13     Do you recall this document,
14 Ms. Ramos?
15     A.   Some of the slides look familiar,
16 yes.
17     Q.   Did you have play a role in
18 creating these slides?
19     A.   Some of them, yes.
20     Q.   And this presentation deck gives
21 an overview of the SOC 360 programming; is
22 that accurate?
23     A.   It looks like it, yes.
24     Q.   I am going to have you go to page
25 9 of the exhibit.

Page 216

1      J. Babia-Ramos
2      A.   Okay.
3      Q.   And do you see that chart, and at
4  the top, it says, Site of Care 360
5  Programs.
6      And in the first box it says, "An
7  arsenal of programs and resources focused
8  on addressing Access, Efficiency and
9  Capacity issues to support solution selling
10 at every account level."
11     Do you see that?
12     A.   Yes.
13     Q.   I know we talked about the term
14 solution selling earlier, but does this
15 refresh your memory as to what solution
16 selling is?
17     A.   Well, the program description
18 looks familiar.
19     Q.   Do you recall what solution
20 selling meant?
21     A.   I see what the slide says, but I
22 don't remember specifically what solution
23 selling meant.
24     Q.   Was the goal to provide services
25 of value to site of care with respect to