**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

THE UNITED STATES OF AMERICA, *ex rel.*
JULIE LONG,

          *Plaintiffs,*

    v.

JANSSEN BIOTECH, INC.,

          *Defendant.*

Civil Action No. 16-CV-12182-FDS

## DEFENDANT JANSSEN BIOTECH, INC.'S CORRECTED REPLY IN SUPPORT OF STATEMENT OF UNDISPUTED MATERIAL FACTS AND RESPONSE TO RELATOR'S STATEMENT OF DISPUTED FACTS

Janssen objects to the improper approach Relator has taken to her statement of facts, which is designed to create the appearance of factual disputes where no genuine dispute of material fact exists, thereby hindering the Court's ability to evaluate the merits of Janssen's Motion for Summary Judgment. To be clear, Janssen's objections go far beyond Relator's improper designation of numerous Janssen fact statements as "disputed," which are the subject of Janssen's pending Motion to Deem Admitted certain of Janssen's Statements of Undisputed Material Facts ("SUMFs"). Dkt. No. 590. The following are examples of Relator's improper tactics wholly apart from the issues encompassed in Janssen's pending motion.

Many of Relator's Statements of Disputed Fact ("SDMFs") improperly fail to cite factual exhibits or testimony at all and, instead, cite *only* reports or testimony from Relator's experts, including the expert's interpretation of evidence. Not only does that confirm that Relator is relying on her experts to improperly narrate the evidence, but it also makes it *impossible* for the Court to see the actual evidence on which Relator purports to rely. For example, the only evidence cited in SDMF ¶ 215 (which makes the extreme allegation that Janssen personnel edited marketing

materials to "conceal the true nature, value, and purpose" of the SOC Programs) is a single paragraph from the report of Relator's proffered expert, Kevin McAnaney. In support of the expert's improper state-of-mind opinion, that paragraph discusses the expert's purported interpretation of five Janssen documents, not a single one of which is in the summary judgment record. In other words, in opposing Janssen's Motion for Summary Judgment on the scienter element, Relator has asserted *as a statement of fact* that Janssen engaged in concealment, which she bases *solely* on her expert's interpretation of five Janssen documents, which the Court is unable to review itself because they are not part of the record.

Furthermore, the extent of Relator's bald reliance on her experts in an attempt to overcome summary judgment is simply breathtaking. Her statements of fact cite to her experts' opinions (and improper narration of evidence) well over 100 times. Incredibly, a whopping 39 of Relator's SDMFs are supported by a citation to nothing more than her experts' reports or testimony. *See* SDMF ¶¶ 128, 146, 152-53, 162, 170, 175-79, 186, 191-95, 215, 248, 250-53, 255-58, and 261-73.

Relator also creates a false and misleading impression of the evidence through her use of cross-references that merely cite back to each other and create immense confusion about the documents upon which she is relying. For example, Relator tells the Court throughout her opposition brief ("Opposition") that Janssen's internal documents *repeatedly* described the SOC Programs as "consultative." Dkt. No. 613 at 3, 5, 9-10, 15, and 40-41. She makes the same assertion throughout her Statement of Disputed Facts. In SDMF ¶ 199, she claims, "Janssen's internal documents repeatedly described ABS services as 'consultative' in nature. *See* ¶¶ 11, 20, 38, 71-73, 80, 132-133, 149, 160, 197, *supra*." Having spent many hours reviewing the twelve paragraphs cited, Janssen has discovered that they identify *just two documents*—Exhibit 1 (Dkt.

No. 597-1) and Exhibit 74 (Dkt. No. 598-23)—that use the word "consultative." One was written by a third party, and the other is highly ambiguous and internally inconsistent. *See* Janssen's Reply to SUMF ¶ 11 (discussing Exhibit 1) and Janssen's Response to SDMF ¶ 133 (discussing Exhibit 74). Relator's representation to the Court that Janssen's internal documents "*repeatedly*" describe the SOC Programs as "consultative" is unsupported in the record, but due to Relator's tactics it would have been virtually impossible for the Court to determine that on its own.

Compounding these problems, Relator's frequent cross-references also fail to specify which portion of the lengthy statements of fact purportedly support the proposition for which they are being cross-referenced. This further obscures that lack of support. Again, the citation in SDMF ¶ 199 is a cross-reference to a dozen other statements of fact. As just two examples, the cross-references include Relator's Response to SUMF ¶ 11 (which cites six exhibits, only *one* of which relates to the subject of SDMF ¶ 199) and Relator's Response to SUMF ¶ 38 (which itself cites seven exhibits and further cross-references two more paragraphs, *none* of which relate to the subject of SDMF ¶ 199).[1]

A party opposing summary judgment is supposed to provide "a concise statement of the material facts" with clear citations to the evidence upon which it relies. Local Rule 56.1. Here, Relator's 98-page Statement of Disputed Facts has created a virtually impenetrable thicket to prevent the Court from assessing whether the material facts are *genuinely* controverted. This is simply not how summary judgment is supposed to work.

---

[1] There are many other examples, including (i) duplicative statements of fact (*compare* SDMF ¶ 172 *with* SDMF ¶ 173); (ii) numerous individual exhibits filed collectively as a single "Composite Exhibit" (*see* Composite Exhibit 113); (iii) citations that do not actually cite to anything (*see* SDMF ¶ 147); (iv) duplicate exhibits (*e.g.,* Exhibit 32 and Composite Exhibit 113 (JANSSENBIO-011-00004628)); and (v) exhibits that are cited for the exact same proposition numerous times (*e.g.,* Exhibit 1 (identified for same proposition in Relator's Responses to SUMF ¶¶ 11, 20, 71, 80-81 and SDMF ¶ 197)).

3

## I.    Janssen Biotech, Inc.

1.    Janssen Biotech, Inc. ("Janssen"), formerly known as Centocor, Inc. and Centocor Ortho Biotech, Inc., is a subsidiary of Johnson & Johnson. Second Am. Compl., Dkt. No. 55 ("SAC"), ¶ 17; Def. Janssen Biotech, Inc.'s Answer to Pl.-Relator Julie Long's ("Relator's") Second Am. Compl., Dkt. No. 83, ¶ 17.[2]

**Relator's Response:** Undisputed.

2.    Janssen manufactures and sells biologic therapies, such as Remicade and Simponi ARIA, for patients with immune-mediated inflammatory conditions. Ex. 1 (Remicade Medication Guide[3]) at 5; Ex. 2 (Simponi ARIA Medication Guide[4]) at 4.

**Relator's Response:** Undisputed.

3.    As a pharmaceutical company of Johnson & Johnson, Janssen and its employees are subject to the compliance policies of Johnson & Johnson. Ex. 3 (Jan. 2012 Global Framework for Health Care Compliance Programs, JANSSENBIO-075-00002132 ("2012 Global HCC Framework")) at -2136.

---

[2] Janssen's Footnote 1: To the extent an exhibit cited in Janssen's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment contains a non-privileged reference to "Legal," the "Law Department," or a Janssen lawyer, Janssen is not relying on that portion of the exhibit. In moving for summary judgment with respect to the elements of Relator's claims, Janssen is not disclosing or intending to imply anything about any legal advice that may or may not have been provided, it is not asserting an advice of counsel defense, and it has not waived, and has no intention of waiving, any applicable privilege.

[3] Janssen's Footnote 2: https://www.jnjlabels.com/package-insert/product-patient-information/REMICADE-medication-guide.pdf.

[4] Janssen's Footnote 3: https://www.jnjlabels.com/package-insert/product-patient-information/SIMPONI+ARIA-medication-guide.pdf.

**Relator's Response:** Undisputed only as to the existence, not application, of compliance policies. *See* paragraphs 70-73, 80-82, *infra*, for evidence of Janssen's failure to follow compliance policies.

**Janssen's Reply:** *See* Janssen's Response to ¶¶ 70-73, 80-82.

## II.    Remicade And Simponi ARIA

4.    In August 1998, Remicade (infliximab) received its initial marketing approval from the United States Food and Drug Administration ("FDA") for the treatment of moderately to severely active Crohn's Disease and fistulizing Crohn's Disease. Ex. 4 (Aug. 24, 1998 FDA Approval Letter for Remicade (Infliximab)[5]).

**Relator's Response:** Undisputed.

5.    In November 1999, Remicade was approved by the FDA for treatment of Rheumatoid Arthritis. Ex. 5 (Nov. 10, 1999 FDA Approval Letter for Remicade (Infliximab)[6]).

**Relator's Response:** Undisputed.

6.    In the years following its initial approvals, Remicade was subsequently approved by the FDA to treat active Ankylosing Spondylitis, Psoriatic Arthritis, pediatric patients with moderately to severely active Crohn's Disease, moderately to severely active Ulcerative Colitis, and pediatric patients with moderately to severely active Ulcerative Colitis. Ex. 6 (Dec. 17, 2004 FDA Approval Letter for Remicade (Infliximab)[7]); Ex. 7 (May 18, 2005 FDA Approval

---

[5] Janssen's Footnote 4:
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/1998/inflcen082498L.htm.

[6] Janssen's Footnote 5:
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/1999/inflcen111099L.htm.

[7] Janssen's Footnote 6:
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2004/103772_5077_ltr.pdf.

Letter for Remicade (Infliximab)[8]); Ex. 8 (May 19, 2005 FDA Approval Letter for Remicade (Infliximab)[9]); Ex. 9 (Sept. 15, 2005 FDA Approval Letter for Remicade (Infliximab)[10]); Ex. 10 (Sept. 23, 2011 FDA Approval Letter for Remicade (Infliximab)[11]).

**Relator's Response:** Undisputed.

7.    In July 2013, another Janssen infusible biologic therapy, Simponi ARIA, was approved by the FDA for treatment of moderately to severely active Rheumatoid Arthritis. Ex. 11 (July 18, 2013 FDA Approval Letter for Simponi ARIA (Golimumab)[12]).

**Relator's Response:** Undisputed.

8.    Simponi ARIA was subsequently approved by the FDA to treat active Ankylosing Spondylitis and Psoriatic Arthritis. Ex. 12 (Oct. 20, 2017 FDA Approval Letter for Simponi ARIA (Golimumab)[13]).

**Relator's Response:** Undisputed.

9.    Remicade and Simponi ARIA are given to patients through IV infusion. Remicade is administered over a period of two hours, and Simponi ARIA is administered over a period of 30 minutes. Ex. 1 (Remicade Medication Guide); Ex. 2 (Simponi ARIA Medication Guide).

---

[8] Janssen's Footnote 7:
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2005/103772s5089ltr.pdf.

[9] Janssen's Footnote 8:
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2006/103772s5138ltr.pdf.

[10] Janssen's Footnote 9:
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2005/103772_5113ltr.pdf.

[11] Janssen's Footnote 10:
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2011/103772s5301ltr.pdf.

[12] Janssen's Footnote 11:
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2013/125433Orig1s000ltr.pdf.

[13] Janssen's Footnote 12:
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/125433Orig1s020s021ltr.pdf.

**Relator's Response:** Undisputed.

10.    During certain times within the relevant period, October 28, 2010 to February 19, 2016 (the "Phase 1 Time Period"), Remicade was the only biologic with FDA approval to treat certain conditions. *See, e.g.*, Ex. 13 (Johnson & Johnson Press Release, REMICADE Receives FDA Approval as First Biologic Treatment for Pediatric Ulcerative Colitis (Sept. 23, 2011)[14]).

**Relator's Response:** Disputed. Janssen does not establish an undisputed material fact because it fails to cite admissible evidence. The sole exhibit supporting this assertion, **Def. Ex. 13**, Doc. No. 539-13, is a Johnson & Johnson press release, which is inadmissible hearsay that cannot be considered in support of a motion for summary judgment. *See Silver State Intell. Techs., Inc. v. Garmin Int'l, Inc.*, 32 F. Supp. 3d 1155, 1170 (D. Nev. 2014) (holding "press release . . . is unauthenticated hearsay which cannot support a summary judgment motion") (citing *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773, 776 (9th Cir. 2002)). Because Janssen has not supported its assertion with admissible evidence, the Court should disregard it. Additionally, even if the press release were admissible, Janssen does not identify the specific conditions for which it claims Remicade was the only approved treatment at any time during the Phase 1 Time Period, rendering the assertion too vague to be material.

**Janssen's Reply:** The exhibit cited by Janssen, a 2011 Johnson & Johnson press release, is admissible under Federal Rule of Evidence 803(6), the business records exception to hearsay. The press release indicates that in September 2011, Remicade became the first biologic approved to treat pediatric Ulcerative Colitis, which means that from September 2011 until a

---

[14] Janssen's Footnote 13: https://www.jnj.com/media-center/press-releases/remicade-receives-fda-approval-as-first-biologic-treatment-for-pediatric-ulcerative-colitis.

competitor biologic was approved (in February 2021), Remicade was the only biologic with FDA approval to treat pediatric Ulcerative Colitis. In addition, Remicade was the only biologic approved to treat adult Crohn's Disease from August 1998 to February 2007, the only biologic approved to treat pediatric Crohn's Disease from May 2006 to September 2014, and the only biologic approved to treat adult Ulcerative Colitis from September 2005 to September 2012. *See* Janssen's Ex. 126 (Excerpts of Expert Report of Brian E. Harvey MD, PhD) ¶ 29; Janssen's Ex. 127 (Excerpts of Expert Report of Simon Helfgott, M.D.) at App'x D. Moreover, from Remicade's introduction to the market in August 1998 to the present, Remicade has been the only drug specifically approved for the treatment of fistulizing Crohn's Disease. *Id.*

## III.    Janssen's Area Business Specialists

### A.    The ABS Role

11.    Janssen had two sales teams that promoted Remicade and Simponi ARIA: Immunology Specialists and Area Business Specialists ("ABSs"). Ex. 14 (2003 GOC Presentation, JANSSENBIO-015-00001769) at slide 5; Ex. 15 (2008 Remicade Site of Care Model Slide Deck, JANSSENBIO-048-00001758) at slides 10-12.

**Relator's Response:** Disputed. In addition to promoting Remicade and Simponi ARIA, Area Business Specialists ("ABSs") provided consulting and business advisory services. **Ex. 1** (2/27/2013 Email w/ ABS RBD Workshop Output slide deck) at slides 4 & 8 (describing the provision of "consultative services to assist with . . . overall practice management" as an "objective" and "critical service" ABSs provided to IOIs, which requires "[p]ractice management skills" and "business acumen" to deliver); Deposition of Brian Smith ("Smith Dep."), **Doc. No. 543-3** at 92:7-16 (testifying Janssen's ABS programming included "information about how to start, run, and manage an in-office infusion suite"); **Ex. 2** (Deposition of Louis Zambelli ("Zambelli Dep.")) at 132:24-133:18 (testifying ABSs provide "practice management" services); Deposition

of Karen Trahan ("Trahan Dep."), **Doc. No. 543-4** at 65:1-23 (testifying ABSs went to physicians' offices to "walk[] them through the steps of what was necessary for them to start infusing in [their own] office"); <u>Ex. 3</u> (8/12/2008 Email w/ 2008 ABS Resource Utilization Presentation) at slide 4 (ABS "force" was created "to provide full support to the business related issues of customers" including "[h]elping practices set up and optimize the in-office infusion process"); <u>Ex. 4</u> (Deposition of Janice Babia-Ramos ("Babia-Ramos Dep.")) at 34:8-35:9, 134:23-25 (testifying she developed and designed "practice management programs" for practices to begin infusing Remicade).

**Janssen's Reply:** Relator's response to SUMF ¶ 11 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response does not dispute SUMF ¶ 11, which is a fact that was asserted in Relator's own complaint. *See* Second Am. Comp. ("SAC"), Dkt. No. 55, ¶ 125.

As to Relator's assertion of a *different* fact, the exhibits cited do not support her assertion that ABSs "provided consulting and business advisory services." Instead, that evidence demonstrates that Janssen ABSs provided education using company-approved resources.

- **Exhibit 1 (Dkt. No. 597-1):** Relator's reliance on this document is based on the fact that a third party, ZS Associates, used the phrase "consultative services" to describe ABS activities. Relator's description mischaracterizes the document. First, the third party was engaged to assist Janssen with reducing the size of the ABS sales force, *see* Doc. No. 543-4 (Trahan Dep.) at 170:12-171:11 (Dkt. No. 543-4); it was not evaluating the substance of the ABS activities, and its generic categorization of company-approved ABS activities is not evidence that ABSs were providing free consulting. Second, the third party was discussing all ABS activities, not the At-Issue SOC Programs specifically. Third, and importantly, the third party was describing ABS activities conducted with both HOPDs and IOIs. Relator's complaint expressly alleged that doctors in HOPDs could not be influenced by a kickback, SAC ¶ 63 (HOPDs "are not owned by prescribers who can be influenced by the opportunity to profit from every vial of Remicade and Simponi ARIA they prescribe and infuse"), so the fact that ABSs were providing programs to HOPDs (not just IOIs) confirms they were being provided for a legitimate reason, not as a kickback to induce prescriptions.

- **Doc. No. 543-3 (Smith Dep.) at 92:7-16 (Dkt. No. 543-3):** As Relator's citation confirms, Mr. Smith simply acknowledged that ABSs provided "information about how to start, run, and manage an in-office infusion suite." Mr. Smith rejected Relator's assertion that this involved consulting. *See* Doc. No. 543-3 (Smith Dep.) at 110:20-111:10 (Dkt. No. 543-3).

- **Exhibit 2 (Zambelli Dep.) at 132:24-133:18 (Dkt. No. 597-2):** In the cited testimony, Mr. Zambelli did not testify that ABSs provided "practice management services," as Relator contends. Instead, he merely agreed that a portion of a 2002 ABS job description was accurate, and that the document lists "practice management" as a topic about which ABSs provided education.

- **Doc. No. 543-4 (Trahan Dep.) at 65:1-23 (Dkt. No. 543-4):** Ms. Trahan explicitly rejected Relator's response to SUMF ¶ 11: "We were not providing consulting services." *See* Doc. No. 543-4 (Trahan Dep.) at 160:1-2 (Dkt. No. 543-4). In the cited testimony, Ms. Trahan testified that ABSs "educated" practices on the "steps" and "key considerations" for in-office infusion: "We went into their office with PRC-approved site of care programming, as well as tools," which included "a billing guide that walked them through the steps of what was necessary for them to start infusing in an office." Relator does not allege the billing guide constituted a kickback and, to the contrary, disavowed that in her Opposition to Janssen's Motion for Judgment on the Pleadings. *See* Dkt. No. 381 at 16.

- **Exhibit 3 (Dkt. No. 597-3):** This document does not say that ABSs were providing "consulting and business advisory services." It is a 2008 draft slide deck that stated that the "creation" of the ABS role in 2002 was "based on the need to provide full support to the business related issues of customers," which included numerous ABS activities Relator does not allege were kickbacks. Relator focuses on one of the eight ABS activities listed, and even that was not limited to the At-Issue SOC Programs (*e.g.*, it also included education on "Nursing Considerations").

- **Exhibit 4 (Babia-Ramos Dep.) at 34:8-35:9, 134:23-25 (Dkt. No. 597-4):** As is clear from Relator's description, the cited testimony of Ms. Babia-Ramos regarding "practice management programs" (not the At-Issue SOC Programs) does not support Relator's contention that ABSs were providing "consulting and business advisory services."

Finally, Janssen objects to Relator's citation throughout her brief to her Responses to SUMF ¶¶ 11, 20, and 71 for the false assertion that Janssen's documents "repeatedly" referred to the SOC Programs as "consultative services." Each of those statements of fact leads back to a single document, Exhibit 1, which is discussed above.

12.    Immunology Specialists focused on promoting the clinical benefits of Remicade and Simponi ARIA at the "Site of Demand" ("SOD"). Janssen used the term "Site of Demand" to refer to the location where the patient was identified and prescribed Remicade or

Simponi ARIA by a doctor. Ex. 16 (Long Ex. 15, Apr. 2013 Site of Care Reference Guide, JANSSENBIO-041-00000009) at -12; Ex. 15 (2008 Remicade Site of Care Model Slide Deck) at slides 5, 10; Ex. 17 (Excerpts of Deposition of Julie Long ("Long Dep.")) at 197:5-198:1; Ex. 18 (Excerpts of Deposition of Paul Wickmann ("Wickmann Dep.")) at 192:4-193:21; Ex. 19 (Excerpts of Deposition of Thao Marzullo ("Marzullo Dep.")) at 46:21-47:21; Ex. 20 (Excerpts of Deposition of Marti Heckman ("Heckman Dep.")) at 23:5-24:16; Ex. 21 (Excerpts of Deposition of James Knepp ("Knepp Dep.")) at 40:16-44:14.

**Relator's Response:** Undisputed.

13.     ABSs focused on the "Site of Care" ("SOC"). Janssen used the term "Site of Care" to refer to the location where the patient received the infusion of Remicade or Simponi ARIA. Ex. 16 (2013 Site of Care Reference Guide) at -12; Ex. 15 (2008 Remicade Site of Care Model Slide Deck) at slides 5, 10; Ex. 17 (Long Dep.) at 197:5-198:1; Ex. 20 (Heckman Dep.) at 24:3-26:18; Ex. 22 (Excerpts of Deposition of Janssen 30(b)(6) Witness Brian Smith ("Smith Dep.")) at 412:25-414:2; Ex. 21 (Knepp Dep.) at 40:16-44:14; Ex. 19 (Marzullo Dep.) at 46:21-47:21.

**Relator's Response:** Disputed. ABSs also worked to develop sites of care. **Doc. No. 543-3** (Deposition of Brian Smith ("Smith Dep.")) at 224:19-225:4 (testifying part of Janssen's program was to "develop sites of care"); **Doc. No. 543-4** (Trahan Dep.) at 60:24-61:10 (testifying one of the objectives of the site of care team was to "expand the number of physician practices that had IOIs").

**Janssen's Reply:** Relator's response to SUMF ¶ 13 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response does not dispute SUMF ¶ 13.

11

14.     ABSs called on all Sites of Care, including in-office infusion suites at doctors' offices ("IOIs"), hospital outpatient departments ("HOPDs"), and stand-alone infusion centers. Ex. 17 (Long Dep.) at 191:24-192:7.

**Relator's Response:** Disputed. Janssen preferred or offered more services to particular sites of care based on Remicade sales volume and the potential to increase it. **Ex. 5** (Deposition of Julie Long ("Long Dep.")) at 291:23-292:24 (testifying Janssen offered site of care programs to only some HOPD accounts based on sales volume and the potential for increased sales); **Doc. No. 539-52** (Assessment of RA Business Support) at slide 3 ("In the 2nd half of 2013, headcount was lowered to 38 ABSs to support/call on the top 400 IOI accounts monthly and top hospitals for all Immunology products/indications.").

**Janssen's Reply:** Relator's response to SUMF ¶ 14 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response does not dispute SUMF ¶ 14.

15.     The Site of Demand at which a patient received a prescription for Remicade or Simponi ARIA may not have been the Site of Care where the patient received an infusion. For example, a rheumatologist's office may have been a Site of Demand but referred patients to other Sites of Care—such as IOIs at other doctors' offices, HOPDs, or stand-alone infusion centers—to receive their infusions. Ex. 16 (2013 Site of Care Reference Guide) at -15; Ex. 17 (Long Dep.) at 197:5-199:10; Ex. 19 (Marzullo Dep.) at 46:21-47:21.

**Relator's Response:** Undisputed.

16.     Janssen maintained a Site of Care Reference Guide that stated, "Now that providers are convinced of the clinical benefits of REMICADE, a key role of the Janssen field representative is to actively educate your clients about getting their patients from the SOD to an

12

SOC. Whether providers choose to infuse their patients in the office [i.e., in-office infusion (IOI)] or send patients to another facility, there are resources available to assist in the process." Ex. 16 (2013 Site of Care Reference Guide) at -11.

**Relator's Response:** Disputed. Janssen limited resources based on sales volume. **Doc. No. 539-56** (Immunology 3Q4Q 2013 Call Plan) at p. 5 (describing "ABS targeting strategy" as "based on the Remicade decile of annual Remicade Units" and setting target to provide more services for accounts with a larger decile and no services for accounts below Decile 20); **Doc. No. 539-27** (Immunology Sales 2013 Business Plan – Site of Care) ("Currently, the ABS target universe consists of approximately 3000 accounts+………..ABS & targeting changes every year to address the evolving market dynamics"); **Doc. No. 539-52** (Assessment of RA Business Support) at slide 3 ("In the 2nd half of 2013, headcount was lowered to 38 ABSs to support/call on the top 400 IOI accounts monthly and top hospitals for all Immunology products/indications.").

**Janssen's Reply:** Relator's response to SUMF ¶ 16 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response does not dispute SUMF ¶ 16.

17.     The Site of Care at which Remicade and Simponi ARIA were infused affected the cost of treatment. Typically, it was less costly for patients and payors to infuse Remicade in an IOI than in a HOPD. Ex. 17 (Long Dep.) at 265:15-266:5; Ex. 23 (Excerpts of Deposition of Relator's Expert Meredith Rosenthal ("Rosenthal Dep.")) at 293:11-18 (referencing Ex. 24 (Excerpts of Report of Janssen's Expert Gregory Russo ("Russo Report")) at 34-36, Fig. 19).

**Relator's Response:** Undisputed. It was also less costly for patients to treat at home than in an IOI. **Doc. No. 539-14** (2003 GOC Presentation) at slide 21 ("Mean cost of administration" = $1,607 at Patient's home; $1887 at Physician's office; $1902 as Outpatient).

18.     Janssen created the ABS position in 2002. Ex. 22 (Smith Dep.) at 62:5-8.

**Relator's Response:** Undisputed.

19.     In 2013, Janssen reduced the size of the ABS team from 65 representatives to 38 representatives. Ex. 25 (Jan. 2013 Janssen Biotech, Inc. – Immunology Sales Organizational Chart (JANSSENBIO-002-00000018)); Ex. 26 (Sept. 2013 Janssen Biotech, Inc. – Immunology Sales Organizational Chart (JANSSENBIO-002-00000028)).

**Relator's Response:** Undisputed.

20.     As Relator has alleged, Janssen publicly advertised the existence of the ABS position, including in job postings. SAC ¶¶ 128-29.

**Relator's Response:** Undisputed that Janssen advertised to fill the ABS position, but disputed that these advertisements disclosed the full scope of services ABSs actually provided to practices, which Janssen internally acknowledged while at the same time providing training that such services were prohibited. Janssen internally characterized the ABS job description as providing consultative services on overall IOI practice management, **Ex. 1** (2/27/2013 Email w/ ABS RBD Workshop Output slide deck) at slides 4 & 8 (describing the provision of "consultative services to assist with . . . overall practice management" as an "objective" and "critical service" ABSs provided to IOIs, which require "[p]ractice management skills" and "business acumen" to deliver), while simultaneously recognizing that "employees may not offer consulting services that relate to the management of customers' business practices because . . . it could be considered a kickback." **Ex. 6** (Health Care Compliance Site of Care ABS Speaker Training) at p. 12; **Def. Ex.**

**76**, Doc. No. 539-76 (2015 Contracting, Pricing, Reimbursement, and Access Compliance Training) at p. 51. And the ABS job description described the site of care responsibilities very generically without providing any detail regarding the programs the ABS would be required to deliver. **Ex. 7** (ABS Job Description) at p. 2 (listing as essential job function: "Plan and execute programs specific to Site of Care issues and IV therapy for accounts in territory.").

**Janssen's Reply:** As Relator admits, this statement of fact (which merely identifies an allegation made in Relator's own complaint) is undisputed. Relator's response that the ABS position was not fully disclosed is vague and irrelevant, and the documents cited in her response have nothing to do with this statement of fact. Exhibit 1 (Dkt. No. 597-1), which is discussed in Janssen's Reply to SUMF ¶ 11, has nothing to do with this statement of fact. Exhibit 6 (Dkt. Nos. 597-6, 597-7) and Def. Ex. 76, Doc. No. 539-76 (Dkt. No. 539-76), are training materials that affirmatively disprove Relator's allegation that ABSs provided consulting services, as Relator herself received this training and she does not dispute that during her 13 years as an ABS, she never once believed she was providing prohibited consulting. *See* SUMF ¶ 91 (undisputed); Janssen's Ex. 17 (Long Dep.) at 145:11-16, 172:21-173:10 (Dkt. No. 539-17). Relator admits that she only changed her view after she met her counsel in this litigation. *See* SUMF ¶ 91 (undisputed). Finally, Exhibit 7 (Dkt. No. 597-8) is a draft version of the ABS position description that confirms Janssen publicly advertised the ABS position, which was about "securing and preserving patient access," and included numerous activities unrelated to the At-Issue SOC Programs.

Janssen also objects to Relator's citation throughout her brief to her Responses to SUMF ¶¶ 11, 20, and 71 for the false assertion that Janssen's documents "repeatedly" referred to the SOC Programs as "consultative services." Each of those paragraphs leads back to a single document, Exhibit 1 (Dkt. No. 597-1), which is discussed in Janssen's Reply to SUMF ¶ 11.

21.     Janssen identified two types of attrition that limited patient access to Remicade and Simponi ARIA: pre-needle and post-needle attrition. Pre-needle attrition occurs when a patient is identified for an infusible product but never actually receives the first infusion. Post-needle attrition occurs when a patient begins to receive infusions but discontinues the infusions. Ex. 17 (Long Dep.) at 150:6-151:20; Ex. 27 (2013 Business Plan – Site of Care, JANSSENBIO-008-00004400 ("2013 Business Plan")) at slide 5.

**Relator's Response:** Undisputed.

22.     The ABS team was engaged in efforts to reduce pre-needle and post-needle attrition. Ex. 17 (Long Dep.) at 151:21-152:25, 189:23-191:2; Ex. 28 (July 11, 2010 Email and Attached Central PA Market Review Meeting Follow Up, JANSSENBIO-011-00012628, JANSSENBIO-011-00012630) at -30-31 (Julie Long's notes of her efforts to "[m]inimize attrition," which were being shared by her manager with the larger ABS team to show "what is working"); Ex. 29 (June 22, 2011 Email re ID to IV Pull Through Efforts, JANSSENBIO-015-00004586 ("2011 Email re ID to IV")); Ex. 27 (2013 Business Plan) at slide 5.

**Relator's Response:** Disputed. The ABS team was engaged in efforts to increase sales. **Ex. 8** (Deposition of Scott Shelhamer ("Shelhamer Dep.")) at 68:12-21, 236:15-19 (testifying one of the points of the ABS system is "to help increase sales" and "growing Remicade was part of the ABS role"); **Ex. 9** (Deposition of Lawrence Conley ("Conley Dep.")) at 252:1-6 (testifying, according to Janssen slide deck, that the "objectives for ABSes included increasing IV portfolio market share versus competition"), 254:24-255:14 (same), 256:11-25 (testifying another goal was to "[i]ncrease Simponi ARIA market share and volume"); **Doc. No. 543-3** (Smith Dep.) at 57:7-10 (testifying "one of the goals of the ABS program [was] to grow sales of Remicade and Simponi ARIA"); **Ex. 10** (2000 Practice Management Program Update) at p. 3 ("A large in-office

16

infusion base strengthens Remicade's advantage against current competitors (injected)).

**Janssen's Reply:** Relator's response to SUMF ¶ 22 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response does not dispute SUMF ¶ 22.

23.      The ABS team was engaged in efforts to improve patient access to infusions of Remicade and Simponi ARIA at Sites of Care. Ex. 16 (2013 Site of Care Reference Guide) at -18; Ex. 27 (2013 Business Plan) at slides 5, 7; Ex. 15 (2008 Remicade Site of Care Model Slide Deck) at slides 5, 7; Ex. 30 (Aug. 13, 2006 Email re BIF to Infusion Graph, JANSSENBIO-041-00004617); Ex. 31 (Excerpts of Deposition of Michelle Walls ("Walls Dep.")) at 75:6-25; Ex. 22 (Smith Dep.) at 54:9-18; Ex. 32 (Excerpts of Deposition of Scott Shelhamer ("Shelhamer Dep.")) at 63:18-65:10; Ex. 21 (Knepp Dep.) at 40:16-44:14; Ex. 33 (Excerpts of Deposition of John Haney) at 87:19-92:20.

**Relator's Response:** Disputed. The ABS team was engaged in efforts to help practices open and operate more profitably. **Doc. No. 543-3** (Smith Dep.) at 224:13-225:4 (testifying they were "develop[ing] sites of care" by "provid[ing] information to rheumatologists about how to start and open an IOI"); **Doc. No. 543-4** (Trahan Dep.) at 61:7-10 (testifying "one of the objectives was to expand the number of physician practices that had IOIs"); **Ex. 11** (2/11/2003 Email) at p. 1 (email from Karen Trahan expressing that "Centocor's Practice Management tools and programming . . . 'put these physicians in business'" and there was a "need to continue . . . expanding the biologics business"); **Ex. 12** (Deposition of Roger Kung ("Kung Dep.")) at 52:23-55:5 (testifying one of the key site of care strategies was "[a]ccelerat[ing] establishment of new IOIs" and "accelerat[ing] growth of new IOI models"); **Ex. 7** (Job Description) at p. 1 (part of

ABS's job is to "[m]entor doctors and staff on how to develop and implement an In Office Infusion program including overall operations management, scheduling, staffing. . .").

**Janssen's Reply:** Relator's response to SUMF ¶ 23 confirms that this statement of fact is undisputed.

With respect to Relator's assertion of a *different* fact, the exhibits cited do not support her assertion. For example, Exhibit 11 (Dkt. No. 597-12) is an email from 2002 that pre-dates the At-Issue SOC Programs and was from just months after the ABS role was created. The assertion that ABSs "engaged in efforts to help practices open and operate more profitably" is unsupported and without merit, as confirmed by Relator's own testimony that (i) Janssen's compliance policies prohibited ABSs from discussing profitability, (ii) she complied with Janssen's compliance policies, (iii) she never thought she was engaging in such activity or doing anything wrong (until she met her counsel in this litigation), and (iv) when she observed two other representatives engaging in activities she thought violated the policies, she reported them to Janssen's compliance department. *See* SUMF ¶¶ 82, 86-91, 95. Indeed, contrary to this assertion, Relator testified that as an ABS, she could provide practices with "information," but it was then up to the practices to "take the bull by the horns" and make any changes themselves. Janssen's Ex. 17 (Long Dep.) at 172:21-173:10 (Dkt. No. 539-17).

24.     If Janssen, through the ABS team, could successfully reduce pre-needle and post-needle attrition and increase "access" or "pull-through," that could potentially improve Janssen's sales of Remicade and Simponi ARIA. Ex. 17 (Long Dep.) at 153:1-154:6; Ex. 22 (Smith Dep.) at 54:9-55:10, 355:24-356:6; Ex. 20 (Heckman Dep.) at 150:9-151:23; Ex. 34 (Excerpts of Deposition of Janssen 30(b)(6) Witness Angela Wood ("Wood Dep.")) at 260:3-17, 366:1-4; Ex.

18

35 (Excerpts of Deposition of Janice Babia-Ramos ("Babia-Ramos Dep.")) at 81:22-82:17; Ex. 29 (2011 Email re ID to IV).

**Relator's Response:** Disputed. The ABS Site of Care programs were intended to, and did, result in increased sales of Janssen's drugs, Remicade and Simponi ARIA. **Ex. 13** (July 11, 2014 Mid-Year Programming Update) at p. 2 ("There is a direct correlation of ABS programming with your impact on growth in target accounts."); **Ex. 14** (10/6/2014 Email w/ ABS Programming Analysis Presentation) at p. 1 ("More programming = MORE SALES = Higher SICP [Sales Incentive Compensation Plan]! . . . Overall, through June 2014, the % growth in the target accounts w/programming exceeded the overall performance for the SOC Market Basket…."); **Ex. 10** (Practice Management Program Update) at slide 3 ("An effective Practice Management Program (PMP) increases demand for Remicade. . . Physicians with in-office infusion capabilities are more likely to prescribe Remicade - Physicians who begin to infuse in-office use more Remicade - Physicians who infuse in-office use Remicade more broadly . . . A large in-office infusion base strengthens Remicade's advantage against current competitors (injected)"); **Doc. No. 543-3** (Smith Dep.) at 57:7-10 (testifying "one of the goals of the ABS program [was] to grow sales of Remicade and Simponi ARIA"); **Ex. 5** (Long Dep.) at 244:8-11 (testifying ABSes were "incentivized with a bonus. 50 percent on our demand generation, so we would go in and try to sell REMICADE and SIMPONI ARIA."); **Ex. 15** (Field Targeting IAM Team Roles/Responsibilities) at slide 3 ("Accounts with ABS focus achieved higher growth for Remicade" and "MBPOs [Managing Biologics in the Physician Offices] conducted in accounts in 2008 demonstrated a 10% higher share over national share vs. accounts without MBPO"); **Ex. 16** (Go Beyond Territory Management Targeting-Routing slide deck) at slide 5 (same); **Ex. 17** (Changing Lives … AMT Business Review) at slide 7 ("Share in MBPO accounts is roughly 10%

19

higher than the national average"); **Ex. 18** (East Zone Site of Care Business Review) at slide 6

("ABS Focus, IAM Team Planning, and Programming have contributed to the Remicade growth

in IOIs….", slide 16 ("ABS Value Proposition elevated in organization due to successes in targeted

IOIs . . . ABS targeting on all IOIs has impacted Gastro growth and minimized Rheum declining

market"); **Ex. 19** (9/12/2010 Email Thread) at p. 1 ("There is a clear advantage when an ABS

delivers a MBPO (Managing Biologics in a Physician's Office – Account Review/Diagnostic) and

provides a 'solution mix' tailored to meet the needs of the account.", p. 2 ("Nationally, Remicade

vials are growing over **two times** faster YTD in our MBPO targets vs. non-targets"); **Ex. 13** (July

11, 2014 Mid-Year Programming Update) at slide 2 ("There is a direct correlation of ABS

programming with your impact on growth in target accounts."); **Ex. 21** (January 21, 2016 Simponi

ARIA STAT Meeting) at slide 24 ("Accounts who received 2-4 ABS programs over 6 months had

the highest growth of Simponi Aria and also the highest contribution to JBI IV growth"); **Ex. 22**

(Deposition of Eugene Kang ("Kang Dep.")) at 108:7-23 (testifying ABS programs were evaluated

to "see which ones increase the most sales").

**Janssen's Reply:** Relator's response to SUMF ¶ 24 is subject to Janssen's pending

Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does

not contradict the assertion. Relator's response does not dispute SUMF ¶ 24.

With respect to Relator's assertion of a *different* fact, it is undisputed that the ABS

role was promotional and intended to increase sales. *See* SUMF ¶¶ 23-24. Despite that fact being

undisputed, Relator cites her response to this SUMF more than a dozen times in her brief *for other

propositions*. As such, Janssen responds to her description of the evidence.

The documents and testimony cited by Relator (a) address the ABS role generally

(including activities that were intended to increase sales and are not challenged as kickbacks), not

the At-Issue SOC Programs specifically; (b) address the ABS role with respect to both HOPDs

and IOIs (not merely IOIs as Relator suggests); (c) include references to correlation, not causation;

and/or (d) pre-date the existence of the ABS role and the At-Issue SOC Programs.

- **Exhibit 10 (Dkt. No. 597-11):** This slide deck is from August 2000, years before the creation of the ABS role, and discusses a "Practice Management Program," not the At-Issue SOC Programs.

- **Exhibit 13 (Dkt. No. 597-14):** This document contradicts Relator's theory of liability. The quoted statement about "correlation" explicitly refers to ABS activities with respect to HOPDs, not just IOIs. Relator's complaint expressly alleged that doctors in HOPDs could not be influenced by a kickback, SAC ¶ 63 (HOPDs "are not owned by prescribers who can be influenced by the opportunity to profit from every vial of Remicade and Simponi ARIA they prescribe and infuse"), so the fact that ABSs were providing programs to HOPDs (not just IOIs) confirms they were being provided to promote Janssen's products for a legitimate reason, not as a kickback to induce prescriptions. In addition, the document addresses ABS programs not alleged to have been kickbacks, such as "Clinical Considerations when Administering Remicade," "SIMPONI ARIA In-Service Deck," and "Outpatient Infusion Management: Insights for Hospital Leadership."

- **Exhibit 14 (Dkt. No. 597-15):** This document is about the ABS role overall, not the At-Issue SOC Programs specifically. As with Exhibit 13 discussed immediately above, this document is addressed to HOPDs and therefore contradicts Relator's theory of liability. Further, Eugene Kang, the person who performed the ad-hoc analysis referenced in the document, testified expressly that the analysis did not attempt to establish causation (which, Mr. Kang explained, would have been impossible). *See* Janssen's Ex. 128 (Additional Excerpts of Deposition of Eugene Kang ("Kang Dep.")) at 99:2-21.

- **Exhibit 15 (Dkt. No. 597-16):** This document relates to call planning for both Immunology Specialists and ABSs and includes an ambiguous reference to growth in accounts selected for ABS programming. It does not address causation. It also includes ABS activities that Relator herself testified are not alleged to have involved kickbacks and were intended to increase sales. *See* Ex. 5 (Long Dep.) at 184:3-7, 204:6-25, 205:1-206:3 (Dkt. No. 597-5).

- **Exhibit 16 (Dkt. No. 597-17):** This is another version of Exhibit 15, discussed immediately above.

- **Exhibit 17 (Dkt. No. 597-18):** This slide deck does not address causation, encompasses both HOPDs and IOIs (not just IOIs), and includes ABS activities that Relator herself testified are not alleged to have involved kickbacks and were intended to increase sales. *See* Ex. 5 (Long Dep.) at 184:3-7, 204:6-25, 205:1-206:3 (Dkt. No. 597-5).

- **Exhibit 18 (Dkt. No. 597-19):** Relator uses ellipses to *remove words* and change the meaning of the quoted language. Slide 6 actually says "ABS Focus, IAM Team Planning, and Programming have contributed to the Remicade growth in IOIs *and HOPD targets*."

21

Relator similarly removed "*and HOPDs*" from the quote of slide 16. In fact, that document explains on slide 5 that the "highest growth" was in HOPDs, not IOIs. Relator's complaint expressly alleged that doctors in HOPDs could not be influenced by a kickback, SAC ¶ 63 (HOPDs "are not owned by prescribers who can be influenced by the opportunity to profit from every vial of Remicade and Simponi ARIA they prescribe and infuse"), so the fact that ABSs were providing programs to HOPDs (not just IOIs) confirms they were being provided to promote Janssen's products for a legitimate reason, not as a kickback to induce prescriptions.

- **Exhibit 19 (Dkt. No. 597-20):** It is undisputed that the ABS role was intended to increase sales. The document states that it used MBPO as a way to define which accounts were being called on by ABSs generally, and ABSs engaged in activities that Relator herself testified are not alleged to have involved kickbacks and were intended to increase sales. *See* Ex. 5 (Long Dep.) at 184:3-7, 204:6-25, 205:1-206:3 (Dkt. No. 597-5). Despite that, the document states that in two regions, growth was not faster in accounts that received an MBPO. *See* discussion of Exhibits 15-18.

- **Exhibit 21 (Dkt. No. 597-30):** Contrary to Relator's position in this case (and her misleading discussion of this document), the quoted slide shows that accounts that received more ABS programs (over 4) had a *lower* growth rate of Simponi ARIA than accounts who received less ABS programs (2-4). *See* slide 24. Moreover, the document is addressing all ABS programs, and it is undisputed that the ABS role was intended to increase sales in all sites of care.

- **Exhibit 22 (Kang Dep.) at 108:7-23 (Dkt. No. 597-31):** It is undisputed that the ABS role was intended to increase sales. Relator is quoting a question by Relator's counsel during the deposition of Mr. Kang, who repeatedly stated that no analysis was conducted to establish causation (which, Mr. Kang explained, would have been impossible). *See* Janssen's Ex. 128 (Kang Dep.) at 99:2-21.

- **Doc. No. 543-3 (Smith Dep.) at 57:7-10 (Dkt. No. 543-3):** The cited testimony is unrelated to this SUMF. Again, it is undisputed that the ABS role (which included but was not limited to the At-Issue SOC Programs) was intended to increase sales in all sites of care.

- **Exhibit 5 (Long Dep.) at 244:8-11 (Dkt. No. 597-5):** Ms. Long provided this testimony, which is unrelated to this SUMF. Again, it is undisputed that the ABS role (which included but was not limited to the At-Issue SOC Programs) was intended to increase sales in all sites of care.

25.    Sales were impacted by patient attrition, which Janssen personnel referred to as "the hole in the bottom of the bucket." Ex. 29 (2011 Email re ID to IV).  For example, in a 2011 email, members of Janssen's Sales team discussed the sales impact resulting from high attrition rates with Remicade and the role of the ABS in "getting patients from the Site of Demand

22

to the Site of Care and then infused," noting that "The easiest growth to get with Remicade is making sure that the patient that has been prescribed Remicade, gets ON Remicade!  33% attrition is a lot – if reduced to 28%, we would be heroes with Remicade Growth.  And what's nice about this 'sell', is that you are not selling against 5 other competitors, convincing the doc about Remicade benefits, IV vs SubQ, etc., etc.  All this has already been done!!!  If I wanted Remicade growth, I would focus a lot of time and energy in plugging the hole in the bottom of the bucket.  Dale summed it up nicely, 'A New patient is not a new patient until they have an IV in their arm… overall impact of that new patient is neutralized if we lose an existing Remicade patient." *Id.*; *see also* Ex. 17 (Long Dep.) at 195:3-196:3; Ex. 36 (Feb. 18, 2011 Slide Deck (JANSSEN.014.0113148)) at -3157 ("Annual REMICADE Rheum attrition = 33%" and "1% increase in persistency = $13MM (1,043 patients).").

**Relator's Response:** Disputed. Janssen's growth objectives extended beyond attrition. **Doc. No. 539-27** (2013 Business Plan – Site of Care) at p. 9 ("Growth in the IOI depends on *identifying new patients* & keeping existing patients….") (Italic emphasis added); **Ex. 23** (July 26, 2005 Strategic Business Franchise 2006 Business Plan) at slide 6 (listing as key business opportunities both increasing the number of new IOIs and patient retention), slide 42 (listing plan in 2006 for market expansion by "driv[ing] growth in the IOI…."). One of the Site of Care strategies was identified as "strengthen the customer's involvement & confidence in IOI operational/efficiency decision-making – Succeed vs Competition." **Doc. No. 539-27** at p. 7.

**Janssen's Reply:** Relator's response to SUMF ¶ 25 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator's response does not dispute SUMF ¶ 25. Relator's allegation that "Janssen's

growth objectives extended beyond attrition" merely raises a new and unrelated topic that is not limited to ABSs. *See* Doc. No. 539-27 at p. 9 (Dkt. No. 539-27) ("Driving new demand through clinical differentiation (IS & ABS)"). Janssen confirmed that the ABS role was promotional and intended to increase sales in its Motion for Summary Judgment.

### B.    The Alleged Kickbacks

26.    In her response to Janssen's Interrogatory No. 2, Relator alleges that Janssen ABSs and outside consultants delivered services to practices through regular live consultative meetings and identifies the names of 36 specific "programs" or "presentations."[15] Her response to Interrogatory No. 13 states the basis for her contention that claims submitted were false claims. Ex. 37 (Excerpts of Pl.'s Fourth Supp. Objs. and Resp. to Def.'s Interrog. No. 2 (June 6, 2023) ("Pl.'s Resp. to Interrog. No. 2")); Relator's Mem. of Law in Opp. to Def.'s Mot. to Compel, Dkt. No. 400, at 5; Ex. 38 (Excerpts of Pl.'s Supp. Objs. and Resps. to Def.'s Interrogs. 11 to 16 (Aug. 9, 2024)) – Interrog. No. 13.

**Relator's Response:** Disputed. Relator's response to Janssen's Interrogatory No. 2 states that "[a]dvisory, educational, and consultative assistance, support, and services concerning [numerous practice management and IOI operational] topics . . . that Defendant provided . . . constituted illegal remuneration, the provision of which violated the Anti-Kickback Statute." **Doc. No. 539-37** at p. 4. Relator's response to Janssen's Interrogatory No. 2 further states that Janssen provided these services "to the selected and targeted practices through consultative meetings, which were also commonly referred to as . . . 'programs' and 'presentations,' that were presented by the Area Business Specialists (in-person) or by outside consultants (in-person, by

---

[15] <u>Janssen's Footnote 14</u>: The in-person delivery of the substance of the 36 programs or presentations is referred to herein as the "SOC Programs."

teleconference, or by videoconference)" and identified the names of 36 presentations and programs through which the services were provided. *Id*. at p. 6. In her response to Interrogatory No. 13, Relator objected to Janssen's misuse of the interrogatory "to improperly attempt to obtain a detailed narrative of Plaintiff's case or [a] pretrial memorandum" and provided her answer to Janssen's interrogatory subject to that objection. **Doc. No. 539-38** at pp. 3-4. Additionally, in response to that interrogatory, Relator stated that Janssen should see her response to Interrogatory No. 11. *Id*. at p. 3; *see* **Doc. No. 383-2** at pp. 12-17 for Relator's Response to Interrogatory No. 11.

**Janssen's Reply:** Relator's response admits this statement of fact, and the more extensive quotation of her allegations does not even attempt to dispute it.

27.     Relator does "not assert that the slideshow presentations [used during the SOC Programs] themselves constituted unlawful remuneration or kickbacks." Order Concerning Mot. to Compel Relator's Am. of Interrog. Resps., Dkt. No. 433, at 2. Nor does Relator allege that Janssen's provision of "'written presentations' or any other written materials" constituted unlawful remuneration or kickbacks. Relator's Mem. of Law in Opp. to Def.'s Mot. to Compel, Dkt. No. 400, at 3-5. Rather, Relator alleges that "the alleged remuneration upon which [her] AKS and FCA claims are based is the free live Services and consultative presentations and programs through which the ABSs and outside consultants provided the Services." *Id.* at 5.

**Relator's Response:** Disputed. Relator's "interrogatory response clearly identifies a range of services that relator alleges Janssen unlawfully provided to selected practices, including 'consultive meetings,' also called 'programs and presentations,' which may have included the use of the identified slideshow presentations 'as visual aids.'" Order Concerning Mot. To Compel Relator's Am. of Interrog. Resps., **Doc. No. 433** at p. 2 (quoting Pl. Resp. to Interrog. 2 at 7-11). Relator does "not assert that the slideshow presentations themselves constituted unlawful

remuneration or kickbacks, but that Janssen provided free services that made use of those presentations." *Id*.

**Janssen's Reply:** Relator's response to SUMF ¶ 27 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator's response does not dispute SUMF ¶ 27, nor could it. SUMF ¶ 27 is quoting the Court's order adopting Relator's position, which was expressly identified in her briefing to the Court. Nothing in Relator's response disputes anything in SUMF ¶ 27.

28.    Relator, through her expert Dr. Meredith Rosenthal, identified for her regression analysis only 13 of the 36 presentations or programs[16] as having been delivered to anyone at any of the Phase 1 Practices—the 11 practices that Relator called on during her time as an ABS that are the focus of Phase 1—between October 28, 2010 and February 19, 2016. Ex. 39 (Excerpts of Report of Relator's Expert Meredith Rosenthal ("Rosenthal Report")) ¶ 34; Ex. 23 (Rosenthal Dep.) at 138:10-15.

**Relator's Response:** Disputed. During that period, Dr. Rosenthal also identified that the Raising the Infusion Suite Experience (a/k/a/ RISE) was delivered to one of the Phase 1 Practices. **Ex. 24** (screenshot from JANSSEN.012.0235679.xlsx). Janssen did not track all Site of Care Programming events provided by ABSs. **Doc. No. 555-1** (Rosenthal Report) at ¶34 & n.57 ("Janssen documents indicate that they did not always track all Site of Care Programming events

---

[16] <u>Janssen's Footnote 15</u>: Billing and Coding for Infusions; Considerations for Proactive Practice Management; Electronic Health Records and Meaningful Use; Exceptions and Appeals; ICD-10; In-Office Infusion Drug Procurement Models; Infusion Optimization Modeler (IOM); Infusion Referrals: Improving the Continuity of Care; Infusion Business Review (iBiz); Inventory and Supply Management; IV Therapy: An Important Option for Your Patients (Why IV); Managing Biologics in the Physician Office (MBPO); and Payer Relationship Management.

provided by ABSs."); **Doc. No. 383-2** (Long Interrogatory Responses) at 10 ("[U]nder Janssen's practices and policies, many of the services that Plaintiff provided to the Phase 1 Accounts were not specifically tracked or recorded."). "All of the services identified in Interrogatory 2 were offered and available to the Phase 1 Accounts." **Doc. No. 383-2** at 9.[17]

   **Janssen's Reply:** Other than suggesting that a single Phase 1 Practice may have received a RISE presentation, which, if true, would mean that only 14 (instead of 13) of the 36 presentations or programs were provided to Phase 1 Practices between October 28, 2010 and February 19, 2016, nothing that Relator says disputes SUMF ¶ 28.

   29. The slideshow presentations used during the SOC Programs were approved by Janssen's Promotional Review Committee ("PRC") for ABS use with health care professionals. Ex. 17 (Long Dep.) at 72:25-73:15; Ex. 21 (Knepp Dep.) at 47:12-48:4.

   **Relator's Response:** Disputed. The PRC did not "review the site of care marketing strategies." **Ex. 25** (Deposition of James Knepp ("Knepp Dep.")) at 48:11-16. The PRC did not create any documentation demonstrating the scope of its evaluation or detailed findings regarding a site of care program's compliance with company policy or the law. **Doc. No. 543-1** (Wood Dep.) at 240:1-241:9; 280:8-19. Furthermore, Relator objects to Janssen's reliance on PRC approval as support for its motion for summary judgment. Janssen has now affirmatively placed

---

[17] Relator's Footnote 1: In Relator's response to Janssen's Interrogatory No. 6, wherein Janssen requested that she identify each instance in which she provided any of the IOI Support programs to any Phase 1 Practice, she lists well over 13 different programs provided. **Doc. No. 383-2** at pp. 7-9 (Relator's Second Supplemental Objections and Responses to Defendant's Interrogatory 6). Janssen's internal documents confirm that Relator provided well over 13 IOI Support programs during her tenure as an ABS. **Composite Exhibit 20** (ABS SOC Program Roll Ups and Reports), JANSSENBIO-013- 00004821 (2006); JANSSENBIO-012-0005893 (2007); JANSSENBIO-008-00001666 (2008); JANSSENBIO-013-00008647 (2009); JANSSENBIO-003-00004182 (2010); JANSSENBIO- 012-00003354 (2011); JANSSENBIO-002-00002481 (2012); JANSSENBIO-007-00000819 (Pl. Ex. 4) (2013); JANSSENBIO-007-00008055 (January-June 2014).

the PRC approval process at issue by relying on it in support of its motion for summary judgment. Specifically, Janssen asserts that the "slideshow presentations used during the SOC Programs[18] were approved by Janssen's Promotional Review Committee ('PRC') for ABS use with health care professionals" (SUMF ¶ 29); that ABSs provided "company-approved programming utilizing slideshow presentations approved by a multi-disciplinary Promotional Review Committee" (Def. Memo. at 5); and that Janssen "utilized compliance policies that required all promotional materials (including the slideshow presentations used during the SOC Programs) to be reviewed and approved by the Promotional Review Committee for compliance with Janssen's HCC policies before they were used with customers." (SUMF ¶ 75). This affirmative reliance on the PRC approval process, which includes attorneys from the legal department, triggers the implied waiver framework established by this Court's prior order. *See* **Doc. No. 435** at 4-5. This Court previously ruled that while the "mere *production* of the PRC documents in discovery" did not constitute an implied waiver, the "*use* of the PRC documents . . . is a different question." *Id*. at 5. Now that Janssen has affirmatively placed the PRC's approval before the Court as evidence supporting its defense that the SOC Programs were lawful, Janssen should not be permitted to use the fact of PRC review and approval as a sword while simultaneously shielding the substance of that review as privileged. *See In re Keeper of Recs*., 348 F.3d 16, 24 (1st Cir. 2003) (implied waiver results when "the party asserting the privilege place[s] protected information in issue for personal benefit through some affirmative act"). To permit Janssen to rely on PRC approval while withholding the underlying legal communications would permit [Janssen] to "selectively disclose fragments helpful to its cause, entomb other (unhelpful) fragments, and in that way kidnap the truth-seeking

---

[18] Relator's Footnote 2: "SOC Programs" or "Site of Care Programs" may sometimes be referred to as "IOI Support" herein or in the materials cited herein.

process." *Id*. Accordingly, Janssen has impliedly waived attorney-client privilege with respect to all legal advice and communications concerning the PRC's review and approval of the SOC Programs, and should be required to produce such materials or, alternatively, be precluded from relying on PRC approval as evidence in support of its motion.

**Janssen's Reply:** Relator's response to SUMF ¶ 29 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. In addition, Relator's response argues that Janssen has waived privilege. In doing so, she uses ellipses to misquote the Court's February 29, 2024 Order denying Relator's second motion for privilege waiver, Dkt. No. 435. Relator's position is baseless, as explained in Janssen's pending Motion. *See* Dkt. No. 591 at 13-15.

30. Thirteen of the slideshow presentations used during the SOC Programs were branded, meaning that they specifically referenced Remicade or Simponi ARIA and thus required the ABS to provide safety and efficacy information about the product. Ex. 40 (Excerpts of Janssen Biotech, Inc.'s Objs. and Resps. to Pl.-Relator Julie Long's Dep. Questions to be Answered in Writing (Aug. 2, 2024)) – Dep. Question 1(c).

**Relator's Response:** Disputed. Branded programs were usually lengthier than unbranded programs "because of all of the required important safety information about the product" that had to be delivered in the branded program. **Doc. No. 543-1** (Wood Dep.) at 149:16-20. By contrast, unbranded programs could not mention any specific Janssen product by name, *id*. at 262:14-20, and "were designed in a way to make sure that [the ABS was] getting at the core of the topics – the general operational considerations. . . ." *Id*. at 261:6-10.

**Janssen's Reply:** Relator's response to SUMF ¶ 30 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does

29

not contradict the assertion. Relator does not dispute that thirteen of the presentations used during the SOC Programs were branded. Instead, she asserts that branded programs were "usually lengthier" because they were required to include disclosures regarding safety from the product's label, which is both undisputed and unrelated to SUMF ¶ 30 (or any issue in the case).

31.    Many of the slideshow presentations used during the SOC Programs explicitly directed the audience to consult legal counsel or reimbursement specialists to address issues specific to the practice. *See, e.g.*, Ex. 41 (Considerations for Working with a Specialty Pharmacy, JANSSENBIO-014-00005618) at slide 2.

**Relator's Response:** Disputed. The referenced version of the PowerPoint slide deck that was used as a visual aid for the SOC program titled "Considerations for Working With a Specialty Pharmacy" states on the second slide that attendees of the program should "consult with your counsel or reimbursement specialist for any reimbursement or billing questions specific to your institution." **Doc. No. 539-41** at slide 2.

**Janssen's Reply:** Relator's response to SUMF ¶ 31 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response does not even attempt to dispute SUMF ¶ 31.

32.    One SOC Program, "Billing and Coding for Infusions," provided information applicable to coding for infusions of Remicade and Simponi ARIA. Ex. 42 (Billing and Coding for Infusions, JANSSENBIO-051-00003096). The slideshow presentation used during the program included slides on "Basics of Billing for Infusion," "Billing and Coding Considerations," and "Medical Necessity Documentation Considerations." *Id.* at slides 4, 12, 22. The presentation further identified tools or personnel from medical associations that "can assist [the] practice with billing/coding and defining benchmarks." *Id.* at slide 21.

30

**Relator's Response:** Disputed. The SOC program titled "Billing and Coding for Infusions" was an unbranded program and the slide deck ABSs used as a visual aid when presenting this program did not mention Remicade or Simponi ARIA. See **Doc. No. 539-42**. The information and advice provided during this SOC program was applicable to all drugs that physician practices could administer via infusions in their infusion suite, not just Remicade and Simponi ARIA. *See id.*

**Janssen's Reply:** Relator's response to SUMF ¶ 32 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator does not actually dispute SUMF ¶ 32. Nor does she cite any evidence to even attempt to contradict this statement of fact. Instead, Relator simply alleges that the information "was applicable to all drugs that physician practices could administer via infusions in their infusion suite." That position is peculiar given that Relator has affirmatively alleged that Janssen's more detailed billing and reimbursement support did not involve an AKS violation. *See* SAC ¶ 166(r) n.14 ("Janssen provides accounts other free services, including assistance with obtaining prior authorizations and insurance coverage for Janssen's products and patient financial assistance, that Relator does not allege violate the Federal AKS, State AKS, and/or FCA in this action."). She does not deny that this presentation related to reimbursement for Janssen's products; she merely argues that it could have theoretical relevance to other medications, which is immaterial, as the Department of Justice and courts have rejected similar attempts to impute independent value where information related to a drug (such as education on a disease or product administration) could have theoretical relevance to other drugs. *See* Janssen's Mem. in Support of Mot. for Summary Judgment, Dkt. No. 538, at 16.

31

33.   Another SOC Program, "Considerations for Working with a Specialty Pharmacy," provided information about the use of specialty pharmacies. Ex. 41 (Considerations for Working with a Specialty Pharmacy). The slideshow presentation used during the program included slides on "What Is a Specialty Pharmacy," "Accessing REMICADE via a Specialty Pharmacy," and "Considerations in Understanding Costs for Infusions of REMICADE." *Id.* at slides 4, 14, 16. The presentation included a disclaimer stating, "This document is presented for informational purposes only and is not intended to provide reimbursement or legal advice." *Id.* at slide 2.

**Relator's Response:** Disputed. Although the slide deck that ABSs used in providing the SOC program titled "Considerations for Working with a Specialty Pharmacy" to physician practices included the slides and disclaimer Janssen references, the information and advice provided during this SOC program was applicable to all drugs that physician practices could obtain through a specialty pharmacy and subsequently administer via infusions in their infusion suite, not just Remicade and Simponi ARIA. *See* **Doc. No. 539-41**.

**Janssen's Reply:** Relator does not actually dispute SUMF ¶ 33, as is clear from her response. Nor does she cite any evidence to even attempt to contradict this statement of fact. Instead, Relator simply alleges that the information "was applicable to all drugs that physician practices could obtain through a specialty pharmacy." She does not deny that this presentation related to the acquisition of Janssen's products; she merely argues it could have theoretical relevance to other medications, which is immaterial, as the Department of Justice and courts have rejected similar attempts to impute independent value where information related to a drug (such as education on a disease or product administration) could have theoretical relevance to other drugs. *See* Janssen's Mem. in Support of Mot. for Summary Judgment, Dkt. No. 538, at 16.

34.    A third SOC Program was "Managing Biologics in the Physician Office." Ex. 43 (Managing Biologics in the Physician Office, JANSSENBIO-009-00011368). The slideshow presentation used during the program included slides on an "Overview of REMICADE," "Important Safety Information for REMICADE," and "Payer/Reimbursement Landscape." *Id.* at slides 7-30, 53-64. It also included a "Business Update" section which discussed the practice's product utilization and Remicade patient population, and issues relating to care delivery options, reimbursement, and affordability for Remicade. *Id.* at slides 31-46. In addition, it included an "In-Office Infusion Efficiency" section with five slides identifying high-level variables that impact infusion efficiency. *Id.* at slides 47-52.

**Relator's Response:** Disputed. This particular version of the slide deck ABSs used during part of the relevant period when providing the "Managing Biologics in the Physician Office" ("MBPO") program identifies the "resources" (i.e., SOC programs) that Janssen offered to the physician practices, including "Improving Infusion Efficiency," "Scheduling," "Inventory Management," "Private Payer Contracting Considerations," "Nurse Education Programs," "Billing and Coding," and "Reimbursement and Billing Process." **Doc. No. 539-43** at slide 32. One reason the ABS provided the MBPO to physician practices was to identify possible issues impacting the operation of the infusion suite and determine what SOC programs could benefit the practices. See **Ex. 94** (Copy Review Submission Cover Sheet for Managing Biologics in the Physician Office Presentation at 3 (Item Objective and Description)). The "Biologic Utilization in Office" section of the slide deck reported the practice's total number of patients receiving Remicade as well as competing biologic drugs and the growth in the patients receiving biologics at the practice. **Doc. No. 539-43** at slides 40-42. The "In-Office Infusion Efficiency" section of the slide deck used during the MBPO program provides practice management advice so the "infusion

33

suite can optimize capacity and efficiency," such as staffing suggestions for particular nurse-to-patient ratios and scheduling suggestions for staggering "start times to maximize resource utilization." **Doc. No. 539-43** at slide 49. The information and advice provided during this SOC program was applicable to all drugs that physician practices could administer via infusions in their infusion suite, not just Remicade and Simponi ARIA. *See id*.

**Janssen's Reply:** Relator's response confirms the accuracy of SUMF ¶ 34. Indeed, Relator's response expressly states, "One reason the ABS provided the MBPO to physician practices was to identify possible issues impacting the operation of the infusion suite and determine what SOC programs could benefit the practices." That is correct.

Relator then attempts to characterize the five-slide "In-Office Infusion Efficiency" section of the presentation as "practice management advice." As the Court can see from the slides themselves, the MBPO provided education related to practice management issues, not practice management consulting. Relator also argues that the MBPO "was applicable to all drugs that physician practices could administer via infusions in their infusion suite." She does not deny that the presentation related to the acquisition and utilization of *Janssen's products*; she merely argues that it could have theoretical relevance to other medications, which is immaterial, as the Department of Justice and courts have rejected similar attempts to impute independent value where information related to a drug (such as education on a disease or product administration) could have theoretical relevance to other drugs. *See* Janssen's Mem. in Support of Mot. for Summary Judgment, Dkt. No. 538, at 16.

35. Another SOC Program was "Infusion Referrals: Improving the Continuity of Care." Ex. 44 (Infusion Referrals: Improving the Continuity of Care, JANSSENBIO-002-00002205). The slideshow presentation used during the program provided information on

coordinating the continuity of care between the Site of Demand and the Site of Care for infusion referrals. *Id.*

**Relator's Response:** Undisputed.

36.     An additional SOC Program was the Infusion Optimization Modeler ("IOM"). When using the IOM with a practice, the ABS generated a standardized print-out for the practice populated with the practice's existing Remicade patient population, number of infusion chairs, and infusion staff hours, as reported by the practice. Ex. 45 (May 2004 IOM Scenario Output for Schlansky, JANSSENBIO-041-00002655); Ex. 46 (Feb. 2013 IOM Output for Robert George Sanford, JANSSENBIO-003-00012333). The IOM print-out provided practices with information on their infusion capacity and the potential increase to Remicade infusion capacity if the practice decided to remove a capacity constraint. Ex. 45 (May 2004 IOM Scenario Output for Schlansky); Ex. 46 (Feb. 2013 IOM Output for Robert George Sanford); Ex. 47 (Long Ex. 64, Feb. 15, 2013 Email re Sanford and Roumm, JANSSENBIO-002-00001410 ("2013 Email re Sanford and Roumm")); Ex. 35 (Babia-Ramos Dep.) at 123:13-126:25; Ex. 48 (Excerpts of Deposition of Lawrence Conley) at 145:8-147:2.

**Relator's Response:** Disputed. The purpose of the IOM was to examine the efficiencies in an infusion center and examine the capacities within the center in order to determine "if they were at capacity." **Ex. 5** (Long Dep.) at 169:20-170:17. By using the optimization modeler, the ABS "could measure out the point at which [the center] would have to add more resources to ensure" patients could get seen for infusions without delay. *Id*. at 170:12-20. The purpose of the IOM was to increase office efficiency. *Id*. at 224:19-225:5. The IOM "involved a *customized assessment* of a physician's practice" and "allowed ABSs and physicians to organize and compare (model) the specific data and details of a physician's practice, such as the number of patients on

Remicade, the number of patients on competitor drugs, the lag time between prescription and reimbursement, how many chairs were needed, how much personnel was needed and the related costs, and how many more patients were needed to bring the practice 'to capacity.'" **Ex. 26** (Report of Virginia Evans ("Evans Report")) at p.42 n.97. Notably, the IOM's efficiency analyses and recommendations were applicable to all infusible drugs administered at a practice, not just Remicade and Simponi ARIA. *See infra* ¶ 129 (testimony that SOC programs would benefit practices regardless of which drugs they infused).

**Janssen's Reply:** Relator's response does not dispute SUMF ¶ 36 but instead confirms its accuracy. Indeed, citing Relator's own testimony, Relator's response states that the IOM was used by ABSs to identify "'the point at which [the center] would have to add more resources to ensure' patients could get seen for infusions without delay." That is correct, and it confirms—*in Relator's own words quoting Relator's own testimony*—Janssen's position that the ABS role involved ensuring patients received timely access to their infusions.

When testifying about the IOM specifically, Relator explained that ABSs were permitted to "give [the practices] the information [in the slideshow presentations], but for them to actually make the changes, they had to take the bull by the horns and do that themselves.'" Janssen's Ex. 17 (Long Dep.) at 172:21-173:10 (Dkt. No. 539-17). That testimony was volunteered by Relator affirmatively. Relator also testified that one purpose of the IOM was "to reduce attrition." *Id.* at 174:16-24.

Relator's response also quotes the report of Relator's proffered compliance expert, Virginia Evans, purporting to attach the label "customized assessment" to the IOM. That assertion does not contradict SUMF ¶ 36. Moreover, as explained in Janssen's pending Motion to Exclude Opinions and Testimony of Virginia B. Evans, Dkt. No. 568, expert witnesses are not permitted to

summarize company documents. *See* Dkt. No. 569 § I.A (citing *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 1:12-CV-10601, 2022 WL 2662678, at *3 (D. Mass. July 8, 2022)).

Finally, even though Relator expressly concedes that the IOM was directly applicable to Remicade and Simponi ARIA and ensured patients received "timely" infusions of those products, Relator argues that the IOM was "applicable to all infusible drugs." That is unsupported by any evidence; the citation to Relator's SDMF ¶ 129 simply cites back to Relator's response here with the identical quote from Relator's expert report. In any event, that assertion is immaterial, as the Department of Justice and courts have rejected similar attempts to impute independent value where information related to a drug (such as education on a disease or product administration) could have theoretical relevance to other drugs. *See* Janssen's Mem. in Support of Mot. for Summary Judgment, Dkt. No. 538, at 16.

37. Another SOC Program was "Hot Buttons," a survey that allowed practices to identify which "Practice Pearls" programs would be most relevant to the practice. Ex. 49 (Hot Buttons, JANSSENBIO-003-00008471); Ex. 50 (Dec. 11, 2015 Email re Hot Buttons, JANSSENBIO-043-00000782) (Hot Buttons "allows customers to indicate which areas in the operation of their practice could use improvement; the rep can then present the slide deck that corresponds with their issue"). The "Practice Pearls" programs that were then delivered to practices were pre-canned, approved presentations that were the same for all practices that received them. Ex. 19 (Marzullo Dep.) at 310:15-315:13.

**Relator's Response:** Disputed. Not all "Practice Pearls" programs were the same for all practices that received them. For instance, the "Practice Pearl" program for "Optimizing patient scheduling and infusion capacity" was iBiz/IOM. **Doc. No. 539-49** at p. 3. As set forth in paragraph 36, the IOM was a customized assessment of a particular practice's situation to provide

tailored advice to increase that practice's efficiency to capacity. *See supra* ¶ 36. Although the slide decks used in presenting these SOC programs were pre-approved by the PRC, Janssen's own internal documents stated that the "Hot Buttons" tool "identifies and prioritizes customized operational support needs within a practice" and that the "interactive educational program, Practice Pearls, can be used to provide customized support." **Doc. No. 539-49** at p. 3; <u>**Ex. 48**</u> (Deposition of Dr. Ian Larkin ("Larkin Dep.")) at 253:14-254:4, 263:12-15, 263:20-264:6 (recounting testimony former ABS Ski Bennof gave to DOJ about the portion of her time during a site of care program that was spent on custom interactions with the customer).

**Janssen's Reply:** Relator's response does not contradict SUMF ¶ 37. First, Relator does not dispute that with the exception of IOM, all Practice Pearls presentations were pre-canned and the same for all practices. With respect to the IOM, *see* SUMF ¶ 36. Second, Relator misleadingly asserts that the Hot Buttons survey was "customized"—that merely meant that the survey was used to determine which of the pre-canned Practice Pearls programs would be most useful to a practice. Third, oddly, Relator cites the deposition of one of her proffered experts, Dr. Ian Larkin, which points to an *ex parte* DOJ interview of a former ABS that has nothing at all to do with Hot Buttons or Practice Pearls and, in any event, is neither in the summary judgment record nor admissible. *See* Janssen's Response to SUMF ¶ 125.

38.    ABSs were permitted to "give [the practices] the information [in the slideshow presentations], but for them to actually make the changes, they had to take the bull by the horns and do that themselves." Ex. 17 (Long Dep.) at 172:21-173:10; see also Ex. 18 (Wickmann Dep.) at 176:25-178:14.

**Relator's Response:** Disputed. ABSs were not merely giving information – they were providing hands-on consulting services that helped practices implement

operational changes to increase their infusion capacity and profitability. *See, e.g., supra* ¶¶ 36 & 37 (ABSs provision of IOM provided customized practice assessment and recommendations). And these services were directly connected to the ability of IOIs to open and/or operate. **Ex. 27** (7/3/2013 Email Thread) at p. 2 ("Megan who is the office coordinator could not thank Janssen enough. She said that they could not have opened this IOI without us."), & p. 1 ("Jack spent long hours educating & bringing in access resources over the last year to open this IOI."); **Ex. 28** (Deposition of Thao Marzullo ("Marzullo Dep.")) at 194:13-16 ("IOIs would close if site of care marketing did not provide the" site of care programs); **Doc. No. 543-1** (Wood Dep.) at 391:19-392:9 (Considerations for Proactive Practice Management program "provides *assistance* with understanding operational issues currently facing practices, including practice costs and the reimbursement landscape, technology advances and emerging trends, and benchmarking and identification of potential areas for improvement.") (emphasis added); **Ex. 29** (Considerations for Proactive Practice Management program) at slide 3 (listing objectives of presentation as: "offer[ing] advice and identify[ing] resources to help practices manage their operational issues more proactively;" "[p]rovid[ing] assistance in understanding practice cost and reimbursement landscape;" "[a]dvis[ing] practices to consider establishing operational SOPs;" "[s]uggest[ing] possible establishment of financial management plan and quality assurance measures;" "[a]dvis[ing] practices to evaluate technology advances and emerging trends;" and "[p]rovid[ing] guidance on determining benchmarking and  potential areas of improvement for practices"); **Doc. No. 543-4** (Trahan Dep.) at 76:5-8 (testifying that "[i]f a practice had an issue or concerns," then an "ABS could have been called in" to help resolve the issues); **Doc. No. 557-1** (Deposition of Garrett Mann ("Mann Dep.")) at 318:9-320:7 (testifying iBiz presentation involved ABS

gathering information from physician practice regarding its particular situation in order to provide tailored guidance); **Doc. No. 539-52** (2014 Assessment of RA Business Support) at slide 9 (internal presentation stating that physician practices are "more likely to accept a review of efficiency of infusion operations (i.e., staffing, patient flow, chair occupancy rate) *and* educational programs") (emphasis added).

**Janssen's Reply:** Relator's response to SUMF ¶ 38 confirms that although Relator may not like this statement of fact, it is undisputed. Janssen's asserted fact is Relator's own testimony that ABSs were permitted to "give [the practices] the information [in the slideshow presentations], but for them to actually make the changes, they had to take the bull by the horns and do that themselves.'" Janssen's Ex. 17 (Long Dep.) at 172:21-173:10 (Dkt. No. 539-17). That testimony was volunteered by Relator affirmatively.

Because Relator cannot dispute her own testimony, she attempts to recharacterize the ABS role as "hands-on consulting services that helped practices implement operational changes." None of the evidence cited supports that allegation. Indeed, Relator points to documents she was contemporaneously involved with; and despite seeing these documents, Relator admitted that during her 13-year tenure as an ABS, she never believed she was providing prohibited consulting (until she met with her counsel in this litigation). *See* SUMF ¶ 91 (undisputed).

- **Exhibit 27 (Dkt. No. 597-36):** This email describes a *sales representative*—not ABS—who "led the charge" in "educating & bringing in access resources" to a practice. Relator, an ABS, assisted in the "educational meetings." This is fully consistent with SUMF ¶ 38, as the email discusses providing information, not "hands-on consulting." Relator's Opposition characterizes two quotes from this email chain as relating to two different IOIs, but the email chain clearly discusses only a single practice.

- **Exhibit 28 (Marzullo Dep.) at 194:13-16 (Dkt. No. 597-37):** Ms. Marzullo's cited testimony was about "the educational approved materials," which Relator omits from the quoted language and which encompassed all ABS activities, not the At-Issue SOC Programs specifically. Relator also omits that Ms. Marzullo's testimony supported the assertion in SUMF ¶ 38 that practices "have to make their own decisions." Ex. 28 (Marzullo

Dep.) at 195:12-25 (Dkt. No. 597-37). Moreover, Ms. Marzullo specifically rejected Relator's attempt to characterize SOC programs as "consultative services," testifying, "I would disagree with the terminology of 'consultative services.' Everything the ABSs did, from my understanding was to educate offices so that it would create access for patients to infusions and to appropriate treatment." Janssen's Ex. 129 (Additional Excerpts of Deposition of Thao Marzullo) at 138:6-14.

- **Exhibit 29 (Dkt. No. 597-38):** The Court should review Exhibit 29 itself, which is one of the At-Issue Programs. As the Court will see, ABSs were not providing "hands-on consulting services," they were providing education, and it was up to the practices to make any changes. Exhibit 29 involves a high-level discussion of "Considerations" a practice might consider —which is not only in the title but is also consistent with the substance of the presentation. As the Court will also see, if "hands-on" action was going to be taken by anyone, it was the practice, not the ABS. That becomes obvious when one goes through the slide deck and circles the verb in each bullet or sentence. The party engaging in the activity is the practice. That would not be the case if the ABSs were engaging in "hands-on consulting."

- **Doc. No. 543-1 (Wood Dep.) at 391:19-392:9 (Dkt. No. 543-1):** Relator's quote from Ms. Wood's deposition is actually a quote from Relator's counsel reading a document saying Considerations for Proactive Practice Management "provides *assistance with understanding* operational issues currently facing practices, including practice costs and the reimbursement landscape, technology advances and emerging trends, and benchmarking and identification of potential areas for improvement." Doc. No. 543-1 (Wood Dep.) at 391:19-392:9 (emphasis added) (Dkt. No. 543-1). That does not contradict SUMF ¶ 38. Moreover, Ms. Wood expressly testified that ABSs were not providing consulting. *Id.* at 417:25-418:3 ("They weren't consulting. Again, they were educating on general types of considerations that IOIs may encounter.").

- **Doc. No. 543-4 (Trahan Dep.) at 76:5-8 (Dkt. No. 543-4):** Relator misrepresents Ms. Trahan's testimony as stating, "'If a practice had an issue or concerns,' then an 'ABS could have been called in' to help resolve the issues." Ms. Trahan actually testified, "The ABSes provided educational materials. If a practice had an issue or concerns about patients not getting infused for whatever reason, the ABS could have been called in."

- **Doc. No. 557-1 (Mann Dep.) at 318:9-320:7 (Dkt. No. 557-1):** Relator misrepresents Mr. Mann's testimony as stating that "iBiz presentation involved ABS gathering information from physician practice regarding its particular situation in order to provide tailored guidance." Mr. Mann did not testify that ABSs were providing "tailored guidance." He testified that iBiz involved typical field representative activity: presenting data regarding *prescriptions* to "help a practice understand how they were *trending with Remicade*." Doc. No. 557-1 (Mann Dep.) at 319:4-320:7 (Dkt. No. 557-1) (emphasis added). Mr. Mann's expert opinion is that ABSs were not providing consulting, so it is perplexing that Relator would cite his testimony as evidence that ABSs were providing "hands-on consulting."

41

- **Doc. No. 539-52 (2014 Assessment of RA Business Support) (Dkt. No. 539-52):** This document has nothing to do with SUMF ¶ 38 (or Relator's Response). It reports market research findings that *other* pharmaceutical companies also provided "support for the infusion practice," Doc. No. 539-52 at slide 10 (Dkt. No. 539-52), and concluded that Janssen was falling behind and "could be more active in practice management education programs in order to be more competitive with" one of Janssen's competitors. Doc. No. 539-52 at slide 49 (Dkt. No. 539-52). Slide 49 specifically identified programs such as: "ICD-10," "Meaningful use/PQRS," "Changing healthcare landscape," "Payer overview/payer changes," and "Management of the infusion suite/sharing of best practices/benchmarking relative to similar practices." This shows that the programs Janssen was providing were education, not consulting, and that similar programs were being provided by Janssen's competitors.

39.     ABSs also provided programs and presentations on benefit investigation and affordability that Relator does not allege were kickbacks, such as programs about AccessOne (a Janssen program that provided a variety of types of patient support, such as benefit investigations, prior authorizations, referrals for infusion, and patient care coordination), RemiStart (Janssen's patient rebate program), and 2infuse.com (a website that helped patients locate infusion centers). Ex. 17 (Long Dep.) at 184:3-7, 186:5-187:1, 204:6-206:3; Ex. 51 (AccessOne Brochure, JANSSENBIO-010-00001070) at 2-4; Ex. 16 (2013 Site of Care Reference Guide) at 7-9; Ex. 27 (2013 Business Plan); SAC ¶ 166(r) n.14 ("Janssen provides accounts other free services, including assistance with obtaining prior authorizations and insurance coverage for Janssen's products and patient financial assistance, that Relator does not allege violate the Federal AKS, State AKS, and/or FCA in this action."); Ex. 37 (Pl.'s Resp. to Interrog. No. 2).

**Relator's Response:** Undisputed.

40.     The programs and presentations that ABSs provided that Relator does not allege were kickbacks also could improve Janssen's Remicade and Simponi ARIA sales. Ex. 17 (Long Dep.) at 204:6-206:3.

**Relator's Response:** Undisputed.

42

41. The ABS role also involved providing clinical education about Remicade and Simponi ARIA. Ex. 17 (Long Dep.) at 225:6-226:1, 239:6-241:21; Ex. 32 (Shelhamer Dep.) at 213:3-21; Ex. 16 (2013 Site of Care Reference Guide) at -17; Ex. 15 (2008 Remicade Site of Care Model Slide Deck) at slide 9; Ex. 47 (2013 Email re Sanford and Roumm) at -1412.

**Relator's Response:** Undisputed.

42. ABSs also provided SOC Programs in settings such as hospitals, where Relator has pled that prescribers cannot be influenced by the opportunity to profit from infusing Remicade and Simponi ARIA. Ex. 17 (Long Dep.) at 191:24-192:7; Ex. 34 (Wood Dep.) at 364:4-366:4; SAC ¶ 166(r) n.14 ("In addition, Relator does not allege any claims based on free business advisory services Janssen provided to hospitals."); *id.* ¶ 176(f) n.15 (noting that referring infusions to IOIs "helped Janssen because, unlike physicians employed by a hospital, the physician practices have a financial incentive to ensure that these patients continue receiving Remicade or Simponi ARIA infusions."); *id.* ¶ 63 ("Moreover, hospitals and hospital-owned providers represent a smaller market for Remicade and Simponi ARIA and are not owned by prescribers who can be influenced by the opportunity to profit from every vial of Remicade and Simponi ARIA they prescribe and infuse.").

**Relator's Response:** Disputed. Relator alleged in the Second Amended Complaint that physicians employed by hospitals do not have a financial incentive to prescribe Remicade and Simponi ARIA, not that they "cannot be influenced by the opportunity to profit from infusing Remicade and Simponi ARIA." **Doc. No. 55** at ¶¶ 63, 176(f) n.15 The cited deposition testimony, in relevant part, states ABSs' job responsibilities included "streamlin[ing] ... HOPDs [(hospital outpatient department infusion suites)]" in addition to IOIs. **Doc. No. 539-17** at 191:24-192:7.

43

**Janssen's Reply:** Relator's response is facially false. Her response states that her complaint did *not* allege that physicians in HOPDs "cannot be influenced by the opportunity to profit from infusing Remicade and Simponi ARIA." But that is exactly what her complaint alleged: "[H]ospitals and hospital-owned providers . . . *are not owned by prescribers who can be influenced by the opportunity to profit* from every vial of Remicade and Simponi ARIA they prescribe and infuse." SAC ¶ 63 (emphasis added).

43.    Janssen hired a third party to conduct market research of practices with an IOI that infused Remicade, Simponi ARIA, and other infusible medicines used by rheumatologists. After conducting its research, that third party informed Janssen that other pharmaceutical manufacturers who sold infusible products provided "practice management education" programs to practices with an IOI. Ex. 52 (2014 Assessment of RA Business Support, JANSSENBIO-017-00008945) at slides 29-32, 45-47, 49.

**Relator's Response:** Disputed. Slides 29, 30, 31, 32, and 47 of the market research document referenced (Doc. No. 539-52) discuss undefined "support services," undefined "access services," "benefit verification" and "benefit investigation" services, patient financial assistance, patient education services, undefined "business support," provided by other pharmaceutical manufacturers, not "practice management education." Slides 45, 46, and 49 state Genentech provided "practice management education." The market research was not limited to a review of practice management education programs. **Doc. No. 539-52** (2014 Assessment of RA Business Support) at slide 9 (internal presentation stating that physician practices are "more likely to accept a review of efficiency of infusion operations (i.e., staffing, patient flow, chair occupancy rate) *and* educational programs"). It revealed Janssen provided business services, not information that had no value apart from Janssen's drugs. *Id*. at slide 24 ("Through Janssen I saw software that explains

to nurses how to make the schedules work."); *id*. ("We gave Remicade our schedule and it was structured by short, medium and long infusions. They then modeled out the number of slots per year by short, medium and long. Originally it helped us establish a schedule by short, medium and long chair assignments. It did improve efficiency; that was their pearl of wisdom."). In discussing the services at issue in his report, Dr. Larkin stated "in my many years researching pharmaceutical sales techniques, I have never come across a pharmaceutical company offering such detailed operational consulting services, whether for a fee or free of charge. To the best of my knowledge, Janssen competitors have never done so, nor have pharmaceutical companies who offer infusible therapies outside the space of Janssen's products at issue in this case." **Ex. 49** (Report of Dr. Ian Larkin ("Larkin Report")) at p. 17. Janssen's own market research, a December 2014 qualitative study of 25 GI IOI practice managers, found that "[m]ost practice managers perceive substantial value in the entire Proactive Practice Management resource." **Ex. 50** (12/15/2014 email w/Gastroenterology IOI Practice Manager & ABS Resource Research slide deck) at slide 19.

**Janssen's Reply:** Relator's response to SUMF ¶ 43 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator's response confirms this statement of fact is undisputed. First, although Relator begins by falsely suggesting that the document does not say other companies provided "practice management education," she immediately goes on to admit that the document says exactly that. *See* Janssen's Ex. 52 (Dkt. No. 539-52) at slide 13 (stating that Janssen's competitor is "particularly strong" with respect to "practice management education"). Second, Relator asserts that the document references "undefined" support programs, but the document explicitly identifies the programs on slide 49 (cited in the SUMF) as including: "ICD-10," "Meaningful use/PQRS,"

"Changing healthcare landscape," "Payer overview/payer changes," and "Management of the infusion suite/sharing of best practices/benchmarking relative to similar practices." The document shows that Janssen and its competitors were providing educational programs about the same topics. Third, Relator claims that slides 9 and 24 supposedly confirm that Janssen (and its competitors, apparently) "provided business services" (*i.e.*, consulting), which is unsupported by the document.

Finally, Relator attempts to dispute that other companies were also providing similar programs by noting that her proffered expert, Dr. Ian Larkin, said he has "never come across a pharmaceutical company offering such detailed operational consulting services." That is undoubtedly true and entirely irrelevant, as Dr. Larkin was saying *he had never heard of Janssen's SOC Programs*. Relator's attempt to manufacture a dispute through her expert is improper and specious. *See* Janssen's Mot. to Exclude Ops. & Testimony of Ian Larkin, Dkt. No. 566.

### C.    ABSs' Provision Of The SOC Programs

44.    Janssen developed call plans identifying the accounts ABSs were to call on during a given period and the frequency with which the accounts would be called on. The call plans did not deal with the substance of what would take place during a call. Ex. 53 (Immunology ABS 2H2014 Call Plan Strategy, JANSSENBIO-011-00012500); Ex. 54 (Immunology ABS 1H2015 Call Plan Strategy, JANSSENBIO-012-00009610).

**Relator's Response:** Disputed. Janssen had strategy objectives and programming requirements for call plans. **Doc. No. 539-53** (Immunology ABS 2H2014 Call Plan Strategy) at slide 3 (stating "[s]trategy related changes" could be found in email setting forth "Programming Requirements"); **Ex. 30** (Deposition of Paul Wickmann ("Wickmann Dep.")) at 237:10-241:17 (testifying ABSs carry out Janssen's "tactics" through their call plans). *See also* note 1, *supra*.

**Janssen's Reply:** Relator's response does not contradict SUMF ¶ 44 and instead concedes that ABSs had call plans to identify which accounts to call on and how often. Her

response purports to raise a separate issue by suggesting that Janssen's call plans included "strategy objectives and program requirements." Whatever she means by that (which is not clear), she does not claim that call plans dealt with the substance of what would happen during a call. They did not. Nor does the evidence she cites say any such thing.

45.    The ABS call plans were reviewed and approved by Janssen's Health Care Compliance department. Ex. 55 (Feb. 27, 2014 Customer Targeting Review & Approval Policy, JANSSENBIO-018-00000957) at -960; Ex. 56 (June 18, 2013 Email and Attached Draft Immunology 3Q4Q 2013 Call Plan, JANSSENBIO-047-00001970, JANSSENBIO-047-00001971).

**Relator's Response:** Disputed. Janssen's Health Care Compliance department's role in reviewing call plans was narrowly focused on customer categorization, not on whether the underlying programs being delivered violated the AKS. **Ex. 31** (Deposition of Thomas Cornely ("Cornely Dep.")) at 234:8-12 ("a call plan was how each therapeutic area or I think position within -- out in the field what customers they called on based on certain criteria").

**Janssen's Reply:** Relator's response to SUMF ¶ 45 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator's response to SUMF ¶ 45 confirms that Janssen's Health Care Compliance department reviewed and approved the ABS call plans. Moreover, the only evidence cited—five lines from a deposition—has nothing to do with this statement of fact (or even Relator's response).

46.    During the relevant period, the call plans directed ABSs to call on large, medium, and small IOIs. Ex. 53 (Immunology ABS 2H2014 Call Plan Strategy) at slide 7; Ex. 54

(Immunology ABS 1H2015 Call Plan Strategy) at slide 6; Ex. 27 (2013 Business Plan) at slide 2 ("Currently, the ABS target universe consists of approximately 3000 accounts+.").

**Relator's Response:** Disputed. The "large, medium, and small" designations were based on the IOIs' Remicade sales volume, not on neutral factors. **Doc. No. 539-58** (COBI ABS 1st Half 2011 Targeting Strategy) at p. 6; **Doc. No. 539-56** (Immunology 3Q4Q 2013 Call Plan) at p. 5 (describing "ABS targeting strategy" as "based on the Remicade decile of annual Remicade Units" and setting target to provide more services for accounts with a larger decile and no services for accounts below Decile 20). Not all small IOIs were called on. **Doc. No. 539-56** at p. 5.

**Janssen's Reply:** Relator's response to SUMF ¶ 46 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator's response does not even attempt to dispute this fact. First, Relator admits the fact and then says the tiers were not based on "neutral factors," but were instead based on sales volume, which is true and was compliant with Janssen's internal policies. *See* Janssen's Ex. 55 at 4 (Dkt. No. 539-55) ("The determination of the called-on . . . should be based on factual information including but not limited to prescription data utilization and market research analyses."). Second, Relator says that "[n]ot all small IOIs were called on," which is true and confirms that Janssen called on all but the smallest practices, thereby disproving her allegation that Janssen targeted only "high-volume accounts" and "Remicade mills." SAC ¶¶ 140, 153. Moreover, Relator's proffered compliance expert confirmed that call plans are common in the industry. *See* Janssen's Ex. 61 (Evans Dep.) at 358:2-5 (Dkt. No. 539-61).

47.  In certain years, the call plans directed ABSs to call on HOPDs with greater frequency than IOIs. Ex. 57 (2013 Immunology ABS 3Q4Q Call Plan, JANSSENBIO-013-00017874) at slide 9; Ex. 53 (Immunology ABS 2H2014 Call Plan Strategy) at slide 7.

**Relator's Response:** Disputed. Even so, ABSs were directed to provide more programs to IOIs than HOPDs. *Compare* **Ex. 32** (6/30/2014 Email w/ Immunology, Site of Care, 2H2014 Changes slide deck) at slide 6 (programming requirements for IOIs were larger than requirements for HOPDs with large IOIs receiving twice as many programs and small IOIs receiving three times as many when compared to HOPDs of the same decile) to **Def. Ex. 53**, Doc. No. 539-53 (Immunology ABS 2H2014) at slide 7.

**Janssen's Reply:** Relator admits this statement of fact ("Even so . . .") but then asserts that "ABSs were directed to provide more programs to IOIs than HOPDs." The documents cited prove otherwise. Slide 3 of Exhibit 32 (Dkt. No. 597-41) shows that large Community HOPDs were to receive 12 calls per six-month period, while large IOIs were to receive 9 calls, and medium Community HOPDs got 9 calls, while medium IOIs got 6 calls. Slide 7 of Def. Ex. 53, Doc. No. 539-53 (Dkt. No. 539-53) shows the same thing. Other call plans confirm this. *See, e.g.*, Janssen's Ex. 57 (2013 Immunology ABS 3Q4Q Call Plan, JANSSENBIO-013-00017874) at slide 9 (Dkt. No. 539-57).

48.  Typically, during the relevant period, the call plans instructed ABSs to call on hospitals in approximately the 20-90 deciles and IOIs in approximately the 20-90 deciles. *See, e.g.*, Ex. 58 (Nov. 30, 2010 COBI ABS 1st Half 2011 Targeting Strategy, JANSSENBIO-012-00004426) at slide 4; Ex. 53 (Immunology ABS 2H2014 Call Plan Strategy) at slide 7; Ex. 54 (Immunology ABS 1H2015 Call Plan Strategy) at slide 6.

**Relator's Response:** Disputed. Higher-decile accounts received substantially more SOC programming and calls than lower-decile accounts. **Ex. 32** (6/30/2014 Email w/ Immunology, Site of Care, 2H2014 Changes slide deck) at slide 6. Small IOI accounts sometimes received no programs. **Doc. No. 543-4** (Trahan Dep.) at 275:11-19. ABSs were directed to provide more programs to IOIs than HOPDs in the same decile. **Ex. 32** (6/30/2014 Email w/ Immunology, Site of Care, 2H2014 Changes slide deck) at slide 6 (programming requirements for IOIs were larger than requirements for HOPDs with large IOIs receiving twice as many programs and small IOIs receiving three times as many when compared to HOPDs of the same decile).

**Janssen's Reply:** Relator's response makes no attempt to dispute SUMF ¶ 48. Instead, Relator makes separate assertions that higher-decile accounts received more programs than smaller-decile accounts, and small IOIs sometimes received no programs. Both of those facts are true and consistent with SUMF ¶ 48. Relator also repeats an unrelated and false assertion made in her response to SUMF ¶ 47, which is addressed in Janssen's Reply to SUMF ¶ 47.

49.    There was a process by which ABSs could request to add additional accounts to their call plans and call on accounts that were not on their original target lists. *See, e.g.*, Ex. 54 (Immunology ABS 1H2015 Call Plan Strategy) at slide 6.

**Relator's Response:** Undisputed.

### D.    The Role Of Xcenda

50.    Sometimes, the SOC Programs were delivered by ABSs, who were paid a salary. Ex. 17 (Long Dep.) at 241:22-243:13.

**Relator's Response:** Disputed. In addition to a salary, ABSs received bonuses based on sales of Remicade and Simponi ARIA. **Ex. 5** (Long Dep.) at 244:8-11 (testifying ABSes were "incentivized with a bonus. 50 percent on our demand generation, so we would go in and try

to sell REMICADE and SIMPONI ARIA."); **Doc. No. 543-3** (Smith Dep.) at 294:8-18, 297:16-23; **Ex. 8** (Shelhamer Dep.) at 238:7-17, 239:7-15.

**Janssen's Reply:** Relator does not dispute this statement, but merely adds the undisputed fact that ABSs were also paid a bonus.

51.     Other times, the SOC Programs were delivered by representatives Janssen retained through a contract with third party Xcenda, pursuant to which Xcenda was paid a set amount for each program delivered. *See, e.g.*, Ex. 59 (Xcenda Work Order for 2013 SOC Programs, JANSSENBIO-017-00008459) at -61-62.

**Relator's Response:** Disputed. Xcenda "is in the business of providing general health care consulting services and related deliverables," **Ex. 33** (Master Services Agreement between J&J & Xcenda) at p. 1, and its "speakers are known nationally for their expertise in . . . practice management efficiencies. . . ." **Def. Ex. 60**, Doc. No. 539-60 at p. 11. Xcenda was advertised by Janssen as "offer[ing] business acumen programs and nurse training workshops delivered by third party consultants with extensive practice management experience and IV therapy experience." **Ex. 34** (Site of Care Solutions) at p. 8. Janssen paid Xcenda approximately $3,000 per live program presentation. **Ex. 25** (Knepp Dep.) at 247:25-248:4; **Doc. No. 543-1**(Wood Dep.) at 243:7-23; **Def. Ex. 59**, Doc. No. 539-59, at p. 3.

**Janssen's Reply:** Relator's response to SUMF ¶ 51 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response confirms the accuracy of SUMF ¶ 51.

52.     At the same time, Xcenda was also a subsidiary of AmerisourceBergen, a large pharmaceutical distributor and a commercially contracted customer of Janssen. *See, e.g.*, Ex.

51

60 (Xcenda Immunology Site of Care Programs 2014 CPC Deck, JANSSENBIO-061-00004259) at slide 2.

**Relator's Response:** Undisputed.

53. OIG guidance recognizes that pharmaceutical manufacturers frequently engage physicians or other health care professionals to furnish services as consultants to the manufacturer. That guidance states that "[i]n general, fair market value payments . . . for *bona fide* consulting or advisory services are unlikely to raise any significant concern." 68 Fed. Reg. 23,731, 23,738 (May 5, 2003).

**Relator's Response:** Disputed. The OIG guidance states, "Pharmaceutical manufacturers frequently engage physicians and other health care professionals to furnish personal services *as consultants or advisers* to the manufacturer. In general, fair market value payments to small numbers of physicians for bona fide consulting or advisory services are unlikely to raise any significant concern." OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23,731-01, 23,738 (May 5, 2003) (emphasis added). It further states, "Pharmaceutical manufacturers and their agents may have a variety of remunerative relationships with persons or entities in a position to refer, order, or prescribe . . . the manufacturers' products, even though the persons or entities may not themselves purchase . . . those products. These remunerative relationships potentially implicate the anti-kickback statute." *Id*. at 23,737. "Pharmaceutical manufacturers sometimes offer purchasers certain support services in connection with the sale of their products. These services may include billing assistance tailored to the purchased products, reimbursement consultation, and other programs specifically tied to support of the purchased product. Standing alone, services that have no substantial independent value to the purchaser may not implicate the anti-kickback statute. However, if a manufacturer provides a service having no

52

independent value (such as limited reimbursement support services in connection with its own products) in tandem with another service or program that confers a benefit on a referring provider . . . the arrangement would raise kickback concerns." *Id*. at 23,735.

**Janssen's Reply:** Relator's response confirms the accuracy of SUMF ¶ 53.

54.    Relator's proffered compliance expert Virginia Evans testified that, when Janssen engaged Xcenda, "Janssen was required to do an FMV analysis to make sure that the amount of money that it was paying to its customer, Xcenda, was consistent with the fair market value of the services that Xcenda was providing." Ex. 61 (Excerpts of Deposition of Relator's Expert Virginia Evans ("Evans Dep.")) at 204:21-207:8.

**Relator's Response:** Disputed. The purpose of performing an analysis of the fair market value Janssen received from the services provided by Xcenda was to make sure it was not overpaying Xcenda, its customer, and thereby potentially inducing Xcenda to purchase Janssen's medications. **Ex. 35** (Deposition of Virginia Evans ("Evans Dep.")) at 205:9-207:8. Relator's proffered compliance expert Virginia Evans is not offering "an opinion that the amount of money that Janssen paid to Xcenda involved remuneration to Xcenda in order to increase sales," *id*. at 207:14-18, or that Janssen overpaid Xcenda. *Id*. at 207:22-208:2.

**Janssen's Reply:** Relator's response confirms the accuracy of SUMF ¶ 54.

55.    Janssen conducted an FMV analysis concerning its use of Xcenda to provide representatives to deliver SOC Programs to customers. *See, e.g.*, Ex. 60 (Xcenda Immunology Site of Care Programs 2014 CPC Deck).

**Relator's Response:** Disputed. Janssen conducted a fair market analysis concerning the value *it received* as a result of Xcenda's services. **Doc. No. 543-1** (Wood Dep.) at 236:2-237:4; **Ex. 26**, (Evans Report) at pp. 19 n.21, 38-39, 46-47. Janssen did not conduct a fair

market analysis of the value the *physician practices received* as a result of Xcenda's services. **Doc. No. 543-1** (Wood Dep.) at 237:16-25, 243:22-244:10 (testifying amount paid to Xcenda "isn't the value back to the physician"); <u>**Ex. 26**</u> (Evans Report) at pp. 19 n.21, 46-47.

**Janssen's Reply:** Relator's response confirms the accuracy of SUMF ¶ 55. Importantly, Relator's allegation that Janssen was required to conduct a fair market value analysis with respect to the At-Issue SOC Programs was invented for this litigation. Relator announces an FMV requirement without citing any support for its existence, and then pivots to Janssen testimony regarding the entirely distinct concept of substantial independent value. The topics are distinct, which is why they are covered by different compliance policies. A comparison of an FMV analysis and substantial independent value assessment proves this point.

An FMV analysis is, by definition, a comparative analysis; it applies when there is *a two-way exchange of value* between parties. The 2003 OIG Guidance gives several examples of when this exchange of value could occur: (1) when a manufacturer pays a purchaser or prescriber of its products "to conduct research activities on behalf of the manufacturer"; (2) when a manufacturer "contract[s] with purchasers [or prescribers] to provide services to the manufacturer" (such as payments to "physicians for *bona fide* consulting or advisory services"); or (3) when "items or services are sold to a physician" or a customer in a position to prescribe or purchase a manufacturer's products. OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23,731, 23,735-38 (May 5, 2003). The purpose of the FMV analysis is to compare the value provided by the manufacturer with the value the manufacturer received from the customer or prescriber to ensure the manufacturer is not using the transaction to disguise a transfer of value to the customer or prescriber to induce purchases or prescriptions. *Id.* Here, Xcenda was a large customer providing services to Janssen in exchange for money. As Relator states in her

Response to SUMF ¶ 56, given that exchange of value, "the purpose of the fair market value analysis of Xcenda's services to Janssen was to ensure that Janssen was not overpaying Xcenda, its customer, thereby potentially inducing Xcenda to purchase Janssen's medications."

By contrast, evaluating whether something has substantial independent value does not involve a comparative analysis; it involves *a one-way transfer of value*. As the 2003 OIG Guidance explains, "Product Support Services" (including billing assistance and other product-related programs) may have no substantial independent value and may not implicate the AKS. 68 Fed. Reg. at 23,735. Here, Relator alleges the "free" At-Issue SOC Programs provided substantial independent value to doctors; she does not allege that doctors provided value in return, such as by paying Janssen for the SOC Programs. Because there was no *exchange* of value, no FMV analysis was required to determine whether the doctors were paying less than fair market value.

Janssen's compliance policies confirm Janssen's position and refute Relator's. Relator alleges the provision of the At-Issue SOC Programs violated Exhibit 39 (Dkt. No. 597-49), Janssen's policy titled "Consulting Services Provided to Customers." *See* Relator's Response to SUMF ¶ 74. Specifically, she alleges that the At-Issue SOC Programs amounted to *free* consulting services—not that they were provided to doctors for a fee that was less than fair market value. That explains why Exhibit 39, the policy governing whether Janssen could provide "product-related items and services" to customers "free of charge," does not require an FMV analysis.

Separately, Janssen had a compliance policy titled "Fair Market Value." Janssen's Ex. 130 (July 1, 2011 Policy Document – Fair Market Value, JANSSENBIO-018-00000555). Its purpose was explicit: "Whenever an arrangement involves the payment of company funds to a customer for products, services or sponsorships, the amount of payment must be consistent with the fair market value of the products or services provided and/or received. FMV is the amount the

company would pay for those products or services from a person or organization that was <u>not</u> in a position to influence the purchase or utilization of the company products." *Id.* at -557 (emphasis in original). Notably, the FMV policy provides five examples of engagements that require FMV analysis: project consulting services, advisory boards, promotional speaker arrangements, company-sponsored research, and sponsorships. *Id.* at -556. Like the examples in the 2003 OIG Guidance, all involve a two-way exchange of value, and none involve a one-way transfer of value. Relator has not submitted any evidence (or argument) regarding this FMV policy because she insists that "[t]he Janssen policy relevant here is" Exhibit 39 (Dkt. No. 597-49). *See* Relator's Response to SUMF ¶ 74.

Finally, for the avoidance of doubt, Relator cannot create confusion by arguing that an FMV analysis was required to compare the value of the At-Issue SOC Programs to consulting services provided by third parties for a fee. If Janssen had been providing free consulting services that practices otherwise would have purchased from third parties for a fee (as Relator falsely asserts), that would have been prohibited under Janssen's policy regardless of whether those services were worth $1,000 or $10,000.

56.    Relator's proffered compliance expert Virginia Evans testified that "the purpose of that [FMV] analysis is to make sure that Janssen is not paying Xcenda too much money." Ex. 61 (Evans Dep.) at 206:5-8.

**Relator's Response:** Disputed. Relator's proffered compliance expert Virginia Evans testified that the purpose of the fair market value analysis of Xcenda's services to Janssen was to ensure that Janssen was not overpaying Xcenda, its customer, thereby potentially inducing Xcenda to purchase Janssen's medications. **Ex. 35** (Evans Dep.) at 205:9-207:8. This is different than the purpose of the required analysis of the fair market value of Xcenda's services to the IOIs,

which is to determine whether those services had substantial value independent of Janssen's products, Remicade and Simponi ARIA. **Ex. 36** (3/19/2014 email w/ September 3, 2009 Product-Related Items and Services presentation) at p.32 ("If a J&J company is making available educational materials, programs or services that provide information to a health care professional . . . about a disease or procedure related to a J&J company product or service, then the educational materials, programs or services may be considered permissible 'product-related' items [unless] they have substantial independent value to a customer"); OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 FR 23,731-01, 23,735 ("services that have no substantial independent value to the purchaser may not implicate the anti-kickback statute"); **Ex. 39** (Janssen Policy Document – Consulting Services Provided to Customers) at p. 3 ("Services or items cannot be provided if it provides a general benefit to the customer rather than a product specific benefit (e.g., practice management consulting, faxes, PCs or other office equipment that is not integrated into or dedicated to the use of the company product.").

**Janssen's Reply:** Relator's response to SUMF ¶ 56 confirms its accuracy. Moreover, Relator's assertion that Janssen was required to conduct an FMV analysis of the value of the SOC Programs to doctors is frivolous. *See* Janssen's Reply to SUMF ¶ 55.

57.     Relator's proffered compliance expert Virginia Evans testified that Janssen "would have had to do that fair market value analysis even if Xcenda was providing a service that had nothing to do with programs being provided to a customer, for example, if Janssen hired Xcenda to do market research" because "the fact that Xcenda is a customer of Janssen's would mean that Janssen had to do a fair market value assessment" to confirm it was paying "fair market value to our customer to provide market research." Ex. 61 (Evans Dep.) at 205:16-206:4.

**Relator's Response:** Disputed. Janssen was also required to conduct a fair market analysis of the value of the services to the IOIs. **Ex. 12** (Kung Dep.) at 97:18-98:3 (testifying that services that "have substantial independent value . . . could implicate the Anti-Kickback Statute"); **Ex. 31** (Cornely Dep.) at 285:3-16 (testifying that if a program similar to an ABS program was available for a fee, Janssen would not be allowed to provide the program for free to IOIs). **Ex. 39** (Janssen Policy Document – Consulting Services Provided to Customers) at p. 3 ("Services or items cannot be provided if it provides a general benefit to the customer rather than a product specific benefit (e.g., practice management consulting, faxes, PCs or other office equipment that is not integrated into or dedicated to the use of the company product.").

**Janssen's Reply:** Relator's response to SUMF ¶ 57 confirms its accuracy. Moreover, Relator's assertion that Janssen was required to conduct an FMV analysis of the value of the SOC Programs to doctors is frivolous. *See* Janssen's Reply to SUMF ¶ 55.

58.    For a time, Janssen also engaged Xcenda to provide independent contractors to serve as Gastroenterology Business Specialists ("GBSs"), an extension of Janssen's ABS team using the same PRC-approved materials and programs. Ex. 20 (Heckman Dep.) at 126:3-127:16.

**Relator's Response:** Disputed. In this role, Xcenda was directed to generate demand for Remicade by opening new gastroenterology IOIs. **Ex. 37** (Deposition of Marti Heckman ("Heckman Dep.")) at 132:1-133:8; **Ex. 51** (Dec. 14, 2015 Xcenda-JBI Ideas 2016 slide deck) at slide 5 ("Xcenda's Gastro Business Specialist (GBS) team opened 53 new IOIs in GI practices – 29 new IOIs were opened in 2011 and 24 were opened in 2012"); **Ex. 52** (JBI GBS Team Business Review 2012) at slide 4 (noting a target of 30 new IOIs as a performance metric).

**Janssen's Reply:** Relator's response to SUMF ¶ 58 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator does not even attempt to dispute SUMF ¶ 58. Instead, ironically, Relator attempts to raise a *separate* issue by taking language out of context and pointing to a slide that explains what was really happening. Slide 5 of Exhibit 51 (Dkt. No. 598), titled "Support for GI Patients Infused in HOPDs," provides critical context that Relator omits. It states, "Some major payers like United Healthcare are pushing infusions out of the HOPD and into lower-cost sites of care. Many GI practices do not offer in-office infusion (IOI), so this push from payers could cause a shortage of infusion sites." Thus, payers—not Janssen—were "pushing infusions out of the HOPD" based on cost concerns, and Janssen was providing SOC Programs to ensure those patients were able to get their infusions in a timely manner at "lower-cost sites of care." That was good for payers, good for patients, and good for Janssen's sales.

59.    Xcenda representatives were required to abide by the same Health Care Compliance rules as ABSs. Ex. 60 (Xcenda Immunology Site of Care Programs 2014 CPC Deck) at slide 7; Ex. 62 (Jan. 21, 2011 Health Care Compliance: Xcenda, JANSSENBIO-063-00002874).

**Relator's Response:** Disputed. Xcenda representatives were required to abide by "all Johnson & Johnson HCC and Regulatory guidelines." **Def. Ex. 60**, Doc. No. 539-60, at p. 12.

**Janssen's Reply:** Relator's response to SUMF ¶ 59 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response does not even attempt to dispute SUMF ¶ 59.

E.    **Records Of ABS Activities**

60.    In her Complaint, Relator alleges that ABSs were warned "not to leave a paper trail" of their activities. SAC ¶ 170.

**Relator's Response:** Disputed. Paragraph 170 of the Second Amended Complaint states in relevant part that "[t]he Regional Directors and Regional Business Managers repeatedly warned ABSs not to leave a paper trail. They instructed ABSs to avoid putting their profitability and practice management discussions with accounts in writing and to never leave the IBiz, IOMs, and other individualized business analyses behind with accounts. Similarly, the Regional Directors and Regional Business Managers repeatedly instructed ABSs not to send them account updates, questions from customers, or anything business related via text message or email because 'we do not want to leave a paper trail.'" **Doc. No. 55** at ¶ 170. The Second Amended Complaint does not allege that ABSs were instructed by their managers to not "inform[] them of what they were doing," as Janssen incorrectly asserts.

**Janssen's Reply:** Relator's response to SUMF ¶ 60 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator's response confirms the accuracy of SUMF ¶ 60. Relator then asserts that her complaint "does not allege that ABSs were instructed by their managers to not 'inform[] them of what they were doing,' as Janssen misleadingly asserts." However, SUMF ¶ 60 makes no such assertion, and SUMF ¶ 61 states that "Relator admitted that she *submitted documents* to keep her manager informed of what she was doing." Relator omits the underlined language.

61.    In her deposition, however, Relator admitted that she submitted documents to keep her manager informed of what she was doing. Ex. 17 (Long Dep.) at 261:16-263:24.

**Relator's Response:** Undisputed.

62.    Relator also admitted that Janssen tracked her provision of SOC Programs. Ex. 17 (Long Dep.) at 250:23-251:5, 294:15-18.

**Relator's Response:** Disputed. Janssen did not track all Site of Care Programming events provided by ABSs. **Doc. No. 555-1** (Rosenthal Report) at ¶34 & n.57 ("Note that Janssen documents indicate that they did not always track all Site of Care Programming events provided by ABSs.").

**Janssen's Reply:** Relator's response does not dispute SUMF ¶ 62. Her assertion that Janssen "did not track all Site of Care Programming" does not contradict her own testimony that Janssen did, in fact, track her provision of SOC Programs. To the extent Relator's response to SUMF ¶ 62 seeks to assert that tracking of SOC Programs may not have been perfect in every instance, that is immaterial and does not refute the fact stated.

63.    Further, Relator has acknowledged that as an ABS she was required to prepare and maintain reports regarding her "top accounts." *See, e.g.*, Relator's Pretrial Memorandum, Dkt. No. 497, at 4; Relator's Opp. to Mot. to Streamline Nationwide Discovery, Dkt. No. 527, at 8.

**Relator's Response:** Disputed. Based on the documents Janssen produced in this action, the "top accounts" reports referenced in Relator's Pretrial Memorandum (Doc. No. 497) and Relator's Opp. To Mot. To Streamline Nationwide Discovery (Doc. No. 527) appear to have been prepared by ABSs for only a portion of the relevant period.

**Janssen's Reply:** Relator's response does not dispute SUMF ¶ 63 other than to assert, without support, that such reports regarding her "top accounts" may have been created "for only a portion of the relevant period." Even if that is true, it is immaterial and obfuscatory. The relevant issue here is that Relator falsely alleged that ABSs were instructed "not to leave a paper trail," but then testified under oath that she was *required* to leave a paper trail in multiple ways (and was scolded when she failed to do so). That is undisputed. *See* SUMF ¶¶ 60-64.

64.     At one point, Relator was asked to be more timely in keeping her reporting up to date. Ex. 17 (Long Dep.) at 262:4-9.

**Relator's Response:** Undisputed.

## IV.     Relator Julie Long

65.     Relator Julie Long was an Area Business Specialist at Janssen from 2003 to February 2016. She was responsible for a territory located within Central Pennsylvania. Ex. 17 (Long Dep.) at 22:8-13, 23:12-15; SAC ¶ 16.

**Relator's Response:** Undisputed.

66.     During her deposition, Relator admitted that on at least five occasions, spanning a period of ten years, she had knowingly misrepresented on resumes that she had won the President's Club award at four different pharmaceutical companies, which she testified was a prestigious award in the pharmaceutical industry. Ex. 17 (Long Dep.) at 23:22-42:18.

**Relator's Response:** Disputed in part. Relator acknowledged that certain statements on her resumes regarding President's Club awards were inaccurate, but did not testify that she "knowingly misrepresented" her credentials. **Ex. 5** (Long Dep.) at 29:14-20. Relator also noted that years can get "confused" when preparing documents for positions later in her career. Id. at 35:7-8, 36:14-16.

**Janssen's Reply:** No amount of obfuscation in Relator's Responses to SUMF ¶¶ 66-69 can change the fact that Relator testified under oath explicitly and unambiguously that she "lied" on her resumes. Relator initially tried to deny that she had lied on her resumes by offering a series of evolving, contradictory and preposterous explanations (*e.g.*, that she misrepresented her credentials on her resumes because she intended to confess the truth during job interviews). *See* Ex. 5 (Long Dep.) at 27:12-13 ("I didn't actually get in that top 10. So I was 11."), 29:8-9 ("The rankings were very high, just not the official Top 10."), 29:14-20 ("I personally do

not feel that I was misrepresenting because the rankings were very high and I did receive accolades for that. But in a resume, I just wanted it to be concise so that when I would explain, I could explain that part."), 33:8-12 ("Because my rankings were very high, I didn't feel like I was misleading. I just thought by putting that down, it lends itself to conversation, and I could explain that."), 34:20-21 ("Most of those years I came close."); 36:14-18 ("I would not say I was lying, but I get the years confused . . . ."), 37:8 ("I don't recall.") (Dkt. No. 597-5).

However, when the lies became overwhelming, she abandoned her story and explicitly and unambiguously admitted that she had indeed "lied" on her resumes. Ex. 5 (Long Dep.) at 42:14-18, 47:24-48:4 (Dkt. No. 597-5). Relator's own expert confirmed this. Janssen's Ex. 61 (Evans Dep.) at 73:22-74:2 (Dkt. No. 539-61) ("Q. She lied on her resume, didn't she? A. She lied on her resume."). Relator's admission that she lied was not because new information refreshed her memory; it was because she eventually realized her denials made no sense. Thus, Relator repeatedly lied under oath by insisting she had not "lied" on her resumes, but she was then forced to admit that she actually had "lied."

It is frivolous for Relator to now deny that she admitted under oath that she "lied" on her resumes. Her testimonial confession was explicit, and her attempt to retract her confession speaks volumes in a case where Relator's claims depend on her own credibility. Relator's attempt to deny that she lied on her resumes is also disproved by her blatant, self-serving lies about her GPAs on many resumes. *See* Janssen's Ex. 131 (Excerpts of Relator's Supp. Objs. & Resp. to Interrog. Nos. 19, 23, 25, 27, and 30 (Mar. 9, 2026)) at 23; Ex. 5 (Long Dep.) at 42:20-45:8 (Dkt. No. 597-5).

67.    Relator admitted that she claimed on her resume that she had won the prestigious President's Club award for four years at Schering-Plough, when she had only won the

award once. Ex. 17 (Long Dep.) at 25:4-28:17, 30:11-31:16. Relator admitted that she claimed on her resume that she had won the prestigious President's Club award two years at Key Pharmaceuticals, when she had never won the award. *Id.* at 28:18-29:20. Relator admitted that she claimed on her resume that she had won the prestigious President's Club award one year at Eli Lilly, when she had never won the award. *Id.* at 31:17-32:3. Relator admitted that she claimed on her resume that, when serving as an ABS, she had won the prestigious President's Club award six years at Janssen, when she had never won the award. *Id.* at 33:19-40:19.

**Relator's Response:** Undisputed that the statements in that version of the resume were inaccurate. Relator has acknowledged that inaccuracies were the result of the passage of time, confusion over the years, and incorrect recollection. **Ex. 5** (Long Dep.) at 35:7-8, 36:14-16; *see also* **Ex. 53** (Relator's Response to Janssen's Interrogatory 30) at pp. 19-24.

**Janssen's Reply:**  *See* Janssen's Reply to SUMF ¶ 66.

68.    During her deposition, Relator repeatedly denied under oath that she had lied on her resume with respect to her representation that she had won the prestigious President's Club award more than a dozen times at multiple pharmaceutical companies. Ex. 17 (Long Dep.) at 29:10-20, 31:1-32:3, 35:19-36:18.

**Relator's Response:** Disputed in part. Disputed in part. Relator did not "repeatedly deny" that her resume entries were inaccurate. She acknowledged that certain resume statements were "not accurate" and testified that inaccuracies resulted from confusion over years and the passage of time. **Ex. 5** (Long Dep.) at 28:16-17, 31:9-10, 35:7-8, 36:14-16.

**Janssen's Reply:** *See* Janssen's Reply to SUMF ¶ 66.

69.    Eventually, Relator admitted under oath that she had in fact lied on her resume with respect to her representation that she had won the prestigious President's Club award

many times at multiple pharmaceutical companies. Ex. 17 (Long Dep.) at 41:7-42:18, 47:24-48:4; *see also* Ex. 61 (Evans Dep.) at 73:13-74:18.

**Relator's Response:** Disputed in part. While Relator testified that certain resume statements claiming President's Club awards were "not true," Relator also testified that she did not intend to deceive anyone and that the inaccuracies were meant to "show my career accomplishments." **Ex. 5** (Long Dep.) at 41:7-42:18, 50:13-15.

**Janssen's Reply:** *See* Janssen's Reply to SUMF ¶ 66.

## V.      Janssen's Health Care Compliance Program

70.     Janssen maintained a Health Care Compliance program. The compliance program governed the conduct of ABSs, among others. Ex. 63 (Sept. 2011 Health Care Compliance Framework, JANSSENBIO-075-00002124 ("2011 HCC Framework")) at -2126.

**Relator's Response:** Disputed. Janssen maintained a Health Care Compliance program on paper, but it was not followed in practice. **Ex. 37** (Heckman Dep.) at 288:20-290:25 (Janssen's former VP of Sales who oversaw the ABS team had never reviewed the policy prohibiting the provision of services that rendered a general benefit to a customer); **Doc. No. 543-1** (Wood Dep.) at 90:1-17, 237:16-25, 243:22-244:10 (Janssen's compliance officer was unable to identify the company's ultimate decision-maker on whether the provision of site of care programs to targeted physician practices was compliant with the AKS, and Janssen did not conduct a fair market analysis of the value the programs the ABSs provided to IOIs); **Ex. 31** (Cornely Dep.) at 13:10-12, 154:3-15 (Janssen's former Health Care Compliance officer received "no formal training" on how to identify whether a service has "independent value"); **Ex. 12** (Kung Dep.) at 79:21-80:1, 100:24-102:4, 103:1-9 (Janssen's former Health Care Compliance officer could not recall whether anyone assessed the independent value of the Site of Care programs).

**Janssen's Reply:** Relator's response confirms the accuracy of SUMF ¶ 70. With respect to Relator's assertion of a *different* fact, the testimony cited does not support her assertion that Janssen's compliance program was "not followed in practice."

- **Exhibit 37, Heckman Dep. at 288:20-290:25 (Dkt. No. 597-47):** Relator mischaracterizes the cited testimony, in which Ms. Heckman, who retired in 2022, stated that she did not "recall seeing" the specific policy put before her. Ex. 37 (Heckman Dep.) at 288:14-18 (Dkt. No. 597-47). Ms. Heckman explained that, in her role in Immunology Sales, she received "a lot of training" on health care compliance, *id.* at 286:7-10, and that she relied on Janssen's Health Care Compliance department to ensure that the SOC Programs complied with policy, *id.* at 289:9-290:25.

- **Doc. No. 543-1, Wood Dep. at 90:1-17, 237:16-25, 243:22-244:10 (Dkt. No. 543-1):** Relator's assertion that Janssen was required to conduct an FMV analysis of the value of the SOC Programs to doctors is frivolous. *See* Janssen's Reply to SUMF ¶ 55. Moreover, Ms. Wood explained that because the SOC Programs were unanimously approved by the members of the PRC, there was no "ultimate decision-maker." *See* Doc. No. 543-1 (Wood Dep.) at 93:8-94:2 (Dkt. No. 543-1).

- **Exhibit 31, Cornely Dep. at 13:10-12, 154:3-15 (Dkt. No. 597-40):** In the cited testimony, Mr. Cornely did not testify that he did not receive training on independent value. To the contrary, he said, "I may have, but I don't recall." Janssen's Ex. 139 (Cornely Dep.) at 154:16-155:2. He then explained, "I imagine I had to, as part of my onboarding into HCC," *id.* at 159:5-15, but the onboarding was more than ten years before his deposition and so it was "hard to remember," *id.* at 46:7-47:24. Mr. Cornely also testified that he "did receive compliance and ethics professional training and passed the exam and was a certified compliance and ethics professional." *Id.* at 49:25-50:22.

- **Exhibit 12, Kung Dep. at 79:21-80:1, 100:24-102:4, 103:1-9 (Dkt. No. 597-13):** Relator cites testimony in which Mr. Kung declined to speculate about "what the lawyer on the Promotional Review Committee was supposed to do." Ex. 12 (Kung Dep.) at 79:10-80:1 (Dkt. No. 597-13). Immediately prior, Mr. Kung testified that the PRC (which he was not a part of) reviewed for independent value. Janssen's Ex. 140 (Kung Dep.) at 75:15-77:3.

A.    **Written Policies And Procedures**

71.    Janssen utilized guidance documents and Health Care Compliance ("HCC") policies that governed the activities of employees at Janssen. Ex. 64 (Excerpts of Deposition of Chris Zalesky ("Zalesky Dep.")) at 151:15-19, 169:20-170:5, 198:16-22; Ex. 3 (2012 Global HCC Framework) at -2142-43; Ex. 63 (2011 HCC Framework) at -2126-28.

**Relator's Response:** Disputed. Janssen's guidance documents and Health Care Compliance policies were not followed by Janssen's employees. The guidance documents and HCC policies explicitly prohibited practice management consulting, **Ex. 6** (Health Care Compliance Site of Care ABS Speaker Training) at p. 12; yet Janssen's internal documents describe ABSs as providing "consultative services to assist with optimization of infusion capabilities and overall practice management." **Ex. 1** (2/27/2013 Email w/ ABS RBD Workshop Output slide deck) at pp. 7, 11. The guidance documents also required Janssen to evaluate whether services provided to customers had "independent value" that would make them impermissible under the AKS, **Ex. 36** (3/19/2014 email w/ September 3, 2009 Product-Related Items and Services presentation) at p.32; **Ex. 12** (Kung Dep.) at 97:18-98:3; **Ex. 31** (Cornely Dep.) at 285:3-16, yet Janssen never conducted this required independent value analysis for the SOC Programs. **Ex. 38** (Janssen's Amended Written Responses to Relator's November 4, 2022 30(b)(6) Deposition Notice) at p. 24 ("Janssen is unaware of anyone assessing, evaluating, or analyzing "customer demand for" or the "value customers derived from" [its] IOI Support Services"); **Doc. No. 543-1** (Wood Dep.) at 237:16-25, 243:22-244:10 (testifying amount paid to Xcenda "isn't the value back to the physician"); **Ex. 26** (Evans Report) at pp. 19 n.21, 46-47; **Ex. 39** (Janssen Policy Document – Consulting Services Provided to Customers) at p. 4 ("If the combined value of multiple product-related items or services exceeds the company's normal marketing and sales overhead or could be viewed as having substantial independent value, the services or items should not be offered together.").

**Janssen's Reply:** Relator's response to SUMF ¶ 71 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator's response does not dispute SUMF ¶ 71. With respect to Relator's assertion of a *different* fact, the documents cited do not support her assertion that Janssen's policies "were not followed by Janssen's employees." First, Relator provides no evidence that ABSs provided consulting. To the contrary, Relator's own testimony confirms that (i) Janssen's compliance policies and training prohibited ABSs from providing consulting, (ii) she complied with Janssen's compliance policies, (iii) she never thought she was engaging in consulting or doing anything wrong (until she met her counsel in this litigation), and (iv) when she observed two other representatives engaging in activities she thought violated the prohibition on consulting, she reported them to Janssen's compliance department. *See* SUMF ¶¶ 74, 80-82, 86-91, and 95. Indeed, contrary to this assertion, Relator herself testified that as an ABS, she could provide practices with "information," but it was then up to the practices to "take the bull by the horns" and make any changes themselves. Janssen's Ex. 17 (Long Dep.) at 172:21-173:10 (Dkt. No. 539-17).

Second, Relator falsely asserts that "Janssen never conducted th[e] required independent value analysis for the SOC Programs," citing the testimony of Ms. Wood (who rejected Relator's argument that Janssen was required to conduct an FMV analysis) and Janssen's written response to Topic 3 of Relator's Nov. 4, 2022 30(b)(6) Deposition Notice (Dkt. No. 597-48) (which asked who evaluated "customer demand for" or the "value customers derived" from the SOC Programs, not who evaluated "independent value"). Relator's argument that Janssen was required to conduct any such FMV analysis is frivolous. *See* Janssen's Reply to SUMF ¶ 55.

Finally, with respect to Janssen's evaluation of "independent value," Janssen's policies required that all product-related items and services provided to customers meet a six-factor test, which included a requirement that a program have a "Close Relationship" to Janssen's product. *See* Janssen's Ex. 66 (Oct. 20, 2005 Guidance Document on Consulting and Product-

68

Related Items and Services Provided to Customers, JANSSENBIO-068-00005537) at -5537-38 (Dkt. No. 539-66); Ex. 39 (2011 Policy Document – Consulting Services Provided to Customers, JANSSENBIO-018-00000520) at -522 (Dkt. No. 597-49). Janssen witnesses testified repeatedly that this "Close Relationship" or "independent value" requirement was evaluated and satisfied for the SOC Programs. *See, e.g.*, Doc. No. 543-1 (Wood Dep.) at 186:11-21, 199:17-201:10, 239:17-241:4, 249:4-12, 251:18-253:12, 280:9-281:21, 283:5-14, 305:10-306:6, 312:9-313:14 (Dkt. No. 543-1); Doc. No. 543-5 (Zalesky Dep.) at 253:20-255:15 (Dkt. No. 543-5); Janssen's Ex. 139 (Cornely Dep.) at 267:14-268:21; Janssen's Ex. 132 (Additional Excerpts of Deposition of Michelle Walls ("Walls Dep.")) at 190:7-191:2, 218:2-220:1.

Janssen also objects to Relator's citation throughout her brief to her Responses to SUMF ¶¶ 11, 20, and 71 for the false assertion that Janssen's documents "repeatedly" referred to the SOC Programs as "consultative services." Each of those statements of fact leads back to a single document, Exhibit 1, which is discussed in Janssen's Reply to SUMF ¶ 11.

72.     It was mandatory for Janssen employees, including ABSs, to adhere to the guidance documents and HCC policies. Ex. 34 (Wood Dep.) at 119:20-120:20; Ex. 64 (Zalesky Dep.) at 262:10-15.

**Relator's Response:** Disputed. Janssen employees were directed to act in violation of the company's guidance and HCC policies. As part of their job responsibilities, ABSs are required to provide consulting and business advisory services that include general practice advice to assist with overall practice management, including assistance with how to start, run, and more efficiently manage an in-office infusion suite. **Ex. 1** (2/27/2013 Email w/ ABS RBD Workshop Output slide deck) at slides 4 & 8; **Doc. No. 543-3** (Smith Dep.) at 92:7-16; **Ex. 2** (Zambelli Dep.) at 132:24-133:18; **Doc. No. 543-4** (Trahan Dep.) at 65:1-23; **Ex. 3** at slide 4; **Ex. 4** (Babia-Ramos

Dep.) at 34:8-35:9, 134:23-25. These ABS job responsibilities are in direct violation of Janssen's policy:

a. "It is not permissible to provide commercial services at no cost to the customer. . . . ." Ex. 39 (Janssen Policy Document – Consulting Services Provided to Customers) at p. 3;

b. "Services or items cannot be provided if it provides a general benefit to the customer rather than a product specific benefit (e.g., ***practice management consulting***, faxes, PCs or other office equipment that is not integrated into or dedicated to the use of the company product)." *Id*. (emphasis added);

c. "If the items or services do not qualify as product-related . . . the company may not provide them without charge to the customer or pay the customer's costs." *Id*. at p. 5;

d. "The company may offer various health care consulting services to customers ***for a fee***. If these services are offered on the commercial market, it is not permissible to provide customers with "free" consulting services in connection with an agreement to purchase the company products." *Id*. (emphasis added);

e. "The company cannot provide . . . . outside consulting services [regarding the efficiency of physician's business] because the consulting services relate to the management of customers' business practices, which is part of customers' normal overhead expenses." *Id*. at p. 7.

*See also* **Ex. 36** (3/19/2014 email w/ September 3, 2009 Product-Related Items and Services presentation) at p.32 ("If a J&J company is making available educational materials, programs or services that provide information to a health care professional . . . about a disease or procedure

70

related to a J&J company product or service, then the educational materials, programs or services may be considered permissible 'product-related' items [unless] they have substantial independent value to a customer"); **Ex. 6** at p. 12 ("According to policy, when providing education or consultation, the topic should have no discernible economic value to customer and services should relate back to our FDA approved product(s). Johnson & Johnson employees may not offer consulting services that relate to the management of customers' business practices because the customer is ultimately responsible for seeking that advice and in many cases paying for the service. If a company were to provide advice, it could be considered a kickback because it could offset the normal overhead expenses for the practice as well as expose our company to potential legal liability."); **Def. Ex. 66**, Doc. No. 539-66 at p. 3 ("Services or items that provide a general benefit to the customer, such as practice management consulting or office equipment that is not integrated into or dedicated to the use of the J&J company product (e.g., facsimile machines or personal computers) do not constitute product-related items or services and may not be offered as such.") & p. 5 ("Where services do not qualify as product-related . . . J&J companies may not provide them without charge to the customer or pay the customer's costs. . . J&J companies may offer various health care consulting services to customers for a fee. If these services are offered on the commercial market, it is not permissible to provide customers with 'free' consulting services in connection with an agreement to purchase J&J company products. . . Similarly, J&J companies may not pay the customer's costs of services furnished by an outside consultant unrelated to the J&J company."); **Def. Ex. 74**, Doc. No. 539-74 (2011 Compliance Guidelines for Site of Care 360 Speakers) at p. 36 ("You cannot directly or indirectly provide consulting services to a physician's office that are part of the physician's general overhead," including information regarding

71

"expanding/reconfiguring their office space to better accommodate their IOI patients on REMICADE.").

**Janssen's Reply:** Relator's response does not dispute SUMF ¶ 72. With respect to Relator's assertion of *different* facts, the evidence cited (Exhibits 1-4, Dkt. Nos. 597-1 to 597-4) does not support her assertion that ABSs "were directed to act in violation of the company's guidance and HCC policies." *See* Janssen's Reply to SUMF ¶ 11.

Relator's allegation that ABSs "were directed to act in violation of the company's guidance" is further refuted by her own testimony that (i) Janssen's compliance policies and training prohibited ABSs from providing consulting, (ii) she complied with Janssen's compliance policies, (iii) she never thought she was engaging in consulting or doing anything wrong (until she met her counsel in this litigation), and (iv) when she observed two other representatives engaging in activities she thought violated the prohibition on consulting, she reported them to Janssen's compliance department. *See* SUMF ¶¶ 74, 80-82, 86-91, 95. Relator testified that as an ABS, she could provide practices with "information," but it was then up to the practices to "take the bull by the horns" and make any changes themselves. Janssen's Ex. 17 (Long Dep.) at 172:21-173:10 (Dkt. No. 539-17).

73.     Janssen utilized compliance policies that applied to, among other things, Janssen's provision of product-related items and services, such as "training and education programs" and "reimbursement and coverage support" to customers. Ex. 65 (July 1, 2011 Policy Document - Consulting Services Provided to Customers, JANSSENBIO-018-00000520) at -521-22; Ex. 66 (Oct. 20, 2005 Guidance Document on Consulting and Product-Related Items and Services Provided to Customers, JANSSENBIO-068-00005537) at -5537-40; Ex. 67 (July 1, 2015

Guidance Document on Company-Provided Items and Services for Customers, JANSSENBIO-031-00016550) at 7-8.

**Relator's Response:** Disputed. These policies were not followed when it came to Janssen's program of having ABSs provide consulting and business advisory services to physician practices. *See supra* at ¶ 72.

**Janssen's Reply:** Relator's response to SUMF ¶ 73 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response does not dispute this statement of fact, and her separate assertions are unsupported. *See* Janssen's Reply to SUMF ¶ 72.

74.    Janssen utilized compliance policies that stated, "Company employees may not conduct chart reviews, business/contract reviews that are not related to company products or contracts, or provide other consulting services on behalf of a customer." Ex. 68 (July 1, 2011 Policy Document – Reimbursement: Discussions, JANSSENBIO-018-00000596) at -599.

**Relator's Response:** Disputed. The compliance policy cited by Janssen "applies to the communication and discussion of reimbursement-related product information to Health Care Professionals (HCPs) and formulary committees," hence its title – Policy Document – Reimbursement: Discussions. **Def. Ex. 68**, Doc. No. 539-68 at p. 3. The Janssen policy relevant here is discussed by Relator in paragraph 72, *supra*. *See* **Ex. 39** (Janssen Policy Document – *Consulting Services Provided to Customers*).

**Janssen's Reply:** Relator's response to SUMF ¶ 74 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator's response does not dispute SUMF ¶ 74. While it is true that Relator is alleging a violation of the policy reflected in Exhibit 39 (Dkt. No. 597-49), to the extent Relator is suggesting the policy reflected in Janssen's Exhibit 68 (Dkt. No. 539-68) did not apply to ABSs' interactions with physician practices or HOPDs, the policy on its face makes clear she is mistaken.

75.     Janssen utilized compliance policies that required all promotional materials (including the slideshow presentations used during the SOC Programs) to be reviewed and approved by the Promotional Review Committee for compliance with Janssen's HCC policies before they were used with customers. Ex. 69 (July 27, 2010 SOP – Submission, Review, and Approval of Promotional Materials, JANSSENBIO-018-00001266) at -1270; Ex. 17 (Long Dep.) at 72:25-73:15; Ex. 31 (Walls Dep.) at 107:9-108:2; Ex. 64 (Zalesky Dep.) at 355:25-356:4; Ex. 70 (Excerpts of Def. Janssen Biotech, Inc.'s Supp. Objs. & Resps. to Pl.-Relator Julie Long's Interrogs. (May 1, 2025)) – Interrog. No. 2.

**Relator's Response:** Disputed. Janssen's Promotional Review Committee ("PRC") did not review or evaluate whether the SOC programs would confer independent value on the IOIs, as required by Janssen's policy and law. Janssen did require the visual aids and Power Point slide decks that were used during SOC programs presented by ABSs and the Xcenda consultants to be reviewed and approved by its PRC. **Def. Ex. 69** at Doc. No. 539-69 at p 2. Part of that review was purportedly ensuring that the materials "compl[ied] with applicable PGHCC&P (Pharmaceutical (POC) Group Health Care Compliance & Privacy) policies, procedures and guidelines, J&J and industry standards and applicable State and Federal laws," *id*. at p. 4, and "compl[ied] with applicable state and federal laws and Corporate Policy." *Id*. at p. 5. But despite both Janssen policy and the AKS prohibiting the provision of free services with independent value to physicians, *see* **Ex. 36** (3/19/2014 email w/ September 3, 2009 Product-Related Items and

74

Services presentation) at p.32; **Ex. 6** at p. 12; OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23,731-01, 23,735 (May 5, 2003), no one on the PRC assessed, evaluated, or analyzed the value of the IOI Support Services provided by the ABSs (or third parties like Xcenda) to the IOIs. **Ex. 38**, Janssen's Am. Written Resp. to 30(b)(6) Deposition Notice, at p. 24; **Doc. No. 543-1** (Wood Dep.) at 237:16-25, 243:22-244:10; **Ex. 26** (Evans Report) at pp. 19 n.21, 46-47. Nor did the PRC assess the promotional material it reviewed for compliance with the AKS. **Doc. No. 543-6** (Zalesky Dep.) at 255:10-11.

**Janssen's Reply:** Relator's response to SUMF ¶ 75 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response does not dispute SUMF ¶ 75; instead, the second sentence of her response expressly admits SUMF ¶ 75.

With respect to Relator's assertion of *different* facts, the evidence cited does not support her assertions. Citing the identical evidence identified in her response to SUMF ¶ 71, Relator again asserts that "no one on the PRC assessed, evaluated, or analyzed the value of the" SOC Programs. That is false. *See* Janssen's Reply to SUMF ¶ 71. It is undisputed that the PRC reviewed every SOC Program to ensure compliance with Janssen's policies. *See* SUMF ¶ 29.

**B.     Training Governing The Activities Of ABSs**

76.     ABSs delivering SOC Programs, including Julie Long, received training on Janssen's Health Care Compliance policies. Ex. 63 (2011 HCC Framework) at -2128; Ex. 17 (Long Dep.) at 60:23-61:4; Ex. 34 (Wood Dep.) at 26:7-19.

**Relator's Response:** Undisputed.

77.     Janssen's training instructed ABSs that they "[c]annot exchange anything of value in return for business" and cannot "give HCPs anything of value to induce them to prescribe or purchase products that are reimbursed in whole or part by a federal healthcare

program." Ex. 71 (Email and Attached May 2008 HCC Training to ABSs, JANSSENBIO-048-00000949, JANSSENBIO-048-00000950 ("2008 ABS Training")) at slide 13; Ex. 72 (2014 HCC Site of Care ABS Speaker Training, JANSSENBIO-008-00004441 ("2014 ABS Speaker Training")) at -445.

**Relator's Response:** Disputed. Janssen did not provide training on the meaning of "value." **Ex. 31** (Cornely Dep.) at 154:14-15, 165:7-12 (former health care compliance officer testifying he doesn't "recall receiving any formal training on independent value"); **Def. Ex. 71**, Doc. No. 539-71 at p. 16 (stating the AKS prohibits the "exchange of anything of value in return for business" without providing any definition or explanation for "value"); **Def. Ex. 72**, Doc. 539-72 at pp. 6, 13 (stating AKS and company policy prohibit providing anything of "value" or "economic value" without describing or defining those terms).

**Janssen's Reply:** Relator's response to SUMF ¶ 77 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator asserts this identical fact in her own affirmative SDMF ¶ 200.

With respect to Relator's assertion of a *different* fact, her assertion that Janssen did not provide guidance on "the meaning of 'value'" is without merit. Janssen's guidance stated that an item or service has "no independent value" if either (a) It "has no value on the open market" or (b) "The value of the item or service has been incorporated into the purchase price of the product," which occurs if "(i) the items or services sufficiently relate to the product, approved uses for the product, the disease-state or condition treated by the product, coverage and reimbursement of the product or a healthcare regulation or event that may affect use of, or payment for the product, and (ii) the item or service is offered to all customers in a particular class (*e.g.*, all customer hospitals with over 100 beds) without charge by J&J Companies and not sold separately." *See* Janssen's Ex.

76

67 (July 1, 2015 Guidance Document on Company-Provided Items and Services for Customers, JANSSENBIO-031-00016550) at 4 (Dkt. No. 539-67).

78.     Janssen's training instructed ABSs that they could provide only company-approved materials. Ex. 73 (Jan. 17, 2007 Email and Attached HCC Review Slide Deck, JANSSENBIO-008-00003042, JANSSENBIO-008-00003043 ("2007 Email and HCC Review Slide Deck")) at slide 4; Ex. 17 (Long Dep.) at 81:22-82:15; Ex. 71 (2008 ABS Training) at slide 66; Ex. 74 (2011 Compliance Guidelines for Site of Care 360 Speakers, JANSSENBIO-003-00011322) at -329, -360; Ex. 75 (HCC POA1 2012 Meeting Slide Deck, JANSSENBIO-015-00001937) at slide 38; Ex. 72 (2014 ABS Speaker Training) at -454; Ex. 17 (Long Dep.) at 66:16-69:17; Ex. 76 (2015 Contracting, Pricing, Reimbursement, and Access Compliance Training, JANSSENBIO-063-00000561 ("2015 CPRA Training")) at -610.

**Relator's Response:** Undisputed.

79.     Further, Janssen's training instructed ABSs that they could not use homemade sales aids or alter approved materials. Ex. 71 (2008 ABS Training) at slides 65-66; Ex. 74 (2011 Compliance Guidelines for Site of Care 360 Speakers) at -329; Ex. 75 (HCC POA1 2012 Meeting Slide Deck) at slide 38; Ex. 72 (2014 ABS Speaker Training) at -454.

**Relator's Response:** Undisputed.

80.     ABSs also received training that stated, for example, that ABSs are "not business advisors," cannot do "business consulting," "cannot provide business advice," and "may not offer consulting services that relate to the management of customers' business practices." Ex. 77 (Feb. 2003 HCC & Privacy Update, JANSSENBIO-055-00004884) at slides 12 ("not 'business advisors'"), 16 ("can't do . . . [b]usiness consulting"); Ex. 78 (Sept. 2003 Centocor ABS/SBM/RBM HCC & Privacy Update, JANSSENBIO-055-00004975) at slide 14 ("not

77

'business advisors'"); Ex. 73 (2007 Email and HCC Review Slide Deck) at slide 20 ("cannot provide business advice"); Ex. 72 (2014 ABS Speaker Training) at -452 ("may not offer consulting services that relate to the management of customers' business practices"); Ex. 17 (Long Dep.) at 66:16-68:19; Ex. 76 (2015 CPRA Training) at -610 ("may not offer consulting services that relate to the management of customers' business practices").

**Relator's Response:** Disputed. Despite providing this training, Janssen directed ABSs to provide such business consulting services as part of their job responsibilities, which required ABSs to provide consulting and business advisory services that include general practice advice to assist with overall practice management, including assistance with how to start, run, and more efficiently manage an in-office infusion suite. **Ex. 1** (2/27/2013 Email w/ ABS RBD Workshop Output slide deck) at slides 4 & 8; **Doc. No. 543-3** (Smith Dep.) at 92:7-16; **Ex. 2** (Zambelli Dep.) at 132:24-133:18; **Doc. No. 543-4** (Trahan Dep.) at 65:1-23; **Ex. 3** at slide 4; **Ex. 4** (Babia-Ramos Dep.) at 34:8-35:9, 134:23-25.

**Janssen's Reply:** Relator's response to SUMF ¶ 80 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator does not dispute SUMF ¶ 80. With respect to Relator's assertion of a *different* fact, her assertion that "Janssen directed ABSs to provide such business consulting services" is identical to, and cites the identical exhibits (Exhibits 1-4) as, her response to SUMF ¶ 72. Those exhibits do not support that assertion. *See* Janssen's Reply to SUMF ¶ 11 (addressing Exhibits 1-4 (Dkt. Nos. 597-1 to 597-4)).

81.    Janssen's training for ABSs stated that they "cannot directly or indirectly provide consulting services to a physician's office that are part of the physician's general

overhead." Ex. 74 (2011 Compliance Guidelines for Site of Care 360 Speakers) at -356; Ex. 72 (2014 ABS Speaker Training) at -476.

**Relator's Response:** Disputed. Despite providing this training, Janssen directed ABSs to provide such business consulting services as part of their job responsibilities, which required ABSs to provide consulting and business advisory services that included practice advice to assist with overall practice management, including assistance with how to start, run, and more efficiently manage an in-office infusion suite. **Ex. 1** (2/27/2013 Email w/ ABS RBD Workshop Output slide deck) at slides 4 & 8; **Doc. No. 543-3** (Smith Dep.) at 92:7-16; **Ex. 2** (Zambelli Dep.) at 132:24-133:18; **Doc. No. 543-4** (Trahan Dep.) at 65:1-23; **Ex. 3** at slide 4; **Ex. 4** (Babia-Ramos Dep.) at 34:8-35:9, 134:23-25.

**Janssen's Reply:** Relator's response to SUMF ¶ 81 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator does not dispute SUMF ¶ 81. With respect to Relator's assertion of a *different* fact, her assertion that "Janssen directed ABSs to provide such business consulting services" is identical to, and cites the identical exhibits (Exhibits 1-4) as, her response to SUMF ¶ 72. Those exhibits do not support that assertion. *See* Janssen's Reply to SUMF ¶ 11 (addressing Exhibits 1-4 (Dkt. Nos. 597-1 to 597-4)).

82.     Janssen's training instructed ABSs that they could not calculate, discuss, or promote profitability with health care providers. Ex. 77 (Feb. 2003 HCC & Privacy Update) at slide 12 ("Do not discuss profitability. . . . Of course we should never provide advice to physicians or hospitals about how to improve profitability or to manage or optimize their costs."); Ex. 78 (Sept. 2003 Centocor ABS/SBM/RBM HCC & Privacy Update) at slide 14 (same); Ex. 74 (2011

Compliance Guidelines for Site of Care 360 Speakers) at -360 ("Cannot promote, discuss or reference profit/loss"); Ex. 72 (2014 ABS Speaker Training) at -472 ("Don't calculate or discuss profit or loss on our products . . . or encourage customers to make a purchasing decision based on a guarantee of revenue or anticipated profit margin."); Ex. 76 (2015 CPRA Training) at -604 ("Do not discuss profit margins related to reimbursement"), -607 ("Not permitted:  Calculating profit or loss on our products and/or competing products or marking the spread.").

**Relator's Response:** Disputed. While Janssen may have provided some training claiming that ABSs were not supposed to discuss or promote profitability with health care providers, *see* **Def. Ex. 74**, Doc. No. 539-74 (2011 Compliance Guidelines for Site of Care 360 Speakers) at p. 36 ("You cannot directly or indirectly provide consulting services to a physician's office that are part of the physician's general overhead," including information regarding "expanding/reconfiguring their office space to better accommodate their IOI patients on REMICADE."), in practice, it had its ABSs do exactly that. **Ex. 5** (Long Dep.) at 77:12-20 (ABSs "were going in explaining how these offices could negotiate their payor contracts or looking at the optimization of their infusion center or terms of the contracts. We had a host of services that related directly to their financial health of the practice"); **Doc. No. 539-43** at slide 49 (slide deck for Managing Biologics in the Physician Office SOC program, including "In-Office Infusion Efficiency" section for providing practice management advice so the "infusion suite can optimize capacity and efficiency," such as staffing suggestions for particular nurse-to-patient ratios and scheduling suggestions for staggering "start times to maximize resource utilization."). ABSs used an IOM tool to "sustain and grow the infusion model by increasing efficiencies" of the IOIs and provide the IOIs "guidance with operational decisions." **Ex. 40** (1/6/2014 email with Interview Plan: Product Manager, Site of Care slide deck) at slide 12. The purpose of the IOM was to examine

80

the efficiencies in an infusion center and examine the capacities within the center in order to determine "if they were at capacity." **Ex. 5** (Long Dep.) at 169:20-170:17; **Ex. 41** (1/28/2014 Email w/ list and descriptions of SOC Resources and Tools) at p.2 (goals of Infusion Services Review (iBiz) / Infusion Optimization Modeler (IOM) were to "review account-specific infusion operations" and "[s]upport infusion centers by assessing efficiency and capacity of infusion operations," and included the provision of "customized reports of infusion suite resources, capacity, and efficiency"). *See also supra* ¶¶ 36-37. By using the optimization modeler, the ABS "could measure out the point at which [the center] would have to add more resources to" reach maximum capacity. **Ex. 5** (Long Dep.) at 170:12-20, 174:4-14. The purpose of the IOM was to increase office efficiency. *Id*. at 224:19-225:5. The IOM "involved a *customized assessment* of a physician's practice" and "allowed ABSs and physicians to organize and compare (model) the specific data and details of a physician's practice, such as the number of patients on Remicade, the number of patients on competitor drugs, the lag time between prescription and reimbursement, how many chairs were needed, how much personnel was needed and the related costs, and how many more patients were needed to bring the practice 'to capacity.'" **Ex. 26** (Evans Report) at p.42 n.97 (emphasis added); **Ex. 42** (6/24/2019 email with Optimizing Your Infusion Resources slide deck) at pp. 5-15 (slides showing different tools for optimizing an IOI's efficiency and maximizing capacity, resulting in detailed customized reports to help the IOI grow by reaching "full infusion capacity"). Relator's expert Dr. Ian Larkin confirmed that the IOI Support helped practices operate more efficiently. **Ex. 49** (Larkin Report) at p. 3 ("[T]hese services constituted, at least in part, advice on operations and business issues faced by physicians operating IOIs that were applicable to management of the overall infusion suite business . . . .This advice allowed physicians to operate their IOI businesses in a more efficiency manner overall[.]").

**Janssen's Reply:** Relator's response to SUMF ¶ 82 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator does not dispute SUMF ¶ 82. With respect to Relator's assertion of a *different* fact, she has made the same false assertion that Janssen directed ABSs to provide consulting services in her responses to numerous SUMFs, and her position is without merit. *See* Janssen's Replies to SUMF ¶¶ 11, 34, 36, and 55.

83.    Janssen's training instructed ABSs to advise customers seeking specific advice or support that "there are many consultants and attorneys who could assist them . . . for a fee." Ex. 74 (2011 Compliance Guidelines for Site of Care 360 Speakers) at -332, -355; Ex. 17 (Long Dep.) at 62:18-65:7; Ex. 72 (2014 ABS Speaker Training) at -475.

**Relator's Response:** Disputed. Janssen directed ABSs to provide specific, customized advice and support to IOIs to enable them to increase overall IOI efficiency and maximize patient load capacity. *See* paragraphs 36-38, 80-82, *supra*.

**Janssen's Reply:** Relator's response to SUMF ¶ 83 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator does not dispute SUMF ¶ 83. With respect to Relator's assertion of a *different* fact, she has made the same false assertion that Janssen directed ABSs to provide consulting services in her responses to numerous SUMFs, and her position is without merit. *See* Janssen's Replies to SUMF ¶¶ 11, 34, 36-38, and 55.

84.    Janssen's training stated that ABSs could provide "[g]eneral practice management information" if it was within or based on company approved material. Ex. 74 (2011

Compliance Guidelines for Site of Care 360 Speakers) at -331; Ex. 17 (Long Dep.) at 62:18-64:10; Ex. 72 (2014 ABS Speaker Training) at -470; Ex. 76 (2015 CPRA Training) at -603.

**Relator's Response:** Disputed. Janssen directed ABSs to provide specific, customized advice and support to IOIs to enable them to increase overall IOI efficiency and maximize patient load capacity. *See* paragraphs 36-38, 80-82, *supra*.

**Janssen's Reply:** Relator's response to SUMF ¶ 84 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator does not dispute SUMF ¶ 84. With respect to Relator's assertion of a *different* fact, she has made the same false assertion that Janssen directed ABSs to provide consulting services in her responses to numerous SUMFs, and her position is without merit. *See* Janssen's Replies to SUMF ¶¶ 11, 34, 36-38, and 55.

85.    Janssen's Health Care Compliance training regularly instructed employees, including ABSs, to report compliance concerns to management, to Human Resources, to Health Care Compliance, or through the Employee Compliance Hotline. Ex. 71 (2008 ABS Training) at slide 7; Ex. 74 (2011 Compliance Guidelines for Site of Care 360 Speakers) at -363; Ex. 17 (Long Dep.) at 62:18-66:15; Ex. 75 (HCC POA1 2012 Meeting Slide Deck) at slide 40; Ex. 72 (2014 ABS Speaker Training) at -483; Ex. 76 (2015 CPRA Training) at -631.

**Relator's Response:** Undisputed.

C.    **Relator's Understanding Of Janssen's Health Care Compliance Policies And Training**

86.    Relator understood that Health Care Compliance was important and tried to comply with HCC policy. Ex. 17 (Long Dep.) at 145:2-9.

**Relator's Response:** Undisputed.

87.     Relator believed that, when working as an ABS, she complied with HCC policy. Ex. 17 (Long Dep.) at 145:11-16.

**Relator's Response:** Undisputed.

88.     Relator understood that, under Janssen's Health Care Compliance policies, she was prohibited from acting as a consultant to a practice and did not engage in such interactions. Ex. 17 (Long Dep.) at 125:9-129:23, 172:21-173:10, 249:2-250:22.

**Relator's Response:** Disputed in part. Although Relator believed she was acting in compliance with the law, she did engage in the provision of valuable business consulting services to IOIs as part of her duties as an ABS. **Ex. 5** (Long Dep.) at 47:19-23, 77:12-25, 236:18-237:7. The IOIs recognized the value of her services. *Id.* at 290:4-291:4 (IOI offered to provide Relator with a 1099 tax form typically provided to independent contractors), 100:8-17 (customer to whom Relator provided optimization modeling services described her services as "having a personal MBA"); **Ex. 27** (email thread regarding IOI that Relator helped open after spending countless hours of work and providing help with the IOI's billing needs; IOI's office coordinator "said they could not have opened th[e] IOI without" the help); **Ex. 43** (Report of Dr. Fugh-Berman) at p. 23 (stating that Stacey Fitch, DO, "to whom [Relator] regularly provided Site of Care programs, services, and supports" attributed Relator's "business knowledge and background in infusion [as] help[ing] streamline [her] center to be more cost effective, structured, and provided needed educational support for staff and patients.")

**Janssen's Reply:** As Relator admits, this statement of fact is undisputed. With respect to Relator's assertion of a *different* fact that she engaged in consulting, the evidence cited does not support that assertion. First, Relator has falsely asserted in her responses to numerous

SUMFs that she engaged in consulting, and Janssen has replied accordingly. *See* Janssen's Replies to SUMF ¶¶ 11, 34, 36-38, and 55.

Second, Relator's own testimony confirms that (i) Janssen's compliance policies prohibited ABSs from providing consulting, (ii) she complied with Janssen's compliance policies, (iii) she never thought she was engaging in consulting or doing anything wrong (until she met her counsel in this litigation), and (iv) when she observed two other representatives engaging in activities she thought violated the prohibition on consulting, she reported them to Janssen's compliance department. *See* SUMF ¶¶ 82, 86-91, 95. Indeed, Relator testified that as an ABS, she could provide practices with "information," but it was then up to the practices to "take the bull by the horns" and make any changes themselves. Janssen's Ex. 17 (Long Dep.) at 172:21-173:10 (Dkt. No. 539-17). Her testimony demonstrates that she was aware that consulting was prohibited, that she did not engage in consulting, and that she reported others when she thought they did.

Third, Relator's contention that she supposedly engaged in consulting without realizing it is not only belied by the evidence, but also by the fact that she was a Health Care Compliance Liaison (and disclosed on her resume that she had served as a Janssen "HCC Officer"). *See* SUMF ¶ 89; Janssen's Ex. 17 (Long Dep.) at 45:13-46:15 (Dkt. No. 539-17).

89.    Relator served as a Health Care Compliance Field Liaison, who was responsible for addressing field representatives' Health Care Compliance questions and concerns. Ex. 17 (Long Dep.) at 45:13-46:15, 75:3-21; Ex. 80 (July 27, 2006 HCC Field Liaison Slide Deck, JANSSENBIO-040-00000933).

**Relator's Response:** Undisputed. *See* ¶ 88, *supra*.

90.    While employed as an ABS, Relator did not believe that she was violating HCC policy by providing the SOC Programs. Ex. 17 (Long Dep.) at 145:11-16, 289:6-22.

85

**Relator's Response:** Undisputed. *See* ¶ 88, *supra*. Relator has been clear that she relied upon and trusted Janssen's leadership as to the lawfulness of her employment activities. **Ex. 53** (Relator's Response to Janssen's Interrogatory 19) at pp. 7-8 ("Plaintiff believed and trusted that Defendant's leadership, legal counsel, and compliance personnel had reviewed and approved all the advisory, educational, and consultative assistance . . . . Plaintiff also assumed and trusted that Defendant's leadership would not have ABSs and outside consultants provide services or engage in conduct that violated the law or relevant policies.").

**Janssen's Reply:** Relator does not dispute SUMF ¶ 90. Moreover, her assertion that she unwittingly provided consulting services in violation of Janssen's policies is without merit. *See* Janssen's Reply to SUMF ¶ 88.

91.     While employed as an ABS, Relator did not believe that she was violating the law or providing a kickback. Ex. 81 (Excerpts of Pl.'s Supp. Objs. & Resps. to Def.'s Interrogs. 6 to 18 (Mar. 17, 2023) ("Pl.'s Resps. to Interrogs. 6 to 18")) – Interrog. No. 8 ("Plaintiff does not recall having any communications before February 19, 2016, in which she 'discussed, or raised concerns about, the legality' of the services and related presentations and programs identified in her response to Interrogatory 2 with anyone other than her attorneys . . . ."); Ex. 81 (Pl.'s Resps. to Interrogs. 6 to 18) – Interrog. No. 9 ("Plaintiff first became aware that the in-office infusion support services that Janssen provided violated the law in or around the second quarter of 2016 after she had retained counsel."); Ex. 17 (Long Dep.) at 17:2-17, 19:13-20:9, 145:18-21, 146:8-23, 289:6-22.

**Relator's Response:** Undisputed. *See* ¶ 88, *supra*.

92.     While employed as an ABS, Relator never had any communications with Janssen employees in which she discussed, or raised concerns about, the legality of the provision

of the SOC programs. Ex. 81 (Pl.'s Resps. to Interrogs. 6 to 18) – Interrog. No. 8 ("Plaintiff does not recall having any communications before February 19, 2016, in which she 'discussed, or raised concerns about, the legality' of the services and related presentations and programs identified in her response to Interrogatory 2 with anyone other than her attorneys . . . ."); Ex. 17 (Long. Dep.) at 17:2-17.

> **Relator's Response:** Undisputed.

93.    Relator admitted that she never told any account that if it did not buy more Remicade, she would stop providing the SOC Programs. Ex. 17 (Long Dep.) at 367:10-17.

> **Relator's Response:** Undisputed.

### D.    Investigation Of Reports Of Non-Compliance

94.    Janssen investigated complaints of potential non-compliance with company policy when they were raised. *See, e.g.*, Ex. 79 (JJEP-08-12-0020 Case Report, JANSSENBIO-075-00001772); Ex. 82 (1001-2013 Case Report, JANSSENBIO-075-00001775); Ex. 83 (1001-2013 Investigation Summary, JANSSENBIO-075-00001785); Ex. 84 (2302-2015 Case Report, JANSSENBIO-075-00001817); Ex. 85 (2302-2015 Investigation Summary, JANSSENBIO-075-00001806).

> **Relator's Response:** Disputed. Janssen's investigations were minor, peripheral matters involving individual employee policy violations, not investigations of the core compliance risks of its SOC marketing scheme. **Def. Ex. 79**, Doc. No. 539-79 (2008 investigation involving a single sales representative who was terminated for discussing profitability with physicians, but not addressing whether the SOC programs violated the AKS); **Def. Exs. 82 & 83**, Doc. No. 539-82 & Doc. No. 539-83 (investigation concerning Relator for emailing blackened-out patient forms to other employees without realizing some of the hidden patient-identifying information became visible, not relating to the legality of the SOC programs at all); **Def. Exs. 84 & 85**, Doc. No. 539-

84 & Doc. No. 539-85 (2015 investigation involving a single sales representative who was alleged to have engaged customers in detailed profitability discussions but not addressing whether the SOC programs violated the AKS).

**Janssen's Reply:** Relator does not dispute SUMF ¶ 94. With respect to her attempt to portray the investigations as irrelevant, it is baseless. First, citing no evidence, she characterizes Janssen's investigations as "minor, peripheral matters." In reality, the investigations could not be more on point given the allegations in this case. As Relator admits, Janssen investigated multiple complaints _made by Relator herself_ when she thought other representatives might be violating _the very prohibitions at issue in this case_. *See* Relator's Responses to SUMF ¶¶ 95-96.

Second, Relator's assertion that Janssen failed to investigate "the core compliance risks of its SOC marketing scheme" in response to her complaints are nonresponsive and nonsensical. Her complaints involved rogue employee allegations—allegations that specific employees were violating Janssen's compliance policies. As a result, the investigations focused on the actions of those employees. When Relator made those allegations against two specific Janssen employees, she did not allege that there was anything improper about the SOC Programs or the ABS role. It is absurd for her to now suggest that Janssen failed to investigate a complaint she never filed (because, as she admits, she never had any concern about the propriety of the ABS role or the SOC Programs until she met her counsel in this litigation). *See* SUMF ¶ 91 (undisputed).

95. On at least two separate occasions, when Relator thought that a representative may have been violating policies, she reported the conduct to her manager and Health Care Compliance. Ex. 86 (Long Ex. 56, Mar. 14, 2011 Email re Overview of Initial Meeting Between Xcenda and GI Account (RGAL), JANSSENBIO-002-00002902); Ex. 87 (Oct.-Dec.

2015 Emails re Thank You/Follow Up Information Regarding Investigation NEPA, JANSSENBIO-003-00008081); Ex. 17 (Long Dep.) at 125:9-129:23, 342:19-344:8.

**Relator's Response:** Disputed. Relator reported to her manager and Health Care Compliance that Xcenda consultant Andree Ruth agreed to assist a physician practice with a review of the practice's profit and loss financial statement, *see* **Def. Ex. 86** and **Ex. 5** (Long Dep.) at 343:7-343:21, a service that was outside the scope of the services that ABSs were directed and allowed to provide and therefore also outside the scope of the conduct at issue in this action. Additionally, Relator reported that another Jansen representative, Dana Griffith, was improperly calling on her accounts and also improperly providing services beyond those that ABSs were directed and permitted to provide, including "create[ing] spreadsheets of the various payers with their allowed amounts, and she would go in and discuss the spread with physician practices. And she would do that with the drug, the procedure codes, and she would go and actually like go into the practice and some of these specific financial discussions." **Ex. 5** (Long Dep.) at 127:11-128:3.

**Janssen's Reply:** Relator's response to SUMF ¶ 95 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response does not dispute SUMF ¶ 95.

96.    Janssen conducted an investigation in response to each of Relator's concerns. Ex. 88 (Mar. 28, 2011 Email re Overview of Initial Meeting Between Xcenda and GI Account (RGAL), JANSSENBIO-068-00005600); Ex. 17 (Long Dep.) at 342:19-344:8; Ex. 85 (2302-2015 Investigation Summary); Ex. 89 (Oct. 28, 2015 Notes of Interview of Julie Long, JANSSENBIO-075-00001826); Ex. 90 (Jan. 28, 2016 Notes of Interview of Dana Griffith, JANSSENBIO-075-00001811); Ex. 91 (Jan. 28, 2016 Notes of Interview of Joanne, from the

Offices of Dr. Martin Blidner, JANSSENBIO-075-00001810); Ex. 92 (Feb. 2, 2016 Health Care

Compliance Educational Letter, JANSSENBIO-075-00001822).

**Relator's Response:** Disputed. Janssen investigated the employee conduct Relator

reported, but not the core compliance risks of its SOC marketing scheme. **Def. Ex. 88**, Doc. No.

539-88 (email communication regarding actions of a single employee, not examination of ABSs'

provision of SOC programs); **Def. Exs. 89-92**, Doc. Nos. 539-89 - Doc. No. 539-92 (documents

regarding the same single-employee investigation addressed in Def. Exs. 84 & 85).

**Janssen's Reply:** Relator's response to SUMF ¶ 96 is subject to Janssen's pending

Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does

not contradict the assertion.

Relator's response does not dispute SUMF ¶ 96. With respect to Relator's *separate*

assertion that Janssen failed to investigate "the core compliance risks of its SOC marketing

scheme" in response to her complaints, that is baseless. *See* Janssen's Reply to SUMF ¶ 94.

## VI.    The Phase 1 Practices

97.     Relator identified 11 practices that she called on during her time as an ABS,

which are the focus of Phase 1 of the case:

a.   Altoona Arthritis & Osteoporosis Center

b.   Arthritis & Osteoporosis Center

c.   Berks Center for Digestive Health (a/k/a Berks Center for Digestive Disease; Digestive Disease Associates; Digestive Disease of West Reading (DDWR))

d.   Capital Arthritis and Rheumatology Associates (f/k/a George Kunkel, M.D.)

e.   Cumberland Valley Rheumatology (f/k/a Schlansky & Clawson)

f.   Ellen M. Field-Rubbo, M.D.

g.   Emkey Arthritis & Osteoporosis Clinic

90

h.   Jackson Siegelbaum Gastroenterology (f/k/a West Shore Endoscopy Center)

i.   Pottstown Medical Specialists (a/k/a PMSI)

j.   Sanford, Roumm, and Acharya Rheumatology (f/k/a Sanford and Roumm Rheumatology)

k.   U.S. Digestive Health (f/k/a Lancaster Gastroenterology (LGI), Regional Gastroenterology Associates of Lancaster (RGAL)).[19] Ex. 37 (Pl.'s Resp. to Interrog. No. 2) at 14.

**Relator's Response:** Undisputed.

98.    At least four of the Phase 1 Practices hired third-party consultants to help them with practice management and other tasks related to operating their infusion suites during the same time that they were being called on by Relator. Ex. 17 (Long Dep.) at 235:20-236:10, 349:3-19.

**Relator's Response:** Disputed. The third-party consultants were hired because ABSs, despite their ability to provide customized business management consulting, were not able to "actually do [the IOIs] contract negotiations [or] know exactly what their contracted rates were." **Ex. 5** (Long Dep.) at 236:13-17.

**Janssen's Reply:**  Relator's response to SUMF ¶ 98 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response does not dispute SUMF ¶ 98.

99.    More than half of the Medicare patients at the Phase 1 Practices from 2013 to 2016 were treated with competitor autoimmune products and injectable products, not Remicade

---

[19] Janssen's Footnote 16: Relator treats these two practices as one because they were acquired by U.S. Digestive Health in 2017.

or Simponi ARIA. The percentage of patients treated with Remicade and Simponi ARIA as compared to non-Janssen products decreased from 39% in 2013 to 29% in 2016. Ex. 23 (Rosenthal Dep.) at 292:22-24 (referencing Ex. 24 (Russo Report) at 25-26, Fig. 15).

**Relator's Response:** Undisputed.

100.    Relator, through her expert Dr. Meredith Rosenthal, stated that from Q4 2010 through Q1 2016, the Phase 1 Practices received the following number of "SOC Programming events." Dr. Rosenthal testified that she identified a Phase 1 Practice as receiving an "SOC Programming event" when data indicated that one of the 36 SOC Programs was delivered to someone at the practice.

| Phase 1 Practice | SOC Programming Events |
|---|---|
| Altoona Arthritis & Osteoporosis Center | 6 |
| Arthritis & Osteoporosis Center | 14 |
| Capital Arthritis and Rheumatology Associates | 4 |
| Cumberland Valley Rheumatology | 7 |
| Digestive Disease Associates (a/k/a Berks Center for Digestive Health) | 2 |
| Ellen M. Field, M.D. | 3 |
| Emkey Arthritis & Osteoporosis Clinic | 7 |
| Lancaster Gastroenterology, Inc. (a/k/a U.S. Digestive Health) | 7 |
| Pottstown Medical Specialists | 12 |
| Sanford, Roumm, and Acharya Rheumatology | 5 |
| West Shore Endoscopy Center/Jackson Siegelbaum Gastroenterology | 5 |

Ex. 39 (Rosenthal Report) at Attachment C, Figs. C1-C10; Ex. 23 (Rosenthal Dep.) at 54:18-57:23.

**Relator's Response:** Disputed. The specific SOC Programming Event counts that Janssen attributes to Relator's expert, Dr. Meredith Rosenthal, are contradicted by its own expert. Figure 17 of the Expert Report of Gregory Russo, titled "At-issue Programming Across Phase 1 Accounts 2010-016," reports the following counts of at-issue ABS programming for each Phase 1 Practice:

| Phase 1 Practice | SOC Programming Events |
|---|---|
| Altoona Arthritis & Osteoporosis Center | 8 |
| Arthritis & Osteoporosis Center | 21 |
| Capital Arthritis and Rheumatology Associates | 5 |
| Cumberland Valley Rheumatology | 10 |
| Digestive Disease Associates | 2 |
| Ellen Field Rubbo | 3 |
| Emkey Arthritis & Osteoporosis Clinic | 7 |
| Lancaster Gastroenterology, Inc. | 7 |
| Pottstown Medical Specialists | 12 |
| Sanford, Roumm, and Acharya Rheumatology | 6 |
| West Shore Endoscopy Center | 5 |

**Doc. No. 555-3** (Russo Report) at p.28. At his deposition, Mr. Russo confirmed that the at-issue programming counts in his Figure 17 were derived from Dr. Rosenthal's underlying data and that he did not independently verify with Janssen whether those data captured every at-issue program provided to those accounts. **Doc. No. 555-2** (Russo Dep.) at 230:15-234:4.

Dr. Rosenthal's regression model does not depend on the raw count of programming events delivered to any given practice. Rather, her difference-in-differences model uses a binary indicator variable (coded as 1 in the quarter a Phase Once Account received its second at-issue SOC program and in all subsequent quarters, and 0 in all prior quarters) to identify the treatment effect. **Ex. 44** (Deposition of Meredith Rosenthal ("Rosenthal Dep.")), at 162:13-165:5. As Dr. Rosenthal testified: "[I]n the regression model, the counts of the programs don't -- they are not in there. Just the yes/no, has a second program occurred, that 1-0 variable." *Id*. at 163:14-17. *See also id*. at 162:3-5 ("I included all of their claims for the whole period, but I designate the post-period after the second program."); **Doc. No. 555-1** (Rosenthal Report) at pp. 65-72 (Att. C at ¶¶ 5–7 - describing the Two-Way Fixed Effects model and time-varying indicator).

The SOC programming-event counts set forth by Janssen in paragraph 100 capture only the 36 at-issue SOC programs recorded in Janssen's Site of Care Programming data; they do

not reflect the full scope of ABS engagement with the Phase 1 Practices. **Ex. 44** (Rosenthal Dep.) at 82:2-11. Dr. Rosenthal noted that the Phase 1 Practices received an average of 12.3 ABS calls based on the currently available Site of Care Programming data, while acknowledging that "not all Access call data files have the messaging information necessary [to] identify the at-issue Site of Care programming." **Doc. No. 555-1** (Rosenthal Report) at p. 17 n.69; **Doc. No. 383-2** at p. 10 (Relator's Response to Janssen's Interrogatory 6) at p. 9 ("[U]nder Janssen's practices and policies, many of the services that Plaintiff provided to the Phase 1 Accounts were not specifically tracked or recorded.").

      **Janssen's Reply:** Relator is confused, and her response does not create a genuine dispute of material fact. SUMF ¶ 100 tallies "SOC Programming events" from **Q4 2010 through Q1 2016**, as reflected in Figures C1 through C10 of Dr. Rosenthal's report. *See* Janssen's Ex. 39 (Rosenthal Report) at Attachment C, Figs. C1-C10 (Dkt. No. 539-39). The data cited by Relator from Figure 17 in Mr. Russo's report does not contradict those numbers, because Mr. Russo's Figure 17 counts programs from **January 2010 through December 2016** (inclusive of all of 2010 and 2016). *See* Janssen's Ex. 24 (Russo Report) at 28, Fig. 17 (Dkt. No. 539-24). The remainder of Relator's response is not responsive to SUMF ¶ 100.

      101.    Relator's expert Dr. Rosenthal testified that her analysis showed that Phase 1 Practices that submitted more Remicade and Simponi ARIA claims did not necessarily receive more SOC Programs and that those that received more SOC Programs did not necessarily submit more Remicade or Simponi ARIA claims. Ex. 23 (Rosenthal Dep.) at 277:8-278:18.  She also testified that the number of SOC Programs delivered to Phase 1 Practices was not in "lockstep" with the number of prescriptions. *Id.*

**Relator's Response:** Disputed. Dr. Rosenthal testified that neither she nor Janssen's expert Gregory Russo conducted an analysis of the correlation between the total volume of SOC programs the Phase 1 Practices received and an increase in the submission of claims for Remicade or Simponi ARIA. **Ex. 44** (Rosenthal Dep.) at 277:19-278:5.

**Janssen's Reply:** Relator's response does not create a genuine dispute of material fact. Although it is true that Dr. Rosenthal testified that she did not "tr[y] to do an actual correlation analysis," Ex. 23 (Rosenthal Dep.) at 277:18-278:5 (Dkt. No. 539-23), her testimony confirms the accuracy of SUMF ¶ 101. Indeed, she answered "Yes" to the question, "So just as an empirical matter, for the Phase One accounts, at least, it is not the case that practices that submitted more claims necessarily received more of the SOC programs?" Ex. 44 (Rosenthal Dep.) at 277:8-278:5 (Dkt. No. 597-54). And she testified that number of SOC Programs delivered to Phase 1 Practices was not in "lockstep" with the number of prescriptions. *Id.*

102.    In performing her analysis, Relator's expert Dr. Rosenthal did not know and said it was irrelevant which persons at any of the Phase 1 Practices (i.e., doctor or staff) received the SOC Programs. Ex. 23 (Rosenthal Dep.) at 142:12-143:11, 147:7-148:6.

**Relator's Response:** Disputed. Dr. Rosenthal testified that she "identif[ied] a practice as being affected by the alleged misconduct when it has its second site-of-care visit for those challenged programs, regardless of how many physicians participated in the programs themselves." **Ex. 44** (Rosenthal Dep.) at 147:13-20.

**Janssen's Reply:** Relator's response is not responsive to SUMF ¶ 102. As Relator appears to confirm in her response to SUMF ¶ 103, Dr. Rosenthal testified that she did not know and said it was irrelevant which individuals at the Phase 1 Practice received the SOC Programs. Relator's response ignores this testimony and addresses a different point.

103.    In performing her analysis, Relator's expert Dr. Rosenthal did not consider whether any of the doctors at the Phase 1 Practices received the SOC Programs, whether any of the doctors knew that any SOC Programs were provided, or even whether any of the doctors knew what an Area Business Specialist was. Ex. 23 (Rosenthal Dep.) at 148:16-150:22.

**Relator's Response:** Disputed. Dr. Rosenthal testified that she did not consider whether doctors associated with the Phase 1 Practices received or were aware of the SOC programs or knew about ABSs because that data was not relevant to her analysis. **Ex. 44** (Rosenthal Dep.) at 149:15-150:22.

**Janssen's Reply:** Relator's response to SUMF ¶ 103 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's response confirms the accuracy of SUMF ¶ 103. Janssen agrees with Relator's response.

104.    According to data relied on by Relator's expert Dr. Rosenthal, 53 of the 87 providers at the Phase 1 Practices identified as a rendering or referring provider on a claim for Remicade or Simponi ARIA during the Phase 1 Time Period did not receive an SOC Program during the Phase 1 Time Period. Ex. 23 (Rosenthal Dep.) at 293:24-294:3 (referencing Ex. 24 (Russo Report) Fig. 23, at 43).

**Relator's Response:** Disputed. Dr. Rosenthal's causation model treats site-of-care programming as a practice-wide intervention that affects operations and prescribing regardless of which individual clinicians attended any given session. **Ex. 44** (Rosenthal Dep.) at 143:4-144:2. Defendant's reference to "53 of the 87 providers" is to a characterization by its expert, Gregory Russo, not an admission by Dr. Rosenthal and not a rebuttal to her practice-level analysis to which this figure is irrelevant. *Id*. at 293:24-294:3 (referencing Figure 23 of Russo's Report, Doc. No.

555-3, at p. 43). Further, this figure is unreliable because Mr. Russo's own report concedes that it "is not possible to definitively determine if any physician was specifically delivered an At-issue ABS program for calls that took place after June 2014," as the underlying data "did not contain detailed attendee information, only identifying practices associated with a call." **Doc. No. 555-3** (Russo Report) at p. 43 n.103. Janssen's own logs did not consistently track all SOC programming or identify "at-issue" content. **Doc. No. 555-1** (Rosenthal Report) at ¶34 & n.57 ("Note that Janssen documents indicate that they did not always track all Site of Care Programming events provided by ABSs. Additionally, not all of these Access datasets contained key messaging information used to identify at-issue Site of Care programming.") And the rendering/referring provider fields on which Mr. Russo relies do not reliably identify the prescribing physician. **Ex. 44** (Rosenthal Dep.) at 141:5-24. Mr. Russo also conceded at deposition that he did not verify with Janssen whether those were all of the at-issue programs provided to those accounts, further underscoring the inadequacy of the data on which Defendant's assertion rests. **Doc. No. 555-2** (Russo Dep.) at 196:15-197:14.

**Janssen's Reply:** Relator's response does not dispute SUMF ¶ 104. It appears to recharacterize the statement as asserting that Dr. Rosenthal made an "admission" or a "rebuttal," which it does not. The point is simply that the "data relied on by Relator's expert Dr. Rosenthal" reflects the information conveyed in SUMF ¶ 104. The rest of Relator's response is not responsive and does not contradict the fact stated. Instead, it is an admission that Dr. Rosenthal does not know who received the At-Issue SOC Programs or who wrote the prescriptions associated with the claims.

105. According to data relied on by Relator's expert Dr. Rosenthal, the Phase 1 Practices infused Remicade or Simponi ARIA to patients who had been referred to them by

providers at non-Phase 1 Practices. Ex. 23 (Rosenthal Dep.) at 293:19-23 (referencing Ex. 24 (Russo Report) at 42, Fig. 22).

**Relator's Response:** Disputed. Dr. Rosenthal testified about data tables prepared by Janssen's expert, Gregory Russo, which depict that some Remicade/Simponi ARIA infusions rendered at Phase 1 Practices list referring providers outside those practices. **Ex. 44** (Rosenthal Dep.) at 293:19-23 (referencing Figure 22 of Russo's Report, Doc. No. 555-3, at p. 42). That observation neither contradicts nor rebuts Dr. Rosenthal's practice-level causation model, which treats the challenged site-of-care programming as a practice-wide intervention and estimates the change in utilization at the practice level, regardless of which individual clinician attended the program or whether a particular patient was referred from another practice. **Doc. No. 555-1** (Rosenthal Report) at ¶¶ 35-42. Russo's calculation of "externally referred claims" is unreliable because he classified all claims with a blank referring provider field as externally referred, even where the rendering provider was a Phase 1 Practice physician, and admitted he performed no independent assessment to verify that a blank field actually indicated an external referral. **Doc. No. 555-2** (Russo Dep.) at 196:2-6, 196:15-200:10.

**Janssen's Reply:** Relator's response does not dispute the fact stated—that according to the data relied on by Dr. Rosenthal, the Phase 1 Practices infused patients referred by providers at non-Phase 1 Practices. Dr. Rosenthal repeatedly confirmed that her analysis included referrals from external prescribers during her deposition. *See* Doc. No. 604-2 (Rosenthal Dep.) at 133:8-24, 140:24-141:13 (Dkt. No. 604-2). Instead, Relator's response disputes facts regarding the "calculation" of the percentage of externally referred claims that are not included in SUMF ¶ 105.

106.    Relator's expert Dr. Rosenthal testified that, typically, in situations where patients were referred for infusion, the referring provider would have been the doctor prescribing

the medication, and the produced CMS claims data upon which she relied may or may not have had information about the identity of the referring provider (i.e., the prescriber). Ex. 23 (Rosenthal Dep.) at 140:4-141:24.

**Relator's Response:** Disputed. Dr. Rosenthal testified that while, in some clinical contexts, the provider listed as the "referring" physician on a claim might also be the prescriber, she expressly emphasized that the CMS claims data do not reliably identify the prescribing physician, and the "referring provider" field may or may not reflect the actual prescriber. **Ex. 44** (Rosenthal Dep.) at 140:4-141:24.

**Janssen's Reply:** Relator's response confirms the accuracy of SUMF ¶ 106 and makes clear that it is not disputed. In the testimony that both Janssen and Relator cite, Dr. Rosenthal expressly stated that "[her] understanding is the prescriber is in the referring provider field, typically." Ex. 44 (Rosenthal Dep.) at 141:5-7 (Dkt. No. 597-54); *see also id.* at 140:10-23 ("Q. And that claims data does not indicate who prescribed the medication, correct? A. The referring provider includes the prescriber. Q. So the referring provider is the prescriber? A. I think typically that's the way the referring provider, in the case of a physician-administered drug like this[.]").

In her response, Relator also mentions that Dr. Rosenthal emphasized that the CMS claims data do not reliably identify the prescribing physician associated with the claims. While this goes beyond the fact stated in SUMF ¶ 106, Janssen agrees that the CMS claims data produced in this case do not reliably identify the prescribing physician associated with the claims for Remicade and Simponi ARIA.

107.    According to data relied on by Dr. Rosenthal, 64% of the claims submitted by Phase 1 Practices during the Phase 1 Time Period either identified an external provider as the

referring provider or did not identify the referring provider at all. Ex. 23 (Rosenthal Dep.) at 293:19-23 (referencing Ex. 24 (Russo Report) at 42, Fig. 22).

**Relator's Response:** Disputed. The "64%" figure comes from Mr. Russo's analysis, not from any calculation in Dr. Rosenthal's report, and was raised with Dr. Rosenthal only while counsel was walking her through Russo's report. **Ex. 44** (Rosenthal Dep.) at 293:19-23 (referencing Figure 22 of Russo's Report, Doc. No. 555-3, at p. 42). As set forth in paragraph 105 above, Russo's calculation of "externally referred claims" is unreliable and neither contradicts nor rebuts Dr. Rosenthal's practice-level causation model. **Doc. No. 555-1** (Rosenthal Report) at ¶¶ 35-42.

**Janssen's Reply:** Relator's only purported dispute is that the 64% figure calculated by Mr. Russo includes claims that did not identify a referring provider. However, SUMF ¶ 107 expressly states that the 64% figure includes both claims where an external provider was identified as the referring provider and claims where no referring provider was identified, so there is no dispute at all.

108.    Janssen continued to provide the SOC Programs even when a practice prescribed Remicade and Simponi ARIA with far less frequency than self-injectable ("subcutaneous" or "Sub-Q") products. For example, as Relator stated in 2013 when providing a "deep dive" summary of one of the Phase 1 Practices (Sanford and Roumm), the practice prescribed far more Sub-Q products than IV products, which Relator explained was because "[a]ll physicians [at the practice] have similar prescribing habits . . . SQ first[;] Remicade secondary." Ex. 47 (2013 Email re Sanford and Roumm) at -1410-11. Nevertheless, Janssen continued to provide the SOC Programs to the practice. Ex. 39 (Rosenthal Report) at Attachment C, Fig. C.10.

100

**Relator's Response:** Disputed. When faced with an IOI that prescribed more Sub-Q products than IV products, Janssen planned to present the very practice management services at issue in this litigation, such as providing the IOI with the customized IOM program to show the practice that it would reach "full capacity within three months" but by adding a nurse, the IOI could add additional capacity. **Def. Ex. 47**, Doc. No. 539-47 at p. 2. In fact, Janssen specifically targeted the Sub-Q market in an effort to take some of its market share. **Ex. 45** (7/2/2012 Email w/ MA IV League Mid Year Business Plan Update) at slides 3 & 4 ("Objective – Reverse Sub-Q trends[20] and accelerate I.V. market. Tactics – Prepare IOM and MBPO for top account[s] that generate 80% of this class of trade"); **Ex. 46** (The Future is O.U.R.S. slide deck) at slide 6 ("*Objectives:* . . . Grow sales in our 645 accounts and halt the growth of ORENCIA . . . Reverse the share decline").

**Janssen's Reply**: Relator's response to SUMF ¶ 108 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator's response does not dispute the facts set forth in SUMF ¶ 108. In fact, Relator appears to admit that Janssen continued to provide SOC Programs to practices that prescribed Sub-Q products with greater frequency. Whether Janssen "specifically targeted the Sub-Q market" and the alleged reasons it did are irrelevant to this statement of fact.

## VII.    CMS Form 1500

109.    The CMS Form 1500 is a paper form that may be used for submitting a claim to CMS for reimbursement. There have been various versions of CMS Form 1500 over time.

---

[20] Relator's Footnote 3: By "reversing Sub-Q trends," Janssen was referring to competitors' subcutaneous products. **Doc. No. 543-3** (Smith Dep.) at 158:24-159:6.

Ex. 93 (CMS Form 1500 12/98, Relator_Govt_Comms002153); Ex. 94 (CMS Form 1500 08/05, Relator_Govt_Comms002155); Ex. 95 (CMS Form 1500 02/12, Relator_Govt_Comms002157); Ex. 23 (Rosenthal Dep.) at 19:5-25; Ex. 96 (Excerpts of Deposition of Janssen's Expert Brett Barlag ("Barlag Dep.")) at 113:2-25.

**Relator's Response:** Undisputed.

110.  Since 2003, Medicare has required providers to submit claims electronically, instead of on CMS Form 1500 paper claim forms, unless they meet certain specific criteria. Administrative Simplification Compliance Act § 3, Pub. L. 107-105, 115 Stat. 1005-06 (2001); 42 C.F.R. § 424.32(d)(2); Ex. 23 (Rosenthal Dep.) at 19:5-25; Ex. 97 (Excerpts of Report of Janssen's Expert Brett Barlag ("Barlag Report")) ¶ 49.

**Relator's Response:** Disputed. A small provider of services (*i.e.*, a provider with 25 full-time employees or less) is not required to file a CMS Form 1500 electronically. 42 C.F.R. § 424.32(d)(3)(ii); **Ex. 47** (Deposition of Brett Barlag ("Barlag Dep.")) at 137:16-138:10. When claims are submitted electronically, providers use the 837P format, which is the electronic equivalent of the CMS Form 1500. **Ex. 95** (CMS Medicare Learning Network Fact Sheet - Medicare Billing: 837P and Form CMS-1500, Mar. 2013). As with the paper CMS Form 1500, when seeking reimbursement electronically, the claim submitter makes specific representations about the goods or services provided, including the patient's name, the provider's name and NPI, the dates of service, the codes relating to the procedures or services provided to the patient, and the charges for those codes. **Ex. 96** (National Uniform Claim Committee 02/12 1500 Claim Form Map to the X12 Health Care Claim: Profession (837), Apr. 2014).

**Janssen's Reply:** Relator's response to SUMF ¶ 110 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator does not actually dispute SUMF ¶ 110. Instead, she merely identifies one of the criteria which may make a provider eligible to submit CMS Form 1500 paper claims. The remainder of Relator's response raises a new and unrelated topic concerning electronic claims. Her assertions regarding electronic claims are addressed in Janssen's Responses to SDMF ¶¶ 242-43.

111.    On February 23, 2021, Relator was informed by U.S. Department of Health and Human Services ("HHS") employee Emily Oren that HHS did not have the forms on which claims for Remicade or Simponi ARIA were submitted, had no claim forms in its data, and had only electronic mapping of claims data. Ex. 98 (Feb. 23, 2021 Email from HHS, Relator_Govt_Comms002870) at -2879.

**Relator's Response:** Disputed. Defendant mischaracterizes the February 23, 2021 email from Emily Oren. The email's reference to "no claim form[s] in our data, only electronic mapping of claims data" addressed the format in which CMS maintains claims data—*i.e.*, an electronic record of the claims submitted and paid by Medicare—not the existence or availability of the claim forms (paper or electronic) submitted to CMS. **Def. Ex. 98**, Doc. No. 539-98 (Feb. 23, 2021 Email from HHS, Relator_Govt_Comms002870) at 11. Indeed, Relator ultimately requested and received the generic, unpopulated CMS-1500 paper claim forms (Relator did not ultimately request the actual forms, paper or electronic, submitted by providers) and CMS produced the requested Medicare Part B and Medicare Advantage claims data. *See id.* at 2. CMS's Integrated Data Repository contains "a complete record of all CWF-processed Part A and Part B Medicare claims submitted by providers or beneficiaries and payments made by Medicare for

services rendered to Medicare beneficiaries." **Ex. 54** (Declaration of Mark Hogle, CMS Director of the Enterprise Architecture & Data Group ("Hogle Decl.")) at ¶¶ 2-3. In response to Relator's subpoena, CMS produced all available Medicare Part B and Medicare Advantage claims for the relevant CPT codes, delivered electronically on or about May 21, 2021. *Id.* ¶ 9. Relator's expert, Dr. Meredith Rosenthal, relied upon this CMS-produced claims data in her causation and damages analyses to tie the submission of Medicare claims to specific physicians. **Doc. No. 555-1** (Rosenthal Report) at pp. 19-21. In her description of the Medicare claims data in her report, Dr. Rosenthal references the file layouts for the claims data that CMS produced in the action along with the claims data. **Doc. No. 555-1** (Rosenthal Report) at pp. 16-17, n.68. The file layouts produced by CMS list the various fields of data that are included in the Medicare Claims Data produced, including, but not limited to, the fields for: the Remicade and Simponi ARIA drug codes (CLM_LINE_HCPCS_CD and HCPCS_CD), the paid amount (CLM_ENCTR_OTHR_PYR_PD_AMT, CLM_PMT_AMT, and CLM_PMT_AMT), the date of service (CLM_FROM_DT and CLM_THRU_DT), the provider's identity (RFRG_NPI_NUM, PRFRMG_NPI_NUM, PRVDR_RFRG_PRVDR_NPI_NUM, LM_RFRG_PRVDR_NPI_NUM,PRVDR_CPO_FAC_NPI_NUM, CLM_BLG_PRVDR_NPI_NUM, PRVDR_BLG_PRVDR_NPI_NUM, CLM_RNDRG_PRVDR_NPI_NUM, PRVDR_RNDRNG_PRVDR_NPI_NUM, CLM_RNDRG_PRVDR_GRP_NPI_NUM, and PRVDR_RNDRNG_PRVDR_GRP_NPI_NUM), and the patient's identity (CLM_HIC_NUM, CLM_LAST_NAME, CLM_1ST_NAME, BENE_CLM_ACNT_NUM, BENE_LAST_NAME, and BENE_1ST_NAME). **Ex. 123** (Layout of 1998-2005 Medicare Part B Data); **Ex. 124** (Layout of 2006-2021 Medicare Part B data); **Ex. 125** (Layout of Medicare Advantage Data). This

104

information in the Medicare Claims Data comes from the claims for payment providers submitted to Medicare. **Ex. 54** (Declaration of Mark Hogle, CMS Director of the Enterprise Architecture & Data Group ("Hogle Decl.")) at ¶¶ 4-6.

**Janssen's Reply:** Relator's response confirms the accuracy of SUMF ¶ 111. As Relator's response acknowledges, CMS produced "generic, unpopulated CMS-1500 claims forms," not "the actual forms, paper or electronic, submitted by providers." Relator's response then raises a number of nonresponsive and irrelevant points that do not contradict SUMF ¶ 111 and have nothing to do with Janssen's Motion for Summary Judgment.

112.    The first version of the paper CMS Form 1500 that mentioned the AKS was version 02/12. Ex. 95 (CMS Form 1500 02/12). CMS Form 1500 version 02/12 did not become available for use until January 6, 2014. Ex. 23 (Rosenthal Dep.) at 19:5-25; Ex. 97 (Barlag Report) at 19; Ex. 96 (Barlag Dep.) at 112:14-113:1.

**Relator's Response:** The CMS Form 1500 (version 02/12), which has been in use since January 6, 2014, is the first version of the CMS Form 1500 that, in a section on the reverse side titled "SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)," includes the express certification:

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law) . . . .

**Def. Ex. 95**, Doc. No. 539-95 at p. 3.

105

**Janssen's Reply:** Relator's response to SUMF ¶ 112 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion. Relator's Response to SUMF ¶ 112 does not even use the word "disputed." Instead, it points to specific language in CMS Form 1500 (version 02/12) that Relator states was not included in prior versions of CMS Form 1500, and thus confirms that this statement of fact is undisputed.

113.    CMS has continued to pay claims for Remicade and Simponi ARIA submitted by the Phase 1 Practices. *See, e.g.*, Ex. 39 (Rosenthal Report) ¶ 35.

**Relator's Response:** Undisputed.

## VIII.   Government Knowledge

114.    Beginning in approximately 2003, the Department of Justice conducted an investigation into Centocor's marketing practices for Remicade. Ex. 99 (July 2, 2003 Requests, JANSSENBIO-037-00001377); Ex. 100 (Feb. 11, 2005 Requests, JANSSENBIO-037-00001373); Ex. 101 (Nov. 28, 2005 Requests, JANSSENBIO-037-00001365).

**Relator's Response:** Disputed in part. Janssen cites Doc. Nos. 539-99 and 539-101, requests for voluntary document production from the U.S. Attorney's Office for the District of New Jersey regarding "Centocor's Marketing Practices." It is undisputed that the United States declined to intervene in *United States ex rel. Heineman v. J&J*, No. 05-cv-2633 (D.N.J.) ("*Heineman*") and *United States ex rel. Greer v. J&J, Inc.*, No. 07-cv-1660 (D. Minn.) ("*Greer*"). But the cited requests do not indicate why they were served or whether they related to *Heineman* or *Greer*. Janssen thus has not established that the requests stemmed from any DOJ investigation of those qui tam complaints. Janssen has produced no Civil Investigative Demand from the *Heineman* or *Greer* investigations and no evidence from DOJ about what investigation, if any, it

106

conducted into those allegations, including whether DOJ requested or reviewed any documents from Janssen.

**Janssen's Reply:** Relator's response to SUMF ¶ 114 confirms the important point that the government sought and obtained documents from Janssen relating to marketing practices for Remicade. Relator's quibbling regarding which particular investigation caused the government to seek those documents is immaterial.

115.    The government ultimately declined to intervene in the *qui tam* cases that were the subject of the investigation. Ex. 102 (Notice of Election to Decline Intervention, *United States ex rel. Heineman v. J&J*, No. 05-cv-2633 (D.N.J. May 17, 2010), Dkt. No. 29); Ex. 103 (Gov't's Notice of Election to Decline Intervention, *United States ex rel. Greer v. J&J, Inc.*, No. 07-sc-1660 (D. Minn. May 20, 2010), Dkt. No. 27).

**Relator's Response:** Disputed. For the reasons stated in paragraph 114, Janssen has not established that the cited document requests stemmed from any DOJ investigation of the *Heineman* or *Greer* allegations. Moreover, this Court has already rejected Janssen's attempt to use those cases as a shield. In denying Janssen's motion for judgment on the pleadings based on the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4)(a), the Court held that "nothing in *AWP*, *Heineman*, or *Greer* provided clear evidence, much less a direct allegation, that the services defendant allegedly provided constituted unlawful kickbacks. Those disclosures did not allege that the services had independent value to prescribing physicians; that defendant targeted certain physicians with those services; or even that the services were provided free of charge to those physicians—all of which are key facts alleged in the complaint here. Instead, each of the prior proceedings was concerned with the practice of marketing the 'spread' that physicians could achieve by purchasing and prescribing Remicade, not the provision of free business services."

**Doc. No. 432** at 8; *see also* **Doc. No. 378** (Def.'s Mem. in Support of Mot. for Judgment on the Pleadings).

> **Janssen's Reply:** *See* Janssen's Reply to SUMF ¶ 114.

116.    During this investigation, Centocor produced documents to the government, including information relevant to the ABS role, such as the ABS position description, and versions of the approved slideshow presentations used during the SOC Programs. *See, e.g.*, Ex. 104 (2002 Email Attaching Org Charts and Job Descriptions (MDL-CEN00033648, JANSSENBIO-062-00039499) at -512, -526-30; Declaration of Jason Raofield ("Raofield Decl.") ¶ 5.

> **Relator's Response:** Disputed. Janssen did not produce documents to the Department of Justice in *Heineman* or *Greer* to make it aware of the full scope of the kickback scheme and AKS violations at issue in this litigation, much of which occurred or intensified after the Department of Justice declined to intervene in *Heineman* and *Greer*. Janssen's corporate representative Angela Wood testified that she "can't for certain say that it was the full disclosure of materials" and that Janssen did not furnish evidence to the government showing that the SOC programs had independent value, were intended to induce prescriptions, or were known to be unlawful. **Doc. No. 543-1** (Wood Dep.) at 323:20-324:9, 325:14-326:17.

> **Janssen's Reply:** *See* Janssen's Reply to SUMF ¶ 114. In addition, Relator does not dispute that Janssen's productions to the government included the documents referenced in SUMF ¶ 116.

117.    Janssen submitted at least 18 of the slideshow presentations used during the SOC Programs to the Food and Drug Administration with FDA Form 2253. Ex. 105 (Excerpt of July 28, 2003 FDA 2253 for Infusion Therapy Services Provided in Converted ASC Space, JANSSENBIO-066-00000239); Ex. 106 (Excerpt of Aug. 3, 2004 FDA 2253 for Remicade

Account Review, JANSSENBIO-066-00000600); Ex. 107 (Aug. 9, 2007 FDA 2253 for Medicare Physician Payment Update, JANSSENBIO-066-00003509); Ex. 108 (Feb. 18, 2010 FDA 2253 for IOM, JANSSENBIO-066-00006509); Ex. 109 (Apr. 29, 2010 FDA 2253 for Considerations for Proactive Practice Management, Enhancing Patient Care and Access, JANSSENBIO-066-00007163); Ex. 110 (Sept. 23, 2010 FDA 2253 for Checkpoints for Infusion Center Optimization, Setting Up In-Office Infusions of Remicade, JANSSENBIO-066-00007553); Ex. 111 (Dec. 10, 2010 FDA 2253 for Considerations for Working with a Specialty Pharmacy, JANSSENBIO-066-00008095); Ex. 112 (Dec. 20, 2010 FDA 2253 for Becoming an ASOC for Therapy with Remicade in Your Community, Practice Compliance for Remicade, Private Payer Contracting Considerations, JANSSENBIO-066-00008235); Ex. 113 (Feb. 4, 2011 FDA 2253 for Successful Implementation of a New Infusion Suite for Gastroenterology Practices, JANSSENBIO-066-00009137); Ex. 114 (Apr. 25, 2011 FDA 2253 for Managing Biologics in the Physician Office, JANSSENBIO-066-00009840); Ex. 115 (May 25, 2011 FDA 2253 for Successful Implementation of a New Infusion Suite, JANSSENBIO-066-00010535); Ex. 116 (Dec. 23, 2011 Successful Infusion Site Management, JANSSENBIO-066-00013599); Ex. 117 (Mar. 11, 2013 FDA 2253 for Infusion Services Review, JANSSENBIO-066-00015397); Ex. 118 (Mar. 11, 2014 FDA 2253 for iBiz, JANSSENBIO-066-00016322).

**Relator's Response:** Disputed. "[T]he FDA is not a regulator under the Antikickback Statute," **Ex. 55** (Deposition of Dr. Daniel Aaron ("Aaron Dep.")) at 210:7-8, and "the 2253 process does not consider AKS issues." *Id*. at 206:10-11. "[T]o the extent FDA reviewed any Form 2253 submissions by Janssen relevant to the claims in this case, it would have focused on whether Janssen's promotional material met the [FDA's] 'true statement' requirements. It would not have focused on, much less reviewed, whether the promotional material or overall marketing

scheme violated the AKS." **Ex. 56** (Rebuttal Report of Virginia Evans) at p. 5. "Silence does not mean that the FDA has reviewed a material submitted under Form 2253 and determined that it is accurate and non-misleading. And silence likewise does not mean that the FDA reviewed a material submitted under Form 2253 for compliance with the AKS and concluded that the statute is not implicated." **Ex. 57** (Report of Dr. Daniel Aaron) at p. 9.

**Janssen's Reply:** Relator's response to SUMF ¶ 117 is subject to Janssen's pending Motion to Deem Admitted (Dkt. No. 590) because Relator's response is not responsive and does not contradict the assertion.

Relator does not dispute that Janssen submitted at least 18 of the slideshow presentations used during the SOC Programs to FDA, as stated. Instead, Relator makes arguments about whether the FDA enforces the AKS and the scope of FDA's review of Form 2253 submissions. Those points are entirely irrelevant to SUMF ¶ 117.

118.    Relator filed her initial complaint in this matter on October 28, 2016. Compl., Dkt. No. 1.

**Relator's Response:** Undisputed.

119.    Relator provided the DOJ with an October 19, 2016 written disclosure statement of material evidence Relator possessed pursuant to 31 U.S.C. § 3730b(b)(2). Ex. 119 (Oct. 19, 2016 Memo, Relator_Govt_Comms000615).

**Relator's Response:** Undisputed. that Relator provided the DOJ with an October 19, 2016 written disclosure statement of material evidence pursuant to 31 U.S.C. § 3730(b)(2). **Def. Ex. 119**, Doc. No. 539-119 (Oct. 19, 2016 Memo). The disclosure statement specifically alerted the government to the SOC Program kickback scheme, a theory of fraud distinct from the AWP manipulation and off-label promotion that were the subjects of the prior *Heineman* and *Greer*

investigations. *See* **Ex. 77** (Angela Wood 30(b)(6) Topics Written Responses) at Topic 9 (confirming that *Heineman* "alleged that J&J and Centocor violated the False Claims Act by manipulating the average wholesale price of Remicade and marketing the potential profit that could be made from the spread," and *Greer* alleged "manipulating the average sales price of Remicade, soliciting off-label use of Remicade, marketing the profitability of Remicade to physicians, and paying physicians to give speeches and host preceptorships"). Nothing in those prior cases involved the provision of free business advisory and practice management services to targeted physician practices, which is the subject of this action. *See* **Doc. No. 432** (Order on Def. Mot. For Judg. On the Pleadings) at p. 8.

**Janssen's Reply:** Relator admits that SUMF ¶ 119 is undisputed. She then discusses the content of the written disclosure statement and theorizes about its relationship to the *Heineman* and *Greer* investigations, which is immaterial to the fact stated.

120.    DOJ and OIG investigated Relator's claims, including by issuing Civil Investigative Demands on Janssen Biotech, Inc. and on Xcenda, LLC, and interviewing witnesses, including another ABS. Ex. 120 (Mar. 27, 2017 CID to Janssen Biotech, Inc., JANSSENBIO-003-00000001); Ex. 121 (Nov. 9, 2017 CID to Susan (Ski) Bennof, JANSSENBIO-018-00006836); Ex. 122 (Invite for Jan. 17, 2017 Follow-Up Interview of Relator, Relator_Govt_Comms002938); Raofield Decl. ¶ 6.

**Relator's Response:** Undisputed that DOJ and OIG investigated Relator's claims, including by issuing Civil Investigative Demands on Janssen and Xcenda and interviewing witnesses. Disputed as to the implication that the investigation's outcome reflects a government determination that the SOC Programs were lawful. The scope of the investigation is, if anything, consistent with the seriousness of the allegations, not with a finding of no violation. Defendant's own witness, Freddy Jimenez, testified that "there [are] a lot of reasons why the government may

not . . . proceed with enforcement including the merits of the case, their development of case law, priorities, et cetera." **Doc. No. 543-6** (Deposition of Freddy Jimenez ("Jimenez Dep.")) at 215:24-216:16. *See also* **Ex. 97** (Apr. 11, 2022 OIG Letter) at p. 3 ("[T]he United States may decline to intervene in a particular case for numerous reasons wholly unrelated to the materiality or legal viability of the violations alleged.").

**Janssen's Reply:** Relator admits that SUMF ¶ 120 is undisputed. She then discusses the "implication" of the "outcome" of the government's investigation, which is entirely irrelevant to the fact stated.

121.    In response to the government's requests, Janssen produced more than 100,000 documents to the government, which included multiple versions of the approved slideshow presentations used during the SOC Programs. Raofield Decl. ¶ 7.

**Relator's Response:** Undisputed that Janssen produced more than 100,000 documents to the government in response to the CID, including multiple versions of the approved slideshow presentations used during the SOC Programs. Disputed as to the implied inference. The production of documents in a mass document request does not establish that the government reviewed and approved those documents for AKS compliance, nor does it establish that the government concluded the SOC Programs were lawful. **Ex. 97** (Apr. 11, 2022 OIG Letter) at p. 3 ("[T]he United States may decline to intervene in a particular case for numerous reasons wholly unrelated to the materiality or legal viability of the violations alleged.").

**Janssen's Reply:** Relator admits that SUMF ¶ 121 is undisputed. She then discusses the "implied inference" of the government's investigation, which is entirely irrelevant to the fact stated.

122.    Janssen also produced information about the ABS role, including the ABS position description. Ex. 123 (2002 ABS Position Description, JANSSEN.011.0386522).

**Relator's Response:** Undisputed that Janssen produced information about the ABS role, including the ABS position description. However, the production of a general position description does not establish that the government reviewed and approved the specific free business advisory services that Relator alleges constitute unlawful remuneration under the AKS. As set forth in ¶ 20, *supra*, the ABS position description did not disclose the full scope of services ABSs provided to physician practices.

**Janssen's Reply:** Relator admits that SUMF ¶ 122 is undisputed. She then discusses what the production of the ABS position description "establish[ed]," which is entirely irrelevant to the fact stated.

123.    As part of the investigation, DOJ interviewed Relator Julie Long three times. Ex. 124 (Emails re Nov. 28, 2016 Interview of Relator, Relator_Govt_Comms000996); Ex. 122 (Invite for Jan. 17, 2017 Follow-Up Interview of Relator); Ex. 125 (Emails re Mar. 13, 2017 Follow-Up Call with Relator, Relator_Govt_Comms003279).

**Relator's Response:** Undisputed that DOJ interviewed Relator Julie Long three times. Disputed as to the implication that the investigation's conclusion reflects a government determination that the SOC Programs were lawful. That the government conducted multiple detailed interviews of the whistleblower is consistent with the seriousness of the allegations, not with a finding that the conduct was permissible. Mr. Jimenez confirmed that there are "a lot of reasons" the government may not proceed with enforcement, aside from the merits. **Doc. No. 543-6** (Jimenez Dep.) at 215:24-216:16. The government never communicated to Janssen, whether during the earlier investigation or the investigation of Relator's claims, that it had determined the

113

SOC Programs to be lawful. **Ex. 97** (Apr. 11, 2022 OIG Letter) at p. 2 ("There is no indication . . . that OIG shared the information" from its investigations with Janssen or its predecessor, Centocor).

**Janssen's Reply:** Relator admits that SUMF ¶ 123 is undisputed. She then discusses the "implication" of the "investigation's conclusion," which is entirely irrelevant to the fact stated.

124.    DOJ declined to intervene in the case on August 9, 2019. United States' Notice of Election to Decline Intervention, Dkt. No. 40.

**Relator's Response:** Undisputed that DOJ declined to intervene on August 9, 2019. Disputed as to the implied significance. A declination of intervention does not constitute a determination that the alleged conduct was lawful or that Relator's claims lack merit. **Ex. 97** (Apr. 11, 2022 OIG Letter) at p. 3 ("[T]he United States may decline to intervene in a particular case for numerous reasons wholly unrelated to the materiality or legal viability of the violations alleged."); **Doc. No. 543-6** (Deposition (Jimenez Dep.) at 215:24-216:16.

**Janssen's Reply:** Relator admits that SUMF ¶ 124 is undisputed. She then discusses the "implied significance" of DOJ's declination, which is entirely irrelevant to the fact stated.

## ADDITIONAL DISPUTED MATERIAL FACTS

125. The SOC programs were not mere slide presentations. **Ex. 48** (Larkin Dep.) at 243:20-244:7 (testifying "ABS program gave business advice, consulting advice to owners or would-be owners of IOIs on how to be efficient and more profitable in their operations. PowerPoints were used as a discussion starter [and] helped facilitate conversations through Q&As, through identifying needs that were most important for a given client . . . and thereby help their clients focus on what they needed to do to make their operations more efficient."); **Ex. 58** (Deposition of Dr. Adriane Fugh-Berman ("Fugh-Berman Dep.")) at 276:4-17 (testifying that "the slide presentations are . . . not just being handed to physicians. [T]hey're a tool that is being used by the ABS, who has a whole relationship with the physician and the office and is providing curated, tailored services to that office. [T]he presentations themselves, the slide sets themselves are just foundational tools"); **Ex. 66** (Nov. 16, 2012 email from Regional Business Director Karen Trahan) ("It is the depth of knowledge and understanding in the SOC 360 programs that the ABSs know and can diagnose situations when needed since they know the depth of the content. . . . It is not the content, it is the depth of the conversations, the dialogue to engage the customers and the efficiencies and optimization discussions that differentiates. It is their process orientation and the attention to detail to diagnose issues when an issue or barrier arises the ability to do a differential diagnosis through appropriate questioning to get to the root cause of some issues").

**Janssen's Response:** Does not create a genuine dispute of material fact. Paragraphs 125, 127, and 128 are cited collectively in Relator's Opposition as support for a single proposition: that the PRC-approved SOC presentations were used as "discussion starters" that led to "customized" services akin to those provided by "practice management consultants." Dkt. No. 613 at 2. Relator does not even claim to have any evidence that the SOC Programs were similar to services provided by practice management consultants. *See* Janssen's Response to SDMF ¶ 175.

115

With respect to the rest of this statement of fact, it is unsupported by the evidence cited, which is comprised of two exhibits and the testimony of two of Relator's experts. Janssen responds to SDMF ¶¶ 125, 127, and 128 collectively here.

First, the exhibits do not support Relator's assertion that the PRC-approved SOC presentations were used as "discussion starters" that led to free consulting.

- **Exhibit 59 (Dkt. No. 598-8):** Relator misrepresents the quoted language as evidence that ABSs provide value *to customers*. *See* SDMF ¶ 127 (quoting Exhibit 59: "Oh my God, my ABS provides so much value. Sometimes we commute together and she pulls up data and we figure out what we're going to do."). In reality, that was a quote from a Janssen Rheumatology sales representative (i.e., "IS-R") discussing the value *to the sales representative* of her relationship with the ABS. This is clear from the very slide quoted by Relator, which is titled "ABS – IS-R Relationship Varies by Region & Individuals," and includes a contrasting quote from a sales representative about ABSs: "I don't know what they do… We don't need them and they act like your bosses… I've got my manager… I don't need another one." Exhibit 59 (Dkt. No. 598-8) does not say the SOC presentations were used to facilitate free consulting. To the contrary, it suggests the opposite. Slide 44 indicates that the "Average Duration" of an ABS visit to a practice was just 26.3 minutes, which is inconsistent with the assertion that ABSs used a lengthy PRC-approved presentation as a "discussion starter" to provide free consulting.

- **Exhibit 66 (Dkt. No. 598-15):** This email addresses three SOC Programs: "MBPO, MBHOPD and Chargemaster." First, two of those programs are specific to HOPDs, which Relator ignores because her complaint expressly alleged that doctors in HOPDs could not be influenced by a kickback, SAC ¶ 63 (HOPDs "are not owned by prescribers who can be influenced by the opportunity to profit from every vial of Remicade and Simponi ARIA they prescribe and infuse"), so the fact that ABSs were providing programs to HOPDs (not just IOIs) confirms the programs were being provided to promote Janssen's products for a legitimate reason, not as a kickback to induce prescriptions. Second, *according to Relator's own summary judgment filing*, the language Relator quotes about the "depth of the conversations" was about using the MBPO to select which PRC-approved programs to provide: "One reason the ABS provided the MBPO to physician practices was to *identify possible issues* impacting the operation of the infusion suite *and determine what SOC programs could benefit the practices*." Relator's Response to SUMF ¶ 34 (emphasis added); *see also* Janssen's Ex. 141 (Heckman Dep.) at 208:17-209:1 (confirming Exhibit 66 (Dkt. No. 598-15) refers to being "able to understand the needs of the account and determine the right program that would satisfy those needs.").

116

Second, to fill the significant evidentiary gap between the factual record and Relator's allegation, Relator points to the testimony of two of her proffered experts characterizing the SOC presentations as "discussion starters" used to provide free consulting. With respect to Dr. Fugh-Berman, Relator cites just four lines of deposition testimony in which she simply asserted without support that ABSs provided "tailored office-specific information." Ex. 58 (Fugh-Berman Dep.) at 276:4-17 (Dkt. No. 598-7).

With respect to Dr. Larkin, Relator cites his testimony saying ABSs used the presentations to "facilitate conversations" and "dig to identify office inefficiencies and needs." Ex. 48 (Larkin Dep.) at 243:20-244:7, 253:14-254:4, 255:16-20, 263:20-264:6 (Dkt. No. 597-58). As the basis for this assertion, Dr. Larkin identifies Exhibit 59 (Dkt. No. 598-8), which is discussed immediately above. Doc. No. 607-2 (Larkin Dep.) at 255:1-25, 256:18-257:14 (Dkt. No. 607-2). He asserts that Janssen's documents said the SOC Programs were "customizable" or "customized," *id.* at 254:1-4, 259:24-260:5, which Janssen addresses in SUMF ¶ 37.

Dr. Larkin also points to inadmissible evidence (which Relator did not even put in the summary judgment record) referenced in SDMF ¶ 127 (an *ex parte* DOJ interview of a former ABS) as purportedly saying that 25% of an ABS's time involved "just general question and answer and customization," *id.* at 253:14-25, 263:20-264:6, while ignoring that the witness said ABSs did not provide consulting. That *ex parte* interview is not in the summary judgment record and is inadmissible hearsay under Federal Rule of Evidence 801(c) that cannot be back-doored into evidence through an expert witness. *See Jones ex rel. United States v. Mass. Gen. Hosp.*, 780 F.3d 479, 494-95 (1st Cir. 2015) ("An expert's testimony 'is not a vehicle by which evidence that is otherwise inadmissible may be introduced'" (quoting *Presley v. Com. Moving & Rigging, Inc.*, 25 A.3d 873, 893 (D.C. 2011))); *see also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir.

117

2013) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.").

The testimony of both experts is the subject of Janssen's pending Motions to Exclude. *See* Dkt. Nos. 564 & 566. Moreover, the First Circuit has repeatedly held that conclusory expert opinions are insufficient to defeat a motion for summary judgment because they do not generate a material dispute of fact. *See Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 58 (1st Cir. 2024) ("Hence, a party's 'reliance on a bare ultimate expert conclusion' is not 'a free pass to trial.'" (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993))). Relator must point to admissible, relevant, and reliable evidence, not her experts' characterizations about the ABS role.

126.    The SOC programs at-issue were identified in Relator's response to Interrogatory 2, set forth below with Janssen's internal descriptions of them:

a. *Becoming an Alternative Site of Care for Therapy with Remicade in Your Community*: "Educates ASOCs about key considerations prior to expanding infusion services, how to identify their site as available to accept patients for infusion therapy, the processes involved in receiving patients as an ASOC, and the roles and responsibilities within the process." **Ex. 98** (Site of Care Solutions 2010 at-a-glance guide) at p. 5;

b. *Billing and Coding for Infusions*: "Key topics: Understand the basics of billing for infusions; Billing and coding: workflow optimization prior to claims submission; Billing and coding: process improvement." **Doc. No. 539-49** at p. 4;

c. *Checkpoints for Infusion Center Optimization*: "Provides an overview of current infusible therapies, and outlines guidelines and resources that

118

can improve processes within the infusion center." **Ex. 98** at p. 4;

d.  *Considerations for Proactive Practice Management (a/k/a Current Considerations for Proactive Practice Management; Proactive Practice Management)*: "Provides assistance with understanding operational issues currently facing practices, including practice costs and the reimbursement landscape; technology advances and emerging trends; and benchmarking and identification of potential areas for improvement." **Ex. 98** at p. 4;

e.  *Considerations for Standard Operating Procedures in the Infusion Suite*: "Key topics: Role of clinical protocols in the infusion suite; Considerations for infusion protocols and records; Additional protocols and SOPs." **Doc. No. 539-49** at 4;

f.  *Considerations for Working with a Specialty Pharmacy (a/k/a Specialty Pharmacy Considerations)*: "Provides an overview of specialty pharmacy providers (SPPs) and managed injectable programs, including the services of SPPs, role of the practice, and impact on patients and providers." **Ex. 98** (Site of Care Solutions 2010 at-a-glance guide) at p.4; *see generally* **Doc. No. 539-41**;

g.  *Electronic Health Records and Meaningful Use (Part 1 and Part 2)*: "Key topics: Appreciate the relationship between electronic health records (EHR), health information exchange (HIE), and meaningful use (MU); Understand CMS incentives/penalties and the potential impact on a practice; Provide an overview of the Core and Menu Objectives for

119

MU-1 and MU-2." **Doc. No. 539-49** at 4;

h. *Emerging Trends in Health Care*: "Provides an overview of current and future healthcare initiatives including Recovery Audit Contractors (RACs), Evidence-Based Medicine (EBM), Value-Driven Healthcare, E-Prescribing, and Physician Quality Reporting Initiative (PQRI)." **Ex. 34** (Site of Care Solutions) at p.5;

i. *Enhancing Patient Care and Access*: "Provides an understanding of how proper management of infusion resources and administrative procedures can improve on-site delivery of infusion therapy with REMICADE®." **Ex. 98** (Site of Care Solutions 2010 at-a-glance guide) at p. 4;

j. *Exceptions and Appeals: Objectives:* "Discuss the difference between an Exception and an Appeal; Identify steps necessary to initiate the Exceptions and Appeals process; List resources that can be used to facilitate an exception and/or appeal request." **Ex. 68** (Exceptions and Appeals Process slide deck) at slide 3*;*

k. *ICD-10*: "Key topics: Impact of ICD-10 on each functional area within a practice; Key steps for developing an ICD-10 transition plan; Basic framework of ICD-10 codes and crosswalking; Principles of crosswalking ICD-10 codes." **Doc. No. 539-49** at 4*;*

l. *In-Office Infusion Drug Procurement Models*: "Key topics: Overview of drug procurement models; Process workflows for drug procurement models; Considerations for managing drug procurement and inventory." **Doc. No. 539-49** at 3;

120

m.  *Infusion Business Review (a/k/a iBiz):* "Goal: Review account-specific infusion operations and support the IV model to ensure patient access to our products; Support infusion centers by assessing efficiency and capacity of infusion operations." **Ex. 62** at p. 3;

n.  *Infusion Optimization Modeler (a/k/a IOM):* "Designed to help customers manage infusion resources and patient load at the site of care in order to improve patient access to treatment with REMICADE®." **Ex. 98** at p. 7;

o.  *Infusion Referrals: Improving the Continuity of Care (a/k/a Coordinating the Continuity of Care with Infusion Referrals; Quality Improvements in Coordinating the Continuity of Care with Infusion Referrals):* "Goal: To help focus on key elements for quality improvements in coordinating the continuity of care with infusion referrals. Topics Include: Offers insights specific to the perspectives of your audiences; Designed to educate and inform the individual stakeholders about the referral process while gaining a better appreciation about each other's perspectives." **Ex. 62** (July 23, 2014 Email with Site of Care Resource Guide) at p. 4; see also **Doc. No. 539-44** at 4;

p.  *Infusion Services Review:* "Goal: Review account-specific infusion operations and support the IV model to ensure patient access to our products; Support infusion centers by assessing efficiency and capacity of infusion operations." **Ex. 62** at p. 3;

q.  *Infusion Suite Scheduling and Staffing:* "Key topics: Why you should care about scheduling and staffing; Considerations for infusion suite scheduling; Considerations for infusion suite staffing." **Ex. 69** (Janssen Practice Pearls) at p. 2;

r.  *Infusion Therapy Services Provided in Converted ASC Space (a/k/a Infusion Services and Ambulatory Surgical Centers (ASCs) – Planning Considerations; ASC Space Reclassification for Infusion Therapy)*: "This presentation will help you: Differentiate between certified Ambulatory Surgical Center (ASC) space and physician office space; Discuss guidance explaining how to adapt ASC space to provide infusion service." **Ex. 76** (Infusion Services and Ambulatory Surgical Centers (ASCs)) at slide 3;

s.  *Inventory and Supply Management*: "Key topics: Overview of drug procurement models; Considerations for managing drug procurement and inventory; Considerations for equipment and supply management." **Doc. No. 539-49** at 4;

t.  *IV Therapy: An Important Option for Your Patients (a/k/a Why IV)*: "Goal: Demonstrate the importance of IV as an option for providers and patients. Topics Include: Why infusion therapy?; Options for patient access to IV therapy; How to begin providing infusion services; Review the importance of providing a positive patient experience; Review the steps for effective billing and reimbursement processes." **Ex. 41** at p. 4;

u.  *Managing Biologics in the Physician Office (a/k/a MBPO)*: *"Provides*

122

*a business review for IOIs to assess their use of REMICADE and other biologics."* **Ex. 98** at p. 6; see generally **Doc. No. 539-43**;

v. *Medicare Audits*: "[T]his deck was created for proactive education about the different types of Medicare Audits." **Ex. 103** (Nov. 16, 2009 email regarding Medicare Audit Deck approval);

w. *\*Medicare Quality Payment Program: A Focus on MIPS: "Topics*: What is the Quality Payment Program? What do I need to know about MIPS? How do I participate in MIPS?" **Ex. 104** (Medicare Quality Payment Program) at slide 4;

x. *\*Patient Experience in the Infusion Suite: "Key topics*: Why you should care about patient experience; Factors that impact the patient experience; Patient experience considerations: place, process, and people." **Ex. 69** (Janssen Practice Pearls) at p. 2;

y. *Payer Relationship Management*: "Key topics: Day-to-day payer relationship management; Benchmarking payer performance; Trends in the payer landscape." **Doc. No. 539-49** at 4;

z. *Practice Compliance for Remicade*: "Educates you about the need to understand and support accurate documentation and chart review procedures related to treatment with REMICADE®." **Ex. 98** at p. 4;

aa. *Private Payer Contracting Considerations (Part 1 and Part 2) (a/k/a Private Payer Contracting Considerations for Therapy with Remicade)*: "Provides an overview of considerations for evaluation of managed care contracts with private payers; tips on how to prepare to negotiate MCO

contracts; and communication strategies when negotiating contracts."
**Ex. 34** (Site of Care Solutions) at p. 5;

bb. *Quality of Care in the Infusion Suite*: "Key topics: Factors that affect
quality across the continuum of care; The role of quality of care in
today's healthcare environment; Why you should care about quality of
care." **Doc. No. 539-49** at 3;

cc. *Raising the Infusion Suite Experience (a/k/a RISE)*: "Goal: a 360-degree
approach to educating customers to improve the patient experience in
the infusion center." Also described as a "[t]ool to help accounts assess
their patient/staff effectiveness (vetted surveys), as well as assists with
infusion suite redesign (colors, layout, etc.)." **Ex. 41** (1/28/2014 Email
w/ SOC Resources and Tools) at p. 7; **Ex. 105** (12/14/2015 Email w/
Janssen Non Branded Resources list) at p. 2;

dd. *Remicade Account Review (a/k/a Physician Office Account Review for
Remicade)*: "Provide your target accounts with helpful information by
conducting standardized account reviews of their use of REMICADE.
Gives you the tools you need to assess practice status and identify
solutions the specific barriers to patient access and care within each
account. Includes Centocor informational resources (programs and
tools) that can benefit the practice." **Ex. 106** (Site of Care Resources
Catalog) at p. 16;

ee. *Setting Up In-Office Infusions of Remicade*: Informational Resources:
"Provides an overview of setting up new in-office infusion sites for

124

therapy with REMICADE® and benefits of physician-controlled infusions in facilitating quality patient management." **Ex. 98** at p. 4;

ff. *Specialty Drug Market Dynamics: Implications for Infusions*: "Key topics: Specialty drug market dynamics are driving changes in management; The rationale behind a site-of-care shift; The implications for infusions in your practice." **Ex. 69** (Janssen Practice Pearls) at p. 2;

gg. *Successful Implementation of a New Infusion Suite*: "This deck is comprised of 3 primary areas of focus: Setting Up In-Office Infusions of REMICADE® Provides an overview of setting up new in-office infusion sites for therapy with REMICADE® and benefits of physician-controlled infusions in facilitating quality patient management.; Reimbursement and Billing Process Helps you learn about coding and billing, understand updated Medicare rules, review appeals procedures, and discover how AccessOne® can help simplify the process.; Introduction to Infusing REMICADE®-Part I and Part II Part I: Addresses basic practical information necessary for the delivery of therapy with REMICADE®, including reconstitution, administration, and managing mild-to-moderate infusion reactions Part II: This hands-on training session demonstrates how to properly reconstitute REMICADE®." **Ex. 107** (Site of Care Solutions 2012 Resource Guide) at p. 6;

hh. *Successful Implementation of a New Infusion Suite for Gastroenterology Practices:* "The goal of this presentation is to highlight some key steps

125

in the process of setting up infusion suites in gastroenterology (GI) practices. As part of the Centocor Ortho Biotech commitment to streamline and simplify access to innovative biologic therapies, this presentation will illustrate how adding infusion services can help improve patient access to therapy with REMICADE®." **Ex. 108** (Successful Implementation of a New Infusion Suite for Gastroenterology Practices) at slide 3;

ii. *Successful Infusion Site Management for Gastroenterology (a/k/a Successful Infusion Suite Management for Gastroenterology)*: "The goal of this presentation is to inform and educate gastroenterology (GI) practices about what is involved in providing in-office infusions (IOI); Janssen Biotech, Inc., is committed to streamlining and simplifying access to biologic therapy. As part of that commitment, this presentation will illustrate how adding additional services may benefit patients and increase the range of services offered within the practice." **Ex. 109** (Successful Infusion Suite Management for Gastroenterology) at slide 3;

jj. *Akin Gump teleconferences, including, but not limited to*: (a) Medicare Physician Payment Update: "The goal of this session will be to provide physicians and their staff with a concise overview of key issues contained within the 2010 final rule on Medicare physician office payment. These issues include: Overview of the 2010 final physician payment rule; Update on the sustainable growth rate formula and

126

changes; and Update on regulatory changes to reimbursement for physician services." **Ex. 110** (Invitation to Medicare Physician Payment Update Teleconference); (b) Healthcare Reform Update: Various topics including but not limited to "expanding insurance coverage-insurance exchanges; Part D reforms; Quality initiatives; New delivery models; Payment reforms; Integrity & transparency reforms; Biosimilar pathway and data exclusivity; Expansion of 340B Purchasing." **Ex. 111** (8.9.2010 Email re: HCR Update Invite); (c) Medicare Shared Savings Program and Accountable Care Organization Proposed Rule Update: "[T]he Center for Medicare & Medicaid Services (CMS) published a proposed rule that implemented the Medicare Shared Savings Program. This regulation proposes a new delivery model that allows physicians, hospitals, and other healthcare providers to form a new type of entity known as an Accountable Care Organization (ACO). . . . To help our customers understand the implications of this proposed rule, we will be offering policy update teleconferences." **Ex. 112** (teleconference invitation).

**Janssen's Response:** Undisputed but immaterial. It is undisputed that the exhibits cited in SDMF ¶ 126 contain the language quoted. However, these internal descriptions of the SOC Programs are immaterial to Janssen's Motion for Summary Judgment. The content of each program speaks for itself.

127.    ABSs spent significant time on question-and-answer sessions and customer customization that went beyond the content of the slide decks. **Ex. 48** (Larkin Dep.) at

253:14-254:4, 263:12-15, 263:20-264:6 (recounting testimony former ABS Ski Bennof gave to DOJ about the portion of her time during a site of care program that was spent on custom interactions with the customer); **Ex. 58** (Fugh-Berman Dep.) at 276:14-17 (testifying ABSs provided "tailored office-specific information . . . to physicians about their specific problems and -- and how they could be solved."), *see also* 322:2-323:11; **Ex. 59** (Feb. 9, 2011 COBI Sales Representative Ethnography & Message Transmission Research) at slide 26 ("Oh my God, my ABS provides so much value. Sometimes we commute together and she pulls up data and we figure out what we're going to do.").

   **Janssen's Response:** Does not create a genuine dispute of material fact. *See* Janssen's Response to SDMF ¶ 125.

   128. Janssen's own market research identified effective ABSs as those adept at "dig[ging] to identify office inefficiencies and needs." **Ex. 48** (Larkin Dep.) at 255:16-20. Merely giving a presentation does not amount to "digging." *Id*.

   **Janssen's Response:** Does not create a genuine dispute of material fact. *See* Janssen's Response to SDMF ¶ 125.

   129. The Infusion Optimization Modeler ("IOM") was a customizable tool that ABSs used to provide practice-specific analysis of infusion scheduling, chair utilization, and capacity, incorporating the individual practice's data. *See supra* ¶ 36. The IOM "involved a *customized assessment* of a physician's practice" and "allowed ABSs and physicians to organize and compare (model) the specific data and details of a physician's practice, such as the number of patients on Remicade, the number of patients on competitor drugs, the lag time between prescription and reimbursement, how many chairs were needed, how much personnel was needed

and the related costs, and how many more patients were needed to bring the practice 'to capacity.'"
**Ex. 26** (Evans Report) at p.42 n.97.

**Janssen's Response:** Does not create a genuine dispute of material fact. *See* Janssen's Reply to SUMF ¶ 36 (because SDMF ¶ 129 is encompassed in Relator's Response to SUMF ¶ 36).

130.    In April 2014, Janssen combined the IOM and the Infusion Services Review into a new resource called "iBiz," which was in use from April 2014 through June 2019. **Ex. 60** (Aug. 2, 2024 Excerpt of Answers to Depositions) at p.1 n.5. The iBiz program was described internally as "[b]asically a new, combined version of the MBPO and IOM. Focus is on practice infusion management, capacity with metrics for the practice." **Ex. 61** (Aug. 26, 2014 Email re: Rheum Practice Offerings Resources). The iBiz/IOM module description states its goal was to "[r]eview account-specific infusion operations," "[a]ssess[] nurse time, chair space, treatment options and hours of operations," and "[p]rovide[] customized reports of infusion suite resources, capacity, and efficiency." **Ex. 62** (July 23, 2014 Email with Site of Care Resource Guide) at p.3.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that the cited exhibits (which are not the IOM or iBiz) contain the quoted language. However, the content of the IOM speaks for itself. *See* Janssen's Reply to SUMF ¶ 36 and Janssen's Response to SDMF ¶ 126. Relator's Opposition cites this SDMF as evidence that the IOM involved free consulting, but Relator's own Response to SUMF ¶ 36 confirms that the IOM was used by ABSs to identify "'the point at which [the center] would have to add more resources to ensure' patients could get seen for infusions without delay." *See* Relator's Response to SUMF ¶ 36.

Moreover, when testifying about the IOM, Relator explained that ABSs were permitted to "give [the practices] the information [in the slideshow presentations], but for them to actually make the changes, they had to take the bull by the horns and do that themselves.'" Ex. 5 (Long Dep.) at 172:21-173:10 (Dkt. No. 597-5). That testimony was volunteered by Relator affirmatively. Relator also testified that one purpose of the IOM was "to reduce attrition." *Id.* at 174:16-24.

131.    Janssen's own internal planning documents described the SOC 360 program as a "customized account-specific solution." **Ex. 63** (Changing Lives Forever slide deck) at slide 10. The overview instructed ABSs to "Analyze . . . your customers' needs," "Strategize . . . choose the programs," "*Customize . . . deliver a customer specific set of solutions*," and "Energize . . . make it happen!!!" *Id*. at slide 24 (emphasis added).

**Janssen's Response:** Does not create a genuine dispute of material fact. Relator is misrepresenting Exhibit 63 (Dkt. No. 598-12), an internal document from January 2006. The item to be "customized" was a presentation regarding *which of the SOC resources* (only some of which were At-Issue SOC Programs) were most likely to be relevant to a given site of care. Relator omits that the "customized account-specific solution" language on slide 10 is expressly describing a "'Support 360' Customer Presentation," not any specific At-Issue SOC Program. Slides 19-21 explain that the "Customer Presentation" was to be made using "Program Flashcards" to introduce the possible programs, at which point the customer was provided an 800 number to schedule any actual programs selected. Angela Wood explained this during her deposition. *See* Doc. No. 543-1 (Wood. Dep.) at 147:20-149:9 (Dkt. No. 543-1). Relator has presented no evidence that any of the SOC presentations themselves had been "customized" for a given practice.

130

132.    When shown an internal user guide describing the SOC 360 Programs as "A customized account-specific solution" and instructing ABSs to "Analyze customer needs and design your presentation," Wood acknowledged: "Q. And the internal user guide says analyze customer needs and design your presentation? A. Yes." Wood Dep. at 151:22-25.

**Janssen's Response:** Does not create a genuine dispute of material fact. *See* Janssen Response to SDMF ¶ 131.

133.    Janssen's internal documents repeatedly described ABS services as "consultative" in nature. *See* ¶¶ 11, 20, and 80, *supra*. For instance, the "SOC Proactive Practice Management" Program, which was delivered by third-party presenters for "discussing 'Considerations for Proactive Practice Management'" was "designed to be *consultative* and non-promotional." **Ex. 74** (PRC Submittal Form). This consultative program was approved by the PRC, including Freddy Jimenez as the PRC's legal representative. *Id.*; **Doc. No. 543-6** (Jimenez Dep.) at 78:11-20.

**Janssen's Response:** Does not create a genuine dispute of material fact. To generate this statement of fact, Relator relied on the improper tactic she uses repeatedly: citation to duplicative statements of fact designed to make it impossible for the Court to assess the evidence, while creating a false appearance of exactly the type propagated by SDMF ¶ 133. SDMF ¶ 133 cites to *three other statements of fact*, all of which discuss *only a single document* involving the phrase "consultative services"—Relator's Exhibit 1 (Dkt. No. 597-1). *See* Relator's Response to SUMF ¶¶ 11, 20, and 80. Janssen's internal documents did not "repeatedly describe[] ABS services as 'consultative' in nature." The only document cited in SDMF ¶ 133 itself—Relator's Exhibit 74 (Dkt. No. 598-23)—indicates that the approved material involved a "Promotional/ Leave-behind" that would be "Distributed by" someone other than ABSs and "delivered by third

party presenters" who are not identified. In any event, the Considerations for Proactive Practice Management presentation, Exhibit 29 (Dkt. No. 597-38), plainly did not involve consulting. *See* Janssen's Reply to SUMF ¶ 38 (discussing Exhibit 29).

134.    As a legal reviewer on the PRC, Mr. Jimenez would have had "a role in determining [a program's] compliance with the Antikickback Statute." **Doc. No. 543-6** (Jimenez Dep.) at 100:11-14.

**Janssen's Response:** Undisputed but immaterial. It is undisputed that from the late 1990s until 2006, Mr. Jimenez would have had "a role in determining compliance with the Anti-Kickback statute." Dkt. No. 543-6 (Jimenez Dep.) at 80:17-81:6, 89:9-23; 98:13-101:5. In providing this response, Janssen is only responding to Relator's statement of fact; it is not relying on Mr. Jimenez's presence or role (or the presence or role of any other attorney) on the PRC or otherwise.

135.    Not only did Mr. Jimenez receive healthcare compliance training, as did all Janssen employees, **Doc. No. 543-6** (Jimenez Dep.) at 44:16-21, and participated in providing the training to other employees, *id*. at 47:11-17, 49:10-17, but he even helped draft company guidance for compliance with the law. *See* **Ex. 121** (Centocor Guidance Document #2 markup). The overview of this guidance was that "[l]imited types of product related, value added services may be offered to customers free of charge. When considering a program/service that will be provided to a customer, you must first determine if the program/service is product related and value added." *Id*. at p. 1.

**Janssen's Response:** Undisputed but immaterial. In providing this response, Janssen is only responding to Relator's statement of fact; it is not relying on Mr. Jimenez's presence or role (or the presence or role of any other attorney) on the PRC or otherwise.

136. Mr. Jimenez edited the policy to clarify that *all* of the following criteria must be satisfied before product related, value-added services may be offered to customers: 1) the service must be "closely related to the specific" product; 2) "[o]ffered to all customers free of charge and not sold separately;" 3) "[n]ot normally performed by the customer's employees or purchased . . . on the open market; and 4) be within the company's "normal sales and marketing overhead." *Id*.

**Janssen's Response:** Undisputed but immaterial. In providing this response, Janssen is only responding to Relator's statement of fact; it is not relying on Mr. Jimenez's presence or role (or the presence or role of any other attorney) on the PRC or otherwise.

137. Mr. Jimenez also specified in the guidance document that the company "may not pay a customer's costs of services furnished by an outside consultant unrelated" to the company, *id*., and may not "provide services for free or pay the customer's cost of such services when . . . [t]he services would normally be paid for by the health care professional to enhance or sustain their business or otherwise offset their overhead. . . ." *Id*. at 1-2. *See also id*. at p. 5 (adding to checklist of requirements for providing consulting and services to customers that the "service not [be] customarily performed by the customer's employees nor purchased separately by the customer on the open market").

**Janssen's Response:** Undisputed but immaterial. In providing this response, Janssen is only responding to Relator's statement of fact; it is not relying on Mr. Jimenez's presence or role (or the presence or role of any other attorney) on the PRC or otherwise.

138. He further advised as part of the guidance that the company was not permitted to pay for third-party consulting services for customers that purchased a specified volume of its products. *Id*. at p. 3.

**Janssen's Response:** Does not create a genuine dispute of material fact. Relator inaccurately represents Mr. Jimenez's edits to Exhibit 121 (Dkt. No. 599-32). Mr. Jimenez added: "Such arrangements are only permitted under a combined product and service arrangement consistent with the Guidance Document on that subject." Ex. 121 at 3 (Dkt. No. 599-32). In providing this response, Janssen is only responding to Relator's statement of fact; it is not relying on Mr. Jimenez's presence or role (or the presence or role of any other attorney) on the PRC or otherwise.

139.    Mr. Jimenez was the legal reviewer on the PRC for at least the following Site of Care Programs: Becoming an Alternative Site of Care; Considerations for Proactive Practice Management; Emerging Trends in Healthcare; Infusion Optimization Modeler (IOM); Practice Compliance for Remicade; Private Payer Contracting Considerations for Remicade; Remicade Account Review; and Setting Up In-Office Infusions of Remicade. **Ex. 122** (Janssen Biotech, Inc.'s Supplemental Objections And Responses To Plaintiff-Relator Julie Long's Interrogatories) at p. 17.

**Janssen's Response:** Undisputed but immaterial. In providing this response, Janssen is only responding to Relator's statement of fact; it is not relying on Mr. Jimenez's presence or role (or the presence or role of any other attorney) on the PRC or otherwise.

140.    Janssen instructed sales personnel to refer to third-party vendors as "site of care consultants." **Doc. No. 543-1** (Wood Dep.) at 198:22-199:3. When asked to explain how these vendors could be "consultants" without providing "consulting," Janssen's corporate representative testified: "[C]onsultants is a kind of larger terminology. Not consulting. They were consulting. We use consultants in a variety of ways." *Id*. at 199:4-7.

134

**Janssen's Response:** Does not create a genuine dispute of material fact. The second sentence of SDMF ¶ 140 is incomplete and misleading. Ms. Wood testified that Janssen considered Xcenda and MCV site of care "consultants" because "they were acting in a consulting capacity for our company. They were not consulting for physicians." Doc. No. 543-1 (Wood Dep.) at 401:20-402:9 (Dkt. No. 543-1). Janssen explained this further in its written responses to Relator's 30(b)(6) Deposition Notice. *See* Janssen Resp. Ex. D at 19 (Dkt. No. 581-4).

141.    In a November 13, 2012 email, Wood referred to "third-party site of care consultants such as Xcenda or MCV." Wood Dep. at 197:24-198:1; Ex. 326. When asked whether she "considered Xcenda and MCV site of care consultants," Wood acknowledged: "Yes." Wood Dep. at 198:15-18.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed for the reasons stated in Janssen's Response to SDMF ¶ 140 (*i.e.*, Ms. Wood testified the third parties were consultants to Janssen, not consultants to practices).

142.    A 2010 internal presentation presented results from a Peak Development Survey in 2000 in which ABSs were asked: "What do you think core responsibilities should be?" **Ex. 64** (Excerpt from September 2010 POA III slide deck) at p.16. The responses included "Strategic business development," "Business expert," and recommendations to "Rename the position to encompass broader strategic and consulting responsibilities," and to get "[i]nvolved in business strategic planning/not just implementation." *Id*. The presentation acknowledged that by that time in 2010, the ABS position did include all of these attributes: "Doesn't this define the ABS position today!" *Id*.

**Janssen's Response:** Does not create a genuine dispute of material fact. Exhibit 64 contains the quoted language from a survey regarding the Reimbursement Specialist role from

2000, but Relator's reliance on that language is misplaced, as the document makes clear when it states that the ABS role in 2010 was to "Ensure Patient Access," "Support clinical messaging (reactively)," focus on attrition ("Patient Pull through" and "ID to IV"), "to educate customers on industry complexities and identify key considerations that may impact patient access," "Utilize prescriptive SOC 360 programming to match local market needs," and to do so "Using company approved resources." Ex. 64 at slides 35, 65 (Dkt. No. 598-13).

143.    An ABS job description listed as a "key competency" the ability to be an "expert in business processes" with the ability to "clearly connect[] solutions to business needs" and "uncover issues and educate customers to make informed decisions." **Ex. 65** (ABS Product Sustainability slide deck) at slide 4. Dr. Larkin opined that "[i]mportantly, these mimic the actions and competencies of a business consultant." **Ex. 49** (Larkin Report) at p. 13.

**Janssen's Response:** Does not create a genuine dispute of material fact. Exhibit 65 (Dkt. No. 598-14) is not an "ABS job description"; it is a slide deck titled "ABS Product Sustainability." Although the document contains the language quoted, the first substantive page of the presentation (slide 2) makes clear the ABS role was about addressing both "Pre-Needle Attrition" and "Post-Needle Attrition" to ensure patients received timely access to infusions with Remicade. *See* SUMF ¶ 22. The rest of the presentation contradicts Dr. Larkin's assertion that ABSs were engaged in consulting, and demonstrates that the ABS role was to use SOC resources (many of which were not At-Issue SOC Programs) to "secure and preserve patient access to Remicade." Ex. 65 at 5-10 (Dkt. No. 598-14).

Dr. Larkin's opinion that the ABS activities "mimic the actions and competencies of a business consultant" is baseless, inadmissible, and does not create a factual dispute.

Dr. Larkin's opinion is baseless and inadmissible because Dr. Larkin admitted that, in reaching this opinion, he provided no analysis and followed no methodology to conclude that ABSs engaged in activities that are similar to those performed by consultants. *See* Dkt. No. 567 at 14. For these reasons, Dr. Larkin's opinion is the subject of Janssen's pending Motion to Exclude. *See* Dkt. No. 566.

This statement of fact also does not create a factual dispute. The First Circuit has repeatedly held that baseless and conclusory expert opinions are insufficient to defeat a motion for summary judgment because they do not generate a material dispute of fact. *See Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 58 (1st Cir. 2024) ("Hence, a party's 'reliance on a bare ultimate expert conclusion' is not 'a free pass to trial.'" (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993))). Relator must point to admissible, relevant, and reliable evidence, not her expert's speculation about what the ABSs actually did. Relator does not do that here. Dr. Larkin's only support for his claim that ABSs engaged in business consulting was a handful of internal Janssen documents and conversations with doctors that never received SOC Programs. Ex. 49 (Larkin Report) at 13-14 (Dkt. No. 597-59). Moreover, Dr. Larkin did virtually nothing to educate himself on the services that infusion consultants provide, beyond performing rudimentary internet searches and accepting website descriptions at face value. *Id.* at 16. Thus, Dr. Larkin's unsupported conclusions cannot and do not create a dispute of fact. *See Hoover*, 99 F.4th at 58.

144.    ABSs used an iPad-based "Hot Buttons" tool to identify and prioritize physicians' operational support needs. **Def. Ex. 49**, Doc. No. 539-49 at p. 3 ("Hot Buttons identifies and prioritizes customized operational support needs within a practice."). "[O]nce those needs were identified the ABSs provided physicians 'customized support' through 'interactive

educational programs' referred to as 'Practice Pearls.'" **Ex. 49** (Larkin Report) at pp. 13-14; *id*. at pp. 3-4; **Doc. No. 539-49** at pp. 3-4.

**Janssen's Response:** Does not create a genuine dispute of material fact. *See* Janssen's Reply to SUMF ¶ 37.

145.    The Practice Pearl programs covered a broad range of practice management issues including: Prior Authorizations and Benefit Investigation Workflow Optimization; Navigating Affordability in Commercial Plans and Medicare; In-Office Infusion Drug Procurement Models; Infusion Referrals: Improving the Continuity of Care; iBiz/IOM; Quality of Care in the Infusion Suite; Inventory and Supply Management; Considerations for Standard Operating Procedures in the Infusion Suite; Billing and Coding for Infusions; ICD-10; EHR and MU-2; and Payer Relationship Management. **Doc. No. 539-49** at pp. 3-4.

**Janssen's Response:** Does not create a genuine dispute of material fact. Although SDMF ¶ 145 itself is undisputed, SDMF ¶ 145 does not support the assertion for which it is cited in Relator's Opposition (Dkt. No. 613 at 9) that Practice Pearls were "tailored consulting." *See* SUMF ¶ 37.

146.    The Hot Buttons tool "automated what was previously a manual process, where an ABS would inquire about the business needs of an IOI business and then steer the conversation towards the identified needs." **Ex. 49** (Larkin Report) at p. 14. As Dr. Larkin explained: "The critical part of the conversation is not necessarily identifying the business need, it is the follow-up discussion around the specific needs and how the learnings applied to the business at hand." *Id*.

**Janssen's Response:** Does not create a genuine dispute of material fact. First, Relator mischaracterizes Hot Buttons, which was a simple survey used to identify which pre-

canned SOC Programs (called "Practice Pearls") an ABS would then present to practices—*i.e.*, the "follow-up discussion." *See* SUMF ¶ 37. It is clear from Dr. Larkin's own testimony that he considers the mere identification of which SOC Programs were likely to be relevant to a practice to involve customization. *See* Doc. No. 607-2 (Larkin Dep.) at 259:24-260:8, 261:5-10 (Dkt. No. 607-2) ("It's about picking which one to do, which, by the way, is customization. . . ."). Moreover, Dr. Larkin's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 143.

147.    As with ABSs, a significant portion of Xcenda's time was spent in question-and-answer sessions. *Id*. at slide 20 ("I'd like to take a quick moment to praise Jen and Alberto for their work last night at the Xcenda Proactive Practice Management program with Dr. McAlwain's staff. . . Alberto masterfully engaged [participants] in numerous robust discussions while imparting key important takeaways from the content. They stayed another 2 hours after he finished presenting asking us questions about how to take their infusion suite from a clinical trials only operation to a full-blown, 20-chair IOI. . . [T]his was one of the best programs I've attended in my 19+ years in the Industry due to Alberto's platform skills, knowledge of the subject matter, and Jen's passion to help customers/patients and her ability to map out next steps and gain their commitment to such. . . .").

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). SDMF ¶ 147 also does not identify the exhibit that it purports to cite.

148.    Janssen's own compliance training materials acknowledged the consultative nature of the ABS role. A compliance training slide stated: "ABS role is complex: Educate on access, clinical, reimbursement & patient affordability resources; Speaker-related responsibilities.

According to policy, when providing education or consultation, the topic should have no discernible economic value to customer and services should relate back to our FDA approved product(s). Johnson & Johnson employees may not offer consulting services that relate to the management of customers' business practices because the customer is ultimately responsible for seeking that advice and in many cases paying for the service. If a company were to provide advice, it could be considered a kickback because it could offset the normal overhead expenses for the practice as well as expose our company to potential legal liability." **Ex. 6** at slide 12.

      **Janssen's Response:** Does not create a genuine dispute of material fact. The mere existence of compliance materials prohibiting "consulting" does not establish that Janssen understood that the SOC Programs involved "consulting" prohibited by its compliance policies. Moreover, Relator's Opposition cites SDMF ¶ 148 as evidence that "Janssen's own witnesses described the ABS role as 'consultative,'" (Dkt. No. 613 at 9-10), which SDMF ¶ 148 does not even address.

      149.    Additional compliance training instructed ABSs that they were "not 'business advisors,'" could not do "business consulting," "cannot provide legal advice/business analysis," **Ex. 67** (Health Care Compliance & Privacy Update) at slides 12, 16, 20, and "may not offer consulting services that relate to the management of customers' business practices." **Ex. 6** at slide 12. The existence of these prohibitions confirms that Janssen understood the ABS role had the potential to cross the line into impermissible consulting.

      **Janssen's Response:** Does not create a genuine dispute of material fact. The final sentence of SDMF ¶ 149 is unsupported legal argument. The mere existence of compliance materials prohibiting "consulting" is not evidence that Janssen understood that the SOC Programs involved "consulting" prohibited by its compliance policies.

150.    Compliance officer Roger Kung testified that if ABSs "were identifying challenges and recommending customized solutions, that would be inappropriate." **Ex. 12** (Kung Dep.) at 135:24-136:5. Yet Janssen's own internal documents, including the SOC 360 program overview, the Hot Buttons/Practice Pearls system, and the iBiz/IOM tools, were explicitly designed to do exactly that: identify challenges and provide customized solutions. *See* ¶¶ 135-136, 144-146, *supra*.

**Janssen's Response:** Does not create a genuine dispute of material fact. Relator's characterization of the SOC Programs is false. *See* SUMF ¶¶ 34 (MBPO/iBiz), 36 (IOM), and 37 (Hot Buttons); *see also* Janssen's Responses to SDMF ¶¶ 144-46. Moreover, Mr. Kung testified that he never thought the SOC Programs were unlawful. *See* Janssen's Ex. 140 (Kung Dep.) at 222:4-9.

151.    Wood testified that ABSs "regularly called upon the accounts to whom they provided the site of care program" and that "I am sure they had some level of understanding with respect to operational considerations or challenges, perhaps, that accounts were facing." Wood Dep. at 415:12-23.

**Janssen's Response:** Undisputed but immaterial.

152.    Janssen tracked Medicare reimbursement data for each Phase 1 Practice, including the number of Medicare claims submitted and the total Medicare reimbursement received. Janssen operated under the "buy and bill" model, in which physician practices purchased Remicade and Simponi ARIA from the manufacturer, administered the drugs to patients, and then billed the patients' health insurance, including Medicare Part B, for reimbursement. **Doc. No. 555-1** (Rosenthal Report) at ¶ 15; **Ex. 26** (Evans Report) at 29.

**Janssen's Response:** Does not create a genuine dispute of material fact. SDMF ¶ 152 is immaterial to Janssen's Motion for Summary Judgment. However, it is undisputed that, during the relevant period, physician practices could engage in a "buy and bill" model to purchase and administer Remicade and Simponi ARIA, and then bill the patients' health insurance for reimbursement. Relator's assertion that "Janssen tracked Medicare reimbursement data for each Phase 1 Practice, including the number of Medicare claims submitted and the total Medicare reimbursement received" is not supported by the exhibits Relator cites in SDMF ¶ 152.

153.    Medicare Part B reimburses providers for physician-administered drugs at a rate equivalent to Average Sales Price ("ASP") plus 6 percent, and manufacturers, including Janssen, report their ASP to CMS on a quarterly basis. **Doc. No. 555-1** (Rosenthal Report) ¶ 16.

**Janssen's Response:** Undisputed (during the relevant period) but immaterial.

154.    Janssen's SOC Programs included the "Managing Biologics in the Physician Office" ("MBPO") presentation, which contained an entire section on "Reimbursement" that addressed Medicare reimbursement rates, ASP methodology, and the quarterly CMS-published ASP Drug Pricing Files. **Doc. No. 539-43** (MBPO Presentation) at slides 33-37, 53-62; **Ex. 99** (Successful Implementation of a New Infusion Suite slide deck) at slides 69-71 ("Medicare allowable in the physician office setting is ASP+6%" and "Drug reimbursement rates are updated quarterly").

**Janssen's Response:** It is undisputed but immaterial (and not cited in Relator's Opposition) that the MBPO contained a section entitled "Payer/Reimbursement Landscape" and discussed the content identified in SDMF ¶ 154.

155.    Janssen tracked its own Remicade Payer Mix, maintaining data showing the "Primary Insurance Among RA Remicade Users" was 45% Medicare, 36% Private, 16%

Uninsured, and 3% Medicaid, and the "Primary Insurance Among Crohns Remicade Users" was 26% Medicare, 47% Private, 14% Medicaid, and 11% Uninsured. **Ex. 100** (2002 IBU Strategic Business Plan Health Economics and Reimbursement) at slide 79 titled "Remicade Payer Mix."

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that Exhibit 100 (Dkt. No. 598-50), a slide deck from 2001 (a decade before the relevant period), contains the material identified in SDMF ¶ 155. However, slide 79 does not show that "Janssen tracked its own Remicade Payer Mix" or "maintain[ed]" such data. A single slide in a single document does not establish that Janssen systematically "tracked" or "maintain[ed]" insurance data, and the slide itself demonstrates that the data is drawn from an external source ("Source: 1996 NAMCS"), not generated or maintained by Janssen. Ex. 100 at slide 79 (Dkt. No. 598-50).

156.    Janssen's practice management economic models calculated reimbursement by payer type, including specific Medicare reimbursement amounts per infusion, and modeled annual revenue based on payer mix scenarios such as Medicare 40% / Private Payers 35% / Medicaid 5%. **Ex. 10** (Centocor Practice Management Program) at slides 13-14 (containing detailed reimbursement tables breaking down per-patient infusion reimbursement by Medicare, Commercial Plans A-C, Capitated Plan, and Medicaid).

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). SUMF ¶ 156 relies on a slide deck from 2000, a decade before the relevant period and years before the creation of the ABS role or the At-Issue SOC Programs. Ex. 10 (Dkt. No. 597-11). It concerns the "Practice Management Program" and "Immunology Specialist[s]," not ABS activities or the SOC Programs, which did not exist at the time. *Id.* at slides 1, 12. Further, neither the cited slides nor others in the deck discuss "practice management

143

economic models." The Medicare reimbursement methodology in this slide deck from 2000 does not address the reimbursement methodology that was in place during the relevant period, as described in SDMF ¶ 153. Relator points to no information of the type identified from the relevant period, because there is none.

157.    Janssen's internal Simponi ARIA strategic documents tracked the "Primary Insurance of RA Patients" by physician segment, showing detailed breakdowns of Commercial Insurance, Medicare (with and without supplemental coverage), Medicaid, and Veterans/Military coverage. **Ex. 21** (January 21, 2016 Simponi ARIA STAT Meeting) at slide 11, "Primary Insurance of RA Patients."

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). Relator's assertion that Exhibit 21 (Dkt. No. 597-30) demonstrates that Janssen "tracked the 'Primary Insurance of RA Patients'" broadly is unsupported. A single slide in a single document does not establish that Janssen systematically "tracked" insurance data as SDMF 157 ¶ implies.

158.    ABSs were trained to understand Medicare reimbursement rates and to use that information in their interactions with physician practices. The ABSs were described internally as the "Site of Care experts" and the "[l]iaison for all business model, payer, and reimbursement issues in all sites of care" and "[l]ead customer educator on all CMS, payers, and issues impacting all sites of care." **Ex. 102** (Nov. 2, 2005 ABS Evolution and Deployment slide deck) at slide 9.

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). It is undisputed that Exhibit 102 (Dkt. No. 599-1) contains the quoted language. However, ABSs were trained to provide only company-approved materials. *See*

144

SUMF ¶ 78. Exhibit 102 (Dkt. No. 599-1) does not support the first sentence in SDMF ¶ 158 and Relator cites no other evidence for that assertion.

159.    Janssen's SOC Programs included multiple presentations that trained ABSs on Medicare reimbursement and directed them to educate physician practices on reimbursement methodology. The MBPO presentation instructed ABSs to present slides showing quarterly Medicare reimbursement rates for Remicade (e.g., "2011 1st Quarter Medicare Allowable" of "$60.58 per 10 mg" and "2011 2nd Quarter Medicare Allowable" of "$60.04 per 10 mg") and to explain that "[m]any private payers base their drug allowance on amounts established by Medicare." **Ex. 99** (Successful Implementation of a New Infusion Suite slide deck) at slides 69, 103.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that Exhibit 99 (Dkt. No. 598-49) contains the language quoted. However, Exhibit 99 (Dkt. No. 598-49) is not the MBPO presentation as stated in SDMF ¶ 159.

160.    The "Considerations for Proactive Practice Management" presentation trained ABSs to educate practices on the "Medicare Physician Fee Schedule," the "ASP reimbursement methodology," the "Sustainable Growth Rate and physician fee schedule decreases," and the "[t]ransition to private payers and their trend toward adopting hybrids of Medicare methodologies." **Ex. 29** (Proactive Practice Management) at slide 11. The program was "designed to be *consultative* and non-promotional." **Ex. 74** (PRC Submittal Form). *See* ¶133, *supra*.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that Exhibit 29 (Dkt. No. 597-38) contains the quoted language. However, there is no support for the assertion that the program was "designed to be *consultative* and non-promotional"

for the reasons stated in Janssen's Reply to SUMF ¶ 38 (discussing Exhibit 29 (Dkt. No. 597-38)) and Janssen's Response to SDMF ¶ 133 (discussing Exhibit 74 (Dkt. No. 598-23)).

161.    ABSs were also trained to help practices "Prepar[e] to Review and Negotiate a Contract" by advising them to "[b]e familiar with Medicare payment methodologies" and to "[i]dentify codes used by the practice for infusion services, and submit for reimbursement rates." **Ex. 99** (Successful Implementation of a New Infusion Suite slide deck) at slide 68.

**Janssen's Response:** Does not create a genuine dispute of material fact. First, ABSs did not "help practices" review or negotiate contracts, and there is no support for that assertion. The slide quoted in Exhibit 99 (Dkt. No. 598-49), titled "Preparing to Review and Negotiate a Contract," merely lists educational considerations, such as the ones quoted, for ABSs to "[r]ead [off the] slide." Second, Relator herself testified that ABSs "could give PRC-approved contract considerations programming, but [they] could not actually help negotiate contracts." Ex. 5 (Long Dep.) at 86:15-25 (Dkt. No. 597-5). The actual PRC-approved program (Private Payer Contracting Considerations) suggested practices hire a third-party consultant to assist them with negotiating contracts, Janssen's Ex. 133 (Private Payer Contracting Considerations for Therapy with Remicade, JANSSENBIO-017-00022581) at slide 2, and Relator testified that several of the Phase 1 Practices actually hired third-party consultants to do that. Ex. 5 (Long Dep.) at 235:20-236:10, 349:3-19 (Dkt. No. 597-5).

162.    ABSs advised targeted prescribers on how to negotiate higher reimbursement rates for their most frequently billed drugs and services under contracts with private payers. **Ex. 26** (Evans Report) at pp. 118-119.

**Janssen's Response:** Does not create a genuine dispute of material fact. First, Relator herself testified that ABSs "could give PRC-approved contract considerations

programming, but [they] could not actually help negotiate contracts." Ex. 5 (Long Dep.) at 86:15-25 (Dkt. No. 597-5). In fact, Relator testified that several of the Phase 1 Practices actually hired third party consultants to do that. *Id.* at 235:20-236:10, 349:3-19. Second, Relator's only support for this statement of fact is her expert, Virginia Evans. As explained in detail in Janssen's pending Motion to Exclude Opinions and Testimony of Virginia Evans, Dkt. No. 568, Ms. Evans' opinions constitute narrative testimony not based on sufficient facts or reasoning. *See* Dkt. No. 569 at 9-15. The First Circuit has repeatedly held that baseless and conclusory expert opinions such as these offered by Ms. Evans are insufficient to defeat a motion for summary judgment because they do not generate a material dispute of fact. *See Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 58 (1st Cir. 2024) ("Hence, a party's 'reliance on a bare ultimate expert conclusion' is not 'a free pass to trial.'" (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993))). Relator must point to admissible, relevant, and reliable evidence, not her expert's speculation about the ABS role.

163.    The SOC programs provided by ABSs to the IOIs had substantial independent value. **Ex. 34** (Site of Care Solutions) at slide 2 ("'When I tell you this is one of the most valuable resources our company has to provide to our customers it is an understatement.' . . . 'The speaker's extensive experience and overall practice management acumen allowed us to open new doors for Centocor Ortho Biotech and REMICADE'"), slide 5 ("We were contemplating closing our infusion center but have implemented some process changes and decided to expand it as a result of this presentation. . . These programs are the best resource I have seen from any pharmaceutical company."); slide 8 ("Let your practices know that you offer business acumen programs . . . delivered by third party consultants with extensive practice management experience . . . as value-added services that have received excellent reviews from other customers, and can help to advance practice operations.   .   .   . "); **Doc. No. 543-3** (Smith Dep.) at 287:15-288:9 (testifying

ABS program was intended to be "valuable to the physician practices"), 249:6-15 (testifying at least some of the ABS site of care programs are beneficial to practices regardless of whether they want to infuse Simponi ARIA or Remicade); **Doc. No. 543-1** (Wood Dep.) at 394:35-395:14, 395:25-398:22 (testifying some of the ABS site of care programs were provided to oncology practices because they were relevant to other infusible therapies, not just Remicade and Simponi ARIA); **Ex. 50** (12/15/2014 email w/ Gastroenterology IOI Practice Manager & ABS Resource Research slide deck) at slide 20 ("The Large Majority of [IOI] Practice Managers Perceive Substantial Value in the *Proactive Practice Management*" ABS site of care program, the objective of which is "[t]o provide practice management considerations and identify resources to help practices manage their operational issues more proactively. . . ."); **Ex. 28** (Marzullo Dep.) at 194:13-16 ("IOIs would close if site of care marketing did not provide the" site of care programs).

**Janssen's Response:** Does not create a genuine dispute of material fact. This is a legal contention that is both unsupported by any evidence and inconsistent with the exhibits and testimony cited by Relator.

- **Exhibit 28 (Marzullo Dep.) at 194:13-16 (Dkt. No. 597-37):** *See* Janssen's Reply to SUMF ¶ 38 (discussing Exhibit 28).

- **Exhibit 34 (Dkt. No. 597-44):** Exhibit 34 is an internal document regarding "Site of Care Solutions" generally (not specific programs), which were available for all sites of care— "IOI, HOPD, ASOC/ITP"—not just IOIs. Ex. 34 at -701. Relator's complaint expressly alleged that doctors in HOPDs could not be influenced by a kickback, SAC ¶ 63 (HOPDs "are not owned by prescribers who can be influenced by the opportunity to profit from every vial of Remicade and Simponi ARIA they prescribe and infuse"), so the fact that ABSs were providing programs to HOPDs (not just IOIs) confirms they were being provided for a legitimate reason, not as a kickback to induce prescriptions. Moreover, Relator's reliance on the term "value-added" is misplaced. "Value-added" is a defined term in Janssen's guidance documents that refers to programs that were *compliant* with Janssen's policies, not ones that were prohibited. *See* Janssen's Response to Relator's Statement of Undisputed Facts In Support of her Motion for Partial Summary Judgment, Dkt. No. 581, ¶ 52. Indeed, Relator herself referred to the SOC Programs as value-added services and did not think they were improper. *Id.* Finally, the availability of similar programs from Janssen's competitors is discussed in SUMF ¶ 43.

148

- **Exhibit 50 (Dkt. No. 597-60):** *See* Janssen's Response to SDMF ¶ 180 (discussing Exhibit 50).

- **Doc. No. 543-3 (Smith Dep.) at 287:15-288:9, 249:6-15 (Dkt. No. 543-3):** First, Mr. Smith rejected Relator's assertion that ABSs were providing consulting. Doc. No. 543-3 (Smith Dep.) at 110:20-111:10 (Dkt. No. 543-3). Second, in the cited testimony, Mr. Smith was referring to value as having "relevance with customers." *Id.* at 287:10-288:9. Third, while Relator asserts that Mr. Smith testified that some SOC Programs could be relevant to practices' infusion of other products, Relator admits the programs were directly applicable to Remicade and Simponi ARIA. *See* Janssen's Reply to SUMF ¶ 36. In any event, that assertion is immaterial, as the Department of Justice and courts have rejected similar attempts to impute independent value where information related to a drug (such as education on disease or administration) could have theoretical relevance to other drugs. *See* Janssen's Mem. in Support of Mot. for Summary Judgment, Dkt. No. 538, at 16.

- **Doc. No. 543-1 (Wood Dep.) at 394:35-395:14, 395:25-398:22 (Dkt. No. 543-1):** Ms. Wood testified that a few SOC Programs were administered by "an oncology ABS team" that promoted Janssen's oncology infusible products, and she also explained that "oncology practices could administer Remicade as an alternative site of care." Doc. No. 543-1 (Wood Dep.) at 395:25-397:20 (Dkt. No. 543-1).

164.    Janssen paid Xcenda approximately $3,000 per live program presentation.

**Ex. 25**, Knepp Dep. at 247:25-248:4; **Doc. No. 543-1** (Wood Dep.) at 243:7-23; **Def. Ex. 59**, Doc. No. 539-59, at p. 3.

**Janssen's Response:** Undisputed but immaterial. *See* Janssen's Reply to SUMF ¶ 55.

165.    Janssen conducted a fair market value ("FMV") analysis concerning its use of Xcenda to provide representatives to deliver SOC Programs to customers. **Def. Ex. 60**, Doc. No. 539-60 (XCENDA Immunology Site of Care Programs 2014). It benchmarked Xcenda's fees against comparable vendors, including MCV ($2,000–$2,500 per program) and Covance ($3,500 per program), and set Xcenda's rate at $2,925 per single program, $3,200 per double program, and $3,595 per weekend program. *Id*. at slide 9. Based on this analysis, Janssen budgeted over $300,000 for approximately 106 single Xcenda programs in 2014. *Id*. at slide 10.

**Janssen's Response:** Undisputed but immaterial. *See* Janssen's Reply to SUMF ¶ 55.

166.    Janssen's 2015 FMV assessment of Xcenda confirmed the same pricing structure, again setting Xcenda's rate at $2,925 per single program, $3,200 per double program, and $3,595 per weekend program. **Ex. 70** (Xcenda Immunology Site of Care Programs 2015) at slide 6. Janssen noted that "Covance would . . . not be a true comparator to XCENDA since they do not have the expertise and knowledge of healthcare reform, billing and coding, and reimbursement." *Id*. Janssen decided not to select MCV for services because MCV Nurses are not "practice management experts." *Id*. at slide 7.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that Janssen's 2015 FMV assessment of Xcenda set Xcenda's rates at the prices above, and that Exhibit 70 (Dkt. No. 598-19) contains the quoted language about Covance. However, with respect to the statement that "Janssen decided not to select MCV for services because MCV Nurses are not 'practice management experts,'" the slide cited by Relator provides three reasons that Janssen did not select MCV: (1) "MCV presenters are experts in **Nursing** for the JBI areas of focus;" (2) "MCV Nurses, are **NOT** clinical, practice management experts, or directly experience[d] in health economics or managed markets;" and (3) "MCV Nurses **educate Nurses** in the clinical nurse management, IOI and HOPD setting only."  Ex. 70 at slide 7 (Dkt. No. 598-19). *See also* Janssen's Reply to SUMF ¶ 55.

167.    Janssen's corporate representative testified that the approximately $3,000  per-program cost to Janssen represented the amount Janssen paid Xcenda to deliver programming, but stated that "[t]his doesn't translate to value provided to a physician." **Doc. No. 543-1** (Wood Dep.) at 244:1-2.

**Janssen's Response:** Undisputed but immaterial. *See* Janssen's Reply to SUMF ¶ 55.

168.    Janssen never assessed the fair market value of Xcenda's services to the physician practices. **Ex. 38** (Janssen's Amended Written Responses to Relator's November 4, 2022 30(b)(6) Deposition Notice) at p. 24 ("Janssen is unaware of anyone assessing, evaluating, or analyzing  "customer demand for" or the "value customers derived from" [its] IOI Support Services); **Ex. 26** (Evans Report) at pp. 19 n.21, 46-47, p. 81 ("Janssen reviewed what the SOC programs cost Janssen but not what the physicians gained in valuable, free business services."); **Ex.  35** (Evans Dep.) at 211:15-212:2 (testifying "there was not an analysis of what that $3,000 program -- what impact or value that had to the physicians who heard that information and who were able to ask the ABS or the Xcenda representative questions about their own practices, seeking information, seeking additional information or seeking information about how to optimize their practice").

**Janssen's Response:** Does not create a genuine dispute of material fact. Relator's assertion that Janssen was required to conduct an FMV analysis of the value of the SOC Programs to doctors is frivolous. *See* Janssen's Reply to SUMF ¶ 55.

169.    Despite paying Xcenda approximately $3,000 per program to deliver SOC programming, Janssen simultaneously maintained that the same programming had "no independent value" when provided to physician practices. **Doc. No. 543-1** (Wood Dep.) at 248:14-20, 250:17-23.

**Janssen's Response:** Does not create a genuine dispute of material fact. Although Janssen maintained that the SOC Programs had "no independent value" to physician practices, there is no relationship between the entirely distinct "FMV" assessment of payments to Xcenda

for services Xcenda provided to Janssen, on the one hand, and the alleged "independent value" of the SOC Programs to practices, on the other hand. Relator's position is frivolous. *See* Janssen's Reply to SUMF ¶ 55.

170.     This contradiction was highlighted by Relator's compliance expert, Virginia Evans: "***Did the SOC programs have value or not?*** If the FMV of each Xcenda program was $3,000 to Janssen, did that value magically disappear when the program was provided to a prescriber?" **Ex. 26** (Evans Report) at 88 n.249. Evans further noted that "Janssen reviewed what the SOC programs cost Janssen but not what the physicians gained in valuable, free business services." *Id*. at 81.

**Janssen's Response:** Does not create a genuine dispute of material fact. Relator's assertion that there was a "contradiction" is frivolous because there is no relationship between the entirely distinct "FMV" assessment of payments to Xcenda for services Xcenda provided to Janssen, on the one hand, and the alleged "independent value" of the SOC Programs to practices, on the other hand. *See* Janssen's Reply to SUMF ¶ 55.

171.     Janssen's internal materials instructed sales personnel to "[l]et your practices know that you offer business acumen presentations and nurse training workshops delivered by third-party consultants with extensive practice management experience and IV therapy experience" and to "[p]osition these presentations as *value-added services* that have received excellent reviews from other customers, and can help to advance practice operations and the delivery of quality care." **Ex. 2** (Zambelli Dep.) at 299:14-23 (reading from internal Janssen document) (emphasis added).

**Janssen's Response:** Does not create a genuine dispute of material fact. The quoted text reflects Relator's counsel reading from a specific exhibit marked at the deposition, which was a 2012 Site of Care Resource Guide addressed to all Site of Care resources, including ABS

152

activities that Relator does not allege involved kickbacks. *See* Janssen's Ex. 142 (Zambelli Dep.) at 272:20-274:11. In addition, "value-added services" is a defined term in Janssen's compliance policies. *See* Janssen's Response to SDMF ¶ 172.

172.    Janssen's corporate representative was unable to explain what the term "value-added services" means. **Doc. No. 543-1** (Wood Dep.) at 403:15-16 ("I don't know what they meant by value added services."). Nor was a former Janssen Regional Business Manager with approximately 20 years of experience. **Ex. 2** (Zambelli Dep.) at 300:2-18.

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). It is undisputed that Ms. Wood and Mr. Zambelli testified that they did not know what was meant by the language as used in the specific exhibits they were shown. However, "value-added" is a defined term in Janssen's guidance documents that refers to programs that were *compliant* with Janssen's policies, not ones that were prohibited. *See* Janssen Resp. Ex. C (Excerpts of Centocor Health Care Compliance Manual (JANSSENBIO-037-00000125)) at 269 (Dkt. No. 581-3); Doc. No. 543-5 (Zalesky Dep.) at 355:25-356:12 (Dkt. No. 543-5). Relator herself referred to the SOC Programs as value-added services and did not think they were improper. Ex. 5 (Long Dep.) at 289:6-22 (Dkt. No. 597-5).

173.    When asked about the term "value-added services," which Janssen instructed sales personnel to use when positioning SOC programs, Wood testified: "I don't know what they meant by value added services." Wood Dep. at 403:15-16.

**Janssen's Response:** This paragraph is duplicative of SDMF ¶ 172. *See* Janssen's Response to SDMF ¶ 172.

174.    No one on Janssen's Promotional Review Committee, which reviewed visual aids and Power Point slide decks that were used during SOC programs presented by ABSs

and the Xcenda consultants, assessed, evaluated, or analyzed the value of the IOI Support Services provided by the ABSs (or third parties like Xcenda) to the IOIs. **Ex. 38** (Janssen's Am. Written Resp. to 30(b)(6) Deposition Notice) at p. 24; **Doc. No. 543-1** (Wood Dep.) at 237:16-25, 243:22-244:10; **Ex. 26** (Evans Report) at pp. 19 n.21, 46-47.

          **Janssen's Response:** Does not create a genuine dispute of material fact. This statement of fact is frivolous and entirely unsupported by the evidence cited. First, Exhibit 38 (Dkt. No. 597-48) had nothing to do with "independent value." Second, Janssen's policies required that all product-related items and services provided to customers satisfy a six-factor test, which included a requirement that a program have a "Close Relationship" to Janssen's product. *See* Janssen's Ex. 66 (Oct. 20, 2005 Guidance Document on Consulting and Product-Related Items and Services Provided to Customers, JANSSENBIO-068-00005537) at -5537-38 (Dkt. No. 539-66); Ex. 39 (2011 Policy Document – Consulting Services Provided to Customers, JANSSENBIO-018-00000520) at -522 (Dkt. No. 597-49). Janssen witnesses, including Ms. Wood, testified *repeatedly* that this "Close Relationship" or "independent value" requirement was evaluated and satisfied for the SOC Programs. *See, e.g.*, Doc. No. 543-1 (Wood Dep.) at 186:4-21, 199:17-201:10, 239:17-241:4, 249:4-12, 251:18-253:12, 280:9-281:21, 283:5-14, 305:10-306:6, 312:9-313:14 (Dkt. No. 543-1); Doc. No. 543-5 (Zalesky Dep.) at 253:20-255:1 (Dkt. No. 543-5); Janssen's Ex. 139 (Cornely Dep.) at 267:14-268:21; Janssen's Ex. 132 (Walls Dep.) at 190:7-191:2, 218:2-220:1.

          175.    There is a "robust market for consulting services that look similar to Janssen's offerings. Large consulting practices such as Deloitte, McKesson and AmerisourceBergen offer services which overlap with those offered by Janssen." **Ex. 49** (Larkin Report) at p. 15. For instance, McKesson's "infusion therapy center . . . ensures your infusion

center's productivity, efficiency and profitability" and promises to "help support a new source of revenue for your practice" by "help[ing] you set up and manage an efficient, full-service infusion center." *Id*.

**Janssen's Response:** Does not create a genuine dispute of material fact. Moreover, Dr. Larkin's opinions are baseless, inadmissible, and do not create a factual dispute. *See* Janssen's Response to SDMF ¶ 143. Neither Dr. Larkin (nor any of Relator's other experts) did any comparison of the SOC Programs to consulting services offered by third parties, and Relator does not even claim to have any evidence that the two were similar.

Finally, to the extent Relator's Opposition cites SDMF ¶ 175 as support for her argument that Janssen was required to conduct an FMV analysis of the value of the SOC Programs to doctors, that argument is frivolous. *See* Janssen's Reply to SUMF ¶ 55.

176.    Smaller consulting firms offered practice management services, including Innovative Healthcare Solutions, Practice & Liability Consultants, Rock Consulting, Woodcock & Associates, Allen Consulting, and Zetter Healthcare Management Consultants. *Id*. McKesson acquired IntraFUSION, Inc. in 2017, describing it as "a leading provider of physician practice management services" that "specializes in the management of infusion centers based in physicians' offices. . . ." *Id*. IntraFUSION was founded in 1999, before Janssen started providing the services at issue. *Id*.

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). Dr. Larkin's opinions are baseless, inadmissible, and do not create a factual dispute. *See* Janssen's Response to SDMF ¶ 143.

177.    A "robust market of paid consultants for IOIs is indicative that the services are valuable. That Janssen provided similar services to these paid consultants over a long period

of time, at considerable cost to itself, is indicative of the fact that the services provided value for physicians receiving the services, and for Janssen itself." *Id*.

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). Dr. Larkin's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 143.

178.    The value of the consultative services provided by the ABSs were of significant value to infusion practices. **Ex. 48** (Larkin Dep.) at 144:11-147:10 (testifying he interviewed an infusion provider who would have paid $500 an hour for the ABS consultative services).

**Janssen's Response:** Does not create a genuine dispute of material fact. Moreover, the only support for this statement of fact is Relator's proffered expert, Dr. Larkin, whose opinion is baseless, inadmissible, and does not create a factual dispute.

Dr. Larkin's opinion is baseless and inadmissible because, in reaching this opinion, he attempted no analysis and followed no methodology to conclude that the SOC Programs conferred "significant value" to physicians. *See* Dkt. No. 567 at 3-8. For these reasons, Dr. Larkin's opinion is the subject of Janssen's pending Motion to Exclude. *See* Dkt. No. 566.

This statement of fact also does not create a factual dispute. The First Circuit has repeatedly held that baseless and conclusory expert opinions are insufficient to defeat a motion for summary judgment because they do not generate a material dispute of fact. *See Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 58 (1st Cir. 2024) ("Hence, a party's 'reliance on a bare ultimate expert conclusion' is not 'a free pass to trial.'" (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993))). Relator must point to admissible, relevant, and reliable evidence, not her expert's speculation about the alleged value of the SOC Programs. Relator does not do that here. First, Dr.

Larkin admitted that he did not interview or conduct any analysis of doctors who actually received an SOC Program. *See* Doc. No. 607-2 (Larkin Dep.) at 48:22-49:1, 68:21-25, 321:18-24 (Dkt. No. 607-2). He relied on conversations with six physicians, two of whom were identified and paid by Relator's counsel, four of whom were social acquaintances in his personal network, and none of whom has ever received an SOC Program or has any knowledge of the ABS role. *Id.* at 98:14-100:14, 100:18-104:21, 120:14-125:5, 144:19-145:24, 188:7-15, 189:7-10. The $500 figure cited in SDMF ¶ 178 comes from the second-hand opinion of Dr. Cramer, *id.* at 145:22-146:7, a paid "fact" witness who is a neurologist in Virginia and has never infused Remicade or Simponi ARIA and has never received an SOC Program. *Id.* at 144:19-145:24. Second, Dr. Larkin's use of the term "significant value" or "substantial independent value" is based on multiple, conflicting definitions of the term that he made up. *See id.* at 211:8-212:12, 217:13-218:1 (explaining that he assessed "substantial independent value" through the lens of "economic value," which he equated with "economic significance"). Thus, Dr. Larkin's unsupported conclusions cannot and do not create a dispute of fact. *See Hoover*, 99 F.4th at 58.

179.    Dr. Larkin constructed a financial model to measure the value of just three aspects of ABS services: better use of chair space, more efficient use of nursing staff, and more efficient inventory management. **Ex. 49** (Larkin Report) at p. 17. Assuming modest increases of 10% in chair utilization (from 80% to 88%) and 5% in nurse efficiency, and a 20% reduction in inventory days on hand (from 15 to 12 days), Dr. Larkin determined that for an IOI with $1 million in annual revenue from infusions, "these relatively small changes would increase profits by $138,000." *Id*. at pp. 17-18. He further noted: "In this hypothetical business, a consultant could charge nearly $70,000 annually for services and still help a client achieve a triple-digit ROI." *Id*. at p. 18.

**Janssen's Response:** Does not create a genuine dispute of material fact. Moreover, Relator's only support for this statement of fact is her expert, Dr. Larkin, whose opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 178. Moreover, the purported "financial model" referenced in SDMF ¶ 179 was, in Dr. Larkin's own words, "back-of-the-envelope" math, and it lacked any accompanying work papers or computations. *See* Doc. No. 607-2 (Larkin Dep.) at 66:20-68:2 (Dkt. No. 607-2). Further, it was based on hypothetical assumptions that he asserted were plausible based on his "belief." *Id.* at 308:19-309:24, 310:8-16, 314:4-6, 315:4-316:3.

180.    Janssen's own market research, a December 2014 qualitative study of 25 GI IOI practice managers, found that "[m]ost practice managers perceive substantial value in the entire Proactive Practice Management resource." **Ex. 50** (12/15/2014 email w/ Gastroenterology IOI Practice Manager & ABS Resource Research slide deck) at slide 19.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that the cited document, Exhibit 50 (Dkt. No. 597-60), contains the quoted language on slide 19. However, the market research was focused on the PRC-approved slide deck, which Relator does not allege constituted illegal remuneration. Also, this language appears in a 48-page market research slide deck containing information from a third party, Ethnographic Solutions, without context as to who came up with the language or what was meant by it.

181.    The same research found that "[t]he large majority of practice managers perceive substantial value in the Proactive Practice Management resource" and view it as "highly relevant to their own role within, and goals for, their practices." *Id*. at slide 20. One practice manager stated: "This is mostly my part of the job. I would be very interested in getting all this." *Id*. Another

stated: "They [topics] all look good. It discusses the ways that we can improve on what we're doing already." *Id*.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that the cited document, Exhibit 50 (Dkt. No. 597-60), contains the quoted language on slide 20. However, the market research was focused on the PRC-approved slide deck, which Relator does not allege constituted illegal remuneration. Also, this language appears in a 48-page market research slide deck containing information from a third party, Ethnographic Solutions, without context as to who came up with the language or what was meant by it.

182.    A separate 2011 online survey of SOC 360 program recipients found that "[r]espondents consistently report that all target SOC360 programs offer relatively high value to their practices." **Ex. 71** (9/10/2014 Email w/ SOC360 Program Research – Online Survey Findings, 11.10.2011) at slide 17.

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). It is undisputed that the cited document, Exhibit 71 (Dkt. No. 598-20), contains the quoted language on slide 17. However, this language appears in a 46-page market research slide deck containing information from a third party, PharmaStrat, LLC, without context as to who came up with the language or what was meant by it.

183.    Following the Proactive Practice Management program, respondents reported implementing concrete changes: "We now double check each insurance and count all co-pays at the end of the day. We also watch the new patient scheduling very closely"; "The program made us take more control of the financial aspect of the practice, i.e. copays, balance reports, etc."; "We're more focused on optimizing physicians' time and scheduling patients properly." *Id*. at slide 28.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that the cited document, Exhibit 71 (Dkt. No. 598-20), contains the quoted language on slide 28. However, this language appears in a 46-page market research slide deck containing information from a third party, PharmaStrat, LLC, without context as to who came up with the language or what was meant by it.

184.    Customers found the site of care programs to be extremely valuable. **Ex. 34** (Site of Care Solutions) at slide 2 ("'When I tell you this is one of the most valuable resources our company has to provide to our customers it is an understatement.' . . . 'The speaker's extensive experience and overall practice management acumen allowed us to open new doors for Centocor Ortho Biotech and REMICADE'"), slide 5 ("We were contemplating closing our infusion center but have implemented some process changes and decided to expand it as a result of this presentation. . . These programs are the best resource I have seen from any pharmaceutical company."); slide 8 ("Let your practices know that you offer business acumen programs . . . delivered by third party consultants with extensive practice management experience . . . as value-added services that have received excellent reviews from other customers, and can help to advance practice operations. . . ."). *See also supra* ¶ 142 (additional evidence of substantial independent value).

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). The assertion is inconsistent with the exhibit cited by Relator. First, the quoted language on page 2 of Exhibit 34 (Dkt. No. 597-44) is from an ABS, not a customer, so it cannot provide support for what "[c]ustomers found." Second, the document refers to programming for IOIs as well as for HOPDs and ASOC/ITPs, as to which Relator has not alleged any kickbacks, and it is unclear whether the references to "programs" in the quoted language at

slides 5 and 8 refer to the At-Issue SOC Programs, as opposed to ABS programming more generally. Relator's SDMF ¶ 142 provides no "additional evidence of substantial independent value," which is a baseless legal conclusion.

185.   The SOC programs addressed billing, coding, payer contracting, staffing, scheduling, patient flow, inventory management, and other practice management topics applicable to all infusible drugs, not just Remicade and Simponi ARIA. *See* ¶¶ 32-34, 36, *supra*. Janssen's own corporate representative, Brian Smith, conceded this point when asked: "Would you agree that some of those programs would be of interest or have value to doctors even if those doctors were not going to use Remicade or Simponi ARIA?" **Doc. No. 543-3** (Smith Dep.) at 249:6-9. Smith answered: "They would have interest if the provider -- the physician wanted to infuse products in their office regardless of Simponi ARIA or Remicade." *Id*. at 249:12–15.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that the SOC Programs provided education on the topics identified. However, the remainder of this statement of fact is unsupported, including because Janssen only provided the SOC Programs to practices that prescribed and/or administered Remicade and Simponi ARIA, and because the SOC Programs were related to the utilization, acquisition, administration, and reimbursement of Janssen's products. To the extent that this statement of fact implies that Mr. Smith "conceded" that the SOC Programs would, as a theoretical matter, be "applicable to all infusible drugs," Mr. Smith did not. That assertion is also immaterial, as the Department of Justice and courts have rejected similar attempts to impute independent value where information related to a drug (such as education on disease or administration) could have theoretical relevance to other drugs. *See* Janssen's Mem. in Support of its Mot. for Summary Judgment, Dkt. No. 538, at 16.

161

186.    "Any experienced health care counsel would have recognized that Janssen's IOI Support Services had substantial value to the recipients wholly independent of any Janssen product and constituted remuneration for purposes of the AKS. ABSs did not passively provide generally available information to the practices. Rather their job was to provide physician practices with valuable actionable intelligence on how to set up and operate their infusion centers more efficiently and more profitably from persons with wide experience and expertise in the industry and with the physicians' operations." **Ex. 72** (Report of Kevin McAnaney ("McAnaney Report")) at ¶ 157.

**Janssen's Response:** Does not create a genuine dispute of material fact. Moreover, Mr. McAnaney has not yet been deposed,[21] and the unsupported and conclusory opinion in his expert report, which purports to opine on several ultimate legal issues, such as intent and remuneration, is improper. *See, e.g.*, *Singular Computing LLC v. Google LLC*, No. 19-12551-FDS, 2023 WL 8810187, at *5 (D. Mass. Dec. 20, 2023) (Saylor, J.) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."); *Adams v. New England Scaffolding, Inc.*, No. 13-12629-FDS, 2015 WL 9412518, at *7 (D. Mass. Dec. 22, 2015) (Saylor, J.) (stating testimony "as to an ultimate legal conclusion, such as an opinion that a defendant was 'negligent'" is not helpful to the trier of fact and "should therefore be admitted rarely, if at all"). Mr. McAnaney's opinion will be the subject of a forthcoming motion to exclude. It is also insufficient to defeat a motion for summary judgment. *See Hoover v. Hyatt Hotels Corp.*, 99 F.4th

---

[21] Relator's expert, Kevin McAnaney, experienced an unexpected and serious medical incident that made him unable to complete his expert rebuttal report and prepare for and attend his deposition by the deadline. *See* Dkt. No. 518. Mr. McAnaney remains unavailable for deposition until after briefing on the pending Motion for Summary Judgment is complete.

45, 58 (1st Cir. 2024) ("Hence, a party's 'reliance on a bare ultimate expert conclusion' is not 'a free pass to trial.'" (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993))).

187.    ABSs' incentive compensation was directly tied to sales of Remicade and Simponi ARIA. The ABS compensation plan had two principal components: (1) a sales-based component weighted at 50% of incentive compensation, measured by Remicade and Simponi ARIA volume growth and percentage growth in the ABS's territory; and (2) a Management By Objectives ("MBO") component weighted at the remaining 50%. **Ex. 73** (2014 Sales Incentive Compensation Plan) at slides 19-21 (setting forth Site of Care team compensation structure with Remicade at 30% weight, Simponi ARIA at 20% weight, and MBO at 50% weight, with a 325% earnings cap and a 2-to-1 national portfolio forecast attainment multiplier for the IV Portfolio). The MBOs were also heavily weighted toward sales objectives. **Ex. 49** (Larkin Report) at pp. 21-22 (opining that MBOs were "heavily weighted towards sales" and that Relator's 2015 Year-End Performance Review listed the first objective as "Meet or exceed franchise sales goals and drive sales performance compliantly as measured by Sales Incentive Comp Plan").

**Janssen's Response:** Does not create a genuine dispute of material fact. First, Relator's compliance expert testified that OIG is aware that pharmaceutical companies routinely pay field representatives incentive compensation based on increase sales, and that OIG has issued guidance cautioning about the use of "extraordinary incentive compensation." Doc. No. 602-1 (Evans Dep.) at 381:3-382:18 (Dkt. No. 602-1). Relator's expert is not offering an opinion in this case that the ABS incentive compensation involved "extraordinary incentive compensation." *Id.* at 383:1-16. Second, Relator's summary of an ABS incentive compensation plan is materially incomplete and misleading. ABSs received a salary plus a bonus. *See* SUMF ¶ 50. Although half of an ABS's bonus, which was a relatively small portion of an ABS's overall compensation, was

based on sales, it was based on what Janssen referred to as "*all dirt*," which meant it was based on sales to *all accounts* in an ABS's territory, *regardless of whether an ABS called on those accounts*. *See* Ex. 5 (Long Dep.) at 245:21-246:6 (Dkt. No. 597-5). Also, because it was based on all sales, it encompassed both (1) ABS activities that Relator testified were intended to increase sales and did not involve a kickback, *see id.* at 184:3-7, 204:6-25, 205:1-206:3, and (2) the promotional activities of the traditional sales representatives known as ISGs and ISRs, *see* Janssen's Ex. 134 (Excerpts of Janssen Biotech, Inc.'s Objs. and Resps. to Plaintiff-Relator Julie Long's Dep. Questions to be Answered in Writing (Aug. 2, 2024) – Response to Deposition Question 16) at 48. It also encompassed promotional activities to HOPDs, which Relator does not allege involved kickbacks. *See* Ex. 5 (Long Dep.) at 246:2-10 (Dkt. No. 597-5). As such, ABS incentive compensation was structured in a manner that contradicts the assertion in Relator's Opposition (citing SDMF ¶¶ 187-188) that it supposedly incentivized ABSs to increase prescriptions. *See* Dkt. No. 613 at 13. It is undisputed that the ABS role was intended to increase sales. *See* SUMF ¶ 24. Finally, as explained in Janssen's Motion to Exclude, Dr. Larkin engages in improper narration of the record by summarizing internal company documents. *See* Dkt. No. 567 at 13-16 (citing *U.S. ex rel. Bawduniak v. Biogen Idec, Inc*., No. 1:12-CV-10601, 2022 WL 2662678, at *3 (D. Mass. July 8, 2022)). These opinions are improper under Rule 702 and therefore inadmissible.

188.    The sales-based component of ABS compensation was indexed to national average performance, creating a direct financial incentive for ABSs to outperform the national average in growing Remicade and Simponi ARIA volume within their territories. For example, in 2014, an ABS whose territory achieved 150% of the national average volume growth for Remicade would receive a payout of approximately $3,714 on just that one component. **Ex. 73** (2014 Sales

Incentive Compensation Plan) at slides 23-24 (Remicade and Simponi ARIA payout examples demonstrating indexed performance calculation).

**Janssen's Response:** Does not create a genuine dispute of material fact. *See* Janssen's Response to SDMF ¶ 187.

189.    For every one percent increase in forecast attainment above 100%, a 2-to-1  multiplier was applied to the total portfolio payout. *Id.* at slide 21. ABSs' annual targeted earnings from incentive compensation alone were $35,500. *Id.* at slide 19.

**Janssen's Response:** Does not create a genuine dispute of material fact. *See* Janssen's Response to SDMF ¶ 187.

190.    Janssen's ABSs' "Account Action Plans" had the clearly expressed objective to track and increase sales of Janssen products. One such plan listed as its objective to "Grow Remicade and improve [Janssen] market share," including strategies such as preparing and presenting IOM scenarios and "differentiat[ing] Remicade's Clinical Benefits and reverse the growing Orencia trend." **Ex. 49** (Larkin Report) at p. 21 (citing JANSSENBIO-009-00010631, Ex. 113 (composite). Strategy 3 in the same plan was expressly focused on helping improve IOI efficiency: "The site will have optimized processes involved with managing and administering Remicade to their patients." *Id.*

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). It is undisputed that the ABS role was intended to increase sales. *See* SUMF ¶ 24. However, this statement is improper to the extent it relies on characterizations found in the report of Dr. Larkin, whose opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 178.

165

Dr. Larkin's opinion is the subject of Janssen's Motion to Exclude, Dkt. No. 566, including because he improperly narrates the record by characterizing and interpreting internal company documents. Dkt. No. 567 at 13-16 (citing *U.S. ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 1:12-CV-10601, 2022 WL 2662678, at *3 (D. Mass. July 8, 2022)). Furthermore, Janssen disputes Relator's characterizations of the referenced Account Action Plan in "composite" Exhibit 113 (Dkt. Nos. 599-12 to 599-24), which speaks for itself.

191.    Janssen's own internal strategy documents confirmed that the purpose of the early ABS programs was to generate demand for Remicade. A 2000 Practice Management Program Update stated: "An effective Practice Management Program (PMP) increases demand for Remicade. . . . Physicians with in-office infusion capabilities are more likely to prescribe Remicade— Physicians who begin to infuse in-office use more Remicade — Physicians who infuse in-office use Remicade more broadly. . . . A large in-office infusion base strengthens Remicade's advantage against current competitors (injected)." **Ex. 10** (2000 Practice Management Program Update) at slide 3.

**Janssen's Response:**  Does not create a genuine dispute of material fact. The cited document, Exhibit 10 (Dkt. No. 597-11), was from years before the ABS role was even created and so, by definition, does not support this statement of fact. In any event, it is undisputed that the ABS role was intended to increase sales. *See* SUMF ¶ 24.

192.    Relator's expert Dr. Adriane Fugh-Berman opined that the business services, resources, and support that targeted physicians received from Janssen "helped physicians establish, maintain, optimize, and increase the growth of their IOIs, and thus constituted highly valuable gifts" that "provided the physicians with the opportunity to maintain and increase their profits both from infusions and from infused medications, which included but were not limited to

Remicade and Simponi Aria." **Ex. 43** (Report of Dr. Adriane Fugh-Berman ("Fugh-Berman Report")) at pp. 20-22.

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). Dr. Fugh-Berman's opinion is baseless, inadmissible, and does not create a factual dispute.

Dr. Fugh-Berman's opinion is baseless and inadmissible because, in reaching this opinion, she attempted no analysis and followed no methodology to conclude that the SOC Programs constituted "highly valuable gifts" or allowed physicians an "opportunity to maintain and increase their profits." *See* Dkt. No. 565 at 7-14. For these reasons, Dr. Fugh-Berman's opinion is the subject of Janssen's pending Motion to Exclude. *See* Dkt. No. 564.

This statement of fact also does not create a factual dispute. The First Circuit has repeatedly held that baseless and conclusory expert opinions are insufficient to defeat a motion for summary judgment because they do not generate a material dispute of fact. *See Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 58 (1st Cir. 2024) ("Hence, a party's 'reliance on a bare ultimate expert conclusion' is not 'a free pass to trial.'" (quoting *Hayes v. Douglas Dynamics*, Inc., 8 F.3d 88, 92 (1st Cir. 1993))). Relator must point to admissible, relevant, and reliable evidence, not her expert's speculation about the alleged value of the SOC Programs. Relator does not do that here. First, Dr. Fugh-Berman admitted that she did not interview or conduct any analysis of doctors who actually received an SOC Program. Doc. No. 565-3 (Fugh-Berman Dep.) at 103:13-104:7 (Dkt. No. 565-3). She relied on conversations with two physicians who were identified and paid by Relator's counsel, neither of whom has ever received an SOC Program or has any knowledge of the ABS role. *Id.* at 96:2-97:19, 171:14-173:19. Second, she opined that the SOC Programs would increase profits for a practice, but she did not look at any financial information or analysis to reach such a

167

conclusion. *Id.* at 180:12-15. Thus, Dr. Fugh-Berman's unsupported conclusions cannot and do not create a dispute of fact. *See Hoover*, 99 F.4th at 58.

193.    Dr. Fugh-Berman further opined that "Janssen's gift of business services fostered brand loyalty, and caused physicians to increase their prescriptions and infusions of Remicade and Simponi Aria to their patients, including Medicare patients." *Id.* at 17.

**Janssen's Response:**  Does not create a genuine dispute of material fact. Dr. Fugh-Berman's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 270.

194.    Relator's expert Kevin G. McAnaney opined that the IOI Support Services (i) "were targeted to physicians in a position to prescribe and hopefully purchase Remicade and SA"; (ii) "were both valuable and had substantial independent value and were provided based on purchases of Remicade and SA"; and (iii) "were intended to induce recipients to use Remicade and SA." **Ex. 72** (McAnaney Report) at p. 51.

**Janssen's Response:** Does not create a genuine dispute of material fact. Mr. McAnaney's opinions are baseless, inadmissible, and do not create a factual dispute. *See* Janssen's Response to SDMF ¶ 186.

195.    McAnaney noted that "[t]hroughout the entire period, Janssen provided IOI Support Services to physicians because physicians with IOI services prescribed more Remicade, used more Remicade per patient, and used Remicade for a broader set of patients." *Id.* at 50.

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). Mr. McAnaney's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 186.

196.    Janssen's internal documents show that one of its early "insights" around Remicade and IOI Support was "declining reimbursement for Remicade (drug or infusion) may drive down usage for some IOI and HOPD accounts," and that a "leverage opportunity" in response to that "insight" was to "use education to drive acceptance and utilization of Remicade in alternate sites of care." **Ex. 75** (Strategic Business Franchise 2007 Business Plan Strategy Review) at slide 12. Another "insight" was identified as "physician practice concerns are largely influenced by perceptions and experience," followed by another "leverage opportunity" to "improve perception of the Remicade infusion process via [IOI Support], AccessOne, etc." *Id.*

**Janssen's Response:** Undisputed but immaterial (and is not cited in Relator's Opposition).

197.    As set forth in ¶¶ 11, 20, and 71-73, *supra*, Janssen internally characterized the ABS job description as providing consultative services on overall IOI practice management while simultaneously recognizing that such services "could be considered a kickback." The contradiction between Janssen's internal descriptions of the ABS role and its compliance training demonstrates that Janssen knew the SOC Programs posed AKS risks. *See* **Ex. 1** at slides 4 & 8; **Ex. 6** at p. 12; **Def. Ex. 76**, Doc. No. 539-76 at p. 51.

**Janssen's Response:** Does not create a genuine dispute of material fact. This statement of fact is unsupported. *See* Janssen's Replies to SUMF ¶¶ 11, 20, and 71-73.

198.    While Janssen did investigate compliance policy violations, Janssen's investigations were minor, peripheral matters involving individual employee policy violations, not investigations of the core compliance risks of its SOC marketing scheme. **Def. Ex. 79**, Doc. No. 539-79 (2008 investigation involving a single sales representative who was terminated for discussing profitability with physicians, but not addressing whether the SOC programs violated

169

the AKS); **Def. Exs. 82 & 83** (investigation concerning Relator for emailing blackened-out patient forms to other employees without realizing some of the hidden patient-identifying information became visible, not relating to the legality of the SOC programs at all); **Def. Exs. 84 & 85** (2015 investigation involving a single sales representative who was alleged to have engaged customers in detailed profitability discussions, but not addressing whether the SOC programs violated the AKS).

**Janssen's Response:** Does not create a genuine dispute of material fact. As Relator admits, Janssen assessed the core compliance risks of its SOC marketing program on multiple occasions. *See* SDMF ¶¶ 206-208. The exhibits she cites in support of this fact, which concern three particular investigations into alleged employee violations of Janssen policy, do not show otherwise. With respect to the purported characterization of Janssen's investigations as "minor" or "peripheral," that is unsupported by the evidence cited and baseless. *See* SUMF ¶¶ 94-96.

199.    Janssen's internal documents repeatedly described ABS services as "consultative" in nature. *See* ¶¶ 11, 20, 38, 71-73, 80, 132-133, 149, 160, 197, *supra*.

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). Janssen objects to Relator's improper and duplicative statements of fact that are designed to make it impossible for the Court to assess the purported evidence, while creating the false appearance of the type of "fact" propagated by SDMF ¶ 199. First, Relator includes repeated cross-references, including to numerous statements of fact discussing the identical evidence. For example, this statement of fact itself purports to summarize a dozen other statements of fact, many of which then do the same. *See, e.g.*, SDMF ¶ 197 (like SDMF ¶ 199, purporting to summarize Relator's Responses to SUMF ¶¶ 11, 20, 71-73). Second, to create the appearance of "repeated" references in documents to the subject of this statement of fact, Relator

cites to numerous other statements of fact that all discuss only a <u>single</u> document: Exhibit 1 (Dkt. No. 597-1). Exhibit 1 is the only exhibit relating to the subject of SDMF ¶ 199 that is discussed in Relator's Responses to SUMF ¶¶ 11, 20, 71-73, and 80. In addition, Relator's cross-references fail to specify the portion of each of the lengthy statements of fact cited that purports to relate to SDMF ¶ 199. *See* Relator's Response to SUMF ¶ 11 (citing six exhibits, only one of which related to SDMF ¶ 199). Finally, Janssen objects to Relator's citation to SDMFs that are actually unrelated to SDMF ¶ 199. *See* Relator's Response to SUMF ¶ 38; SDMF ¶¶ 132, 149.

> *See also* Janssen's Reply to SUMF ¶¶ 11 (discussing Exhibit 1 (Dkt. No. 597-1)) and Janssen's Response to SDMF ¶ 133 (discussing Exhibit 74 (Dkt. No. 598-23)). Those are the only two documents Relator cites in support of the assertion that "Janssen's internal documents repeatedly described ABS services as 'consultative' in nature."

200.    Janssen trained its employees that the Anti-Kickback Statute "[m]akes it illegal for pharmaceutical manufacturers to give [health care practitioners] anything of value to induce them to prescribe or purchase products that are reimbursed in whole or part by a federal healthcare program." **Ex. 6** (Health Care Compliance Site of Care ABS Speaker Training) at slide 5.

**Janssen's Response:** Undisputed.

201.    Janssen further trained its employees that "remuneration" under the Anti-Kickback Statute is defined "very broadly" to include not only cash, but also "'free products or services or even the opportunity to earn money.'" **Ex. 77** (Angela Wood 30(b)(6) Topics Written Responses) at p. 8 (quoting **Ex. 78** (J&J Bright Lines Overview of Regulatory Issues).

**Janssen's Response:** Undisputed.

202.    Janssen's internal training materials stated that the government "does not want to cover the cost of Rx products when they violate . . . [the] Anti-Kickback Statute [or the] False Claims Act." **Ex. 6** (Health Care Compliance Site of Care ABS Speaker Training) at slide 4.

**Janssen's Response:** It is undisputed that the quoted language appears in Exhibit 6 (Dkt. No. 597-6), but this SDMF is not cited in Relator's Opposition, so Janssen does not respond further.

203.    On December 1, 2010, Chris Firriolo, Director of Regulatory Affairs, Advertising and Promotion, and a member of the PRC, wrote to Michelle Walls, Compliance Officer for Immunology at Janssen, and Angela Wood, also a compliance officer, raising concerns about Janssen's plan to engage Xcenda to provide an ABS role in the Gastroenterology franchise to support "an interest in increasing in-office infusion capacity among gastroenterologists who prescribe Remicade." **Ex. 26** (Evans Report) at p. 129; **Ex. 79** (Email Firriolo to Walls, Dec. 1, 2010). Firriolo correctly observed that this plan "could be presented as a means to generate revenue for the practice" and that "there is the risk that inappropriate involvement by us (or an agent of ours) could be viewed as offsetting costs that the practice would otherwise need to incur to set up their in-office infusion capacity." *Id.*

**Janssen's Response:** Does not create a genuine dispute of material fact. Relator is using selective quotation to misrepresent the document, which stated the opposite of what Relator asserts in her Opposition. *See* Dkt. No. 613 at 16-17, 38. Mr. Firriolo's email addressed a new "GBS" role which, for the first time, involved using third-party representatives (rather than Janssen employees) "to fill an ABS role for the GI" space. Ex. 79 (Dkt. No. 598-28). Mr. Firriolo began by recognizing that the ABS role was appropriate, but involved "potential risks" that Janssen's compliance department oversaw. As a responsible compliance officer, Mr. Firriolo then raised

172

important questions *about Janssen's oversight of the activities when performed by third-party representatives*. That is why the directives he identified in the next paragraph of his email involved "this effort with Xcenda" and stated that "appropriate execution of this program will require HCC support in the form of PRC review of the materials, training, monitoring and oversight." Ex. 79 (Dkt. No. 598-28). It is also why he did not propose *any* directives relating to the existing ABS role. As Ms. Wood explained, "the only concern that Mr. Firriolo raised was related to the fact that these programs were provided by an outside consultant that was not a Janssen employee." Doc. No. 543-1 (Wood Dep.) at 381:13-19 (Dkt. No. 543-1). Finally, Relator omits that Mr. Firriolo's contemporaneous documents confirm that he and Janssen viewed the ABS role and SOC Programs as appropriate and consistent with Janssen's policies. *See* Janssen's Response to SDMF ¶ 213.

204.    Angela Wood served as Director of Healthcare Compliance for immunology and oncology from 2010 to 2014, with direct responsibility for reviewing the SOC Programs for compliance with the Anti-Kickback Statute. Wood Dep. at 19:16-21:11; 22:1-7. When asked whether she considered herself "an expert on the Anti-Kickback Statute," Wood testified: "One of the more important aspects of healthcare compliance. Why our function exists. So, yes." Wood Dep. at 177:5-10.

**Janssen's Response:** Does not create a genuine dispute of material fact. There is no support for that assertion that Ms. Wood had "direct responsibility for reviewing the SOC Programs for compliance with the Anti-Kickback Statute." Ms. Wood is not an attorney, and the testimony cited by Relator does not support that claim. Instead, Ms. Wood testified that as the HCC representative on the PRC, she reviewed proposed product-related initiatives, including the SOC Programs, for compliance with HCC policies, which were themselves "intended to be in line

173

with all of the laws and regulations." *See* Doc. No. 543-1 (Wood Dep.) at 93:4-94:2, 95:24-98:2, 175:4-176:16 (Dkt. No. 543-1).

205.    In 2011, Wood attended a four-day Seton Hall Law School certification program "focused on the pharmaceutical space, which covered many aspects of Anti-Kickback as well as other topics." Wood Dep. at 26:22-27:16. Wood described this as "a more comprehensive type of training cases and other relevant information" beyond the standard training provided to all employees. Wood Dep. at 29:21-30:4.

**Janssen's Response:** Undisputed.

206.    Wood participated in the December 2010 review that was triggered by Chris Firriolo's concerns about the Xcenda engagement. Wood Dep. at 205:15-17 ("Q. Were you a participant in that meeting? A. Yes."). Wood testified that this review "would have reviewed the site of care programs for compliance with the guidance document related to product-related services" and "the HCC policy related to consulting services provided to customers." Wood Dep. at 205:6-14.

**Janssen's Response:** Does not create a genuine dispute of material fact. Relator's Opposition cites SDMF ¶ 206 as evidence that Janssen knew the ABS role and SOC Programs involved impermissible consulting services. *See* Dkt. No. 613 at 41. That is false. *See* Janssen's Response to SDMF ¶ 203. As Ms. Wood explained, "the only concern that Mr. Firriolo raised was related to the fact that these programs were provided by an outside consultant that was not a Janssen employee." Doc. No. 543-1 (Wood Dep.) at 381:13-19 (Dkt. No. 543-1).

207.    Wood participated in a May to November 2011 "holistic review" of the SOC Programs. Wood Dep. at 215:2 ("Q. Were you a part of that review? A. Yes."). Wood testified that the purpose of the review was to "perform a holistic review of all the related site of care materials"

and "that assessment and analysis to allow us to have the right assurances that it was appropriate based on HCC policy." Wood Dep. at 216:13-19. Wood testified that this review was triggered because "Mr. Firriolo did raise concerns." Wood Dep. at 212:19.

**Janssen's Response:** Does not create a genuine dispute of material fact. The May to November 2011 review of the SOC Programs was not triggered by Mr. Firriolo's concerns. As Ms. Wood explained, it was the separate December 2010 review of the "GBS" role that was triggered by Mr. Firriolo's desire to ensure Janssen had sufficient oversight of an ABS role being performed by a third party, so the "GBS" role would be just as appropriate and compliant as the existing ABS role being performed by Janssen employees. *See* Janssen's Responses to SDMF ¶¶ 203, 206, and 213.

208.    Wood received an email in May 2011 from Chris Firriolo attaching "the site of care resource guide that catalogs all of our offerings and my summary of the historical HCC perspective on site of care initiatives." Wood Dep. at 360:1-12. Wood testified that she received this material because "I, along with Roger Kung were newer to role, so the historical perspective on these programs was really important as well as the kickoff for the larger holistic assessment that we talked about earlier." Wood Dep. at 360:16-21.

**Janssen's Response:** Undisputed (but not cited in Relator's Opposition) so Janssen does not respond further.

209.    Janssen's corporate representative, Brian Smith, testified that his understanding of the Anti-Kickback Statute is that "you give something of value in exchange for something of value." **Doc. No. 543-3** (Smith Dep.) at 22:15-17. Smith testified that providing a "bag of cash" to a physician "in return for a medical provider to prescribe that pharmaceutical company's drugs" would be "illegal" and that such conduct "could be inducing inappropriate

175

claims." *Id.* 24:22-25:2; 27:12-14. Smith further testified that the purpose of the Anti-Kickback Statute is "[t]o make sure that companies aren't providing value to induce prescribing that could then be billed to government." *Id.* 23:8-11.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that Mr. Smith provided this testimony. However, Mr. Smith is not a lawyer, and the testimony was beyond the scope of Mr. Smith's Rule 30(b)(6) deposition notice.

210.    Smith acknowledged that all Janssen employees receive training regarding the Anti-Kickback Statute. *Id.* 30:23-31:10.

**Janssen's Response:** Undisputed.

211.    In 2009, Janssen provided an internal training session on its product-related guidance. Janssen noted that the requirement that the service be "closely related" to a purchased item or service required that the product "must be integrated into or dedicated to the use of Company's product" and that "items and services of general benefit" such as "practice management," "office equipment," or "consulting" could not be provided. **Ex. 72** (McAnaney Report) at p. 33 (citing **Ex. 80** (JANSSENBIO-064-00000483)).

**Janssen's Response:** Does not create a genuine dispute of material fact. Relator omits that Exhibit 80 (Dkt. No. 598-29) was training on Janssen's compliance policy, which explicitly stated, "A product-related item or service must be closely related to the specific J&J company product(s) that is being sold to the customer…. Services or items that provide a general benefit to the customer, *such as practice management consulting or office equipment* that is not integrated into or dedicated to the use of the J&J company product (e.g., facsimile machines or personal computers) **do not** constitute product-related items or services and may not be offered as

176

such." Janssen's Ex. 66  (Oct. 20, 2005 Guidance Document) at -5538 (emphasis added) (Dkt. No. 539-66).

212.    In 2011, Roger Kung, a Janssen compliance officer, initiated an "assessment" of the SOC 360 strategy in order to "seek better understanding of commercial strategic SOC vision and alignment of compliance frameworks in an effort to minimize potential future risk." **Ex. 72** (McAnaney Report) at p. 34 (quoting **Ex. 81** (JANSSENBIO-078-00000018)).

**Janssen's Response:** Undisputed.

213.    As part of that assessment effort, Chris Firriolo prepared a summary of his understanding of the views of Janssen's compliance department with respect to the IOI Support prior to 2011. Among his observations were that "[i]t is appropriate to provide information, considerations, and tools to the various sites of care (e.g. prescriber's office, ASOC), and the various functions within each site of care (e.g. Physician, nurse, office manager, billing dept.) directly related to the utilization of our product" and notes a "compliance sensitivity" as Janssen "[m]ust not provide a resource or service that . . . may benefit the customer with value that they would otherwise need to pay for themselves or offsets other overhead expenditure." **Ex. 72** (McAnaney Report) at p. 35 (quoting **Ex. 82**).

**Janssen's Response:** Does not create a genuine dispute of material fact. First, Relator omits that Mr. Firriolo's summary, Exhibit 82 (Dkt. No. 598-31), stated that the SOC Programs "provide general considerations" and that, "The overall intent and tone of our interactions related to SOC is to help the patient gain access to the prescribed treatment <u>after</u> the clinical decision to treat has been made." Ex. 82 (emphasis in original). Second, Relator omits that Mr. Firriolo sent both this document and the SOC Resource Guide (which listed all of the SOC

177

Programs) together, and his email confirms that he and HCC viewed the ABS programs as appropriate and consistent with the principles identified in Exhibit 82 (Dkt. No. 598-31).

214.    A draft of a December 2012 marketing team slide deck for a meeting with ABSs stated that one of the "Strategic Imperatives" in the 2013 Marketing Strategies for ABSs was to "Sustain and grow the infusion model by increasing efficiencies and improving the experience," which was a "Value Proposition" to be achieved through "Strengthen[ing] customer operational competency and efficiencies." **Ex. 114** (Site of Care Marketing 2013 slide deck) at slide 20.  In reviewing this language, Kathryn Roberts, a Director of Regulatory Advertising and Promotion at Janssen, commented that "[W]e can't directly impact efficiencies. [W]e can provide information to help improve the delivery of remicade." *Id*. at p. 27. James Knepp, however, advised that the slide and language were approved and kept the slide in the deck without modification. **Ex. 115** (1/3/2013 email with final version of Site of Care Marketing 2013 slide deck) at p. 1 & slide 20.

**Janssen's Response:** Does not create a genuine dispute of material fact and is not cited in Relator's Opposition, so Janssen does not respond further.

215.    Janssen's compliance personnel edited marketing materials and internal documents to conceal the true nature, value, and purpose of Janssen's IOI Support. For example, in 2011, Janssen compliance personnel edited a pocket resource designed to promote the "Helping you optimize access to infusion therapy" program by: 1) adding the phrase "with our products" in sections highlighting services to address operational or management issues of the physician practice; 2) removing a customer testimonial that praised the IOI Support for preventing the closure of an IOI and allowing its expansion after receiving the services; and 3) removing language that ABSs could recommend "customized solutions related to the management of infusion

178

therapy." **Ex. 72** (McAnaney Report) at p. 34 ¶ 113. But Janssen continued to provide these customized, consultative services.

**Janssen's Response:** Does not create a genuine dispute of material fact. This proposed statement of fact is not a statement of fact at all; it is an unsupported inference of Relator's counsel, improperly laundered through the report of a proffered expert witness who does not even claim to have experience or a methodology to analyze Janssen's intent, and who, under Rule 702, has no business providing a narrative summary of Janssen's internal documents, let alone drawing unsupported inferences as to Janssen's intent. As noted above, Mr. McAnaney's opinions are baseless, inadmissible, and do not create a factual dispute. *See* Janssen's Response to SDMF ¶ 186.

The evidence cited establishes merely that a compliance representative proposed a change to a document to make it accurate (and Relator makes no effort to show that the change did anything more). In fact, Relator's argument that a customer testimonial was supposedly removed for concealment purposes is baseless; the draft document with the testimonial was dated April 18, 2011, and the document without the testimonial, which appears to be a draft undergoing edits (with an entire section removed, not just the testimonial), was dated September 2, 2011— which is nearly 5 months later. Even assuming the testimonial was ever removed, Relator cites no evidence as to when or why.

216.    A draft marketing bulletin concerning the introduction of the "Enhancing Patient Access and Care" SOC Program, which was developed to help ABSs "have capacity and *efficiency* discussions with [their] customers," was edited by Chris Firriolo, a compliance and regulatory officer, to whitewash the objective of the program. **Ex. 116** (9/11/2006 email with draft IBU Marketing Bulletin) at p. 3 (emphasis added). The document originally described the

179

program as: "The presentation helps improve patient care by providing our customers with **the most efficient way to** manage their site of care," which was consistent with the purpose of the program. *See id*. (emphasis added). As revised, the program is innocuously described as: "The presentation helps improve patient care by providing our customers with **information to help them** manage their site of care," thereby concealing the true consultative nature of the program. *Id*. (emphasis added).

**Janssen's Response:** Does not create a genuine dispute of material fact. Relator's concealment allegation is unsupported by the exhibit cited and facially preposterous, including because nothing is concealed by changing "providing our customers with the most efficient way to manage their site of care" to "providing our customers with information to help them manage their site of care." First, Exhibit 116 (Dkt. No. 599-27) is a 2006 draft internal alert about the Enhancing Patient Access and Care slide deck, with a simple proposed edit by Mr. Firriolo to accurately describe the content of the deck. Relator failed to attach the Enhancing Patient Care and Access presentation itself, from which the Court could see it involved education about high-level considerations to help ensure patients who were prescribed Remicade could receive timely access to treatment. *See* Janssen's Ex. 135 (Enhancing Patient Care and Access, JANSSENBIO-064-0006542). Indeed, the deck included a section (slides 14-22) titled "Scheduling Efficiency" with basic considerations that (as stated on slide 20) would be "particularly important to practices that may have a backlog of patients." Thus, the program involved education relating to ensuring patients received timely access to Remicade.

Second, Relator's concealment argument in her Opposition makes no sense. She falsely alleges that Mr. Firriolo was "warning about the AKS while simultaneously editing documents to obscure that very risk," Dkt. 613 at 39, but he was not "warning about the AKS risk"

180

of the SOC Programs. As his own contemporaneous documents show, he and Janssen viewed the SOC Programs as appropriate and consistent with Janssen's policies. *See* Janssen's Response to SDMF ¶ 203. In any event, Relator has the timing wrong: the issue Mr. Firriolo raised (the supposed "warning") regarding a new "GBS" role in 2010 was four years *after* the edit to the internal document discussed in SDMF ¶ 216. Relator's concealment argument is also based on the false premise that the program involved consulting, which is the very thing Relator has been unable to establish.

217.    In June 2013, compliance officer Angela Wood reviewed a slide deck for a national ABS meeting and instructed the marketing team to change the language "Operational Efficiency" to "something like Access Support for our IV Therapies" and the language "IOI Sustainability" to "IOI Support for Our Products." **Ex. 117** (6/17/2013 email re: MRC Review) at p. 1.

**Janssen's Response:** Does not create a genuine dispute of material fact. Relator's Opposition cites SDMF ¶ 217 as establishing that Ms. Wood was engaging in concealment by "whitewashing." *See* Dkt. 613 at 42. The evidence cited in SDMF ¶ 217 shows no such thing. It is undisputed that Ms. Wood reviewed the internal slide deck in Exhibit 117 (Dkt. No. 599-28) (not an SOC Program) and gave the instructions quoted above. Thus, the document cited establishes nothing more than that a compliance representative required a change to an internal document to make it accurate (and Relator makes no effort to show that the change did anything more).

218.    Later, in December 2013, compliance officer Angela Wood again reviewed a slide deck for a national ABS meeting and instructed the marketing team to change the language in order to whitewash the true nature of the program by directing "Engage all account stakeholders (HOPD and IOI) to increase IV utilization ... Change to something like: Engage all account

181

stakeholders (HOPD and IOI) on clinical benefits of our IV products and challenge them to identify appropriate patients for IV." **Ex. 118** (12/19/2013 Email from Wood to Marzullo, Thomas Cornely, and copying James Knepp).

**Janssen's Response:** Does not create a genuine dispute of material fact. Relator's Opposition cites SDMF ¶ 218 as establishing that Ms. Wood was attempting to "conceal the true nature of the program." *See* Dkt. No. 613 at 42. That is baseless and nonsensical. First, there was no "program"—the cited exhibit involved internal slide deck. Second, it is undisputed that Ms. Wood reviewed the internal slide deck in Exhibit 118 (Dkt. No. 599-29) (not an SOC Program) and gave the instructions quoted above. Thus, the document cited establishes nothing more than that a compliance representative required a change to an internal document to make it accurate (and Relator makes no effort to show that the change did anything more).

Moreover, SDMF ¶ 218 contradicts Relator's concealment assertion. Relator alleges the thing Ms. Wood was acting to conceal was that the SOC Programs *involved a kickback*. To the contrary, the statement of fact itself shows that whatever the document involved (which neither Relator nor the exhibit even identify) related to HOPDs. Relator's complaint expressly alleged that doctors in HOPDs could not be influenced by a kickback, SAC ¶ 63 (HOPDs "are not owned by prescribers who can be influenced by the opportunity to profit from every vial of Remicade and Simponi ARIA they prescribe and infuse"), so the fact that ABSs were providing programs to HOPDs (not just IOIs) confirms they were being provided for a legitimate reason, not as a kickback to induce prescriptions.

219.    Although the incentive compensation for ABSs, called Management by Objectives ("MBOs"), was heavily weighted toward sales, *see supra* at ¶ 187, Janssen's Health Care Compliance and Comp department required the strategy for MBOs be listed as "Improve Site

of Care access to enhance product growth," rather than "Increase Market Share". **Ex. 119** (1/20/2011 Email thread re: 2011 MBO roll out).

**Janssen's Response:** Does not create a genuine dispute of material fact. The statement of fact has the facts wrong, as shown by the cited evidence. The incentive compensation program was not called Management By Objectives, and it was not "heavily weighted toward sales" (whatever that means). *See* Janssen's Response to SDMF ¶ 187. In any event, the assertion in Relator's Opposition that SDMF ¶ 219 is evidence of concealment is specious and based on a false premise. According to Relator, the mere existence of the incentive compensation program is evidence of a kickback. However, Relator's compliance expert testified that OIG is aware that pharmaceutical companies routinely pay field representatives incentive compensation based on sales, and that OIG has issued guidance cautioning about the use of "extraordinary incentive compensation." Doc. No. 602-1 (Evans Dep.) at 381:3-382:18 (Dkt. No. 602-1). Relator's expert is not offering an opinion in this case that ABS incentive compensation (which was a relatively small part of an ABS's compensation) involved "extraordinary incentive compensation." *Id.* at 383:1-16. Thus, there was nothing to conceal. Again, it is undisputed that the ABS role was intended to increase sales (including in many ways Relator does not allege involved a kickback). *See* SUMF ¶ 24.

220.    In September 2014, Relator's manager, Lou Zambelli, instructed ABSs not to "talk about growth using vial information" and "NO to % Growth in vials either" because "[a]ll we can use is patient growth. . . [r]emember we are all about access and patients." **Ex. 120** (9/12/2014 email re: 2H2014 MBO Summary Instructions). But, in fact, ABS bonuses were based on vial sales growth, not patient growth. *See* ¶¶ 24, 50, 187-189, 219, 260, *supra*.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that Mr. Zambelli sent an email with the language quoted. However, Relator fails to include the attachment to the email, which makes clear the discussion included identifying "5 HOPD accounts." *See* Janssen's Ex. 136 (JANSSENBIO-002-00000737). Relator's complaint expressly alleged that doctors in HOPDs could not be influenced by a kickback, SAC ¶ 63 (HOPDs "are not owned by prescribers who can be influenced by the opportunity to profit from every vial of Remicade and Simponi ARIA they prescribe and infuse"), so the fact that ABSs were providing programs to HOPDs (not just IOIs) confirms they were being provided for a legitimate reason, not as a kickback to induce prescriptions.

Moreover, with respect to the assertion that "ABS bonuses were based on vial sales growth, not patient growth," *see* Janssen's Response to SDMF ¶ 187, Relator's compliance expert testified that OIG is aware that pharmaceutical companies routinely pay field representatives incentive compensation based on sales, and that OIG has issued guidance cautioning about the use of "extraordinary incentive compensation." Doc. No. 602-1 (Evans Dep.) at 381:3-382:18 (Dkt. No. 602-1). Relator's expert is not offering an opinion in this case that ABS incentive compensation (which was a relatively small part of an ABS's compensation) involved "extraordinary incentive compensation." *Id.* at 383:1-16. Again, it is undisputed that the ABS role was intended to increase sales (including in many ways Relator does not allege involved a kickback). *See* SUMF ¶ 24.

221.    Janssen's internal training materials further stated: "Bottom line: none of our job activities can violate the false claims act or the anti-kickback statute. Easier said than done. There is a lot of gray in HCC." **Ex. 83** (Health Care Compliance Site of Care ABS Speaker Training) at slide 4 (speaker notes).

**Janssen's Response:** Undisputed.

222.    In 2015, Wood received training on an updated guidance document that specifically identified an "[i]ncreasing focus on FCA and AKL [anti-kickback law] cases in the area of reimbursement services" as part of the "Enforcement Environment." Wood Dep. at 131:16-24. Wood testified that this enforcement environment "was part of the assessment in which to make determinations to update the guidance document." Wood Dep. at 132:3-7.

**Janssen's Response:** Undisputed.

223.    Janssen's internal training materials described the Site-of-Care programs as designed to "[d]eliver unique, value-added, site-of-care solutions for a competitive edge . . . and increase access to REMICADE!" **Ex. 34** (Site of Care Solutions) at slide 1.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that the cover page of the cited document contains the quoted language, which confirms the undisputed fact that the ABS role was intended to "increase access to Remicade" and thereby increase sales. *See* SUMF ¶ 24.

224.    Janssen's corporate representative, Angela Wood, testified that Janssen is "not permitted to" provide consultative services to customers. **Doc. No. 543-1** (Wood Dep.) 193:1-4. Despite this prohibition, Janssen's corporate representative, Brian Smith, testified that the Site-of-Care programming provided information on topics including "how to start an IOI, how to manage an IOI, how to make an IOI more efficient." **Doc. No. 543-3** (Smith Dep.) 114:18-116:2; **Ex. 27** (email thread regarding IOI that Relator helped open after spending countless hours of work and providing help with the IOI's billing needs; IOI's office coordinator "said they could not have opened th[e] IOI without" the help).

**Janssen's Response:** Does not create a genuine dispute of material fact. SDMF ¶ 224 is duplicative of numerous other statements of fact. It is undisputed that Janssen prohibited ABSs from providing consulting. Ms. Wood testified that consulting was "very different, though, than what our ABSes were doing." Doc. No. 543-1 (Wood Dep.) at 191:4-18 (Dkt. No. 543-1). Moreover, Exhibit 27 (Dkt. No. 597-36) does not support this statement of fact. *See* SUMF ¶ 38 (discussing Exhibit 27). As Relator's citation confirms, Mr. Smith simply acknowledged that ABSs provided information relating to how to start, run, and manage an IOI. Mr. Smith rejected Relator's assertion that this involved consulting. *See* Doc. No. 543-3 (Smith Dep.) at 110:20-111:10 (Dkt. No. 543-3).

225. Angela Wood testified that in order for Janssen to act in "good faith" to comply with the Anti-Kickback Statute, it would need to evaluate the independent value of the Site-of-Care programs. **Doc. No. 543-1** (Wood Dep.) 336:19-338:20. When asked whether Janssen believed it could not make a "good faith effort to comply with the Anti-Kickback Statute" unless it evaluated the independent value of the Site-of-Care programs, Wood testified: "Correct. We would need to evaluate against all the six factors in order to make that determination." *Id.* 338:8-20.

**Janssen's Response:** It is undisputed that Ms. Wood testified that Janssen would need to evaluate against the six-factor test in Janssen's compliance policy, which included the "close relationship" to the product, and that she testified that Janssen did so. *See* SUMF ¶ 71.

226. The "six factors" refers to a "test that's used [by Janssen] to assess activities or programming or related material to ensure [it is] performing them compliantly and that they pass all six factors listed within the policy." *Id.* 58:16-21. Wood further testified that this evaluation

186

"would have to be done individually and collectively for the programs and the support that Janssen provided." *Id.* 338:21-339:7.

**Janssen's Response:** Undisputed.

227.    Despite acknowledging that good-faith compliance required evaluation of independent value both individually and holistically, *id.* 339:5-7, Wood testified that there was no written documentation of this evaluation: "There was no separate documentation in writing. It was done through our PRC process, the policies were applied, but no separate kind of independent — if you are looking for like a document, per se, no." *Id.* at 239:19-24.

**Janssen's Response:** Does not create a genuine dispute of material fact. This is a mischaracterization of the testimony cited based on a false premise that Ms. Wood repeatedly rejected: that an evaluation of independent value (referred to as a "Close Relationship to the Product" in Janssen's compliance policy) requires a written analysis separate and apart from the PRC approval documentation produced in this case. The policy's six-factor test included a requirement that a program have a "Close Relationship" to the Janssen product. *See* Janssen's Ex. 65 (2011 Policy Document – Consulting Services Provided to Customers, JANSSENBIO-018-00000520) at -522 (Dkt. No. 539-65). Ms. Wood testified repeatedly that the close relationship requirement was evaluated and satisfied, both individually and holistically, and that while there would be documentation of the PRC approval, there would be no other written analysis. *See* Doc. No. 543-1 (Wood Dep.) at 186:11-21, 199:17-201:10, 239:17-241:4, 249:4-12, 251:18-253:12, 280:9-281:21, 283:5-14, 305:10-306:6, 312:9-313:14 (Dkt. No. 543-1).

228.    Wood conceded that "[p]art of PRC is not just what you see on paper, right, there is sometimes months of context and related discussion related to programming." *Id.* 252:9-12.

**Janssen's Response:** Does not create a genuine dispute of material fact. Ms. Wood did not "concede" anything. It is otherwise undisputed that Ms. Wood testified that "[p]art of PRC is not just what you see on paper, right, there is sometimes months of context and related discussion related to programming. Ultimately, what you see in terms of either the approval or the rejection is what our documentation consists of. But I can tell you, and I have been part of it, that there is quite a bit of analysis and assessment that goes into all of our programming or any item that may even somewhat come close to value." Doc. No. 543-1 (Wood Dep.) at 252:9-20 (Dkt. No. 543-1).

229.    But Wood acknowledged that the discussions and analysis underlying the purported independent-value determination were never "written down." *Id.* 252:22-253:12.

**Janssen's Response:** Does not create a genuine dispute of material fact. *See* Janssen's Response to SDMF ¶ 227.

230.    Janssen has produced no documents reflecting any contemporaneous written analysis of the independent value of the Site-of-Care programs or the IOI support provided to physician practices.

**Janssen's Response:** Does not create a genuine dispute of material fact. *See* Janssen's Response to SDMF ¶ 227.

231.    The Centers for Medicare & Medicaid Services (CMS) maintains a data repository that includes a full record of the Medicare Part B claims for payment submitted by providers and payments made by Medicare. **Ex. 54** (Hogle Decl.) at ¶¶ 2 - 6.

**Janssen's Response:** Undisputed.

232.    In response to a subpoena served by Plaintiff, CMS produced all Medicare Part B fee for service and Medicare Part C Medicare Advantage claims for Remicade (CPT code J1745) from September 1, 1998 to May 15, 2021 and Simponi ARIA (CPT code J1602) from July

188

1, 2013 to May, 15, 2021 ("Medicare Claims Data"). **Ex. 54** (Hogle Decl.) at ¶ 9; **Doc. No. 555-1** Rosenthal July 25 Report at pp. 16-17.

**Janssen's Response:** It is undisputed that Exhibit 54 (Dkt. No. 598-3) says that CMS will provide "all *available*" claims.

233.    In order to participate in the Medicare program and receive payment for items or services furnished to Medicare beneficiaries, physicians and group practices are required to complete and submit a Medicare Enrollment Application. See 42 C.F.R. §§ 424.505, .510(d)(1).

**Janssen's Response:** It is undisputed that to participate in the Medicare program, providers must complete an enrollment application. Janssen's response regarding the specific enrollment applications discussed by Relator is encompassed in Janssen's Responses to SDMF ¶¶ 234-35.

234.    The Medicare Enrollment Application for physicians (CMS Form-855I) requires physicians to sign a certification statement requiring the providers to agree to abide by Medicare laws and regulations, including the AKS. For example, the CMS Form-855I that was in effect from approximately July 2011 to 2019 required providers to sign and date the following certification statement set forth in Section 15, paragraph 4: "I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare." **Ex. 84** (Medicare Enrollment Application, CMS Form-855I (version 07/11)).

189

**Janssen's Response:** Does not create a genuine dispute of material fact. First, in this case, Relator never alleged that this form could be the source of a false certification, and, in fact, alleged that the relevant form for this case was Form-855B. *See* Janssen's Ex. 38 (Excerpts of Pl.'s Supp. Objs. & Resps. to Def.'s Interrogs. 11 to 16) – Resp. to Interrog. No. 13 (Dkt. No. 539-38). Relator cannot use a statement of fact as a means to introduce a new, unsupported theory of liability for the first time. *See Carrozza v. CVS Pharmacy, Inc.*, 391 F. Supp. 3d 136, 149 (D. Mass. 2019), *aff'd*, 992 F.3d 44 (1st Cir. 2021) ("A litigant may not posit a theory for the first time in opposition to a summary judgment motion, so this argument must be rejected." (citing *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 589 (1st Cir. 2007))).

Second, Relator has no evidence regarding the version of Form-855I, a paper form, she introduces here. She does not have evidence that this version of this form was required to be used, that the form was the same for all providers, or when the form was in use. Instead, she merely makes assertions, such as that the form "was in effect from approximately July 2011 to 2019," which are wholly unsupported by any admissible evidence or even the inadmissible document cited by Relator in SDMF ¶ 234. Relator appears to ask the Court to assume that CMS Form-855I (version 07/11) was required as of July 2011 based on nothing more than the version identifier 07/11. Yet, Relator does not dispute that another CMS form, CMS Form 1500 version 02/12, did not become available for use until January 2014, SUMF ¶ 112, notwithstanding the version identifier of 02/12, which demonstrates the version identifier is not a reliable way to establish when a CMS form became available for use.

Third, Relator has no evidence that any Phase 1 doctor ever submitted this particular version of this particular paper form. Indeed, even the inadmissible evidence cited by Relator indicates that there was a separate, internet-based system providers could use to enroll,

190

which was different than the paper CMS Form-855I. *See* Ex. 84 at 1 ("Physicians and non-physician practitioners can apply for enrollment in the Medicare program or make a change in their enrollment information using *either . . .* [t]he *Internet-based* Provider Enrollment, Chain, and Ownership System (PECOS), *or . . .* [t]he *paper enrollment application process (e.g., CMS 855I)*." (emphasis added) (Dkt. No. 598-33). And, as Relator knows, CMS' internet-based forms and submissions do not necessarily contain the same certifications as paper-based forms. *See, e.g.*, Janssen's Response to SDMF ¶ 242 ("Even Relator does not allege that the certification relating to the AKS, cited in SDMF ¶ 240, exists in the electronic 837P format. It does not.").

Finally, Relator's attempt to plug this evidentiary gap with a form she appears to have pulled from the Internet fails because it is not admissible.

235.    The Medicare Enrollment Application for group practices (CMS Form-855B) requires group practices to sign a certification statement requiring the practices agree to abide by Medicare laws and regulations, including the AKS. For example, the CMS Form-855B that was in effect from July 2011 to 2019 required providers to sign and date the following certification statement set forth in Section 15, paragraph 3: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare." **Ex. 85** (Medicare Enrollment Application, CMS Form-855B (version 07/11)).

191

**Janssen's Response:** Does not create a genuine dispute of material fact. First, Relator has no evidence regarding the version of Form-855B, a paper form, she introduces here. She does not have evidence that this version of this form was required to be used, that the form was the same for all "group practices," what constitutes a "group practice" to which this form would apply, whether any Phase 1 Practice was a "group practice," or when the form was in use. Instead, she merely makes assertions, such as that the form "was in effect from July 2011 to 2019," which are wholly unsupported by any admissible evidence or even the inadmissible document cited by Relator in SDMF ¶ 235. Relator appears to ask the Court to assume that CMS Form-855B (version 07/11) was required as of July 2011 based on nothing more than the version identifier 07-11. Yet Relator does not dispute that another CMS form, CMS Form 1500 version 02/12, did not become available for use until January 2014, SUMF ¶ 112, notwithstanding the version identifier of 02/12, which demonstrates the version identifier is not a reliable way to establish when a CMS form became available for use.

Second, Relator has no evidence that any Phase 1 Practice ever submitted this particular version of this particular paper form. Indeed, even the inadmissible evidence cited by Relator indicates that there was a separate, internet-based system providers could use to enroll, which was different than the paper CMS Form-855B. *See* Ex. 85 at 3 ("Clinics and group practices can apply for enrollment in the Medicare program or make a change in their enrollment information using *either* . . . [t]he *Internet-based* Provider Enrollment, Chain, and Ownership System (PECOS), *or* . . . [t]he *paper enrollment application process (e.g., CMS 855B)*." (emphasis added) (Dkt. No. 598-34). And, as Relator knows, CMS' internet-based forms and submissions do not necessarily contain the same certifications as paper-based forms. *See, e.g.*, Janssen's Response

192

to SDMF ¶ 242 ("Even Relator does not allege that the certification relating to the AKS, cited in SDMF ¶ 240, exists in the electronic 837P format. It does not.").

Third, Relator's attempt to plug this evidentiary gap with a form she appears to have pulled from the Internet fails because it is not admissible.

236.    During the relevant period, in order to seek and obtain reimbursement from Medicare for Remicade and Simponi ARIA and related infusion procedures, the Phase 1 Practices and associated providers must have completed and submitted a Medicare Enrollment Application and have been a party to this provider agreement. *See* 42 C.F.R. §§ 424.505, .510(d)(1).

**Janssen's Response:** It is undisputed that to participate in the Medicare program, providers must complete an enrollment application. Janssen's response regarding the specific enrollment applications discussed by Relator is encompassed in Janssen's Responses to SDMF ¶¶ 234-35.

237.    Extending back prior to the relevant period, to request reimbursement for drugs or services from Medicare, health care providers or entities could submit claims in paper form, if they meet certain regulatory exceptions set forth at 42 C.F.R. § 424.32(d)(2), or electronically. *See* 42 C.F.R. § 424.32. One of the exceptions to the requirement that bills be submitted electronically is when "the entity submitting the claim is a small provider of services or small supplier." 42 C.F.R. § 424.32(d)(3)(ii). A "small provider of services" is defined as "[a] provider of services with fewer than 25 full-time equivalent employees" or "[a] physician, practitioner, facility, or supplier with fewer than 10 full-time equivalent employees." 42 C.F.R. § 424.32(d)(1)(viii).

**Janssen's Response:** Undisputed.

238.    When a health care provider requests reimbursement from Medicare using a paper form, the claim is submitted to Medicare on CMS Form 1500. The current version of the

CMS 1500 Form is version 02/12, which has been in use since January 6, 2014. *See* **Ex. 86** (CMS Form 1500 (version 02/12)) (https://www.cms.gov/medicare/cms-forms/cms-forms/cms-forms-items/cms1188854). The prior version of the CMS Form 1500 is version 08/05, which was in use from 2007 until March 31, 2014. See CMS Transmittal No. R3083CP, Form CMS-1500 Instructions: Revised for Form Version 02/12 (Oct. 2, 2014). (https://www.cms.gov/regulations-and-guidance/guidance/transmittals/downloads/r3083cp.pdf).

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that CMS Form 1500 version 02/12 was available as of January 6, 2014. However, there is no support for the contention that the prior version of CMS Form 1500, version 08/05, was not "in use from 2007 until March 31, 2014," because there is no evidence in the record that that version of the form was in use "from 2007." The evidence Relator cites in SDMF ¶ 238 offers no support for this, and it is an inadmissible citation to the internet.

239. On both versions of the CMS Form 1500, the claim submitter makes specific representations about the goods or services provided, including, inter alia, the patient's name, the provider's name and NPI, the dates of service, the codes relating to the procedures or services provided to the patient, and the charges for those codes. Both versions of the CMS Form 1500 include a signature field that states: "SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)" **Ex. 86** (CMS Form 1500 (version 02/12)); **Ex. 87** (CMS Form 1500 (version 08/05), Relator_Govt_Comms002153).

**Janssen's Response:** Undisputed.

240. The reverse side of the CMS Form 1500 version 02/12 includes a section titled "SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND

194

BLACK LUNG)," which includes the following certification, in relevant part: "In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as the Stark Law) . . . ." **Ex. 86** (CMS Form 1500 (version 02/12). Consequently, every claim submitted to Medicare on the CMS Form 1500 version 02/12 includes a certification that the claim complies with the AKS.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that the CMS Form 1500 version 02/12 contains the quoted language. However, there is no support for the assertion that "every claim submitted to Medicare on the CMS Form 1500 version 02/12 includes a certification that the claim complies with the AKS," which is a legal conclusion.

241.    The reverse side of the CMS Form 1500 version 08/05 includes a section titled "NOTICE," which includes the following certification: "This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws." **Ex. 87** (CMS Form 1500 (version 08/05), Relator_Govt_Comms002153).

**Janssen's Response:** Undisputed.

242.    When a claim is submitted to Medicare electronically, providers use the 837P format, which is the electronic equivalent to the CMS Form 1500. See CMS Medicare Learning Network Fact Sheet – Medicare Billing: 837P and Form CMS-1500 (Mar. 2013) (https://www.cms.gov/files/document/837p-cms-1500pdf); CMS Medicare Learning Network Medicare Billing: CMS-1500 & 837P (Dec.2025) (https://www.cms.gov/files/document/mln006976-medicare-billing-cms-1500-837p.pdf). As with the paper CMS Form 1500, when seeking reimbursement electronically, the claim submitter makes specific representations about the goods or services provided, including, inter alia, the patient's name, the provider's name and NPI, the dates of service, the codes relating to the procedures or services provided to the patient, and the charges for those codes. *See* National Uniform Claim Committee 02/12 1500 Claim Form Map to the X12 Health Care Claim: Profession (837) (Apr. 2014), *available at* https://www.nucc.org/images/stories/PDF/1500_claim_form_map_to_837P_v3-2_2012_02.pdf.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that when submitting the 837P, the claim submitter provides information about the goods or services provided. However, there is no support for the assertion that the 837P is "equivalent" to the CMS Form 1500. Even Relator does not allege that the certification relating to the AKS, cited in SDMF ¶ 240, exists in the electronic 837P format. It does not.

243.    To submit claims to Medicare electronically using the 837P format, providers must complete and submit an Electronic Data Interchange ("EDI") Enrollment Form (CMS Form 10164B). See Medicare Claims Processing Manual (Pub.100-04), Chapter 24, Sections 10.1, 30.1, 30.2. All versions of the EDI Enrollment Form in use during the relevant period include an agreement that the provider "will submit claims that are accurate, complete, and truthful" and

196

the provider acknowledges that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." See CMS EDI Enrollment Form (https://www.cms.gov/files/document/cms-10164b.pdf).  This EDI Enrollment agreement serves as the signature for every electronic claim a provider submits to Medicare.

**Janssen's Response:** Does not create a genuine dispute of material fact. First, in this case, Relator never alleged that this form could be the source of a false certification, and, in fact, alleged that the relevant form for this case was Form-855B. *See* Janssen's Ex. 38 (Excerpts of Pl.'s Supp. Objs. & Resps. to Def.'s Interrogs. 11 to 16) – Resp. to Interrog. No. 13 (Dkt. No. 539-38). Relator cannot use a statement of fact as a means to introduce a new, unsupported theory of liability for the first time. *See Carrozza v. CVS Pharmacy, Inc.*, 391 F. Supp. 3d 136, 149 (D. Mass. 2019), *aff'd*, 992 F.3d 44 (1st Cir. 2021) ("A litigant may not posit a theory for the first time in opposition to a summary judgment motion, so this argument must be rejected." (citing *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 589 (1st Cir. 2007))).

Second, Relator has no evidence regarding the EDI Enrollment Form (CMS Form 10164B) that she introduces here. She does not have evidence that this form was required to be used, that the form was the same for all providers, that all versions of the form during the relevant period included the quoted language, or that the agreement "serves as the signature for every electronic claim." Instead, she merely makes assertions, such as that "[a]ll versions of the EDI Enrollment Form in use during the relevant period include" the cited language. The evidence Relator cites in SDMF ¶ 243 offers no support for this, and it is an inadmissible citation to the

internet. Similarly, Relator offers no support for the assertion that the "EDI Enrollment agreement serves as the signature for every electronic claim a provider submits to Medicare."

Third, Relator has no evidence that any Phase 1 doctor ever submitted this particular form. Fourth, the language Relator quotes does not say anything about the AKS. Finally, Relator's attempt to plug this evidentiary gap with a form she appears to have pulled from the internet fails because it is not admissible.

244.    While it was providing the SOC Programs to physician practices, Janssen understood that Medicare does not cover claims that do not comply with the AKS. Materials Janssen used during compliance training sessions stated that the "Government does not want to cover the cost of Rx products when they violate . . . [the] Anti-Kickback Statute [or the] False Claims Act," and non-compliance can result in fines, Corporate Integrity Agreements, and exclusion from the Medicare program. See, e.g., **Ex. 6** (2014 ABS Speaker Training, JANSSENBIO-008-00004441) at slides 4, 8; **Ex. 88** (Health Care Compliance ABS Speaker Training, JANSSENBIO-061-00006864) at 4-6; **Ex. 89** (Health Care Compliance - Xcenda Jan. 21, 2011) at 8-12.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that Janssen's training included the quoted language. The rest of this statement of fact constitutes a legal argument. Janssen's "providing the SOC Programs" was not a failure to "comply with the AKS."

245.    Likewise, Janssen knew that the DOJ places a high priority on enforcement of violations of the AKS and causing claims to be submitted to Medicare and Medicaid that do not comply with the AKS. Indeed, the company monitored DOJ's enforcement of the AKS and FCA. Materials Janssen used during compliance training sessions reported on numerous enforcement

actions DOJ has brought against companies to enforce AKS-FCA violations. *See, e.g.*, **Ex. 90** (2001 Centocor Health Care Compliance Training - Train the Trainer) at slides 17-23; **Ex. 91** (Enterprise Customer Group Health Care Compliance Training Apr. 22, 2015) at slide 10; **Ex. 92** (Rep Training – Orientation, JANSSENBIO-061-00006594) at slide 24 (stating AKS was "'number two' priority at DOJ after violent crime").

**Janssen's Response:** It is undisputed that the company monitored DOJ's enforcement of the AKS and FCA and that Janssen knew that the DOJ places a high priority on enforcement of violations of the AKS. The rest of the first sentence of this statement of fact is ambiguous and appears to be asserting a legal conclusion.

246.    Janssen and its affiliates have settled FCA actions in which the DOJ asserted claims to hold the companies liable for causing claims for reimbursement for another drug to be submitted to the government health care programs that did not comply with the AKS. In connection with this settlement, Janssen was also required to enter into a Corporate Integrity Agreement with the Department of Health and Human Services Office of Inspector General. *See* **Ex. 93** (Def.'s Objs. & Resps. to Pl.'s Follow-Up 30(b)(6) Dep. Questions) at 6-7 (describing the 2013 settlements concerning *U.S. ex rel. Starr v. Janssen Pharmaceutica Products, L.P.*, Civ. No. 04-1529 (E.D. Pa.) and related cases as well as *U.S. ex rel. Lisitza v. Johnson & Johnson*, Civ. No. 07-10288-RGS (D. Mass.) and related case).

**Janssen's Response:** Undisputed.

247.    Freddy Jimenez was aware of this Corporate Integrity Agreement, which was in place while Janssen was providing SOC Programs. **Doc. No. 543-6** (Jimenez Dep.) at 246:2-12.

**Janssen's Response:** Undisputed. In providing this response, Janssen is only responding to Relator's statement of fact; it is not relying on Mr. Jimenez's presence or role (or the presence or role of any other attorney) on the PRC or otherwise.

## CAUSATION: SOC PROGRAMS CAUSED INCREASED CLAIMS

248.    Utilizing data that Janssen produced concerning the dates it provided certain SOC Programs to the Phase 1 Practices and data from the Medicare Claims Data, Dr. Rosenthal developed an econometric model to identify and quantify the causal effect of the SOC Programs on the Phase 1 Practices' claims to Medicare ("Phase One Regression Analysis"). *See* Rosenthal July 2025 Report at pp. 18-20. The Phase One Regression Analysis quantifies the average treatment effect (or impact) of the SOC Programs during the relevant period on physicians associated with the Phase 1 Practices' claims to Medicare for Remicade and Simponi ARIA. This estimate is called "the average treatment effect on the treated" ("ATET"). See **Doc No. 555-1** (Rosenthal July 2025 Report) at 20-2**.**

**Janssen's Response:**  Does not create a genuine dispute of material fact. Moreover, Dr. Rosenthal's opinion is baseless, inadmissible, and does not create a factual dispute.

Dr. Rosenthal's opinions in this case, embodied in her original report served on July 7, 2025, her reply report served on November 26, 2025, her first amended report served on February 11, 2026, and her second amended report served on March 5, 2026, are baseless and inadmissible for many reasons. First, her regression model is unreliably designed for three reasons: (i) For her treatment of the receipt of two At-Issue SOC Programs as the trigger for her causation analysis, she relies on assumptions from counsel about the opinion of *another* expert, Dr. Larkin, with whom she never spoke and whose opinion she never read or independently

analyzed, Dkt. No. 561 at 5-8; (ii) Her selection of the control and treatment groups for her regression analysis are untethered from any reliable methodology, and the fundamental differences between those groups precludes any reliable conclusion about causation, *id*. at 8-10; and (iii) Dr. Rosenthal did not conduct a parallel trends analysis, despite her acknowledgement that the "fundamental" assumption of her model is that the control and treatment groups would have followed parallel trends absent the provision of the at-issue SOC Programs, *id*. at 10-14. Second, Dr. Rosenthal impermissibly seeks to summarize certain factual documents and speculate about Janssen's intent. *Id*. at 15-17. Third, Dr. Rosenthal admits that she did not attempt to measure the effect of the At-Issue SOC Programs on physician *prescribing*, does not know who the prescriber was for any at-issue claim, and did not even take into account whether the prescriber was from a non-Phase 1 Practice or had even ever heard of an ABS. *Id*. at 17-18. Finally, Dr. Rosenthal's damages estimates are unreliable. *Id*. at 18-20. Indeed, Dr. Rosenthal and Relator have admitted that the results of the report cited in SDMF ¶ 248 were incorrect, necessitating two separate amendments. *See, e.g.*, Dkt. Nos. 571, 576. For these reasons, Dr. Rosenthal's opinion is the subject of Janssen's pending Motion to Exclude. *See* Dkt. No. 560.

This statement of fact also does not create a factual dispute. The First Circuit has repeatedly held that baseless and conclusory expert opinions are insufficient to defeat a motion for summary judgment because they do not generate a material dispute of fact. *See Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 58 (1st Cir. 2024) ("Hence, a party's 'reliance on a bare ultimate expert conclusion' is not 'a free pass to trial.'" (quoting *Hayes v. Douglas Dynamics*, Inc., 8 F.3d 88, 92 (1st Cir. 1993))). Relator must point to admissible, relevant, and reliable evidence, not her expert's speculation about the alleged impact of the SOC Programs on physicians' prescribing decisions. Relator does not do that here, for the reasons described above.

201

249. In her description of the Medicare claims data in her report, Dr. Rosenthal references the file layouts for the claims data that CMS produced in the action along with the claims data. **Doc. No. 555-1** (Rosenthal Report) at pp. 16-17, n.68. The file layouts produced by CMS list the various fields of data that are included in the Medicare Claims Data, including, but not limited to, the fields for: the Remicade and Simponi ARIA drug codes (CLM_LINE_HCPCS_CD and HCPCS_CD), the paid amount (CLM_ENCTR_OTHR_PYR_PD_AMT, CLM_PMT_AMT, and CLM_PMT_AMT), the date of service (CLM_FROM_DT and CLM_THRU_DT), the provider's identity (RFRG_NPI_NUM, PRFRMG_NPI_NUM, PRVDR_RFRG_PRVDR_NPI_NUM, CLM_RFRG_PRVDR_NPI_NUM, PRVDR_CPO_FAC_NPI_NUM, CLM_BLG_PRVDR_NPI_NUM, PRVDR_BLG_PRVDR_NPI_NUM, CLM_RNDRG_PRVDR_NPI_NUM, PRVDR_RNDRNG_PRVDR_NPI_NUM, CLM_RNDRG_PRVDR_GRP_NPI_NUM, and PRVDR_RNDRNG_PRVDR_GRP_NPI_NUM), and the patient's identity (CLM_HIC_NUM, CLM_LAST_NAME, CLM_1ST_NAME, BENE_CLM_ACNT_NUM, BENE_LAST_NAME, and BENE_1ST_NAME). **Ex. 123** (Layout of 1998-2005 Medicare Part B Data); **Ex. 124** (Layout of 2006-2021 Medicare Part B data); **Ex. 125** (Layout of Medicare Advantage Data). This information in the Medicare Claims Data comes from the claims for payment providers submitted to Medicare. **Ex. 54** (Declaration of Mark Hogle, CMS Director of the Enterprise Architecture & Data Group ("Hogle Decl.")) at ¶¶ 4-6.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that Dr. Rosenthal's report references the "file layouts" for Medicare claims data that CMS has produced in this action and that these layouts include various data fields associated with Medicare claims.

However, to the extent this statement of fact implies that all of the information contained in those file layouts comes from information that providers submitted, that is unsupported. In fact, Exhibit 54 (Dkt. No. 598-3), the cited declaration that Relator submitted, contradicts that proposition. Exhibit 54 makes clear that a Medicare contractor and a Common Working File (CWF) both "add additional information" to the claims as the claims are processed for payment. *See* Ex. 54 (Hogle Decl.) ¶ 5 (Dkt. No. 598-3).

250.    The Phase One Regression Analysis determines the ATET by comparing the changes in Medicare claims for Remicade and Simponi ARIA by the Phase 1 Practices (i.e., the aggregate of the claims for Remicade or Simponi ARIA submitted to Medicare by physicians who worked at the practices), before and after receiving the challenged SOC Programs, to changes in claims for Remicade and Simponi ARIA by a control group comprised of physician practices in the State of Pennsylvania believed to have received one or no challenged SOC Programs. See **Doc. No. 555-1** (Rosenthal Report) at 16-20.

**Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Rosenthal's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 248. Dr. Rosenthal's model does not reliably determine the ATET.

251.    Based on the Phase One Regression Analysis, Dr. Rosenthal determined that the average treatment effect on the treated (ATET) is 28.3 Medicare claims per quarter. See July 2025 Report at 22 and amended results reported in the First Amendment at pages 2-3. That is, the Phase 1 Practices submitted, on average, 28.3 more claims for reimbursement for Remicade or Simponi ARIA to Medicare per quarter than a practice that did not receive the SOC Programs. Said differently, absent Janssen's provision of the SOC Programs, the Phase 1 Practices would have

submitted 28.3 fewer claims to Medicare for reimbursement for Remicade or Simponi ARIA each quarter. In summarizing her opinion, Dr. Rosenthal stated:

> Drawing upon economic theory, peer-reviewed literature, discovery materials, and my own econometric analysis, I conclude that the kickback scheme caused Medicare to pay more for the targeted medicines than it would have absent the alleged misconduct. Using econometric methods, consistent with economic theory, related empirical studies, and the Defendant's internal analyses, I find that the business advisory scheme generated increased sales.

**Doc. No. 555-1** July 2025 Report at 1.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that Dr. Rosenthal provided this expert opinion, other than this description: "[T]he Phase 1 Practices submitted, on average, 28.3 more claims for reimbursement for Remicade or Simponi ARIA to Medicare per quarter than a practice that did not receive the SOC Programs." The accurate description of what Dr. Rosenthal purported to do is in the following, meaningfully different sentence of SDMF ¶ 251: "Absent Janssen's provision of the SOC Programs, the Phase 1 Practices would have submitted 28.3 fewer claims to Medicare for reimbursement for Remicade or Simponi ARIA each quarter." However, Dr. Rosenthal's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 248. Dr. Rosenthal's model does not reliably determine the ATET. Moreover, Dr. Rosenthal's model does not in any way take into account who the prescriber was, including whether that prescriber was affiliated with a Phase 1 Practice, whether the prescriber was influenced by or even received At-Issue SOC Programs, or whether the claims submitted by a Phase 1 Practice would have otherwise been submitted by another provider who had prescribed and infused the medicine elsewhere (*e.g.*, at another infusion site such as a hospital or another medical office). She further testified that her causation analysis included claims for patients receiving "maintenance" doses of Remicade and Simponi ARIA and for patients who were referred to Phase 1 Practices by other providers. Doc. No. 604-2 (Rosenthal

Dep.) at 113:13-115:10 (Dkt. No. 604-2). Moreover, Dr. Rosenthal did not purport to analyze but-for causation, but instead opined that the SOC Programs were a "substantial factor" influencing doctor decision-making. *See* Janssen's Ex. 39 ¶¶ 43, 64 (Dkt. No. 539-39).

252.    Dr. Rosenthal's econometric analysis found that practices receiving SOC programming submitted $74,821 more per quarter in Medicare expenditures relative to practices that did not participate in the SOC Programs. **Doc. No. 555-1** (Rosenthal Report) at ¶51, Table 2; **Doc. No. 561-2** (Rosenthal Report - 1st Amendment) at ¶¶ 4-5, Amended Table 2. These results are statistically significant at the 95% confidence level. *Id*.

**Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Rosenthal's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 248. Moreover, during her deposition on April 9, 2026, Dr. Rosenthal admitted that she did not even know if the "errors that [she] made [in her original report] created a statistically significant difference in [her] results" for her first and second amended reports, but she did not "do anything" to test it and "would imagine they did." Janssen's Ex. 137 (Excerpts of Supplemental Deposition of Meredith Rosenthal ("Rosenthal Suppl. Dep.")) at 88:17-90:1.

253.    Dr. Rosenthal's July 2025 Report includes a table for each of the eleven Phase 1 Practices reporting the quarterly volume of claims for Remicade and Simponi ARIA submitted to Medicare by the physicians associated with the accounts plotted against the quarterly volume of SOC Programs that the accounts received. *See* **Doc. No. 555-1** (Rosenthal Report) at Attachment C, Exhibits/Figures C.1 to C.10. These charts show there was temporal proximity between the receipt of SOC Programs by Phase 1 Practices and the submission of Medicare claims for Remicade or Simponi ARIA by physicians associated with the practices. *Id*.

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that Dr. Rosenthal provided tables concerning the quarterly volume of SOC Programs and claims submitted by Phase 1 Practices. However, Dr. Rosenthal's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 248. Moreover, Relator's assertion that the cited materials chart "against the quarterly volume of SOC Programs," Dkt. No. 613 at 20, is inaccurate. Instead, Dr. Rosenthal used "a binary indicator variable" coded as treated in the quarter a practice received a second program, and attributed all claims afterwards to a supposed causal effect. *See* Janssen's Reply to SUMF ¶ 100. Furthermore, these charts do not show "temporal proximity" (whatever that means) between SOC Programs and Medicare claims for Remicade and Simponi ARIA. For example, one Phase 1 Practice submitted no claims for about five years following its receipt of its first SOC Program and submitted no claims for about four years following its receipt of two initial SOC Programs. *See* Doc. No. 555-1 (Rosenthal Report) at Attachment C, Fig. C.8 (Dkt. No. 555-1); Doc. No. 604-2 (Rosenthal Dep.) at 257:15-258:16 (Dkt. No. 604-2). To the extent Relator intends for "temporal proximity" to mean or imply causation, several of Dr. Rosenthal's charts from C.1-C.10 undermine the assertion that SOC Programs led to an increased volume of Remicade and Simponi ARIA. *See* Doc. No. 555-3 (Russo Report) at 28-32 (Dkt. No. 555-3).

254.    Janssen documents produced in discovery corroborate Dr. Rosenthal's findings. A 2014 internal presentation states: "There is a direct correlation of ABS programming with your impact on growth in target accounts." **Doc. No. 555-1** (Rosenthal Report) at ¶55 (quoting **Ex. 113 (composite)**, JANSSENBIO-011-00004628 at slide 1).

**Janssen's Response:** Does not create a genuine dispute of material fact. It is undisputed that the language appears in the cited document. However, Dr. Rosenthal's opinion is

baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 248. Moreover, Relator fails to specify which "Janssen documents" purportedly "corroborate Dr. Rosenthal's findings." The sole document cited by Relator in SDMF ¶ 254 does not "corroborate Dr. Rosenthal's findings." It refers to a "correlation" between ABS programming and "impact on growth in target accounts, which is different from causation. Dr. Rosenthal even admits that documents identifying a correlation, such as the ones she cites, cannot prove causation. Janssen's Ex. 23 (Rosenthal Dep.) at 27:3-9 (Dkt. No. 539-23). Moreover, the document is addressed to ABS programming generally, not the SOC Programs at issue in this case, as illustrated, for example, by the multiple references to programs provided to HOPDs, as to which Relator has not alleged any kickbacks.

255.    Janssen tracked RISE sites and found that they "grew REMICADE sales at an average of 25% vs. the national average of 4.6%." **Doc. No. 555-1** (Rosenthal Report) at ¶ 56.

**Janssen's Response:**  Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). Dr. Rosenthal's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 248. Expert witnesses are not permitted to narrate the record by summarizing internal company documents. *See* Dkt. No. 561 at 15-17 (citing *U.S. ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 1:12-CV-10601, 2022 WL 2662678, at *3 (D. Mass. July 8, 2022)).

SDMF ¶ 255 is also misleading because the underlying document shows that the purported Remicade sales growth occurred at only six RISE "pilot" sites, half of which were HOPDs or academic medical centers, as to which Relator has not alleged any kickbacks. *See* Janssen's Ex. 138 (JANSSENBIO-053-00003093) at slide 15.

256.    From an economic perspective, Janssen's SOC Programs lowered the fixed costs of offering infusions by helping practices put in place the business and operational building blocks for an infusion service, and lowered the marginal costs of infusing patients by helping practices optimize their infusion, practice management, and billing processes. **Doc. No. 555-1** (Rosenthal Report) at ¶ 30.

**Janssen's Response:** Does not create a genuine dispute of material fact. First, Dr. Rosenthal's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 248. Second, it is wholly improper to state as a "fact" something that even Dr. Rosenthal herself said she has analyzed and is not opining on. Doc. No. 604-2 (Rosenthal Dep.) at 259:16-260:3 (Dkt. No. 604-2). Dr. Rosenthal admitted during her supplemental deposition that she did nothing to study or analyze the fixed or marginal costs of infusing patients and was "not looking at" those things in her analyses, and she also admitted that she did not analyze the profits of any Phase 1 Practice. *See* Janssen's Ex. 137 (Rosenthal Suppl. Dep.) at 18:25-19:24. She clearly stated that she was not offering an expert opinion on the profits or costs of any Phase 1 practice. *Id*. Consistent with this testimony, Dr. Rosenthal's report offers no underlying empirical or economic analysis to support this assertion.

257.    Using a conservative econometric approach that accounts only for incremental spending attributable to the alleged misconduct, Dr. Rosenthal calculated that the Phase 1 Practices submitted 6,876 claims (two-year period) to 10,606 claims (five-year period) that were caused by the SOC Programs. **Doc. No. 571-2** (Rosenthal Report – 2nd Amendment) at ¶¶ 4-5. This translates to total damages of $18,204,182 to $28,080,554, with penalties ranging from $54,619,205 to $213,038,532. *Id*.

208

**Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Rosenthal's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 248.

258.    The corrections reflected in Dr. Rosenthal's amendments strengthen rather than undermine her causation analysis. The First Amendment corrected two errors identified during Dr. Rosenthal's deposition: (1) two practices that had received two or more at-issue SOC programs were improperly included in the control group, and (2) a programming error had caused Phase 1 Practices to be marked as "treated" in the quarter they received their first ABS call rather than their second. **Doc. No. 561-2** (Rosenthal Report – 1st Amendment) at ¶¶ 2-3. Dr. Rosenthal anticipated that correcting the control group error would increase her impact estimates because "including practices in the control group that were in fact affected by the challenged conduct would bias [her] results downwards." *Id*. at ¶ 5 n.3. The Second Amendment corrected start dates for two Phase 1 Practices but did not alter the ATET results or the underlying methodology, and the "comprehensive" damages calculations remain unchanged from the original report. **Doc. No. 571-2** (Rosenthal Report – 2nd Amendment) at ¶¶ 1, 3.

**Janssen's Response:** Does not create a genuine dispute of material fact (and is not cited in Relator's Opposition). Dr. Rosenthal's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 248. Moreover, this statement is improper legal argument and a self-serving characterization of Dr. Rosenthal's expert opinions, not a statement of "fact." Far from "strengthen[ing]" her analysis, Dr. Rosenthal's serial amendments demonstrate that her methodology and conclusions are fundamentally flawed and a moving target, underscoring the unreliability of her approach.

259.    Janssen's internal documents show that its provision of the IOI Support caused or was a substantial factor in physicians' decisions to prescribe Remicade or Simponi ARIA and submission of false claims to Medicare for reimbursement of Remicade and Simponi ARIA. See **Ex. 13** (July 11, 2014 Mid-Year Programming Update) at p. 2 ("There is a direct correlation of ABS programming with your impact on growth in target accounts."); **Ex. 14** (10/6/2014 Email w/ABS Programming Analysis Presentation) at p. 1 ("More programming = MORE SALES = Higher SICP [Sales Incentive Compensation Plan]! . . . Overall, through June 2014, the % growth in the target accounts w/programming exceeded the overall performance for the SOC Market Basket…."); **Ex. 10** (Practice Management Program Update) at slide 3 ("An effective Practice Management Program (PMP) increases demand for Remicade. . . Physicians with in-office infusion capabilities are more likely to prescribe Remicade - Physicians who begin to infuse in-office use more Remicade - Physicians who infuse in-office use Remicade more broadly . . . A large in-office infusion base strengthens Remicade's advantage against current competitors (injected)"); **Ex. 15** (Field Targeting IAM Team Roles/Responsibilities) at slide 3 ("Accounts with ABS focus achieved higher growth for Remicade" and "MBPOs [Managing Biologics in the Physician Offices] conducted in accounts in 2008 demonstrated a 10% higher share over national share vs. accounts without MBPO"); **Ex. 16** (Go Beyond Territory Management Targeting-Routing slide deck) at slide 5 (same); **Ex. 17** (Changing Lives … AMT Business Review) at slide 7 ("Share in MBPO accounts is roughly 10% higher than the national average"); **Ex. 18** (East Zone Site of Care Business Review) at slide 6 ("ABS Focus, IAM Team Planning, and Programming have contributed to the Remicade growth in IOIs….", slide 16 ("ABS Value Proposition elevated in organization due to successes in targeted IOIs . . . ABS targeting on all IOIs has impacted Gastro growth and minimized Rheum declining market"); **Ex. 19** (9/12/2010 Email Thread) at p. 1

210

("There is a clear advantage when an ABS delivers a MBPO (Managing Biologics in a Physician's Office – Account Review/Diagnostic) and provides a 'solution mix' tailored to meet the needs of the account.", p. 2 ("Nationally, Remicade vials are growing over two times faster YTD in our MBPO targets vs. non-targets"); **Ex. 21** (January 21, 2016 Simponi ARIA STAT Meeting) at slide 24 ("Accounts who received 2-4 ABS programs over 6 months had the highest growth of Simponi Aria and also the highest contribution to JBI IV growth").

> **Janssen's Response:** Does not create a genuine dispute of material fact. In this statement of fact, Relator recycles a string of exhibits and parenthetical descriptions that are included verbatim in her Response to SUMF ¶ 24. Relator's improper and wholesale "copy-paste" approach demonstrates that she is not using these documents for what they actually say, but rather is using them to try to manufacture evidentiary support where none exists. As explained in Janssen's Reply to SUMF ¶ 24, the documents and testimony cited (a) address the ABS role generally (which included activities that were intended to increase sales and that are not challenged as kickbacks in this case), not the At-Issue SOC Programs specifically; (b) address the ABS role with respect to both HOPDs and IOIs (not merely IOIs as Relator suggests); (c) include references to correlation, not causation; and/or (d) pre-date the existence of the ABS role and the At-Issue SOC Programs. Janssen refers the Court to its Reply to SUMF ¶ 24, where it addresses each of the documents cited in SDMF ¶ 259 in greater detail. *See also* Janssen's Response to SDMF ¶ 260.

260.    Dr. Rosenthal opined that Janssen's documents and Rule 30(b)(6) evidence a causal connection between the IOI Support and sales of Remicade and Simponi ARIA. **Doc. No. 555-1** (Rosenthal Report) at pages 22-26. Dr. Rosenthal specifically referenced that following documents and testimony in support of this opinion. **Composite Ex. 113**: JANSSENBIO-035-00001554-88 at 68 ("$ invested and increase in Remicade usage=ROI," and "% increase in patients

in relation to PMP targets, resulting % increase in sales."); JANSSENBIO-053-00001730, at slide 6 ("Accounts who received an MBPO [Managing Biologics in the Physician Office] presentation grew at 8.19% versus 5.83% for all other ABS targets."); JANSSENBIO-011-00004628, at slide 1 ("The Immunology ABS team has consistently provided education, processes, tools, resources, and Speaker Program support for new IOIs, existing IOIs, and the HOPD channel. There is a direct correlation of ABS programming with your impact on growth in target accounts."); JANSSENBIO-053-00002272 and JANSSENBIO-053-00003093, slide 15 (Accounts that received the RISE program "grew REMICADE sales at an average of 25% vs. the national average of 4.6%."); **Ex. 19** ("Nationally, Remicade vials are growing over two times faster YTD in our MBPO targets vs. non-targets"), ("MBPO Targets make up for approximately 15% of the Remicade vials YTD, and 28% of the Remicade Vial growth YTD"); **Composite Ex. 113** JANSSENBIO-014-00000353 ("From January - November, 30 GI IOIs were opened vs. only 6 openings YTD in 2010. The direction to the ABS team has been to open up IOI's based on an assessment of the number of patients they are prescribing Remicade for. By executing the proposed strategy by the GI team to accelerate the number of new GI IOIs and to drive demand with these same customers so that having an IOI in their practice is viable, the opportunity to enhance persistency will certainly increase."); **Ex. 10** JANSSENBIO-062-00065195 ("An effective Practice Management Program (PMP) increases demand for Remicade."), ("Physicians with in-office infusion capabilities are more likely to prescribe Remicade"); **Composite Ex. 113** JANSSENBIO-062-00103526, at 34 ("SOC initiatives clearly show the ability to accelerate demand and enhance customer intimacy ● Practice Management 1.0 programming shows a 40% growth in patient infusions within the first 2-weeks* ● Practice Management 2.0 programming shows a 9% growth, in patient infusions within the first 2-weeks* …*Growth over base line sales)

212

**Composite Ex. 113** JANSSENBIO-075-00002513, at slide 2 ("Accounts who received 2-4 ABS programs over 6 months had the highest growth of Simponi Aria and also the highest contribution to JBI IV growth"); **Composite Ex. 113** JANSSENBIO-061-00001517, at slide 7-8 ("Share in MBPO accounts is roughly 10% higher than the national average" and "Call activity is aligned with REMICADE volume"); **Ex. 14** JANSSEN.009.0257386 ("More programming = MORE SALES = Higher SICP! We have money! MORE PROGRAMMING!!"; "The customers in the analysis are the customers who received a SOC 360 Program by the SOC team. Overall, through June 2014, the % growth in the target accounts w/programming exceeded the overall performance for the SOC Market Basket (excludes DERM)."; "In 2H2014, we are committed to increasing the programming to ensure the customers embrace the IV model for growth of the [Janssen] portfolio."); **Composite Ex. 113** JANSSENBIO-003-00005234 (Account Action Plan Results Sheet indicating how the Relator (Julie Long) increased capacity, efficiencies, and optimized the IOIs of her customers.); **Composite Ex. 113** JANSSENBIO-009-00010631 (Account Action Plan Worksheet for Relator (Julie Long) that measures the biologic units of Janssen products as well as competitors and lists the "objective" as to "[g]row Remicade and improve [Janssen] Market share"); **Composite Ex. 113** JANSSENBIO-011-00001395 at slide 9 (Area Business Specialist 2010 Incentive Compensation & Recognition Plan presentation explaining that ABS compensation was based on Remicade volume goals, market share, and other "Management By Objectives (MBOs)"); **Composite Ex. 113** JANSSENBIO-059-00001392 ("In order to ensure strong ROI/utilization of SOC resources, Thao has been working closely with the RBD teams across RA and GI to ensure SOC XCENDA programming is maximized for growth with key customers."); **Ex. 75** JANSSENBIO-040-00002765 at slide 24 ("Centocor has provided significant value to customers through the support and education provided to adopt and grow REMICADE

213

capabilities. This has promoted growth and sustained value within these accounts in their original and expanded business goals. This Customer Intimacy has been built successfully through practice management education and training."); Ex. 32 JANSSENBIO-011-00004627 at slide 2 ("Programming requirements for 2H2014 will change to focus on growth of target accounts and Market Share growth"); **Ex. 18** JANSSENBIO-011-00010691 at slide 11 ("High correlation Programming to Account Growth ● MBPO/MBHOPD = 88; total SOC 360 = 455"); **Doc. No. 543-3** (Smith Dep.) at 212:8-213:4 (Q: "So the logical conclusion of that is, if Janssen is investing more resources in the ABS strategy, that would have occurred only because Janssen was satisfied with the impact that that strategy was having on the overall sales of its product?... All of that company effort would have been towards increasing sales?" A: "Yes. That would be the goal."), (297:16-23) (Q: "Was the goal of the bonus structure for ABS reps to incentivize them to have an impact in their territory that resulted in increased growth or increased sales?" A: "Yes.").

   **Janssen's Response:** Does not create a genuine dispute of material fact. This three-page-long statement of fact is an improper attempt to overcome summary judgment through expert narration of twenty documents. As explained in Janssen's pending Motion to Exclude, expert witnesses are not permitted to narrate the record by summarizing internal company documents. *See* Dkt. No. 561 at 15-17 (citing *U.S. ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 1:12-CV-10601, 2022 WL 2662678, at *3 (D. Mass. July 8, 2022)). Moreover, Dr. Rosenthal had her staff search for documents that could be read as supporting her view, but did not "go and ask them for negative results." *See* Doc. No. 604-2 (Rosenthal Dep.) at 218:19-219:14 ("I specifically directed them to find documents and discovery that could show that, at least on paper, that Janssen viewed these programs as expanding sales.") (Dkt. No. 604-2).

In any event, Dr. Rosenthal's assertions are unsupported by the documents cited in her report, which Relator has pasted into this statement of fact. The First Circuit has repeatedly held that unsupported and conclusory expert opinions, such as these, are insufficient to defeat a motion for summary judgment. *See Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 58 (1st Cir. 2024) ("Hence, a party's 'reliance on a bare ultimate expert conclusion' is not 'a free pass to trial.'" (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993))).

Janssen refers the Court to its Reply to SUMF ¶ 24, where Janssen addresses Relator's characterizations of Exhibits 10, 14, 18, and 19. Janssen addresses the remaining exhibits below, none of which support the asserted fact in SDMF ¶ 260.

- **Doc. No. 543-3 (Smith Dep.) at 212:8-213:4, 297:16-23 (Dkt. No. 543-3):** The cited testimony confirms that the ABS role was promotional and intended to increase sales. It does not address causation.

- **Exhibit 75 (Dkt. No. 598-24):** This 2007 slide deck concerns the ABS role generally, not the At-Issue SOC Programs specifically. Indeed, the quoted language about "significant value" is addressed to "SOC 360, AccessOne, 2infuse.com, and [its] Nursing Initiatives," which relate to ABS activities Relator herself testified were intended to increase sales and are not alleged to have involved kickbacks. Ex. 5 (Long Dep.) at 184:3-7, 204:6-25, 205:1-206:3 (Dkt. No. 597-5).

- **Composite Exhibit 113, Generally (Dkt. Nos. 599-12 to 599-24):** This "composite" exhibit includes thirteen documents, none of which show causation. The documents (a) address the ABS role generally (which it is undisputed was intended to increase sales); (b) include ABS activities Relator testified did not involve kickbacks and were intended to increase sales; (c) reference correlation, not causation; and/or (d) pre-date the existence of the ABS role. Four of the documents, which are discussed on page 24 of Relator's Opposition, Dkt. No. 613, are addressed below.

- **Composite Exhibit 113, JANSSENBIO-035-00001554-88 at 68 (Dkt. No. 599-18):** This is a document from the year 2000, which was long before the ABS role or the At-Issue SOC Programs were created.

- **Composite Exhibit 113, JANSSENBIO-053-00001730, at slide 6 (Dkt. No. 599-19):** This document is consistent with the undisputed fact that the ABS role was intended to increase sales. Moreover, the document disproves Relator's causation argument because slide 4 shows that the reference to "MBPO" included "MBHOPD," and Relator's

complaint expressly alleged HOPD physicians could not be influenced by a kickback, SAC ¶ 63, so any increase in sales was not a result of a kickback.

- **Composite Exhibit 113, JANSSENBIO-011-00004628, at slide 1 (duplicate of Exhibit 32) (Dkt. No. 599-16) (Dkt. Nos. 599-20 & 599-21):** This document is consistent with the undisputed fact that the ABS role was intended to increase sales. Moreover, the "ABS programming" referenced in the quote relied on by Relator included programs that went far beyond the At-Issue SOC Programs, *see* slide 7, which Relator herself testified did not involve kickbacks and were intended to increase sales. Finally, the quoted slide confirms that the "ABS programming" included "the HOPD channel" which, as explained in the prior bullet, disproves Relator's causation theory.

- **Composite Exhibit 113, JANSSENBIO-053-00002272 and JANSSENBIO-053-00003093, at slide 15:** The slide cited by Relator shows that the quoted language referred to six accounts in the RISE "Pilot" program, and three of the six accounts were HOPDs. Thus, not only is the document consistent with the undisputed fact that the ABS role was intended to increase sales, but it also disproves Relator's causation theory for the reasons explained two bullets above.

261.    Dr. Larkin has provided an expert opinion that "[t]he practice management services provided by Janssen to these physicians increased their likelihood of prescribing products that would be infused at their infusion practice, including products marketed by Janssen, and were more likely than not a substantial factor in the physicians' decisions to prescribe Remicade and Simponi Aria to their patients." **Ex. 49** (Larkin Report) at 1.

**Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Larkin's opinion is baseless, inadmissible, and does not create a factual dispute.

Dr. Larkin's opinion is baseless and inadmissible because Dr. Larkin admits that, in reaching this opinion, he did not speak to any Phase 1 Practice or doctor, did not review any Phase 1 prescribing, sales, or claims data, and did not conduct any empirical study. *See* Dkt. No. 567 at 12-14. For these reasons, Dr. Larkin's opinion is the subject of Janssen's pending Motion to Exclude. *See* Dkt. No. 566.

This statement of fact also does not create a factual dispute. The First Circuit has repeatedly held that baseless and conclusory expert opinions are insufficient to defeat a motion for

216

summary judgment because they do not generate a material dispute of fact. *See Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 58 (1st Cir. 2024) ("Hence, a party's 'reliance on a bare ultimate expert conclusion' is not 'a free pass to trial.'" (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993))). Relator must point to admissible, relevant, and reliable evidence, not her expert's speculation about the alleged impact of the SOC Programs on physicians' prescribing decisions. Relator does not do that here. First, Dr. Larkin admitted that he did not undertake the basic steps necessary to reliably assess impact of the At-Issue SOC Programs on physician prescribing behavior. He relied only on general research on the effects of standard pharmaceutical marketing on prescribing. *See* Doc. No. 607-2 (Larkin Dep.) at 60:24-62:2 (Dkt. No. 607-2). Second, his use of the term "substantial factor" is unsupported. He made no effort to study all of the variables that inform the relevant prescribing decisions, as he did not even look at any specific prescribing decisions or even data about prescribing in this case. *Id.* at 59:5-18. Third, his use of the term "substantial factor" is not meant as a substitute for an opinion on the but-for cause of prescribing decisions. *Id.* at 205:23-206:7, 320:2-321:9 (admitting he did not have a robust definition for "substantial"). Thus, Dr. Larkin's unsupported conclusions cannot and do not create a dispute of fact. *See Hoover*, 99 F.4th at 58.

262. Dr. Larkin determined that the "principal-agent theory" analysis demonstrates that Janssen provision of the IOI Support was effective in increasing physicians' utilization of Remicade and Simponi ARIA because: (i) "the services offered by Janssen to the average physician targeted by an ABS were worth at least thousands of dollars per physician, which is many orders of magnitude more than those of my and similar studies"; (ii) "there are voluminous number of documents in the discovery materials," many of which are described in Dr, Larkin's report, showing that Janssen actively tracked physicians' utilization of Remicade and Simponi

ARIA after they received the IOI Support; and (iii) "the case materials make it clear Janssen was keenly aware" that the physicians utilization of Remicade and Simponi ARIA aligned with other goals or preferences of the physicians. **Ex. 49** (Larkin Report) at 19-23.

> **Janssen's Response:** Does not create a genuine dispute of material fact. Moreover, Dr. Larkin did not make this determination. Instead, Relator spliced together various quotations from Dr. Larkin's expert report to make it appear that he did. Moreover, the quoted statements made by Dr. Larkin are baseless, inadmissible, and do not create a factual dispute. *See* Janssen's Response to SDMF ¶ 261.

263.    Analyzing the IOI Support using study results reported in academic literature concerning the relationship between the size of the incentive and the size of the effect, Dr. Larkin concluded:

> In my professional opinion, there is no doubt that the Practice Support Services provided to physicians by Janssen became a substantial factor influencing physician prescribing behavior. As noted in the Mitchell et al. article and discussed at length below, the average physician receiving industry payments from pharmaceutical companies is influenced by these payments. The average physician receives a total annual payment of $201.27 (Tringale et al., 2017), summed across all pharmaceutical companies. The value of Practice Support Programs to physicians receiving them is meaningfully larger than $201.27 per year, and therefore logically must significantly influence their prescribing. As discussed above, one of the fundamental findings of the incentives literature is that a larger incentive leads to a larger response, so the fact that payments of meaningfully smaller value significantly influence physician prescribing is evidence that Janssen's Practice Support Programs strongly influence physician prescribing. In sum, Janssen's Practice Support Services clearly and substantially impacted the prescribing behavior of physicians who received these services.

**Ex. 49** (Larkin Report) at 23-24.

> **Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Larkin's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 261. Dr. Larkin did not use any reliable methodology or engage in study to

support the conclusions concerning prescriptions or value to providers, including that the SOC Programs were a substantial factor in physicians' prescribing.

264.    Dr. Larkin further opined that the psychological effect of reciprocity influenced physicians who received the IOI Support to write more prescriptions for Remicade and Simponi ARIA, and that reciprocity was part of Janssen's strategy in providing the IOI Support. See Dr. Larkin Report at 26-27. Dr. Larkin applied the academic literature on reciprocity as well as the results of his own studies in analyzing the reciprocal effects of the Janssen's provision of the IOI Support on physicians' increased use of Remicade and Simponi ARIA. See *id*.

**Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Larkin's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 261. Dr. Larkin did not use any reliable methodology or engage in study to support the conclusions concerning medical decisions and prescriptions, including that the SOC Programs caused any doctor to write more prescriptions.

265.    Applying the results of studies on physician decision making reported in the academic literature, Dr. Larkin opined that "Janssen's Practice Support Programs were a substantial factor in the prescribing decisions for all physicians within the '2+ set' ...[,]" and that "physicians who received 2+ programs were influenced starting from the first Site of Care Program or event, consistent with the literature showing that influence begins immediately." Larkin Report at 28. **Ex. 49.**

**Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Larkin's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 261. Dr. Larkin did not use any reliable methodology or engage in study to

support the conclusions concerning medical decisions or prescriptions, including that the SOC Programs were a substantial factor in physicians' prescribing.

266.    Dr. Larkin further opined that "[t]his is true even for physicians who were prescribing Janssen products even before their first exposure to Practice Support Programs[,]" because "[t]he research on decision making shows that once a significant variable enters the calculus of a decision maker, she can no longer make decisions absent that factor." Larkin Report at 28-29. **Ex. 49.**

**Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Larkin's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 261. Dr. Larkin did not use any reliable methodology or engage in study to support the conclusions concerning medical decisions or prescriptions, including that the SOC Programs were a substantial factor in physicians' prescribing.

267.    Applying the results of studies on physician decision making reported in the academic literature, Dr. Larkin opined that "Janssen's Practice Support Programs were a substantial factor in the prescribing decisions for all physicians within the '2+ set' ...[,]" and that "physicians who received 2+ programs were influenced starting from the first Site of Care Program or event, consistent with the literature showing that influence begins immediately." **Ex. 49** (Larkin Report) at 28.

**Janssen's Response:** Identical to SDMF ¶ 265. *See* Janssen's Response to SDMF ¶ 265.

268.    Dr. Larkin further opined that "[t]his is true even for physicians who were prescribing Janssen products even before their first exposure to Practice Support Programs[,]" because "[t]he research on decision making shows that once a significant variable enters the

calculus of a decision maker, she can no longer make decisions absent that factor." **Ex. 49** (Larkin Report) at 28-29.

**Janssen's Response:** Identical to SDMF ¶ 266. *See* Janssen's Response to SDMF ¶ 266.

269.    Dr. Larkin opined that the IOI Support Janssen provided continues to be a substantial factor in physicians' decisions to utilize Remicade and Simponi ARIA so long as they prescribe infusible products to be infused in their IOI. See Larkin Report at 29-30. Dr. Larkin based this opinion based on academic literature and his beliefs that (i) the financial benefit physicians derived from the IOI Support persisted even after Janssen ceased providing the valuable services; (ii) physician prescribing habits or norms often last for a significant period; and (iii) although Janssen ceased having ABSs provide the IOI Support, reciprocity can persist. **Ex. 49 (**Larkin Report) at 29.

**Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Larkin's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 261. Dr. Larkin did not use any reliable methodology or engage in study to support the conclusions concerning medical decisions or prescriptions, including that the SOC Programs were a substantial factor in physicians' prescribing. Moreover, the academic literature he cites does not support his opinion, including because, as he admitted, none of the studies examined effects lasting longer than two years. *See* Doc. No. 607-2 (Larkin Dep.) at 40:9-41:14 (Dkt. No. 607-2).

270.    Dr. Fugh-Berman has opined that: "The business services, resources and support Janssen provided likely caused the physicians who received the gifts to maintain and increase prescriptions for and infusions of Remicade and Simponi Aria. Physicians who received

these gifts were more likely to prescribe Janssen's infusible drugs instead of competing drugs or other treatment modalities. The business services, resources, and support Janssen provided were a substantial factor in maintaining or increasing recipients' usage of Remicade and Simponi Aria." **Ex. 43 (**Fugh-Berman Report) at 17.

**Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Fugh-Berman's opinion is baseless, inadmissible, and does not create a factual dispute.

Dr. Fugh-Berman's opinion is baseless and inadmissible because Dr. Fugh-Berman admitted that, in reaching this opinion, she did not speak to any Phase 1 Practice or doctor, did not review any Phase 1 prescribing, sales, or claims data, and did not conduct any empirical study. *See* Dkt. No. 565 at 8. For these reasons, Dr. Fugh-Berman's opinion is the subject of Janssen's pending Motion to Exclude. *See* Dkt. No. 564.

This statement of fact also does not create a factual dispute. The First Circuit has repeatedly held that baseless and conclusory expert opinions are insufficient to defeat a motion for summary judgment because they do not generate a material dispute of fact. *See Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 58 (1st Cir. 2024) ("Hence, a party's 'reliance on a bare ultimate expert conclusion' is not 'a free pass to trial.'" (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993))). Relator must point to admissible, relevant, and reliable evidence, not her expert's speculation about the alleged impact of the SOC Programs on physicians' prescribing decisions. Relator does not do that here. First, Dr. Fugh-Berman admitted that she did not undertake the basic steps necessary to reliably assess impact of the At-Issue SOC Programs on physician prescribing behavior. She relied only on general research on the effects of standard pharmaceutical marketing on prescribing and statements in Janssen documents. Doc. No. 565-3 (Fugh-Berman Dep.) at 25:8-26:14 (Dkt. No. 565-3). She did not speak to any doctors who received the SOC Programs or

review prescribing or claims data for these doctors. *Id.* at 102:17-104:7, 232:9-233:13. Second, her use of the term "substantial factor" is unsupported. She made no effort to study all of the variables that inform the relevant prescribing decisions, as she did not even look at any specific prescribing decisions or prescribing data in this case. *Id.* at 232:9-233:13. Third, her use of the term "substantial factor" is not meant as a substitute for an opinion on the but-for cause of prescribing decisions. Janssen's Ex. 143 (Fugh-Berman Dep.) at 292:2-10 (admitting she did not have a robust definition for "substantial"). Thus, Dr. Fugh-Berman's unsupported conclusions cannot and do not create a dispute of fact. *See Hoover*, 99 F.4th at 58.

271.    Applying academic literature concerning the reciprocal effects of gifts by pharmaceutical companies like Janssen on physician decision making, Dr. Fugh-Berman further opined that "[t]here is no question that the business services, resources and support Janssen provided were valuable gifts to physicians that created a sense of reciprocity," which is a physician's sense of obligation towards the gift-giver. Fugh-Berman Report at 17. Dr. Fugh-Berman also opined that "Janssen's gift of business services fostered brand loyalty, and caused physicians to increase their prescriptions and infusions of Remicade and Simponi Aria to their patients, including Medicare patients." **Ex. 43** (Fugh-Berman Report at 17)**.**

**Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Fugh-Berman's opinions are baseless, inadmissible, and do not create a factual dispute. *See* Janssen's Response to SDMF ¶ 270. Dr. Fugh-Berman did not use any reliable methodology or engage in study to support the conclusions concerning medical decisions or prescriptions, including that the SOC Programs caused physicians to write more prescriptions.

272.    "The variety of programs offered, including topical updates, and close monitoring to identify operational issues that could be enhanced and addressed ensured a

223

continuing relationship with Janssen representatives and continuing brand loyalty," and "[t]his loyalty led physicians to continue or increase their use of Remicade and Simponi Aria." **Ex. 43** (Fugh-Berman Report at 18)**.**

   **Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Fugh-Berman's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 270. Dr. Fugh-Berman did not use any reliable methodology or engage in study to support the conclusions concerning medical decisions or prescriptions, including that the SOC Programs caused physicians to write more prescriptions.

   273. Dr. Fugh-Berman opined that Janssen's documents state that "ABS Programs increased Remicade sales." **Ex. 43** (Fugh-Berman Report at 18). Dr. Fugh-Berm formed her opinions based on her analysis of a substantial volume of evidence produced in discovery (including internal marketing plans and emails regarding the IOI Support strategy, Site of Care business plans, deposition testimony, and Relator's 2014 performance and development plan) in which she used her training, experience, and research to apply a mixed methods approach.

   **Janssen's Response:** Does not create a genuine dispute of material fact. Dr. Fugh-Berman's opinion is baseless, inadmissible, and does not create a factual dispute. *See* Janssen's Response to SDMF ¶ 270. Dr. Fugh-Berman did not use any reliable methodology or engage in study to support the conclusions concerning medical decisions or prescriptions, including that the SOC Programs caused physicians to write more prescriptions.

   274. The Phase 1 Practices' submission of the claims to Medicare for reimbursement of Remicade or Simponi ARIA that falsely represented compliance with the AKS was reasonably foreseeable and a natural consequence of Janssen's provision of the IOI Support services. As described above at ¶¶ 22, 24-25, 190-191, 195-196 one of Janssen's purposes in

providing the IOI Support was to induce sales of Remicade and Simponi ARIA. Additionally, Janssen was aware that a substantial percentage of the patients treated by the Phase 1 Practices with Remicade and Simponi ARIA are Medicare patients. *See* ¶¶ 152-161, supra.

> **Janssen's Response:** Does not create a genuine dispute of material fact. SDMF ¶ 274 is entirely legal argument. Whether conduct "falsely represented compliance with the AKS" or was "reasonably foreseeable and a natural consequence" are legal conclusions, not facts. Janssen incorporates by reference its Replies to SUMF ¶¶ 22 and 24-25 and Responses to SDMF ¶¶ 152-161, 190-191, and 195-196, which show that Relator does not support the baseless and conclusory assertions alleged in SDMF ¶ 274. In addition, Relator's cross references to paragraphs in which she states that a purpose of ABS activities was to increase *sales* does not show that Janssen intended the SOC Programs as kickbacks to *induce* use of Janssen's products in return. *See* Janssen's Mem. in Support of Mot. for Summary Judgment, Dkt. No. 538, § I.C; Janssen's Reply in Support of Mot. for Summary Judgment § I.B.

Dated: May 1, 2026

*/s/ Jason C. Raofield*

Jason C. Raofield (BBO No. 641744)
Matthew F. Dunn (admitted *pro hac vice*)
Krysten Rosen Moller (admitted *pro hac vice*)
Mark W. Mosier (admitted *pro hac vice*)
Andrew P. Stanner (admitted *pro hac vice*)
Nicholas Pastan (admitted *pro hac vice*)
Alison S. DiCiurcio (admitted *pro hac vice*)
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
jraofield@cov.com
mdunn@cov.com
krosenmoller@cov.com
mmosier@cov.com
astanner@cov.com
npastan@cov.com
adiciurcio@cov.com

*Attorneys for Defendant Janssen Biotech, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify on this 1st day of May, 2026, that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

_/s/ Jason C. Raofield_
Jason C. Raofield (BBO No. 641744)
Covington & Burling LLP