**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* JULIE LONG | ) | |
| | ) | |
| Plaintiffs, | ) | No. 16-cv-12182-FDS |
| | ) | |
| v. | ) | |
| | ) | |
| JANSSEN BIOTECH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
BASED ON ALLEGED UNCONSTITUTIONALITY OF
THE *QUI TAM* PROVISIONS OF THE FALSE CLAIMS ACT**

This Court should reject Janssen Biotech, Inc.'s ("Janssen" or the "Defendant") argument that the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729–33, violate Article II of the U.S. Constitution. They do not. Pursuant to Fed. R. Civ. P. 5.1(c), and in accordance with its Notice of Intervention under 28 U.S.C. § 2403(a), the United States submits this brief in opposition to the Defendant's Motion for Summary Judgment, ECF No. 537, to address Defendant's contention that the *qui tam* provisions of the False Claims Act violate Article II of the Constitution.[1]

---

[1] This memorandum of law addresses only Defendant's constitutional challenges.

1

## ARGUMENT

The Defendant argues that Relator's litigation of this declined *qui tam* case violates the Appointments Clause, Take Care Clause, and Vesting Clause of Article II of the U.S. Constitution. It does not.

Every court of appeals to have addressed the question has held that the False Claims Act's *qui tam* provisions are consistent with Article II.  *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804-807 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753–58 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1040–42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 749–59 (9th Cir. 1993); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993) (explaining, in rejecting an Article III challenge, that the *qui tam* "provisions do not usurp the executive branch's litigating function").

Almost all district courts, including those within the First Circuit, have followed suit.  *See, e.g.*, *Gublo v. NovaCare*, 62 F.Supp.2d 347, 353 (D. Mass. 1999); *United States ex rel. Souza v. Embrace Home Loans*, No. 1:22-cv-453, 2025 WL 3072653, at *1 n.1 (D.R.I. Nov. 3, 2025); *United States ex rel. Gonite v. UnitedHealthcare of Ga., Inc.*, No. 5:19-CV-246 (MTT), 2025 WL 1184109, at *3-4 (M.D. Ga. Apr. 23, 2025); *United States ex rel. Penelow v. Janssen Prods., LP*, No. CV 12-7758 (ZNQ) (JBD), 2025 WL 937504, at *12 (D.N.J. Mar. 28, 2025); *United States ex rel. Butler v. Shikara*, No. 20-80483-CV, 2024 WL 4354807, at *11–13 (S.D. Fla. Sept. 6, 2024); *United States ex rel. Resolution NJ LLC v. Riverside Medical Group, P.C.*, No. 2:22-cv-4165, 2024 WL 4100372, at *5 (D.N.J. Sept. 6, 2024); *United States ex rel. CLJ, LLC v. Halickman*, No. 20-CV-80645, 2024 WL 3332055, at *21 n.5 (S.D. Fla. June 14, 2024); *United States ex rel. Wallace v. Exactech, Inc.*, No. 7:18-cv-01010-LSC, 2023 WL 8027309, at *4 (N.D. Ala. Nov. 20, 2023);

*United States ex rel. Thomas v. Mercy Care et al.*, 2023 WL 7413669 (D. Ariz., Nov. 9, 2023); *United States ex rel. Miller v. Manpow*, 2023 WL 8290402 (C.D. Cal. Aug. 30, 2023); *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278 (M.D. Fla. 2014); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1212 (M.D. Fla. 1999); *but see United States ex rel. Zafirov v. Fla. Med. Assocs., LLC,* No. 8:19-CV-01236-KKM-SPF, 2024 WL 4349242 (M.D. Fla. Sept. 30, 2024).[2]

This Court should likewise reject Defendant's arguments that the *qui tam* provisions of the False Claims Act are unconstitutional.

## I.    A Relator Need Not Be Appointed In The Manner Prescribed By The Appointments Clause

The Defendant contends that the False Claims Act's *qui tam* provisions are inconsistent with the Appointments Clause, which specifies the permissible means of appointing "Officers of the United States" to public offices "established by Law."  U.S. Const. art. II, § 2, cl. 2.  However, a relator possesses none of the indicia of officeholders within the meaning of the Appointments Clause: The relator's role is limited in time and scope, confined to a particular case, and fundamentally personal in nature.

### A.  A Relator Does Not Occupy a Continuing Position

To be an "Officer of the United States" subject to the Appointments Clause, a person "must occupy a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018).  This requirement comes from the Supreme Court's decision in *United States v. Germaine*, 99 U.S. 508 (1789), which "held that 'civil surgeons' (doctors hired to perform various physical exams) were mere employees because their duties were 'occasional or temporary' rather than 'continuing and

---

[2] An appeal in *Zafirov* is pending before the Eleventh Circuit (Nos. 24-13581, -13583).

permanent.'"  *Lucia*, 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 508, 511-512).  A hallmark of an office is that its "duties continue, though the person" occupying it "be changed."  *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J.).  A relator's role, in contrast, is limited in time and scope rather than continuing from officeholder to officeholder over time, and the Defendant has not shown otherwise.

In its Reply brief, the Defendant appears to assert that a relator is like the independent counsel that was found to be an officer in *Morrison v. Olson*.  487 U.S. 654, 671 n.12 (1988); *see* Defendant's Corrected Reply in Support of Motion for Summary Judgment, ECF. No. 618, at 20.  But the comparison is inapt.  Unlike a relator role, the independent counsel role is not specific to the individual appointed to perform it.  The independent counsel role is continuing in the crucial sense that its "duties" would "continue" even "though the person" performing them "be changed." *Maurice*, 26 F. Cas. at 1214.  As the Supreme Court explained in *Morrison*, Alexia Morrison was not even the first person to hold her independent counsel office: The court that appointed her had initially appointed James McKay, who had resigned and been replaced by her.  *Morrison,* 487 U.S. at 667.  Ms. Morrison's role was thus clearly "continuing" even though it was not permanent.[3]

---

[3] Similarly, the role of bank receiver has also been found to be "continuing," and, like the independent counsel role, its duties are not limited to performance by a single individual. *See Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. at 111.  If a given person appointed to act as a receiver became unable to perform his duties, that would not negate the need for a receivership; it would simply require the appointment of another receiver in place of the first.  In *Stanton v. Wilkeson*, 22 F. Cas. 1074 (S.D.N.Y. 1876), another bank-receiver case, the court made this point clear when explaining that "[v]acation of office by the comptroller" of the currency, who delegated authority to the receiver, would not "vacate the receivership."  22 F. Cas. at 1074–75.  And in *United States v. Donziger*, the Second Circuit—citing *Maurice*—specifically based its ruling on the premise that "the individuals appointed as special prosecutors could be replaced without the duties of the positions terminating."  38 F.4th 290, 297 (2d Cir. 2000).

The role of a relator is nothing like that.  The False Claims Act states expressly that "[w]hen a person brings an action under" the *qui tam* provisions, "*no person* other than the Government may intervene or bring a related action based on the facts underlying the pending action."  31 U.S.C. § 3730(b)(5) (emphasis added).  If a particular relator who has blown the whistle on a fraud by filing a *qui tam* action decides she is no longer interested in pursuing the action, another person cannot simply take her place as relator.  To be sure, an individual can serve as a relator in a particular *qui tam* case for years.  But this is irrelevant to whether the role is continuing in the relevant sense—*i.e.*, whether the duties of the role can be passed from one person who occupies the role to the next.  Whether the Attorney General is an officeholder in a continuing role does not depend on whether she serves for four years or for 40 days.

What matters is whether the duty—here, the duty of litigating a *particular qui tam* action—can continue from inhabitant to inhabitant of the role, and for a relator it clearly cannot.  A relator's pursuit of a *qui tam* action is personal to that relator and not transferable from relator to relator. That a relator's *qui tam* action survives her death and may be pursued by her estate's personal representative—not a different relator—just as the estates of deceased plaintiffs routinely maintain other types of actions personal to the deceased plaintiff—further proves the point.  *United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993).  This underscores that a relator's role is personal and unlike the duties of an actual office holder, such as an Attorney General, Ambassador, or Secretary of the Treasury, whose duties are not personal in any way and are not inherited by the official's estate if she dies.  *See also United States ex rel. Spicer v. Westbrook*, 751 F.3d 354 (5th Cir. 2014) (bankruptcy trustee, as opposed to new relator, can assert False Claims Act claims belonging to relator's bankruptcy estate).

**B.  Congress Did Not Vest Relators With Uniquely Governmental Authority**

A relator is also not an officeholder subject to the Appointments Clause because Congress envisioned the roles as fundamentally personal rather than governmental in nature. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), the Supreme Court held that a *qui tam* relator has Article III standing to sue under the False Claims Act on the ground that the Act "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" by entitling the relator to a share of any ultimate recovery. *Id.* at 773; *see United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 425 (2023) (same). The Supreme Court expressly rejected the theory that a relator brings suit as an agent of the United States. *Stevens*, 529 U.S. at 772. And in another part of the opinion holding that a relator cannot pursue a *qui tam* action against States, the Supreme Court emphasized that a *qui tam* action is a "private suit" brought by "private parties." *Id.* at 780 n.9, 786 n.17.

*Stevens* thus recognized that when Congress authorized a relator to bring a *qui tam* suit under the False Claims Act, it did not intend to create a governmental office subject to the Appointments Clause. Rather, Congress was authorizing a relator to pursue a personal monetary recovery—employing "the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting … under … the hope of gain." *United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885) (quoted in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.5 (1943)); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997).

That a relator brings a *qui tam* suit "in the name of the Government," 31 U.S.C. § 3730(b)(1), does not alter the nature of the relator's interest in the suit. The Supreme Court explained in *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019), that the

statutory provision for *qui tam* actions to be brought "'for the [relator] and for the …

Government,'" and "'in the name of the Government,' … does not make the relator anything other

than a private person" as opposed to an "'official of the United States.'" *Id.* at 272; *see also, e.g.*,

*Taxpayers Against Fraud*, 41 F.3d at 1041 ("Although a relator may sue in the government's name,

the relator is not vested with governmental power.").

The fact that a relator decides whether to commence litigation by filing a *qui tam* complaint

likewise does not make the relator a governmental officeholder. The False Claims Act provides

that a *qui tam* action cannot proceed—indeed, it cannot even be unsealed—until after the

government has had an opportunity to determine whether to "intervene and proceed with the

action," intervene and move to dismiss it, or allow the relator "to conduct the action" subject to

ongoing government oversight. 31 U.S.C. § 3730(b)(2)-(4). This upfront review by the

government makes clear that a relator is not acting as a government official when they bring suit.

It is the government that determines whether the action should go forward and, if so, who should

litigate it.

*    *    *

A Relator does not act on a continuing basis and does not perform a function that only the

government can constitutionally perform. Congress routinely chooses "to rely … on private

enforcement to implement public policy." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421

U.S. 240, 263 (1975). And as explained below, there is abundant evidence that Congress and the

courts have historically viewed private *qui tam* suits as a constitutionally permissible means of

redressing and deterring violations of federal law. For all these reasons, a relator need not be

appointed in a manner consistent with the Appointments Clause.

7

## II.    The *Qui Tam* Provisions Do Not Violate The Vesting and Take Care Clauses

The Vesting and Take Care Clauses state that "[t]he executive power shall be vested in a President of the United States" and that the President "shall take care that the laws be faithfully executed." U.S. Const. art. II, § 3. The Defendant contends that a relator exercises executive power in a manner inconsistent with these Clauses, but this Court should reject that argument too.

Congress unquestionably has the power to authorize private parties who have suffered Article III injury to sue to enforce federal statutes, like Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f), or the antitrust laws, 15 U.S.C. § 15. It is long-established that Article II "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of" protecting the government's interests. *Riley*, 252 F.3d at 753. Private suits under such provisions generally do not raise Article II concerns even if Congress has created a private right of action for the purpose of supplementing government enforcement actions. The Supreme Court has routinely described private suits as a means of enforcing federal statutes for the benefit of the public, not just as a means of redressing private injuries. *See, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022) ("'[P]rivate individuals may sue to enforce' … antidiscrimination statutes[.]"); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ("Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition.").

Private suits under statutes like these do differ in certain respects from *qui tam* suits under the False Claims Act. A *qui tam* relator is authorized to pursue a False Claims Act suit solely on the basis of the government's partial assignment of a share of its right to a monetary recovery, *see Stevens*, 529 U.S. at 773, whereas a private plaintiff under other statutes must establish a personal injury as a basis for standing. A judgment on the merits in a *qui tam* action under the False Claims

8

Act can have claim-preclusive effect against the United States, whereas judgments in private suits under other statutes do not. And the United States receives a share (indeed, the majority) of a monetary judgment in a *qui tam* action under the False Claims Act, whereas judgments in private suits under other statutes are payable solely to the plaintiffs.

An extensive body of evidence confirms that *qui tam* provisions have, since the Founding, been understood as established features of American law. As the Supreme Court observed, "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our [G]overnment." *Hess*, 317 U.S. at 541 n.4 (1943) (quoting *Marvin v. Trout*, 199 U.S. 212, 225 (1905)). In *Stevens*, the Supreme Court reviewed this "long tradition of *qui tam* actions in England and the American Colonies," as well as the "considerable number" of statutes with *qui tam* provisions passed by the First Congress. *Stevens*, 529 U.S. at 774–77. The Supreme Court found this body of history about the deep historical roots of *qui tam* provisions "well nigh conclusive" in the Article III context, *id.* 529 U.S. at 777, and it is just as "conclusive with respect to the Article II question" raised here. *Riley*, 252 F.3d at 752; *see Stevens*, 529 U.S. at 801 (Stevens, J., dissenting); *Butler*, 2024 WL 4354807, at *11 ("[D]ecades—nay, centuries—of litigation through the use of the *qui tam* device under the [False Claims Act] undercuts [defendant's] argument" against the constitutionality of the False Claims Act's *qui tam* provisions).

This is because legislation "'passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, … is contemporaneous and weighty evidence of its true meaning.'" *Marsh v. Chambers*, 463 U.S. 783, 790 (1983); *see also Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*, No. 22-448, 610 U.S. 416, 432 (2024)

9

(same); *Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (same).  Likewise, "'traditional ways of conducting government … give meaning' to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).

The history here shows that *qui tam* provisions are consistent with the original understanding of Article II.  The First Congress enacted "a considerable number of" *qui tam* provisions, including those that "provided both a bounty and an express cause of action" for informers.  *Stevens*, 529 U.S. at 776-777, 777 n.6.  For example, one statute allowed "informer[s] to sue for, and receive half of [the] fine for, [a] failure to file [a] census return."  *Stevens*, 529 U.S. at 777 n.6 (citing Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. at 102).  Another allowed "private individual[s] to sue for, and receive half of [the] fine for, carriage of seamen without contract or illegal harboring of runaway seamen."  *Id.*  (citing Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. at 131, 133).  And another allowed "private individual[s] to sue for, and receive half of [the] goods forfeited for, unlicensed trading with Indian tribes."  *Id.*  (citing Act of July 22, 1790, ch. 33, § 3, 1 Stat. at 137-138).  The enactment of *qui tam* statutes immediately after the Founding clearly indicates that the Framers viewed them as fully compliant with Article II of the Constitution.

The Executive Branch likewise recognized *qui tam* litigation as an established feature of American law when the Attorney General included, in draft legislation in 1795, a cost-shifting provision for *qui tam* suits.  *See* 1 William S. Hein & Co., *American State Papers, Class X, Miscellaneous* 117, 121 (1998) (provision for cost-shifting in suits brought by "any informer or plaintiff, on a penal statute, to whose benefit the penalty, or any part thereof, if recovered, is directed by law to accrue"), https://perma.cc/JGR5-8AQA.  This suggests that the early Executive Branch also perceived no constitutional problem with *qui tam* suits.

10

The Supreme Court repeatedly has recognized *qui tam* provisions as common and legitimate. For example, in *Marvin v. Trout*, 199 U.S. 212 (1905), the Supreme Court commented, while upholding the constitutionality of a state *qui tam* provision, that to reach a contrary conclusion "would be in effect to hold invalid all legislation providing for proceedings in the nature of *qui tam* actions," even though such statutes had "been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *Id.* at 225. And in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), the Supreme Court found that a court of appeals construing the False Claims Act narrowly "on the premise that *qui tam* or informer actions 'have always been regarded with disfavor'" was wrong to do so because "*[q]ui tam* suits have been frequently permitted by legislative action" and "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it." *Id.* at 540-542. The historical record thus suggests that all three branches of the early American government accepted *qui tam* statutes as an established feature of the legal system.

Further, the False Claims Act's *qui tam* provisions provide greater means for governmental control than the early *qui tam* statutes did. As explained *supra*, the government performs an upfront review before a *qui tam* action can proceed, or even be unsealed. *See* 31 U.S.C. § 3730(b)(2)-(4). Even if the government initially declines to intervene, it may still intervene at a later time for good cause. *See* 31 U.S.C. § 3730(c)(2)(D)(3). And the government may move to dismiss a False Claims Act action over a relator's objection, subject to highly deferential review under Federal Rule of Civil Procedure 41(a). *Id.* § 3730(c)(2)(A). The Supreme Court emphasized that district courts must grant dismissal "in all but the most exceptional cases … even if the relator presents a credible assessment to the contrary." *Polansky*, 599 U.S. at 437. The government may also settle a pending suit over the objections of the relator, *see* 31 U.S.C. § 3730(c)(2)(B); and veto

11

a relator's proposed settlement or voluntary dismissal of his action, *id.* § 3730(b)(1).  The United States may also stay any discovery by the relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts," *id.* § 3730(c)(4).  If early *qui tam* statutes, which lacked such controls, were understood to pose no Article II problem, then the current False Claims Act's *qui tam* provisions cannot be understood to pose any Article II problem either.

It is true that if a relator exercised executive power, then constraints on the President's "ability to supervise and remove" a relator would be unconstitutional.  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 238 (2020).  But the Defendant is incorrect to suggest that this renders the *qui tam* provisions unconstitutional in full and requires dismissal of this case  Instead, the appropriate remedy would be to hold invalid—and sever from the rest of the *qui tam* provisions—the statutory constraints on the government's ability to control *qui tam* litigation, including 31 U.S.C. § 3730(c)(3) (requiring good cause to intervene after initial decision not to); 31 U.S.C. § 3730(c)(2)(A)-(B) (constraints on government's settlement or dismissal of action over relator's objection); and 31 U.S.C. § 3730(c)(2)(C) (relator's right to participate in litigation after government intervention).  This is consistent with the Supreme Court's treatment of what it regarded as unconstitutional restrictions on the supervision of administrative patent judges in *United States v. Arthrex, Inc.*, 594 U.S. 1, 24-25 (2021), and respects the judicial obligation to "limit the solution to the problem" "when confronting a constitutional flaw in a statute," by "sever[ing] its problematic portions while leaving the remainder intact."  *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006).

The historical context of the False Claims Act's *qui tam* provisions demonstrates that they are consistent with the Take Care Clause and the Vesting Clause and with the original understanding of Article II. The Defendant's arguments to the contrary should be rejected.

## CONCLUSION

As set forth above, the False Claims Act's *qui tam* provisions are consistent with the Constitution. The Court should reject the Defendant's arguments—as every federal Circuit Court to address these issues has done—and deny the Defendant summary judgment based on the alleged unconstitutionality of the *qui tam* provisions of the False Claims Act.

Dated: May 28 2026                          Respectfully submitted,

                                            BRETT SHUMATE
                                            Assistant Attorney General
                                            Civil Division
                                            United States Department of Justice

                                            JAMIE ANN YAVELBERG
                                            NATALIE WAITES
                                            KIRSTEN V. MAYER
                                            U.S. Department of Justice
                                            Civil Division, Fraud Section
                                            175 N Street, NE
                                            Washington, DC 20002
                                            Telephone No.: (202) 674-0164
                                            E-mail: Kirsten.Mayer@usdoj.gov

                                            LEAH B. FOLEY
                                            UNITED STATES ATTORNEY

                            By:    *s/ Steven Sharobem*
                                   STEVEN SHAROBEM
                                   Assistant United States Attorney
                                   United States Attorney's Office
                                   District of Massachusetts
                                   One Courthouse Way, Suite 9200
                                   Boston, MA 02210
                                   Telephone: (617) 748-3355
                                   steven.sharobem@usdoj.gov

13

*Attorneys for the United States of America*